**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>               Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>         Plaintiff,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF<br>TEXAS, INC.,<br><br>         Defendant. | Adv. Proc. No. 21-_____ (DRJ) |

**DEBTOR'S COMPLAINT OBJECTING TO ELECTRIC RELIABILITY COUNCIL OF**
**TEXAS, INC.'S PROOF OF CLAIM AND OTHER RELIEF**

> <u>**Claim No.:**</u> Stretto Claim No. 403
>
> <u>**Claimant**</u>: Electric Reliability Council of Texas, Inc.
>
> <u>**Date Claim Filed**</u>: June 14, 2021
>
> <u>**Amount of Claim as Filed**</u>: $1,899,152,990.64
>
> <u>**Status of Claim as Filed**</u>: Priority in amount of $1,877,591,506.10; general unsecured in amount of $21,561,484.54

Brazos Electric Power Cooperative, Inc. ("<u>Brazos Electric</u>" or the "<u>Debtor</u>") files this

complaint (the "<u>Complaint</u>") objecting to the allowance and classification of the above-described

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

proof of claim (the "ERCOT Claim") of Electric Reliability Council of Texas, Inc. ("ERCOT") for the reasons and grounds set forth below.

## I.      NATURE OF THE ACTION

1.      The ERCOT Claim should be disallowed, in part, and materially reduced in amount, because: (1) ERCOT seeks to collect an improper amount from the Debtor by ignoring or otherwise failing to follow the parties' contract and its own protocols; (2) ERCOT failed to mitigate its damages as required under the contract and applicable Texas law governing the relationship between the Debtor and ERCOT; (3) the Debtor was not in default prior to the Petition Date due to, among other things, a force majeure event within the meaning of the Debtor's contract with ERCOT; and (4) the ERCOT charges are excessive.

2.      Additionally, the exorbitant and excessive ERCOT charges were avoidable and constructively fraudulent obligations, thereby necessitating a significant reduction of the ERCOT Claim.

3.      Lastly, the ERCOT Claim does not meet the requirements for priority under Bankruptcy Code section 503(b)(9) and must be reclassified as a general unsecured claim in its entirety.

4.      The Debtor therefore requests that this Court disallow, in part, and materially reduce the ERCOT Claim in an amount as determined by this Court. The Debtor additionally requests that the entirety of any allowed ERCOT Claim be properly reclassified as a general unsecured claim.

## II.      THE PARTIES

5.      Plaintiff Brazos Electric is a Texas non-profit electric cooperative corporation pursuant to Section 161.059 of the Texas Utilities Code, located at 7616 Bagby Ave. Waco, Texas

76712.  It is owned by its 16 member cooperatives (collectively, the "Members").  On March 1, 2021 (the "Petition Date"), Brazos Electric filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Brazos Electric is operating its business and managing its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Defendant ERCOT is a membership-based 501(c)(4) nonprofit organization governed by its Board of Directors.  It is the independent system operator for all transmission and generation facilities within the boundaries of the ERCOT power region.  ERCOT has appeared in this bankruptcy proceeding and may be served with process by serving its counsel of record, Deborah Perry, Kevin Lipmann, and Jamil N. Alibhai of Munsch Hardt Kopf & Harr, P.C., 500 N. Akard Street, Suite 3800, Dallas, Texas 75201.

### III.      JURISDICTION, VENUE, AND AUTHORITY

7.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.

8.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The bases for the relief requested herein are sections 105(a), 502, 503, 544, 548, and 1107 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Bankruptcy Local Rules (the "Local Rules").

10.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.  This Court has constitutional authority to enter final orders with respect to the relief requested herein.  The Debtor further confirms its consent to this Court's entry of final orders or judgments on this Complaint if

it is later determined that, in the absence of the consent of the parties, this Court does not have constitutional authority to enter final orders or judgments.

## IV.    FACTUAL BACKGROUND

### A.    The Debtor

11.    Headquartered in Waco, Texas and founded in 1941, the Debtor is Texas's largest and oldest generation and transmission electric cooperative. The Debtor is the wholesale power supplier for its 16 Member distribution cooperatives. The Debtor's Members' service territory extends across 68 counties from the Texas Panhandle to Houston, ultimately delivering electricity to over 700,000 electric meters and approximately 1.5 million Texans. The Debtor owns and operates more than 2,713 miles of transmission line and over 300 substations and wholesale metered points of delivery and is the seventh largest transmission provider in the ERCOT system. The Debtor owns approximately 2,600 MW of generation available to be dispatched by ERCOT, which amounts to approximately 3% of the total ERCOT installed generation capacity.

12.    Prior to the unprecedented and catastrophic energy crisis when a powerful winter storm, which came to be called "Winter Storm Uri," blanketed the entire State of Texas with snow, ice, and sub-freezing temperatures,[2] the Debtor was a model of financial stability. By aggregating the distribution needs of its electric cooperative Members to obtain best-in-class generation and transmission facilities through low-cost financing, the Debtor maintained an "A+" and "A" issuer credit ratings from Fitch and S&P, respectively, prior to the events leading to the Chapter 11 filing.[3]

---

[2] For a discussion of this catastrophic weather event, see section IV.D, *infra*.

[3] *See* S&P Global Ratings, Brazos Electric Power Cooperative Inc., Brazos Sandy Creek Electric Cooperative Inc.; Rural Electric Coop, Jan. 26, 2021; FitchRatings, Fitch Affirms Brazos Electric Power Cooperative, Inc. TX IDR at 'A+' – Outlook Positive, dated June 18, 2020.

13.     During the eight decades prior to Winter Storm Uri, the Debtor consistently met the generation, transmission, and distribution substation needs of its Members and maintained an impeccable financial record, even as Texas's population exploded during this period.

14.     The Debtor's Chapter 11 filing was precipitated by the exorbitant prices ERCOT and other suppliers charged the Debtor for energy required to serve its Members' load and the exorbitant prices and lack of available fuel required to generate electricity during Winter Storm Uri.

15.     To put this into perspective, for the approximate one-week duration of Winter Storm Uri, ERCOT delivered invoices to Debtor in an amount exceeding $2.223 billion,[4] which is more than twice the total wholesale power annual revenue of the Debtor for power supply deliveries to its Members in recent years.[5]

**B.     ERCOT, the ERCOT Protocols, the Texas Interconnection**

16.     There are three main electric grids in the United States:   (a) the Eastern Interconnection;  (b) the Western Interconnection;  and (c) the Texas Interconnection.   ERCOT is the independent system operator (the "ISO") solely responsible for managing the Texas Interconnection, which covers 213 of the 254 Texas counties.   Unlike the Eastern Interconnection and the Western Interconnection, the Texas Interconnection,  managed by ERCOT, is a standalone interconnection  with extremely limited export and import capability to the Eastern and Western

---

[4] The ERCOT Claim for $1.9 billion takes into account a reduction of approximately $350 million of collateral posted by the Debtor that ERCOT unilaterally swept pre-petition and applied to outstanding invoices. The Debtor reserves all rights relating to the sweep of this collateral, calculation of and accounting for the amount swept, and the Debtor's ability to have the collateral applied to any amounts ultimately determined to be owed to ERCOT pursuant to this Adversary Complaint.

[5] The Debtor's wholesale power revenues were $812.5 million and $786.4 million in 2019, and 2020, respectively.

Interconnections.  Texas is the only one of the contiguous 48 states with its own standalone electric grid.[6]  The map below is a depiction of the three main electric grids:



17.      Within this electric grid, ERCOT schedules power for more than 26 million retail electric customers on a network that connects more than 46,500 miles of transmission lines and more than 710 generation units with more than 86,000 MW of available generation capacity.

18.      ERCOT is a membership-based 501(c)(4) nonprofit organization governed by its Board of Directors.  It is the ISO of the electric grid within the boundaries of the ERCOT power region, which covers the vast majority of Texas, including 70% of the state's geography and more than 90% of its residents.  As the ISO of the power grid, ERCOT is responsible for "ensur[ing] the reliability and adequacy of the regional electrical network."  TEX. UTIL. CODE § 39.151(a)(2).

---

[6] http://www.ercot.com/news/mediakit/maps.

19.     ERCOT operates pursuant to certain rules known as "protocols."   The SFA defines the ERCOT protocols as:

> [T]he document adopted by ERCOT . . . as amended from time to time, that contains the scheduling, operating, planning, reliability, and Settlement . . . policies, rules, guidelines, procedures, standards, and criteria of ERCOT.  For the purposes of determining responsibilities and rights at a given time, the ERCOT protocols, as amended in accordance with the change procedure(s) described in the ERCOT protocols, in effect at the time of the performance or non-performance of an action, shall govern with respect to that action.

20.     The ERCOT protocols establish a comprehensive (indeed voluminous) set of rules that govern the ERCOT market and how market participants, including ERCOT, interact.

21.     The ERCOT protocols also establish a competitive market for the purchase and sale of both power and ancillary services.

## C.     The Standard Form Market Participant Agreement

22.     The Debtor and ERCOT are parties to a Standard Form Market Participant Agreement (the "SFA").

23.     The SFA imposes various duties and obligations on both the Debtor and ERCOT. Specifically, both the Debtor and ERCOT agreed to discharge their respective duties and responsibilities under the ERCOT protocols.

24.     As such, the contractual relationship between the Debtor and ERCOT is governed by the SFA, related agreements, and the ERCOT protocols, which are incorporated by reference into the SFA.  SFA at §§ 5 and 6.

25.     As described above, under the terms of the SFA, protocol changes are only effective pursuant to the change provisions contained in the ERCOT protocols.

## D.   Winter Storm Uri

26.    Late in the afternoon on Monday, February 8, 2021, ERCOT issued an emergency Operating Condition Notice ("OCN")[7] report for "an extreme cold weather system approaching Thursday, February 11, 2021."  An OCN is for informational purposes only in order to inform generators of a possible future need for more resources.  An OCN does not give ERCOT the authority to require more resources to be available due to the possibility of an emergency.

27.    The next day, on Tuesday, February 9, 2021, the National Weather Service issued a State of Texas Weather Briefing warning of dangerously cold winter weather, including freezing rain.[8]

28.    On Wednesday, February 10, 2021, ERCOT issued an "Advisory" for the "predicted extreme cold weather event for the ERCOT region."[9]  On this same date, the Emergency Management Coordinator of the Public Utility Commission of Texas (the "PUCT") sent an email to several market participants warning that "this Arctic Air Mass is expected to make it all the way down to the [Rio Grande] Valley!"[10]

29.    On Thursday, February 11, 2021, ERCOT issued a "Watch" for an extreme cold weather event.[11]

---

[7] An "Operating Condition Notice" is the first of three levels of communication issued by ERCOT in anticipation of a possible emergency condition.  Protocol 2.1; Protocol 6.5.9.3.1.

[8] Attachment to Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (Response by Public Utility Commission of Texas to Texas Public Information Act Request, Bates labeled PUCT 0000354, hereinafter referenced by "PUCT [Bates label #]).

[9] An "Advisory" is the second of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition. Protocols 2.1; Protocols 6.5.9.3.2.  Advisory *available at* http://www.ercot.com/services/comm/mkt_notices/notices/2021/02 (issued at 17:09:45 on Feb. 10, 2021).

[10] Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (PUCT 0000352).

[11] A "Watch" is the third of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition. Protocols 2.1; Protocols 6.5.9.4.

30.     On Friday, February 12, 2021, Texas Governor Greg Abbott, pursuant to Section 418.014 of the Texas Government Code, declared a state of disaster due to the expected winter weather.

31.     On Saturday, February 13, 2021, ERCOT issued an emergency notice for extreme cold weather event, which it posted on its website.[12]

32.     On Sunday, February 14, 2021, President Biden declared that an emergency existed in the State of Texas and ordered that federal assistance be provided.

33.     But it was not until the early hours of Monday, February 15, 2021,[13] that ERCOT declared an Energy Emergency Alert ("EEA") "Level 1," urging consumers to conserve power. Within an hour, however, ERCOT elevated to an EEA "Level 2," and only 13 minutes later, at 1:25 a.m., ERCOT elevated to an EEA "Level 3." Level 3 is the highest level of emergency in ERCOT, under which ERCOT "[a]s a last resort, instruct[s] transmission companies to reduce demand on the electric system; typically in the form of controlled outages."[14]

34.     With the grid stressed to within minutes of a catastrophic failure, on February 15, 2021, ERCOT ordered transmission operators to implement deep cuts in load in the form of rolling blackouts to reduce the strain on the ERCOT transmission grid and avoid a complete collapse of the ERCOT system.

---

[12] Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation, dated February 25, 2021, *available at* http://www.ercot.com/content/wcm/lists/226521/Texas_Legislature_Hearings_2-25-2021.pdf

[13] Monday, February 15, 2021 was the Presidents' Day holiday, during which Federal and State agencies, including the PUCT, and all trading through ERCOT, were closed for business, making the first ERCOT trading day following the start of Winter Storm Uri on Tuesday, February 16, 2021. By then, the prices in ERCOT were set at $9,000/MWh.

[14] 2021 Energy Emergency Alert Overview, dated May 2021, *available at* http://www.ercot.com/content/wcm/lists/230330/2021_EEA_Overview_Final.pdf.

35.     The EEA Level 3 remained in effect until Friday, February 19, 2021, leaving over 4.1 million homes and businesses without power, some for more than four consecutive days.[15]

36.     According to a list prepared by ERCOT, at least 312 generating units at 219 power plants lost capacity for varying durations between Sunday, February 14, and Friday, February 19, 2021.[16] The highest amount of unavailable generating capacity during Winter Storm Uri—totaling 51,173 MW of generating capacity off-line—occurred at approximately 8:00 a.m. on Tuesday, February 16, 2021.[17] ERCOT reported that approximately 48.6% of generation capacity was forced out at this highest point of outages due to the impacts of the extreme weather conditions.[18]

37.     In response to invoices sent by ERCOT to the Debtor totaling over $2.247 billion, on February 25, 2021, and in accordance with the terms of the SFA, the Debtor provided a Notice of Force Majeure Event to ERCOT (the "Force Majeure Notice"). ERCOT has not acknowledged or addressed the Force Majeure Notice in any manner.

38.     ERCOT's failure to abide by the ERCOT protocols and the terms of the SFA for the calculation of energy charges Debtor incurred during Winter Storm Uri caused the Debtor to file its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

E.     **The Bankruptcy Case**

39.     On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has continued in possession of its property and has

---

[15] ERCOT News Release, dated February 19, 2021, *available at* http://www.ercot.com/news/releases/show/225962.

[16]     ERCOT     Letter,     dated     March     4,     2021,     *available*     *at* http://www.ercot.com/content/wcm/lists/226521/ERCOT_Letter_Re_Feb_2021_Generator_Outages.pdf.

[17] February 2021 Extreme Cold Weather Event: Preliminary Report on Causes of Generator Outages and Derates, April     6,     2021.     PUC     Project     No.     51878,     Item     20.     Report     *available*     *at* http://interchange.puc.state.tx.us/search/documents/?controlNumber=51878&itemNumber=20.

[18] Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation, dated February 24, 2021, *available at* http://www.ercot.com/content/wcm/key_documents_lists/225373/2.2_REVISED_ERCOT_Presentation.pdf.

continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

40.     On March 15, 2021, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").  *See* Dkt. No. 216. The Committee was reconstituted by the U.S. Trustee on March 24, 2021.  *See* Dkt. No. 285.

41.     Additional information about the Debtor's business and affairs, capital structure, prepetition indebtedness, and the events leading up to the Petition Date can be found in the *Declaration of Clifton Karnei in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [Dkt. No. 3].

42.     On May 5, 2021, the Court entered its *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Dkt. No. 515], setting the deadline for filing proofs of claim on June 15, 2021.

## F.     The ERCOT Claim

43.     ERCOT filed the ERCOT Claim on June 14, 2021.  The ERCOT Claim alleges that the Debtor is liable to ERCOT in the amount of $1,899,152,990.64, with approximately $1,877,591,506.10 of that amount allegedly subject to administrative expense priority status. The ERCOT Claim further alleges that "[p]rior to the Petition Date, Brazos was in default of its obligations under the Brazos SFA and the ERCOT Protocols."

44.     In its *Statement of Electric Reliability Council of Texas to Debtor's Motion for Entry of an Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit*

*Acceptances Thereof* [Dkt. No. 896], ERCOT asserts that the ERCOT Claim "must be promptly cured in connection with the assumption of the executory contracts between ERCOT and the Debtor in order for the Debtor to continue participating in the ERCOT market."

45.     As of the date of the filing of this Complaint, the Debtor has not made a determination whether to assume or reject the SFA or any other agreements between the Debtor and ERCOT, and the Debtor asserts that the ERCOT Claim does not reflect the true cure costs due to ERCOT, if the Debtor does assume the SFA.

46.     Nothing contained herein or any actions taken pursuant to the relief requested in this Complaint is intended or should be construed as a request by or authorization for the Debtor to assume or reject the SFA or any other prepetition agreements between the Debtor and ERCOT pursuant to section 365 of the Bankruptcy Code, and the Debtor reserves all rights with respect to the assumption or rejection of the SFA. Indeed, the ultimate amount of the allowed ERCOT Claim will have to be considered as part of any broader assumption analysis.

## V.     GROUNDS FOR OBJECTION TO ALLOWANCE AND CLASSIFICATION

### A.     ERCOT's Charges to the Debtor for Energy During Winter Storm Uri Contradict the Terms of the SFA and the ERCOT Protocols

47.     The SFA and the ERCOT protocols incorporated therein set out detailed provisions that govern the calculation of amounts the Debtor is contractually obligated to pay to ERCOT.

48.     The invoices ERCOT sent and attached to the ERCOT Claim do not conform to the terms of the SFA and the ERCOT protocols.

49.     The Debtor is not contractually obligated to pay any amount over the price that was agreed to in the SFA and as set by the protocols.

50.     ERCOT has no right to claim or be paid an amount that the Debtor never agreed to pay and does not owe.

51.     Under the SFA, both the Debtor and ERCOT agreed to "comply with, and be bound by, all ERCOT protocols."  SFA at §§ 5 and 6.

52.     The ERCOT protocols contain the Settlement[19] "policies, rules, guidelines, procedures, standards, and criteria of ERCOT."  SFA at Addendum § A.  And the "ERCOT Protocols, as amended in accordance with the change procedure(s) described in the ERCOT Protocols, in effect at the time of the performance or non performance of an action, shall govern with respect to that action."  SFA at Addendum § A.

53.     The ERCOT Claim for approximately $1.9 billion is based on charges that exceed the amount the Debtor owed pursuant to the SFA and the ERCOT protocols in effect during the period at issue.

54.     The amount of the ERCOT Claim exceeds the amount the Debtor properly owes by at least hundreds of millions of dollars, if not over a billion dollars.

55.     ERCOT wholesale energy prices generally trade in the $20-$25/MWh range.  The average price during 2020 for the ERCOT day ahead market was $22/MWh.[20]

56.     The protocols governing the pricing of wholesale energy in ERCOT include a "scarcity pricing" mechanism that is designed to allow prices to increase up to a maximum allowable rate of up to $9,000/MWh under certain circumstances and only in extremely rare periods.

57.     The specific mechanism relating to scarcity conditions contained in the protocols, which are binding on the Debtor and ERCOT, is found in Protocol 6.5.7.3.1, *Determination of*

---

[19] "Settlement" is the process used to resolve financial obligations between a Market Participant and ERCOT. Protocol 2.1.

[20] U.S. Energy Information Administration, *Wholesale U.S. electricity prices were generally lower and less volatile in 2020 than 2019* (Jan. 8, 2021), available at: https://www.eia.gov/todayinenergy/detail.php?id=46396#.

*Real-Time On-Line Reliability Deployment Price Adder*, which sets forth a robust set of shortage-related factors that impact scarcity pricing.

58.     Notably, according to the ERCOT protocols in effect during Winter Storm Uri, firm load shed[21] was not included among the scarcity pricing triggers.  *See* Protocol 6.5.7.3.1.

59.     The omission of firm load shed as a factor in scarcity pricing was by design:  in 2014, ERCOT considered and rejected a proposal to include firm load shed as a factor in scarcity pricing in proposed amendments to section 6.5.7.3.1 of the protocols.

60.     Thus, the rules (*i.e.*, protocols) that governed the Debtor's settlement prices with ERCOT going into Winter Storm Uri expressly did not include firm load shed as a factor in scarcity pricing.[22]   As an admission of the foregoing, ERCOT ultimately did change the protocols to include firm load shed as a consideration in the Real Time Reliability Deployment Price Adder, but not until three months after Winter Storm Uri.

61.     Yet, in the middle of the storm, and over a holiday weekend when ERCOT markets were closed, ERCOT manipulated the operation of the Real-Time Reliability Deployment Price Adder process by making firm load shed a scarcity pricing trigger, despite the fact that firm load shed was not a trigger for invoking scarcity pricing under the protocols.

62.     ERCOT not only treated firm load shed as a scarcity pricing trigger, it pegged the real time price of energy at $9,000/MWh for several days.[23]

---

[21] Rolling blackouts, also known as "firm load shed," are sometimes necessary when there is insufficient generation to meet demand.

[22] *See* NPRR 1081 (approved on June 28, 2021 and effective July 1, 2021).  A record of this NPRR is available here: http://www.ercot.com/mktrules/issues/NPRR1081#summary.

[23] The Debtor does not dispute that the protocols in effect during Winter Storm Uri contained pricing mechanisms that, under certain rare circumstances, would have permitted wholesale energy prices to reach a capped price of $9,000/MWh during certain intervals.  However, firm load shed was not a scarcity pricing trigger under the protocols then in effect, and no protocol permitted ERCOT to peg prices at $9,000/MWh for several days while firm load shed instructions were in place.

63.     The ERCOT Claim is based on this $9,000/MWh price peg, which is a departure from the energy prices that would have prevailed under the ERCOT protocols in effect during Winter Storm Uri.

64.     As such, ERCOT breached the SFA by failing to abide by the ERCOT protocols.

65.     The amount the Debtor owes under the SFA and the protocols in effect during the relevant time is substantially less than the amount of the ERCOT Claim. By way of illustration, a study conducted by London Economics International LLC ("LEI") to determine what market-clearing prices would have been during February 15-19, 2021 if ERCOT had complied with the ERCOT protocols, found that prices would have averaged $2,404/MWh—not $9,000/MWh. [24] Thus, under the LEI study results, average prices under the protocols would have been 73% lower than the prices ERCOT charged the Debtor during the same period.

66.     ERCOT's methodology in calculating the charges to the Debtor set forth in the ERCOT Claim is wrong. Only the SFA and the ERCOT protocols in effect during Winter Storm Uri establish the amount the Debtor owes to ERCOT for energy during the winter storm.

67.     While the price calculation methodology in the ERCOT protocols can be changed, both the SFA and the protocols require that a specific change process be followed. However, ERCOT did not follow the protocol change process and it ignored the contractual terms of the SFA and the pricing process set forth in the protocols when it pegged the price for energy at the system-wide offer cap of $9,000/MWh.

---

[24]  Analysis of ERCOT market prices during February 2021 winter storm event at 5, *available at* https://interchange.puc.texas.gov/Documents/51617_10_1131376.PDF.

68.     The pricing methodology contained in the SFA and the protocols in effect at the time of Winter Storm Uri must be followed and applied by this Court in calculating and determining the Debtor's liability for the ERCOT Claim.

69.     The cornerstone of a properly functioning market is consistency, transparency, and trust that the market rules, especially the rules governing price, will be honored.

70.     In particular, the rules (in this case, the protocols), should be honored during a declared natural disaster when market participants' primary focus is on the mitigation of human suffering and preservation of life.

71.     The SFA provides that the "the ERCOT Protocols, as amended in accordance with the change procedures(s) described in the ERCOT Protocols, in effect at the time of the performance or non-performance of an action, shall govern with respect to that action."

72.     The ERCOT protocols then in effect acknowledged the possibility of emergency conditions requiring prompt revision and implementation.   For instance, Protocol 21.5 provides that a revision can be made on an "urgent" basis where "an existing Protocol or condition is impairing or could imminently impair ERCOT System reliability or wholesale or retail market operations . . . ."   ERCOT failed to follow Protocol 21.5, or any other change procedure provided under the protocols, when it altered the operation of Real Time Reliability Deployment Price Adder and pegged energy prices at $9,000/MWh from February 15-19, 2021.

73.     The Debtor objects to the invoices calculated in violation of the SFA, the protocols, and the course of dealing on which the Debtor had come, and was entitled, to rely.

**B.     ERCOT Failed to Mitigate Its Claim**

74.     Section 8(D) of the SFA requires and other applicable Texas law imposes a duty on ERCOT to mitigate damages.

75.     Nothing in the SFA or the ERCOT protocols entitled ERCOT to charge $9,000/MWh for all intervals from approximately 10:15 p.m. on February 15, 2021 through 9:05 a.m. on February 19, 2021.

76.     ERCOT could and should have mitigated its damages by purchasing power from suppliers, and selling power to the Debtor, at the protocol-determined price, rather than at $9,000/MWh for all intervals described above.

77.     Rather than attempt any mitigation, however, ERCOT set a massively excessive price for power during Winter Storm Uri and attempted to pass the entirety of the excessive price onto power buyers such as the Debtor.

78.     As described above, under the SFA and the ERCOT protocols, ERCOT was not entitled to set a $9,000/MWh price for electricity purchased by the Debtor during Winter Storm Uri for all intervals from approximately 10:15 p.m. on February 15, 2021 through 9:05 a.m. on February 19, 2021.

79.     However, even if ERCOT properly charged $9,000/MWh while firm load shed instructions were in place, which the Debtor disputes, ERCOT could and should have allowed prices to fall below $9,000/MWh once ERCOT ceased shedding firm load.

80.     Doing the latter would have greatly reduced the real time energy price for the last 33 hours of Winter Storm Uri and would have mitigated ERCOT's claim by a substantial amount.

81.     As ERCOT's market notice explained, it modified the operation of the Real-Time Reliability Deployment Price Adder process during all intervals in which it directed firm load shed. However, by midnight on Thursday, February 18, 2021, ERCOT had ceased all firm load shed.

82.     Although firm load shed ceased as of midnight on Thursday, February 18, 2021, ERCOT left the $9,000/MWh price in place for an additional 33 hours—from 12:00 a.m. on

February 18, until 9:00 a.m. on February 19, 2021. This action burdened the market with an astonishing $16 billion in unnecessary electricity costs.

83.     Despite being made aware of the pricing error relating to the last 33 hours of the storm by the numerous market participants, ERCOT refused to take any action to review the price charged to the Debtor after load shed ceased.

84.     ERCOT refused to take action despite the undisputed authority in the protocols allowing ERCOT to reprice the real time market. Protocols 6.3(4).

85.     In fact, the ERCOT protocols authorize ERCOT to direct a resettlement of real time prices "at any time, to address unusual circumstances." Protocols 9.5.6(1). It cannot be disputed that Winter Storm Uri gave rise to extremely unusual circumstances.

86.     Having failed to correct the problem in real time, ERCOT could have mitigated the ERCOT Claim by at least hundreds of millions of dollars through the exercise of its repricing powers under the protocols.

87.     Although ERCOT possesses the power under the protocols to reprice "at any time" as discussed above, it is undisputed that ERCOT also had clear authority to reprice the $9,000/MWh charges within 30 days of the relevant operating days when the charges were assessed. Protocols 6.3(6).

88.     Opinion No. KP-0363 of the Attorney General of Texas issued on March 17, 2021 confirmed that ERCOT had the legal authority to change and correct its excessive prices.[25] ERCOT failed to do so.

---

[25]     Tex. Att'y Gen. Op. No. KP-0363 at 6 (Mar. 17, 2021) *available at* https://www.texasattorneygeneral.gov/sites/default/files/opinion-files/opinion/2021/kp-0363.pdf.

89.     ERCOT's conduct unnecessarily and unreasonably exacerbated the amounts ERCOT charged the Debtor during the storm.

90.     Had ERCOT applied the $9,000/MWh price only during times when firm load shed was in place, or had ERCOT exercised its undisputed right to reprice the real time market at any time, the amount of the ERCOT Claim asserted against the Debtor would have been reduced by hundreds of millions of dollars.

91.     ERCOT also failed to employ a method provided under the ERCOT protocols to bring additional generation online, at a cost that likely would have been much lower than $9,000/MWh.  The process is known as the Reliability Unit Commitment or "RUC" procedure, as established in Section 5 of the ERCOT protocols.

92.     The RUC procedure is generally used to ensure system reliability through sufficient resource capacity.  Rather than using the narrower tool of the RUC process to bring generators on line, ERCOT pegged the price at the highest amount possible, even though that price hike was not consistent with the ERCOT protocols.

C.     **The Debtor Was Not in Default Prior to Petition Date**

93.     ERCOT erroneously claims that "Prior to the Petition Date, [the Debtor] was in default of its obligations" under the SFA and the ERCOT protocols.

94.     Despite making this claim, ERCOT never sent a notice of default to the Debtor.

95.     Section 8 of the SFA, titled "Default," provides that "[i]f, due to a Force Majeure Event, a Party is in breach with respect to any obligation hereunder, such breach shall not result in a Default by that Party."

96.     The ERCOT protocols define a Force Majeure Event as "[a]ny event beyond the reasonable control of, and that occurs without the fault or negligence of, an Entity whose

performance is prevented by the occurrence of such event. Examples of such a Force Majeure Event may include the following, subject to the limitations of the above sentence: an act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, breakage or accident to machinery or equipment, or a curtailment, order, regulation or restriction imposed by governmental, military, or lawfully established civilian authorities." Protocols, 2.1 Definitions.

97.     The Debtor properly provided the Force Majeure Notice to ERCOT on February 25, 2021. ERCOT has not acknowledged or addressed the notice in any manner.

98.     On multiple levels, Winter Storm Uri and the events resulting therefrom constituted a Force Majeure Event.

99.     In light of the Force Majeure Event, and the Debtor's timely notice to ERCOT of same, the Debtor was not in default prior to the Petition Date.

100.    Accordingly, any claimed damages resulting from the Debtor's alleged default under the SFA or the ERCOT protocols are improperly asserted and cannot be collected from the Debtor.

**D.     ERCOT Charged Unreasonably High Prices for Ancillary Services**

101.    In addition to purchasing energy in the ERCOT market during Winter Storm Uri, the Debtor also purchased capacity products known as "ancillary services" from ERCOT.

102.    ERCOT procures and then charges load serving entities like the Debtor for certain ancillary services that allow ERCOT to maintain capacity reserves, both online and offline, to keep the grid in balance. One example of an ancillary service is Responsive Reserve Service ("RRS"). On a daily basis in the Day Ahead Market, ERCOT selects and pays various market participants, representing several types of generation and load, to provide this service.

103.    The primary method by which generators provide RRS service is by being online, but below maximum output, so that they can almost immediately increase or decrease generation output in order to mitigate the effects of a disturbance on the grid. Large loads, such as industrial operations, can provide this service by being available to drop their load automatically in the event of a frequency disturbance on the grid or when instructed by ERCOT.

104.    During Winter Storm Uri, prices for certain day-ahead ancillary services reached more than $20,000/MWh, an amount that far exceeds the system wide offer cap price of $9,000/MWh.

105.    ERCOT's action in charging the Debtor these prices for ancillary services for certain pricing intervals during Winter Storm Uri—prices that far exceed the system wide offer cap for energy—is unreasonable. ERCOT's ancillary service charges should be substantially reduced.

**E.    ERCOT Failed to Ensure the Reliability and Adequacy of the Regional Electrical Network**

106.    ERCOT operates under the statutory duty to ensure the reliability and adequacy of the electric grid. TEX. UTIL. CODE § 39.151(a)(2). The ERCOT protocols underscore that one of the key functions of ERCOT is to "[e]nsure the reliability and adequacy of the ERCOT Transmission Grid." Protocols 1.2(1)(b).

107.    In the SFA, the Debtor and ERCOT agreed to discharge their duties under the ERCOT protocols. One of ERCOT's duties is to ensure the reliability and adequacy of the electric grid, which included a duty to closely monitor and timely inform market participants of the anticipated storm and to plan for, manage, and minimize its financial impact.

108.    ERCOT knew that potentially dangerous extreme cold weather was coming at least one week (on February 8, 2021) before it declared an emergency (on February 15, 2021). ERCOT

was slow to act, waiting until February 13, 2021 to deploy responsive reserves and until February 14, 2021 to issue a conservation alert and media appeal.[26]

109.    ERCOT's inaction caused dramatic hardship across the State of Texas and the assignment of enormous costs to the Debtor. Indeed, ERCOT's performance was so poor that its Chief Executive Officer reported that rapid frequency drops placed the entire grid only 4 minutes and 37 seconds away from a total collapse that could have led to ERCOT-wide outages for weeks or possibly months.[27]

110.    As devastating as Winter Storm Uri was, it was not the first time severe winter weather in Texas caused rolling blackouts.

111.    ERCOT has been aware for more than 30 years that cold Texas weather can have a severe impact on the electric grid resulting in dramatic hardship, excessively high wholesale prices, and rolling blackouts. Based on past experience of rolling blackouts due to severe winter weather, what happened to market participants during Winter Storm Uri was entirely preventable had ERCOT instituted various tools it had at its disposal.

112.    With full knowledge and experience, ERCOT accepted and attempted to carry out its statutory and contractual duty to "ensure the adequacy and reliability of the electric grid," Protocols 1.2(1)(b), which includes the integrity of the grid, and the Debtor relied on ERCOT to fulfill this duty. But ERCOT failed in spectacular fashion, to the detriment of the Debtor.

---

[26] ERCOT News Release dated February 14, 2021 "Grid operator requests energy conservation for system reliability" *available at* http://www.ercot.com/news/releases/show/225151; ERCOT's February 2021 Extreme Weather Event public information and timeline *available at* http://www.ercot.com/news/february2021.

[27] Transcript and recording of ERCOT Press Conference on February 18, 2021 *available at:* https://www.rev.com/transcript-editor/shared/bwpa-1U9FfxRGdAEuXxUGXzJWhtTVX_d7kAt-Had6vHMUnz85GHL4kfQhx2GtGJXNAHjEk8Sm7siE2K_xPjBpxfw_XM?loadFrom=PastedDeeplink&ts=0.22 at 41:12.

113.     ERCOT should have, but did not, take reasonable care in estimating and planning for the amount of power that would be required for Winter Storm Uri and the corresponding financial impact it would have on the market participants.

**F.     The ERCOT Claim Must be Reclassified as a General Unsecured Claim**

114.     ERCOT designated substantially all of the ERCOT Claim (*i.e.*, $1.87 billion of the approximately $1.9 billion asserted) as a priority claim pursuant to Bankruptcy Code section 503(b)(9).

115.     To establish a priority claim under section 503(b)(9), ERCOT must prove "the value of any goods received by the [D]ebtor within 20 days before [the Petition Date] in which the goods have been sold to the [D]ebtor in the ordinary course of [the D]ebtor's business."  11 U.S.C. § 503(b)(9).

116.     ERCOT, despite asserting a $1.87 billion administrative claim, did not submit any evidence or documentation that would satisfy the requirements for a section 503(b)(9) claim.

117.     Under the circumstances of this case, ERCOT cannot satisfy its burden.

118.     According to the statute's plain terms, section 503(b)(9) does not apply to any portion of the ERCOT Claim for the following reasons:

- Electricity is not a "good" for purposes of section 503(b)(9);

- Ancillary services are not "goods" for purposes of section 503(b)(9);

- The electricity and ancillary services charged to the Debtor in the ERCOT Claim were not incurred in the ordinary course of the Debtor's business; and

- The ERCOT Claim far exceeds the "value" of goods received by the Debtor.

119.     Therefore, the ERCOT Claim falls outside the scope of Bankruptcy Code section 503(b)(9) and must be classified in its entirety as a general unsecured claim.

120.     At the very least, if the Court determines that section 503(b)(9) applies to the ERCOT Claim, any priority amount of the ERCOT Claim should be reduced, by, at least, the difference between the power price that ERCOT determined participants should pay and the price that participants likely would have paid if the market had been allowed to work.

## VI.     CAUSES OF ACTION

121.     By this Complaint, the Debtor seeks the disallowance, in part, of the ERCOT Claim in an amount as determined by the Court, pursuant to Bankruptcy Code section 502. The Debtor additionally seeks to reclassify the ERCOT Claim in its entirety as a general unsecured claim.

## COUNT 1: OBJECTION TO ERCOT CLAIM UNDER 11 U.S.C. § 502(B)(1): EXCESSIVE CHARGES BY ERCOT THAT CONFLICT WITH THE SFA

122.     The preceding paragraphs are incorporated herein by reference.

123.     Section 502 of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of [the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Once there is an objection to a proof of claim, the Bankruptcy Code mandates a determination of the amount of the claim absent certain exceptions that are inapplicable here. *See* 11 U.S.C. § 502(b). Section 502 further provides that a court shall not allow a claim if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ." 11 U.S.C. § 502(b)(1).

124.     The SFA and the ERCOT protocols incorporated therein set out detailed mechanisms to calculate the amount of money that the Debtor is obligated to pay to ERCOT. The invoices ERCOT sent and attached to the ERCOT Claim conflict with the terms of the SFA and the ERCOT protocols. Therefore, as asserted, the ERCOT claim is unenforceable against the Debtor under the SFA and the protocols and must be disallowed.

125.    If ERCOT had complied with the SFA and operated pursuant to the ERCOT protocols without artificially interfering with the market and dictating the price of energy to market participants, the prevailing energy price, according to at least one study, would have averaged around $2,404/MWh, not $9,000/MWh.   Application of the terms of the SFA and the ERCOT protocols would substantially reduce the amount of the ERCOT Claim.

126.    The Debtor therefore seeks an order under Section 502(b)(1) disallowing such amount of the ERCOT Claim as exceeds the amount properly charged under the SFA and the ERCOT protocols.   The resulting allowed claim must not exceed the result of: (i) the amounts validly arising under the SFA and the ERCOT protocols minus (ii) any collateral swept and applied by ERCOT prepetition.

## COUNT 2: OBJECTION TO ERCOT CLAIM UNDER 11 U.S.C. § 502(B)(1): ERCOT'S FAILURE TO MITIGATE

127.    The preceding paragraphs are incorporated herein by reference.

128.    The ERCOT Claim for approximately $1.9 billion was based on an excessive $9,000/MWh price, held in place for several days.

129.    Despite being made aware of the pricing error relating to the last 33 hours of the storm by the numerous market participants, ERCOT refused to take any action to review the price charged to the Debtor after load shed ceased or, in the alternative, to take action under the protocols to reprice the real time market.

130.    ERCOT also failed to employ the RUC procedure, a valid method under the protocols, to bring additional generation online, at a cost that likely would have been much lower than $9,000/MWh.

131.    ERCOT made no effort to mitigate the ERCOT Claim.

132.    Section 8(D) of the SFA requires and other applicable Texas law imposes a duty on ERCOT to mitigate damages.  Furthermore, as described above, ERCOT could have reduced its claim without undue risk, burden, or humiliation.

133.    Rather than attempt any mitigation,  however, ERCOT simply  passed the entirety of its excessive $9,000/MWh  charges to the Debtor.

134.    The Debtor has no liability  for these unmitigated  damages, and the amount of the ERCOT Claim should  be reduced substantially.

### COUNT 3: OBJECTION TO ERCOT CLAIM UNDER 11 U.S.C. § 502(B)(1): NO PRE-PETITION DEFAULT DUE TO FORCE MAJEURE

135.    The preceding paragraphs are incorporated herein by reference.

136.    The Debtor was not in default under the SFA prior to the Petition Date.

137.    Section 8 of the SFA, entitled "Default," provides that "[i]f, due to a Force Majeure Event, a Party is in breach with respect to any obligation  hereunder, such breach shall not result in a Default by that Party."  The Debtor properly provided  a Notice of Force Majeure Event to ERCOT on February 25, 2021.  ERCOT has not acknowledged or addressed the notice in any manner.

138.    Pursuant to the Debtor's Force Majeure Notice, the Debtor was not in default prior to the Petition Date.  Accordingly,  to the extent that the ERCOT Claim asserts any amounts resulting  from the Debtor's alleged default under the SFA, such as amounts based on the default uplift process, among others, those amounts should be disallowed  in their entirety.

### COUNT 4: OBJECTION TO ERCOT CLAIM UNDER 11 U.S.C. § 502 AND ACTION TO AVOID CONSTRUCTIVELY FRAUDULENT OBLIGATION UNDER 11 U.S.C. § 548

139.    The preceding paragraphs are incorporated herein by reference.

140.    Under Bankruptcy Code section 548(a), a debtor may avoid any obligation  incurred by the debtor on or within two years prior to the Petition Date, if the debtor received less than a

reasonably equivalent value in exchange for such obligation; and (i) the debtor was insolvent on the date that such obligation was incurred, or became insolvent as a result of such obligation; (ii) the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

141.    The ERCOT Claim for approximately $1.9 billion was based on an exorbitant and excessive $9,000/MWh price for electricity held in place for several days and an unreasonable price for ancillary services. Those excessive charges are an "obligation" imposed by ERCOT within two years before the date of the March 1, 2021 Petition Date. The Debtor received less than a reasonably equivalent value in exchange for such obligation. The Debtor voluntarily or involuntarily either became insolvent as a result of such obligation, was left with an unreasonably small capital with which to engage in business or a transaction, or believed that incurrence of such obligation would be beyond the Debtor's ability to pay debts as such debts matured. Accordingly, the obligation is avoidable pursuant to Bankruptcy Code section 548(a) to the extent that such obligation exceeds the reasonably equivalent value of what the Debtor received, and the ERCOT Claim must be disallowed or substantially reduced.

## COUNT 5: OBJECTION TO ERCOT CLAIM UNDER 11 U.S.C. § 502 AND ACTION TO AVOID CONSTRUCTIVELY FRAUDULENT OBLIGATION UNDER 11 U.S.C. § 544(B) AND TEX. BUS. & COM. CODE § 24.005

142.    The preceding paragraphs are incorporated herein by reference.

143.    Under Bankruptcy Code sections 544(b) and 1107, the Debtor may avoid any obligation incurred by the Debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Bankruptcy Code section 502, or that is not allowable only under Bankruptcy Code section 502(e).

144.     Under TEX. BUS. & COM. CODE § 24.005 (Transfers Fraudulent as to Present and Future Creditors), an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the obligation was incurred, if the debtor incurred the obligation (1) without receiving a reasonably equivalent value in exchange for the obligation and (2) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Such obligations are avoidable pursuant to TEX. BUS. & COM. CODE § 24.008(a).

145.     The ERCOT Claim for approximately $1.9 billion is an obligation that arose within two years prior to the Petition Date for power sold at an exorbitant and excessive $9,000/MWh price and for ancillary services charged at unreasonable prices. The Debtor received less than a reasonably equivalent value in exchange for such obligation. The Debtor either was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, or the Debtor intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

146.     Prior to and at the time of this obligation, and continuing through the Petition Date, there were creditors holding unsecured claims against the Debtor that are allowable under Bankruptcy Code section 502. The ERCOT Claim obligation would be voidable by these creditors by the applicable law, namely TEX. BUS. & COM. CODE §§ 24.005 and 24.008(a).

147.     Accordingly, ERCOT's $1.9 billion claim is a voidable fraudulent obligation under TEX. BUS. & COM. CODE §§ 24.005 and 24.008(a) and Bankruptcy Code section 544(b) to the

extent that such obligation exceeds the reasonably equivalent value in exchange for what the Debtor received, and the ERCOT Claim must be disallowed or substantially reduced.

### COUNT 6: OBJECTION TO PRIORITY OF ERCOT CLAIM UNDER 11 U.S.C. § 503(B)(9): ELECTRICITY IS NOT A GOOD

148.    The preceding paragraphs are incorporated herein by reference.

149.    The ERCOT Claim is not entitled to priority status under Bankruptcy Code section 503(b)(9). The entirety of any allowed portion of the ERCOT Claim should be reclassified as a general unsecured claim.

150.    Specifically, electricity is not a "good" within the meaning of section 503(b)(9).

151.    The Debtor therefore requests that this Court enter an order determining that the ERCOT Claim is not entitled to priority under 11 U.S.C. §§ 503(b)(9) and 507.

### COUNT 7: OBJECTION TO PRIORITY OF ERCOT CLAIM UNDER 11 U.S.C. § 503(B)(9): ANCILLARY SERVICES ARE NOT GOODS

152.    The preceding paragraphs are incorporated herein by reference.

153.    The ERCOT Claim is not entitled to priority status under Bankruptcy Code section 503(b)(9). The entirety of any allowed portion of the ERCOT Claim should be reclassified as a general unsecured claim.

154.    Specifically, ancillary services are not "goods" within the meaning of section 503(b)(9).

155.    The Debtor therefore requests that this Court enter an order determining that the ERCOT Claim is not entitled to priority under 11 U.S.C. §§ 503(b)(9) and 507.

**COUNT 8: OBJECTION TO PRIORITY OF ERCOT CLAIM UNDER
11 U.S.C. § 503(B)(9): GOODS WERE NOT SOLD IN THE
ORDINARY COURSE OF THE DEBTOR'S BUSINESS**

156.    The preceding paragraphs are incorporated herein by reference.

157.    The ERCOT Claim is not entitled to priority status under Bankruptcy Code section 503(b)(9).  The entirety of any allowed portion of the ERCOT Claim should be reclassified as a general unsecured claim.

158.    Specifically, the electricity and ancillary services charged to the Debtor in the ERCOT Claim were not incurred in the ordinary course of the Debtor's business.

159.    The Debtor therefore requests that this Court enter an order determining that the ERCOT Claim is not entitled to priority under 11 U.S.C. §§ 503(b)(9) and 507.

**COUNT 9: OBJECTION TO PRIORITY OF ERCOT CLAIM UNDER
11 U.S.C. § 503(B)(9): THE ERCOT CLAIM EXCEEDS
THE VALUE OF GOODS RECEIVED**

160.    The preceding paragraphs are incorporated herein by reference.

161.    The ERCOT Claim is not entitled to priority status under Bankruptcy Code section 503(b)(9).  The entirety of any allowed portion of the ERCOT Claim should be reclassified as a general unsecured claim.

162.    Specifically, the ERCOT Claim far exceeds the "value" of goods received by the Debtor.

163.    The Debtor therefore requests that this Court enter an order determining that the ERCOT Claim is not entitled to priority under 11 U.S.C. §§ 503(b)(9) and 507.

**VII.   RESERVATION OF RIGHTS AND RIGHT TO AMEND**

164.    This Complaint is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtor to object to any claim on any ground whatsoever. The Debtor expressly reserves all further substantive or procedural objections to the ERCOT Claim and any

other claim.   The Debtor further reserves its right to amend or supplement this Complaint as additional information is discovered.

165.     Nothing contained herein or any actions take pursuant to such relief is intended or should be construed as: (i) an admission as to the validity of any prepetition claim against the Debtor; (ii) a waiver of the Debtor's right to dispute any prepetition claim on any grounds; (iii) a promise or requirement to pay any prepetition claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Complaint or any order granting the relief requested by this Complaint; (v) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (iv) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law.

## VIII.   PRAYER

For the foregoing reasons, the Debtor respectfully requests that this Court enter a final judgment (a) disallowing, in part, and reducing the ERCOT Claim in an amount to be determined by the Court, including a reduction on account of any collateral swept and applied by ERCOT prepetition, and (b) finding that the ERCOT Claim is not entitled to priority under Bankruptcy Code section 503(b)(9), and (c) for such other and further relief as may be just and proper.

Dated: August 18, 2021
     Houston, Texas

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

By: */s/ Lino Mendiola*
Lino Mendiola  (SBT 00791248)
Michael Boldt  (SBT 24064918)
Jim Silliman  (SBT 24081416)
One American Center
600 Congress Ave., Suite 2000
Austin, TX 78701
Telephone: (512) 721-2700
Facsimile: (512) 721-2656
Email: linomendiola@eversheds-sutherland.us
Email: michaelboldt@eversheds-sutherland.us
Email: jimsilliman@eversheds-sutherland.us

*Special Counsel for the Debtor and Debtor in Possession*

**O'MELVENY & MYERS LLP**
Louis R. Strubeck, Jr. (SBT 19425600)
Nick Hendrix (SBT 24087708)
2501 North Harwood Street
Dallas, Texas 75201
lstrubeck@omm.com
nhendrix@omm.com
(972) 360-1925

*Proposed Co-Counsel for the Debtor and Debtor in Possession*

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Jason L. Boland*
Jason L. Boland (SBT 24040542)
Julie G. Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1301 McKinney Street, Suite 5100
Houston, TX 77010
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246
Email: jason.boland@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokrzycka@nortonrosefulbright.com

Paul Trahan  (SBT 24003075)
98 San Jacinto Boulevard, Suite 1100
Austin, TX  78701
Telephone:   (512) 536 5288
Facsimile:   (512) 536 4598
Email: paul.trahan@nortonrosefulbright.com

Michael M. Parker (SBT 00788163)
Steve A. Peirce (SBT 15731200)
111 West Houston Street, Suite 1800
San Antonio, TX  78205
Telephone:   (210) 270-7179
Facsimile:  (210) 270-7205
Email: michael.parker@nortonrosefulbright.com
Email: steve.peirce@nortonrosefulbright.com

*Counsel for the Debtor and Debtor in Possession*