**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>     Debtor. | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.,<br><br>     Defendant. | Adv. Proc. No. 21-03863 (DRJ) |

**ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.'S**
**<u>MOTION TO DISMISS AND FOR ABSTENTION</u>**

## <u>TABLE OF CONTENTS</u>

I.  SUMMARY OF ARGUMENT ...................................................................... 1

II.  FACTUAL BACKGROUND.................................................................... 2

    A.  The State of Texas established a comprehensive regulatory scheme governing the electric industry........................................................................................... 2

    B.  ERCOT's regulation of the market is subject to the PUCT's ultimate authority. ........ 4

    C.  ERCOT complied with PUCT orders issued during Winter Storm Uri...................... 5

    D.  Brazos asks this Court to grant it relief that falls squarely within the PUCT's purview. ........................................................................................................... 9

III.  LEGAL STANDARDS ......................................................................... 11

    A.  Standard for dismissal pursuant to FRCP 12(b)(6)................................................ 11

    B.  *Burford* Abstention. ................................................................................ 13

    C.  Standard for dismissal pursuant to Rule 12(b)(7). ................................................ 16

IV.  ARGUMENT AND AUTHORITIES.................................................... 17

    A.  Brazos's contract claims should be dismissed, because they fail to state plausible claims for relief under the SFA............................................................................ 17

        1.  Count 1 should be dismissed, because it is contrary to the terms of the SFA..... 17

        2.  Count 3 should be dismissed, because it contradicts the SFA's provisions requiring payment even when a Force Majeure Event occurs. ........................... 18

    B.  *Burford* requires that this Court abstain from deciding Brazos's pricing claims. ...... 20

        1.  Brazos's causes of action arise under state law................................................ 22

        2.  This proceeding requires inquiry into unsettled issues of state law. .................. 23

        3.  Utility regulation is an important state interest. ................................................ 23

        4.  Texas needs a coherent policy regarding its electricity grid and market. ........... 23

        5.  Texas has established special state fora for judicial review. ............................... 24

    C.  Brazos's Complaint should be dismissed because the relief sought requires eschewing the PUCT's Orders, and full and consistent relief cannot be granted without the PUCT's joinder to this proceeding. ................................................................ 25

        1.  The PUCT is an indispensable party under Rule 19(a). ..................................... 26

            i.  *First prong: the PUCT's interest*............................................................. 27

            ii.  *Second prong: ERCOT's risk*.................................................................. 28

        2.  Brazos's claims regarding the prices set during Winter Storm Uri should be dismissed pursuant to Rule 19(b). ....................................................... 30

V.  CONCLUSION.......................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*Accord Koken v. Reliance Grp. Holdings, Inc. (In re Reliance Grp. Holdings, Inc.)*,
  273 B.R. 374, 401 (Bankr. E.D. Pa 2002) .............................................................13

*Angst v. Royal Maccabees Life Ins. Co.*,
  77 F.3d 701 (3d Cir. 1996)..................................................................................33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................11, 12

*Associated Gen. Contractors, Inc., etc. v. Laborers Int'l Union*,
  476 F.2d 1388 (Temp. Emer. Ct. App. 1973) ........................................................30

*AT&T Communs. v. BellSouth Telecomms. Inc.*,
  238 F.3d 636 (5th Cir. 2001) ...............................................................................30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................12

*BP Chems., Inc. v. AEP Tex. Cent. Co.*,
  198 S.W.3d 449 (Tex. App.—Corpus Christi 2006, no pet.) ...................................3

*Brown v. Shepherd (In re Lorax Corp.)*,
  Nos. 02-48396-DML-11, 03-4128, 2004 Bankr. LEXIS 598 (Bankr. N.D. Tex. 2004) ................................................................................................................14

*Burford v. Sun Oil Co.*,
  319 U.S. 315 (1943) ................................................................................. *passim*

*Caytrans Project Servs. Ams., Ltd. v. BBC Chartering & Logistics GmbH & Co. KG*,
  No. 20-50449, 2021 U.S. App. LEXIS 18051 (5th Cir. June 17, 2021)....................32

*Cirillo v. Valley Baptist Health Sys. (In re Cirillo)*,
  Nos. 09-10324, 13-01002, 2014 Bankr. LEXIS 1353 (Bankr. S.D. Tex. Apr. 3, 2014) ................................................................................................................12

*Cockrell v. Tex. Gulf Sulphur Co.*,
  299 S.W.2d 672 (Tex. 1956)................................................................................17

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ...............................................................................13

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)................................................................................................13

*Confederated Tribes of Chehalis Indian Reservation v. Lujan*,
928 F.2d 1496 (9th Cir. 1991) ................................................................................31

*Doyle v. Nationstar Mortg., LLC*,
No. H-20-3633, 2021 U.S. Dist. LEXIS 112681 (S.D. Tex. June 16, 2021).........13

*Eastport Assocs. v. City of L.A. (In re Eastport Assocs.)*,
935 F.2d 1071 (9th Cir. 1991) ................................................................................14

*Enter. Mgmt. Consultants, Inc. v. United States*,
883 F.2d 890 (10th Cir. 1989) ................................................................................31

*In re Entergy Corp.*,
142 S.W.3d 316 (Tex. 2004)..............................................................................2, 26

*ERCOT v. Panda Power Generation Infrastructure Fund, LLC*,
552 S.W.3d 297 (Tex. App.—Dallas 2018, orig. proceeding), *mand. denied*,
619 S.W.3d 628 (Tex. 2021).....................................................................................3

*Eubanks v. Esenjay Petroleum Corp.*,
152 B.R. 459 (E.D. La. 1993) .................................................................................25

*Exelon Generation Co. LLC v. Pub. Util. Comm'n of Tex.*,
No. D-1-GN-21-001772 (53rd Dist. Ct., Travis County, Tex. Apr. 19, 2021)........10, 11

*Hilton v. Atlantic Refining Co.*,
327 F.2d 217 (5th Cir. 1964) ..................................................................................27

*Hous. Baseball Partners LLC v. Comcast Corp. (In re Hous. Reg'l Sports
Network, L.P.)*,
514 B.R. 211, 218 (Bankr. S.D. Tex. 2014) ...........................................................14

*HS Res., Inc. v. Wingate*,
327 F.3d 432 (5th Cir. 2003) ......................................................................16, 17, 27

*In re Internationale Resort & Beach Club*,
36 B.R. 189 (Bankr. D.S.C. 1983) ..........................................................................13

*JPMorgan Chase Bank, N.A. v. Sharon Peters Real Estate, Inc*,
Civil Action No. 5:12-cv-1172-XR, 2013 U.S. Dist. LEXIS 98174 (W.D. Tex.
July 15, 2013)..........................................................................................................32

*Kalinsky v. Long Island Lighting Co.*,
484 F. Supp. 176 (E.D.N.Y. 1980) .............................................................29, 30, 31

*Kaye v. Lone Star Fund v. (U.S.), L.P.*,
    453 B.R. 645 (N.D. Tex. 2011)...........................................................................13

*Koerner v. Garden Dist. Ass'n*,
    78 F. App'x 960 (5th Cir. 2003) ........................................................................22

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .............................................................................12

*Luminant Energy Co., LLC v. Pub. Util. Comm'n of Tex.*,
    No. 03-21-00098 (Tex. App.—Austin June 2, 2021) ......................................8, 10

*Luminant Energy Co. LLC v. Pub. Util. Comm'n of Tex.*,
    No. 03-21-00098-CV (Tex. App.—Austin June 7, 2021) .....................................8

*Montco Oilfield Contrs., LLC v. Black Elk Energy Offshore Operations, LLC (In
    re Montco Offshore, Inc.)*,
    595 B.R. 524 (S.D. Tex. Bankr. 2018) ...........................................................18, 20

*N.O.T.I.C.E. v. Cloverly Assocs. Ltd. P'ship*,
    Bankruptcy No. 91-12922S Chapter 11, Adversary No. 93-01095, 1993
    Bankr. LEXIS 405 (Bankr. E.D. Pa. Mar. 3, 1993) .............................................13

*In re N.Y.C. Off-Track Betting Corp.*,
    434 B.R. 131 (Bankr. S.D.N.Y. 2010) .................................................................13

*Nat'l Cas. Co. v. Gonzalez*,
    637 F. App'x 812 (5th Cir. 2016) ........................................................................16

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
    491 U.S. 350 (1989) (*NOPSI*)......................................................................13, 23

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) .............................................................................12

*Oncor Elec. Delivery Co. LLC v. Chaparral Energy, LLC*,
    546 S.W.3d 133 (Tex. 2018)..............................................................................33

*In re Pan American Corp.*,
    950 F.2d 839 (2d Cir. 1991)...............................................................................14

*PUC v. Constellation Energy Commodities Grp., LLC.*,
    351 S.W.3d 588 (Tex. App.—Austin 2011, pet. denied).......................................3

*Pulitzer—Polster v. Pulitzer*,
    784 F.2d 1305 (5th Cir. 1986) .........................................................16, 27, 32, 33

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996)...................................................................................................13, 22

*In re Republic Reader's Serv., Inc.*,
    81 B.R. 422 (Bankr. S.D. Tex. 1987) ..................................................14, 15, 22, 25

*RWE Renewables Americas LLC v. D'Andrea*,
    No. D-1-GN-21-001839 (201st Dist. Ct., Travis County, Tex. Apr. 21, 2021) ....................10

*In re Salem Mortgage Co.*,
    783 F.2d 626 (6th Cir.1986) .......................................................................................14

*Schutten v. Shell Oil Co.*,
    421 F.2d 869 (5th Cir. 1970) ......................................................................................17

*Shipley Garcia Enters., LLC v. Harley-Davidson Motor Co. (In re Shipley Garcia
    Enters. LLC)*,
    Nos. 11-20016, 13-02012, 2014 Bankr. LEXIS 1296 (Bankr. S.D. Tex. Mar.
    28, 2014) .....................................................................................................................12

*Sierra Club v. City of San Antonio*,
    112 F.3d 789 (5th Cir. 1997) ................................................................................22, 23

*Texas v. Ysleta del Sur Pueblo*,
    No. EP-17-CV-179-PRM, 2018 U.S. Dist. LEXIS 223055 (W.D. Tex. Aug.
    27, 2018) ...............................................................................................................27, 28

*Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Lit.)*,
    495 F.3d 191, 205 (5th Cir. 2007) ..............................................................................12

*Wichita & Affiliated Tribes v. Hodel*,
    788 F.2d 765 (1986).....................................................................................................31

*Wilson v. Valley Elec. Membership Corp.*,
    8 F.3d 311 (5th Cir. 1993) ....................................................................................22, 23, 24

*Wood v. Wood*,
    825 F.2d 90 (5th Cir. 1987) ..................................................................................14, 15

*In re Wright*,
    231 B.R. 597 (Bankr. W.D. Tex. 1999)........................................................................14

**Statutes**

28 U.S.C. § 1334(c)(1) ...................................................................................................14

TEX. ADMIN. CODE § 22.251 .....................................................................................11, 26

TEX. ADMIN. CODE § 25.362(h) .......................................................................................4

TEX. ADMIN. CODE §§ 25.501–.507 .........................................................................4, 6, 25

TEX. GOV'T CODE § 2001.176(b)(1) ...........................................................................11, 24

TEX. UTIL. CODE § 31.001(a) .............................................................................2, 22, 23, 26

**Other Authorities**

FED. R. BANKR. P. 7012 ....................................................................................................1

FED. R. CIV. P. 12 ...................................................................................1, 11, 12, 16

FED. R. CIV. P. 19 .............................................................................................. *passim*

Pursuant to Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12, Defendant Electric Reliability Council of Texas, Inc. ("ERCOT") moves to dismiss Plaintiff's Complaint Objecting to Electric Reliability Council of Texas, Inc.'s Proof of Claim and Other Relief [ECF No. 1] (the "Complaint") and for abstention.

## I.     SUMMARY OF ARGUMENT

1.     In this adversary proceeding, Brazos Electric Power Cooperative, Inc. ("Brazos") challenges the amount of ERCOT's claim. Several of its causes of action dispute the price that ERCOT set for electricity during Winter Storm Uri that occurred in February 2021. But ERCOT set those prices based on orders of the Public Utility Commission of Texas ("PUCT") that ERCOT was statutorily obligated to obey. And the Standard Form Market Participant Agreement (the "SFA") into which ERCOT and Brazos entered provides that PUCT orders control in the event of a conflict with the SFA's terms. Brazos's breach of contract claim (Count 1) fails to state a claim upon which relief can be granted because it ignores the fact that the PUCT orders control and that this tenet is part of the SFA. Count 3 challenges ERCOT's claim on the premise that Brazos is not required to pay because it sent notice of an alleged Force Majeure Event to ERCOT. But Brazos again ignores the language of the SFA. Because a Force Majeure Event does not relieve a party affected by a Force Majeure Event of its obligation to make payments, Brazos fails to state a valid claim.

2.     This Court should abstain from deciding Brazos's pricing claims pursuant to the United States Supreme Court's *Burford* decision. To decide Brazos's claims, this Court would have to determine the validity and applicability of the PUCT's orders, the propriety of ERCOT's interpretation and implementation of those orders, and a variety of other issues under Texas's comprehensive and complicated regulatory scheme for electric utilities. To ensure consistency,

these issues are committed to decision by specific Texas courts or by the PUCT. Most importantly, any decision by this Court would necessarily impact other market participants that are not parties to this adversary proceeding.

3.     Finally, Brazos's claims that implicate the PUCT's orders and its pricing should be dismissed for failure to join a necessary party—the PUCT. The PUCT issued orders that Texas law required ERCOT to follow. Any challenge by Brazos regarding pricing during Winter Storm Uri or ERCOT's actions requires joinder of the PUCT as a party. Because joinder is not feasible due to sovereign immunity and Texas's statutory framework for PUCT order challenges, at least Counts 1-5 should be dismissed.

## II.     FACTUAL BACKGROUND

### A.     The State of Texas established a comprehensive regulatory scheme governing the electric industry.

4.     Texas's Public Utility Regulatory Act ("PURA") "establish[ed] a comprehensive and adequate regulatory system for electric utilities." TEX. UTIL. CODE § 31.001(a). The Legislature "intended PURA to be the exclusive means of regulating electric utilities in Texas." *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004). Even as it partially deregulated the industry, Texas found that "the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace." PURA § 31.001(c).

5.     In 1999, Texas enacted a new body of law "to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry." *Id.* § 39.001(a). The centerpiece of this new market structure was an "essential organization" that would oversee and regulate the new market and its participants. *See id.* § 39.151. The Legislature ordered the PUCT to certify an entity to serve as this essential organization to ensure "the reliability and adequacy of the regional electric network" and "that electricity production and delivery are

2

accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a).

6.      The PUCT certified ERCOT to fill this role. *See id.* § 39.151(b). While ERCOT must ensure reliability and manage the market, the PUCT retains the ultimate responsibility to "adopt and enforce rules relating to" these matters. *Id.* § 39.151(d). However, the PUCT "may delegate to" ERCOT that power to adopt rules, as it has in fact done. *Id.* ERCOT has adopted—in Brazos's words—"a comprehensive (indeed voluminous) set of rules that govern the ERCOT market" and participants in it. Complaint (ECF No. 1) at 7, ¶ 20. ERCOT's rules, known as "protocols," "provide the framework for the administration of the Texas electricity market." *BP Chems., Inc. v. AEP Tex. Cent. Co.*, 198 S.W.3d 449, 452 (Tex. App.—Corpus Christi 2006, no pet.). They have the force and effect of Texas statutes. *See PUC v. Constellation Energy Commodities Grp., LLC.*, 351 S.W.3d 588, 594–95 (Tex. App.—Austin 2011, pet. denied). Market participants like Brazos must obey ERCOT's protocols or face administrative penalties. *See* PURA § 39.151(j). ERCOT's protocols also require market participants to execute a Standard Form Market Participant Agreement, the terms of which are defined by the protocols, which further governs ERCOT's and the market participant's relationship. ERCOT Protocols § 22A.

7.      ERCOT is "directly responsible and accountable" to the PUCT, which in turn has "complete authority" over ERCOT's "finances, budget, and operations." PURA § 39.151(d). ERCOT is funded through a state-authorized regulatory fee that the PUCT sets; likewise, the PUCT has line-item authority over ERCOT's budget. *See id.* §§ 39.151(d-1), (e); *ERCOT v. Panda Power Generation Infrastructure Fund, LLC*, 552 S.W.3d 297, 315 (Tex. App.—Dallas 2018, orig. proceeding) ("[T]he system administration fee is authorized by statute, set by the PUC, collected pursuant to the State's power, and intended to further a function for the benefit of the public."),

*mand. denied*, 619 S.W.3d 628 (Tex. 2021). The PUCT has plenary authority over ERCOT's governing documents. PURA § 39.151(g-1). And pursuant to a recently-enacted statute, the State will now choose ten of the ERCOT board's eleven members; the eleventh, ERCOT's CEO, will be chosen by the State-selected board. *Id.* §§ 39.151(g-1), 39.1513; 16 TEX. ADMIN. CODE § 25.362(h).

8.      In sum, ERCOT exclusively performs public functions using state power, subject to the total control of a state agency, under the auspices of a pervasive state regulatory scheme.

**B.      ERCOT's regulation of the market is subject to the PUCT's ultimate authority.**

9.      Pursuant to its power to issue rules regulating ERCOT's market, the PUCT ordered ERCOT to "determine the market clearing prices of energy and other ancillary services"—"[*e*]*xcept as otherwise directed by the* [*PUCT*]." 16 TEX. ADMIN. CODE § 25.501(a) (emphasis added). ERCOT does this by acting as a market clearinghouse: "the central counterparty for all transactions settled by ERCOT," and "the sole buyer to each seller, and the sole seller to each buyer, of all energy." ERCOT Protocols § 1.2(4). ERCOT's role in this regard is non-commercial—it generates no profits. 36 Tex. Reg. 1817, 1818 ("ERCOT does not perform commercial functions."); Internal Revenue Service, Opinion Letter at 1–2, 4–5 (May 11, 2012).[1]

10.      Instead, ERCOT's market design is intended to ensure competition, efficiency, and reliability—especially when, as in this case, a market participant's inability to meet its payment obligations risks destabilizing the market. 16 TEX. ADMIN. CODE §§ 25.501–.507; IRS Op. Ltr. at 4–5. Reliability and market management are intimately related: reliability cannot be achieved unless market participants produce, transmit, and deliver electricity. If one participant—like Brazos—fails to pay for power it purchased, then producers down the line cannot be paid,

---

[1] *Available at* https://www.irs.gov/pub/irs-wd/1219031.pdf.

potentially causing a cataclysmic cascade-reaction of failures that could significantly damage the entire market.

11.     To avoid such harm and to ensure the continued liquidity and function of the market, ERCOT's protocols have short-payment and default-uplift procedures that socialize a market participant's non-payment across the market as a whole. Thus, when a market participant fails to pay, ERCOT must initially reduce payments to market participants that are owed money to account for that short-pay. ERCOT Protocols § 9.19(1)(d). As a result, market participants receive less generation revenue than they are owed. ERCOT must first try to recover the unpaid amount from the short-paying party. But if it cannot, it initiates a "default uplift invoice" procedure to replenish the revenue reductions to generators. ERCOT Protocols §§ 9.19(1)(e) and 9.19.1. ERCOT allocates the short-paying market participant's debt to other market participants using a complex formula based on financial settlement data for the preceding month. ERCOT Protocols § 9.19.9(1)(e), 9.19.1(2).

## C.     ERCOT complied with PUCT orders issued during Winter Storm Uri.

12.     Brazos alleges that ERCOT violated the protocols and the SFA by charging $9,000/MWh for electricity during the storm. But Brazos omits a crucial part of the story regarding how those prices came about.

13.     During the catastrophic Winter Storm in February 2021, the demand for electricity overwhelmed available supply as nearly 50% of the ERCOT region's generation capacity went offline. *See* Complaint at 10, ¶ 36. On February 15, 2021, ERCOT entered Emergency Energy Alert Level 3 ("EEA3") and directed that transmission operators substantially curtail load. *Id.* at 9, ¶ 33. Nevertheless, the system ERCOT uses to set prices kept the clearing price for energy below the system-wide offer cap, which the PUCT had by rule set at $9,000/MWh. *See* Order Directing

ERCOT to Take Action and Granting Exception to Commission Rules PUCT 2/15/21 Order at 1[2]; Second Order Directing ERCOT To Take Action And Granting Exception To Commission Rules (PUCT 2/16/21 Order) at 1[3]; *see also* PUCT, *Electricity Prices during the 2021 Winter Storm* at 2.[4]

14.    On February 15 and 16, the PUCT issued orders finding that, in light of the curtailment of load, this discrepancy "was inconsistent with the fundamental design of the ERCOT market," *id.*, which depends on a scarcity-pricing mechanism, 16 TEX. ADMIN. CODE § 25.505(a). Because "scarcity [was] at its maximum," "the market price for the energy . . . should also [have been] at its highest." PUCT 2/15/21 Order at 1; PUCT 2/16/21 Order at 1. The PUCT thus *ordered* ERCOT to adjust "ERCOT prices to ensure they accurately reflect the scarcity conditions in the market" by "ensur[ing] that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." PUCT 2/15/21 Order at 2; PUCT 2/16/21 Order at 2. ERCOT's price-setting authority is subject to the PUCT's supervening authority. 16 TEX. ADMIN. CODE § 25.501(a). And ERCOT's protocols are subject to the PUCT's power to "tak[e] actions necessary to protect the public interest, including actions that are otherwise inconsistent with the" PUCT rules governing changes to ERCOT's protocols. *Id.* § 25.505(h).

15.    Brazos's Complaint fails to mention the PUCT orders and their significance to the proceedings before this Court. Brazos knows, however, that PUCT orders controlled ERCOT's

---

[2] *Available at* http://interchange.puc.texas.gov/Documents/51617_3_1111656.PDF. A copy of that order is attached as Exhibit "A."

[3] *Available at* https://interchange.puc.texas.gov/Documents/51617_4_1111709.PDF. A copy of that order is attached as Exhibit "B." Brazos cites to PUCT documents available in case 51617 regarding the winter storm. *See, e.g.*, Complaint at 15 n. 24. And the LEI study and Karnei Decl. cited in the Complaint discuss the PUCT's orders. *See id.; see id.* at 11, ¶ 41.

[4] *Available at* https://www.puc.texas.gov/consumer/facts/factsheets/elecfacts/WinterStormPrice Explainer-FIN.pdf.

actions. In his declaration filed in the bankruptcy case on March 1, 2021, Clifton Karnei, Brazos's executive vice president and general manager, stated that "the [PUCT] instructed ERCOT to set record-high prices for electricity. . . ." ECF #3 at 3, ¶ 7; *see also* Complaint at 11, ¶ 41 (citing Karnei Decl.)  He further stated that the "PUCT directed ERCOT to adjust prices" and that "[b]ased on this order, ERCOT set prices at that System Wide Offer Cap **($9,000 per MWh**) for the duration of the time load was being shed." *Id.* at 26, ¶ 53. Indeed, Brazos admitted as much in its original objection to ERCOT's proof of claim. *E.g.*, ECF No. 930 ¶ 33 (conceding that the price about which it complains was "set *by the PUCT* in a February 15, 2021 order" (emphasis added)).[5]

16.     Brazos's leadership is not alone in acknowledging the PUCT's role in directing ERCOT to set the price of electricity during the storm. Brazos's counsel—both Norton Rose Fulbright US LLP and Eversheds Sutherland (US) LLP—have acknowledged the PUCT's role in briefs filed on behalf of other market participants. Its special counsel (Lino Mendiola) explained the PUCT's role in a pending state-court challenge to the orders:

> On February 15 and 16, 2021, **the PUC Commissioners**, who have each since resigned, called impromptu Open Meetings during which they **issued a rule requiring ERCOT to depart from its established rules and set wholesale energy prices at $9,000/MWh**, a massive increase over prevailing prices.
>
> ***
>
> [T]he then-presiding Commissioners changed ERCOT's rules for calculating energy prices, raising the cost of electricity by tens of billions of dollars over a four day span. . . . The surprise rule change wreaked havoc on an already struggling market. **The single largest electric co-operative in the state was forced into bankruptcy.**

---

[5] *Accord id.* ¶ 34 (alleging that "the PUCT adopted an order that impermissibly changed ERCOT's rules for calculating energy prices"); *id.* ¶ 35 ("ERCOT implemented the PUCT Order . . . ."); *id.* ¶ 36 (alleging that the proper market price was "substituted" by "an artificial price set by the PUCT"); *id.* ¶¶ 40–48, 51; *see also id.* ¶ 15 (conceding that Brazos's bankruptcy petition was based in part on the decisions of ERCOT's "overseer, the PUCT").

Opening Br. of App't-Int. Exelon Generation Co., LLC at 1, 5, *Luminant Energy Co., LLC v. Pub. Util. Comm'n of Tex.*, No. 03-21-00098 (Tex. App.—Austin June 2, 2021) (emphasis added); *accord id.* at 13–14, 16, 18, 20–21, 30. A copy of the brief is attached as Exhibit "C."

17.     Similarly, Norton Rose filed a brief on behalf of Pattern Energy (i) joining in and adopting the brief filed by Luminant and (ii) requesting that the "Court declare the PUC's price-increase rule invalid and ineffective [and] remand to the PUC to apply the valid pricing rules." Br. of Pattern Energy Group LP, et al. at 2, *Luminant Energy Co. LLC v. Pub. Util. Comm'n of Tex.*, No. 03-21-00098-CV (Tex. App.—Austin June 7, 2021).

18.     The PUCT's orders (and other governmental agencies) are addressed in Section 11(L) of the SFA between Brazos and ERCOT:

> *This Agreement is subject to applicable federal, state, and local* laws, ordinances, *rules, regulations, order of any Governmental Authority* and tariffs. Nothing in this Agreement may be construed as a waiver of any right to question or contest any federal, state and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff. ***In the event of a conflict between this Agreement and an applicable*** *federal,* **state***, and local* law, ordinance, *rule, regulation,* **order** *of an Governmental Authority* or tariff, ***the applicable*** *federal,* **state***, and local* law, ordinance, *rule, regulation,* **order** *of any Governmental Authority* or tariff ***shall prevail***, provided that Participant shall give notice to ERCOT of any such conflict affecting Participant. In the event of a conflict between ERCOT Protocols and this Agreement, the provisions expressly set forth in this Agreement shall control.

SFA § 11(L). (emphasis added).[6]

19.     The PUCT is a "Governmental Authority" as defined by the protocols, ERCOT Protocols § 2 (defining Governmental Authority as "[a]ny federal, state, local, or municipal body having jurisdiction over a Market Participant or ERCOT"), because it exercises "complete authority" over ERCOT. PURA § 39.151(d).

---

[6] A copy of the SFA is attached to ERCOT's Proof of Claim (Claim 115) and attached without exhibits as Exhibit "D."

20.     ERCOT complied with the PUCT's orders and "implement[ed] the pricing outcomes directed by the order by making an administrative adjustment" to ERCOT's pricing mechanisms "during all intervals in which ERCOT has directed firm Load shed." ERCOT, *Market Notice M-C021521-01 Legal* (Feb. 15, 2021).[7] ERCOT announced that the change would continue "until the [PUCT] directs otherwise." *Id.* As a result, the price of electricity was $9,000/MWh from approximately 10:15 p.m. on February 15[8] until 9:00 a.m. on February 19, when ERCOT exited EEA3. *See* ERCOT, *Market Notice M-C021521-05* (Feb. 19, 2021).[9]

**D.     Brazos asks this Court to grant it relief that falls squarely within the PUCT's purview.**

21.     ERCOT filed a proof of claim for the money Brazos owes ERCOT under the SFA and the protocols. ERCOT did so in its capacity as a clearinghouse: ERCOT needs the money Brazos owes because ERCOT owes money to the other market participants that produced the energy that was sold to Brazos during the winter storm. Brazos's request that this Court reduce the amount of ERCOT's claim on state-law grounds amounts to a collateral attack on the PUCT's pricing orders.

22.     Texas law has mechanisms to address the perceived deficiencies Brazos identifies in ERCOT's performance during the storm. If warranted, these fora could grant market-wide relief in a manner that accounts for that relief's potential effects on the market's and grid's stability.

---

[7] *Available at* http://www.ercot.com/services/comm/mkt_notices/archives/5196.

[8] *See* ERCOT, *Market Notice M-C021521-02* (Feb. 15, 2021), *available at* http://www.ercot.com/services/comm/mkt_notices/archives/5196.

[9] Available at http://www.ercot.com/services/comm/mkt_notices/archives/5228. While ERCOT authorized restoration of previously curtailed load on February 18, many customers remained without power and there was still a substantial amount of capacity offline; ERCOT thus notified the market that it would remain in EEA3 "through at least the morning peak period on Friday, February 19." ERCOT, *Market Notice M-C021521-04* (Feb. 19, 2021), *available at* http://www.ercot.com/services/comm/mkt_notices/archives/5225.

Believing that the PUCT's orders constitute a "competition rule" as defined by PURA, Luminant Energy filed a direct appeal in Texas's Third Court of Appeals in Austin. *See* Not. of Dir. Appeal, *Luminant Energy Co. LLC v. Pub. Util. Comm'n of Tex.*, No. 03-21-00098 (Tex. App.—Austin Mar. 2, 2021). Exelon—again, represented by Brazos's special counsel—intervened in that appeal, as have numerous other interested parties who would either benefit from or be harmed by a repricing of the market. *See id.* These parties include Pattern Energy, represented by Brazos's primary law firm, Norton Rose. The *Luminant* appellants ask that the Third Court invalidate the PUCT orders and remand to the PUCT to reprice the market using its specialized expertise.[10]

23.    In addition to intervening in Luminant's direct appeal, Brazos's special counsel filed, on behalf of Exelon, a pending state district-court appeal of the PUCT's pricing order pursuant to PURA. *See Exelon Generation Co. LLC v. Pub. Util. Comm'n of Tex.,* No. D-1-GN-21-001772 (53rd Dist. Ct., Travis County, Tex. Apr. 19, 2021).[11]   There, too, Brazos's special counsel acknowledges that the PUCT "at all times, retains the authority and the duty to oversee and review ERCOT's rules, which are referred to as 'protocols'"; that the PUCT "ignored this entire framework when [it] ordered ERCOT to immediately increase electricity prices to the maximum allowable rate"; that "ERCOT responded to the Commission's order by setting market prices at the HCAP of $9,000/MWh"; and that the PUCT's "orders devastated the market" causing "[t]he State's largest and oldest electric cooperative, Brazos Electric Power Cooperative, [to] file[] for bankruptcy." *See id.* at 5, 6, and 10. A copy of the Original Petition filed by Brazos's special counsel is attached as Exhibit "E."

---

[10] Although the PUCT claims that the Third Court lacks subject-matter jurisdiction, the PUCT alternatively seeks a judgment affirming the PUCT's orders.

[11] A similar challenge was filed in *RWE Renewables Americas LLC v. D'Andrea*, No. D-1-GN-21-001839 (201st Dist. Ct., Travis County, Tex. Apr. 21, 2021).

24.     If a market participant believes that ERCOT misapplied the PUCT's orders or otherwise erred in a manner that caused it to pay too much or receive too little, ERCOT's protocols and PURA provide a remedy. A market participant that receives an invoice it believes to be incorrect may dispute it, and ERCOT can, if appropriate, resettle those invoices. ERCOT Protocols §§ 6.3(7), 9.2.5(1). 9.5.6(1); *id.* §§ 9.14.2, 9.14.4, 9.5.5. If the market participant is dissatisfied, it may invoke ERCOT's alternative dispute resolution procedure. *Id.* § 20.1(1), 20.10.1. From there, a dissatisfied market participant may appeal to the PUCT. PURA § 39.151(d-4)(6); 16 TEX. ADMIN. CODE § 22.251. The PUCT has exclusive original jurisdiction over such disputes. PURA § 32.001(a); 16 TEX. ADMIN. CODE § 22.251(c). And the Attorney General opinion cited in the Complaint confirms the PUCT's authority. *See* Tex. Att'y Gen. Op. KP-0363 at 4 n. 8, 6, 8 ("[T]he Public Utility Commission has complete authority to act to ensure that ERCOT has accurately accounted for electricity production and delivery among market participants in the region," including by "order[ing] ERCOT to correct prices for wholesale electricity and ancillary services during a specific timeframe."); 16 TEX. ADMIN. CODE § 22.251(*o*). Finally, any PUCT ruling is exclusively appealable to the Texas district courts in Travis County. TEX. GOV'T CODE § 2001.176(b)(1); PURA §§ 11.007(a), 15.001.

### III.   LEGAL STANDARDS

#### A.   Standard for dismissal pursuant to FRCP 12(b)(6).

25.     "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id.* "Only a complaint

that states a plausible claim for relief survives a motion to dismiss." *Cirillo v. Valley Baptist Health Sys. (In re Cirillo)*, Nos. 09-10324, 13-01002, 2014 Bankr. LEXIS 1353, at *22 (Bankr. S.D. Tex. Apr. 3, 2014) (citing *Twombly*, 550 U.S. at 556). While detailed factual allegations are not required, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Naked assertions devoid of further factual enhancement" that are "merely consistent with a defendant's liability" are not sufficient to survive a motion to dismiss. *Shipley Garcia Enters., LLC v. Harley-Davidson Motor Co. (In re Shipley Garcia Enters. LLC)*, Nos. 11-20016, 13-02012, 2014 Bankr. LEXIS 1296, at *15 (Bankr. S.D. Tex. Mar. 28, 2014) (quoting *Twombly*, 550 U.S. at 557). Moreover, a plaintiff's conclusory allegations are "not entitled to the assumption of truth," and therefore a court may look past such conclusory allegations in order to examine the pleaded facts and determine their adequacy. *Id.* (quoting *Iqbal*, 556 U.S. at 678-79).

26.     In assessing a motion to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 251 (5th Cir. 2009); *see Norris v. Hearst Tr.*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007) (stating "it is clearly proper in deciding a 12(b)(6) motion, to take judicial notice of matters of public record").

27.     If a plaintiff mentions a document in its complaint and the document is central to its claim, it is considered part of the pleadings. *Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Lit.)*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). "Although the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claim, the case law suggests that

documents are central when they are necessary to establish an element of one of the plaintiff's claims." *Doyle v. Nationstar Mortg., LLC,* No. H-20-3633, 2021 U.S. Dist. LEXIS 112681, at *5 (S.D. Tex. June 16, 2021) (quoting *Kaye v. Lone Star Fund v. (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011)).

**B.    *Burford* Abstention.**

> [A] federal court must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the case at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (*NOPSI*) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)); *see Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

28.    *Burford* applies in all federal courts, *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730 (1996)—including, necessarily, bankruptcy courts. *E.g.*, *In re N.Y.C. Off-Track Betting Corp.*, 434 B.R. 131, 154 (Bankr. S.D.N.Y. 2010) (abstaining on *Burford* grounds).[12] Indeed, contrary to a district court's "virtually unflagging obligation" to exercise jurisdiction, *Colorado River*, 424 U.S. at 817—to which *Burford* is a narrow exception—Congress requires abstention to "play a far more significant role" in bankruptcy courts than it does in district courts, *In re Republic Reader's Serv., Inc.*, 81 B.R. 422, 425 (Bankr. S.D. Tex. 1987).

---

[12] *Accord Koken v. Reliance Grp. Holdings, Inc. (In re Reliance Grp. Holdings, Inc.)*, 273 B.R. 374, 401 (Bankr. E.D. Pa 2002); *In re Internationale Resort & Beach Club*, 36 B.R. 189, 194 (Bankr. D.S.C. 1983); *see also N.O.T.I.C.E. v. Cloverly Assocs. Ltd. P'ship*, Bankruptcy No. 91-12922S Chapter 11, Adversary No. 93-01095, 1993 Bankr. LEXIS 405 (Bankr. E.D. Pa. Mar. 3, 1993) (noting "that the considerations on which we deem abstention appropriate [under§ 1334(c)(1)] are very similar to the traditional considerations for abstention set forth in *Burford*").

29.    28 U.S.C. 1334(c)(1) incorporates judicial abstention doctrines, such as *Burford*, as a basis for bankruptcy court abstention, and the analysis of the application of Section 1334(c)(1) "encompasses the bases for all the judicially created abstention doctrines." *Eastport Assocs. v. City of L.A. (In re Eastport Assocs.)*, 935 F.2d 1071, 1079 n.7 (9th Cir. 1991); *see In re Wright*, 231 B.R. 597, 600 (Bankr. W.D. Tex. 1999) (observing that § 1334(c)(1) "imports the judicially-created doctrine of federal court abstention," including *Burford*, into "bankruptcy matters").[13]

30.    Pursuant to 28 U.S.C. § 1334(c)(1), bankruptcy courts have "broad power to abstain whenever appropriate 'in the interest of justice, or in the interest of comity with State courts or respect for State law.'" *Wood v. Wood*, 825 F.2d 90, 93 (5th Cir. 1987) (quoting 28 U.S.C. § 1334(c)(1)). "The abstention provisions of [Section 1334] demonstrate the intent of Congress that concerns of comity and judicial convenience should be met, not by rigid limitations on the jurisdiction of federal courts, but by the discretionary exercise of abstention when appropriate in a particular case." *Id.* (citing *In re Salem Mortgage Co.*, 783 F.2d 626, 635 (6th Cir.1986)).

31.    This policy counteracts the vast sweep of § 1334(b) by keeping out of "federal court matters which should be left to state courts to decide." *Hous. Baseball Partners LLC v. Comcast Corp. (In re Hous. Reg'l Sports Network, L.P.)*, 514 B.R. 211, 218 (Bankr. S.D. Tex. 2014) (citing *Wood*, 825 F.2d at 93); *Republic Reader's*, 81 B.R. at 425 (observing that § 1334(c) "reflect[s] a clear expansion of the abstention doctrine within the realm of bankruptcy").

---

[13] *See Brown v. Shepherd (In re Lorax Corp.)*, Nos. 02-48396-DML-11, 03-4128, 2004 Bankr. LEXIS 598, at *29 (Bankr. N.D. Tex. 2004) ("In determining whether permissive abstention is appropriate, courts refer to 'principles developed under the judicial abstention doctrines.'") (quoting *In re Pan American Corp.*, 950 F.2d 839, 846 (2d Cir. 1991)); *see also In re Pan American Corp.*, 950 F.2d at 846 ("Therefore, section 1334(c) 'summarizes and incorporates federal non-bankruptcy abstention doctrines.'") (quoting *General Am. Comms. Corp. v. Landsell (In re General Am. Comms. Corp.)*, 130 Bankr. 136, 146 (S.D.N.Y. 1991)).

32.     In *Burford*, the plaintiff's federal suit "attacked the validity of an order of the Texas Railroad Commission granting the petitioner Burford a permit to drill" oil wells. *Burford*, 319 U.S. at 316–17. That order was "part of the general regulatory system devised for the conservation of oil and gas in Texas"—in other words, it was issued in furtherance of a pervasive state regulatory scheme. *Id.* at 318. Moreover, the Court observed, "each oil and gas field must be regulated as a unit for conservation purposes," and it was the states to which that "principal regulatory responsibility" had been allocated. *Id.* at 319. In Texas, the Railroad Commission ("RRC") had been "vested with 'broad discretion' in administering the law" regarding oil and gas production and conservation. *Id.* at 320. Critically, the "standards applied by the Commission in a given case necessarily affect the entire state conservation system," which is "of vital interest to the general public." *Id.* at 324. In light of the systemic importance of the RRC's functions, Texas "established a system of thorough judicial review by its own state courts," which permitted appeal "to a state district court in Travis County," and from there to the state court of appeals and Supreme Court. *Id.* at 325; *accord id.* at 326 ("To prevent the confusion of multiple review of the same general issues, the legislature provided for concentration of all direct review of the Commission's orders in the state district courts of Travis County.").

33.     Based on these circumstances, the Supreme Court required the district court to abstain from hearing the collateral attack on the RRC's order. The Court held that "questions of regulation of the industry by the state administrative agency . . . so clearly involves basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them." *Id.* at 332. "[A] sound respect for the independence of state action requires the federal equity court to stay its hand." *Id.* at 334. Otherwise, "[d]elay, misunderstanding

15

of local law, and needless federal conflict with the state policy" would be "the inevitable product

of this double system of review." *Id.* at 327.

**C.      Standard for dismissal pursuant to Rule 12(b)(7).**

34.      An indispensable party under Rule 12(b)(7) is one whose presence in the lawsuit is

required for the fair and complete resolution of the dispute. *HS Res., Inc. v. Wingate*, 327 F.3d 432,

438 (5th Cir. 2003). In resolving a Rule 12(b)(7) motion to dismiss, the Court must first determine

under Rule 19 whether a person should be joined to the lawsuit.

A party is required to be joined if:

> (A) in that person's absence, the court cannot accord complete relief among
> existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is
> so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to
>> protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring
>> double, multiple, or otherwise inconsistent obligations because of
>> the interest.

FED R. CIV. P. 19(a)(1).

35.      Once the moving party has met its "initial burden of demonstrating that a missing

party is necessary, after 'an initial appraisal of the facts indicates that a possibly necessary party is

absent, the burden of disputing this initial appraisal falls on the party who opposes joinder.'" *Nat'l*

*Cas. Co. v. Gonzalez*, 637 F. App'x 812, 814-15 (5th Cir. 2016) (quoting *Pulitzer-Polster v.*

*Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986)).

36.      "If joinder is warranted, then the person will be brought into the lawsuit. But if such

joinder would destroy the court's jurisdiction, then the court must determine under Rule 19(b)

whether to press forward without the person or to dismiss the litigation." *H.S. Res.,* 327 F.3d at 439.

37.    When joinder is not feasible, the Court may examine factors under Rule 19(b) including: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder. These factors "are not to be applied mechanically nor are they to be used to override compelling substantive interests." *Schutten v. Shell Oil Co.*, 421 F.2d 869, 873 (5th Cir. 1970).

## IV.    ARGUMENT AND AUTHORITIES

**A.    Brazos's contract claims should be dismissed, because they fail to state plausible claims for relief under the SFA.**

**1.    Count 1 should be dismissed, because it is contrary to the terms of the SFA.**

38.    Brazos alleges that ERCOT breached the SFA and protocols in pricing electricity during the winter storm. *See* Complaint at 24-25. But Brazos's claims ignore the PUCT's orders and their express incorporation into Brazos's SFA.

39.    The SFA (which obligates ERCOT and Brazos to comply with the protocols) is "subject to" PUCT "rules, regulations, and orders," which "shall prevail" over any conflicting provision of the SFA. SFA § 11(L); *see Cockrell v. Tex. Gulf Sulphur Co.*, 299 S.W.2d 672, 676 (Tex. 1956) (holding that "the inclusion of the 'subject to' clause in" a contract "incorporate[s]" into the contract the writing to which the contract is made subject). Thus, ERCOT's compliance with the PUCT's orders was not only required but also entirely consistent with ERCOT's contractual duties to Brazos.

40.     The PUCT "determined that adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market." PUCT 2/15/21 Order at 1. The PUCT thus "direct[ed] ERCOT to ensure that firm load is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." *Id.* ERCOT had no choice but to follow the PUCT's orders. The PUCT has "complete authority" over ERCOT's operations, with which authority ERCOT "shall fully cooperate" or face disciplinary action by the PUCT. PURA §§ 39.151(d); 39.151(d-4)(5) (authorizing the PUCT to "assess administrative penalties against [ERCOT]" if ERCOT "violates . . . a rule or order adopted by the [PUCT]").

41.     Brazos fails to state a claim that the ERCOT invoices conflict with the SFA. ERCOT complied with the protocols and binding PUCT orders that, according to the SFA, controlled. Brazos fails to allege otherwise. Because Brazos's claim fails to consider (or even mention) the PUCT orders or the conflicts provision of the SFA, at least Count 1 fails to state a plausible claim for breach of contract. It should therefore be dismissed. *See Montco Oilfield Contrs., LLC v. Black Elk Energy Offshore Operations, LLC (In re Montco Offshore, Inc.)*, 595 B.R. 524, 545 (S.D. Tex. Bankr. 2018) (dismissing claims for failure to state a plausible breach of contract claim).

**2.     Count 3 should be dismissed, because it contradicts the SFA's provisions requiring payment even when a Force Majeure Event occurs.**

42.     ERCOT seeks payment for unpaid amounts owed by Brazos. *See* Complaint at 11, ¶ 43; *see also* ERCOT Proof of Claim (Claim 115) at 29 (listing outstanding invoices). Brazos acknowledges that it has not paid these amounts. But Count 3 of Brazos's Complaint seeks relief inconsistent with the terms of the SFA and thus fails to state a claim for relief.

43.     Section 8 of the SFA, entitled "Default," discusses breaches and defaults as well as force majeure. Section 8(A)(1) makes clear that Brazos's failure to timely pay is a material breach:

> *Failure by Participant to (i) pay when due, any payment* or Financial Security obligation owed to ERCOT or its designee, if applicable, under the agreement with ERCOT ("Payment Breach"), or (ii) designate/maintain an association with a QSE (if required by the ERCOT Protocols) ("QSE Affiliation Breach"), *shall constitute a material breach and event of default ("Default")* unless cured within one (1) Bank Business Day after ERCOT delivers written notice of the breach to Participant. *Provided further that if such a material breach*, regardless of whether the breaching Party cures the breach within the allotted time after notice of the material breach, *occurs more than three (3) times in a 12-month period, the fourth such breach shall constitute a Default.*

SFA § 8(A)(1) (emphasis added). Plainly, Brazos's "Payment Breach" is a material breach and event of default. *Id.* Indeed, any material failure to comply with the ERCOT Protocols as well as filing a petition for Bankruptcy also constitute events of Default. *Id.* at § 8(A)(2), (3).

44.     Count 3 of Brazos's Complaint quotes section 8(A)(5) which states:

> If, due to a Force Majeure Event, a Party is in breach with respect to any obligation hereunder, such breach shall not result in a Default by that Party.

*Id.* at § 8(A)(5). Brazos then tries to claim that pursuant to its "Force Majeure Notice," Brazos was not in default prior to the petition date. *See* Complaint at 26, ¶ 138

45.     Brazos's reliance on its notice of an alleged Force Majeure Event cannot excuse Brazos's undisputed failure to pay. The force majeure provision (even if applicable, which ERCOT disputes) requires payment: "Notwithstanding the foregoing, **a Force Majeure Event does not relieve a Party affected by a Force Majeure Event of its obligation to make payments** or of any consequences of  non-performance . . . ." SFA § 8(C)(2) (emphasis added). Thus, Brazos's attempt to avoid payment of ERCOT's claim based on force majeure is negated by the terms of

the SFA and fails to state a plausible claim for relief. Count 3 should be dismissed.[14]  *See Montco Oilfield*, 595 B.R. at 545.

**B.     *Burford* requires that this Court abstain from deciding Brazos's pricing claims.**

46.     Brazos's pricing claims arise from and implicate unsettled questions of Texas law, and this Court's resolution of Brazos's claims would undermine Texas's need for coherent electric-regulatory law by stepping on the toes of the state's specially-chosen fora for judicial review.

47.     To understand why abstention is appropriate, it is first necessary to understand the true nature of Brazos's pricing claims. First, Brazos argues that ERCOT violated the SFA and its protocols by charging, pursuant to the PUCT's orders, $9,000/MWh for energy from February 15 until February 19. *See* Complaint ¶¶ 58–64. According to Brazos, ERCOT "breached the SFA by failing to abide by the ERCOT protocols." *Id.* ¶ 66. Brazos claims it is only liable to ERCOT for what the price of energy would have been had ERCOT not made these changes to its pricing methodology because "[o]nly the SFA and the ERCOT protocols in effect during the Winter Storm Uri establish the amount [Brazos] owes to ERCOT for energy during the winter storm." *Id.*

48.     As Brazos has previously acknowledged, ECF No. 930 ¶¶ 15, 33–36, 40–48, 51, *the PUCT* fixed the price of energy at $9,000/MWh and ordered ERCOT to charge it. PUCT 2/15/21 Order; PUCT 2/16/21 Order. Brazos's claim that ERCOT erred in changing its pricing methodology and in pegging the price of electricity during the storm is, therefore, a collateral attack on the PUCT's orders.

---

[14] ¶ 138 also alleges "to the extent that the ERCOT Claim asserts any amounts resulting from the Debtor's alleged default under the SFA, such as amounts based on the default uplift process, among others, those amounts should be disallowed in their entirety." This allegation also contradicts SFA § 8(C)(2) which states that a Force Majeure Event does not relieve Brazos of its obligation to make payments.

49.     Second, Brazos challenges ERCOT's *application of* the PUCT's orders. Brazos alleges that even if ERCOT properly complied with the PUCT's orders during mandatory load shedding,[15] it "could and should have allowed prices to fall below $9,000/MWh once ERCOT ceased shedding firm load" at midnight on February 18. Complaint ¶¶ 79–82. In other words, Brazos argues that ERCOT violated or misinterpreted the PUCT's orders by continuing to peg prices at the offer cap after the PUCT's alleged trigger for that pricing ceased. Brazos ignores, however, that ERCOT did not exit EEA3 until 9:00 a.m. on February 19, at which point it ceased the pricing intervention required by the PUCT orders. *See supra* note 9.

50.     Finally, Brazos alleges that ERCOT failed to mitigate its damages because it did not reprice the market after the storm and did not invoke the Reliability Unit Commitment ("RUC") process. Complaint ¶¶ 74–92. This claim depends, again, on Brazos's collateral attack on the PUCT's orders and its claim that ERCOT failed to properly interpret and comply with the orders. ERCOT had no discretion to reprice the market in contravention of the PUCT's orders. Likewise, whether ERCOT should have repriced the market with respect to the 33 hours after mandatory load shedding ceased depends on whether the PUCT's orders required or permitted ERCOT to continue scarcity pricing until it exited EEA3. *See also* ERCOT Protocols §§ 6.5.1.1(e), 6.5.9.1(2) (broadly granting ERCOT power to take emergency action to protect the grid).

51.     More broadly, whether ERCOT was empowered and obligated to retroactively reprice the market, and whether it could and should have used the RUC process, depend on interpretations of PURA, the ERCOT protocols issued under PURA, and the SFA. These questions

---

[15] The Complaint does not put it in these terms, but in its original objection, Brazos alleged that "*in order to comply with the PUCT Order*, the pricing intervention" should have ended when load shedding ceased. ECF No. 930 ¶ 51 (emphasis added; internal quotation marks omitted).

arise under Texas's comprehensive regulatory scheme governing electric utilities and relate to whether ERCOT complied with its statutory duties in handling the winter storm—a question the Legislature committed to the PUCT's "complete authority."

52.     The Fifth Circuit has recognized five factors that a court should weigh when considering *Burford* abstention: (1) "whether the cause of action arises under federal law or state law"; (2) "whether the case requires inquiry into unsettled issues of state law, or into local facts"; (3) "the importance of the state interest involved"; (4) "the state's need for a coherent policy in that area"; and (5) "the presence of a special state forum for judicial review." *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993). An analysis of these factors shows that this case resembles *Burford* to a remarkable degree.

### 1.     Brazos's causes of action arise under state law.

53.     Application of this factor depends not "on whether the plaintiff's cause of action is alleged under federal or state law," but "on whether the plaintiff's claim may be 'in any way entangled in a skein of state law that must be untangled before the federal case can proceed.'" *Sierra Club v. City of San Antonio*, 112 F.3d 789, 795 (5th Cir. 1997) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727 (1996)). Thus, even if a plaintiff's claim is "framed" as arising under federal law, abstention may be appropriate if "the underlying issues presented are purely state law issues." *Koerner v. Garden Dist. Ass'n*, 78 F. App'x 960, 963 (5th Cir. 2003); *see In re Republic Reader's Serv., Inc.*, 81 B.R. 422, 427 (Bankr. S.D. Tex. 1986) ("Often a proceeding, cast in the language of a core proceeding, merely shrouds state law actions under the guise of a bankruptcy issue."). Here, abstention is appropriate because—while framed as federal issues—Brazos's pricing claims arise exclusively out of state law, including a "comprehensive" regulatory scheme. PURA § 31.001(a).

**2.      This proceeding requires inquiry into unsettled issues of state law.**

54.      To resolve Brazos's pricing claims, this case would have to go through Texas's regulatory scheme and assess the interrelated set of statutes, PUCT rules, ERCOT Protocols, and SFA terms; and it would have to determine the validity of a PUCT order in an unsettled area of state law. These are all novel issues under Texas law. Moreover, in assessing whether ERCOT performed adequately and complied with its statutory, regulatory, and contractual obligations, this Court would have to assess what are complex policy, rather than legal, questions about ERCOT's actions to protect the grid and ensure reliability of electricity to Texas consumers.

**3.      Utility regulation is an important state interest.**

55.      The Fifth Circuit has acknowledged, in the *Burford* context, that "utility regulation 'is one of the most important of the functions traditionally associated with the police power of the States,'" while "federal courts have little interest in hearing" such matters. *Wilson*, 8 F.3d at 315 (quoting *NOPSI*, 491 U.S. at 365). "Nor does the Bankruptcy Code represent a supervening federal interest." *Wilson,* 8 F.3d at 315. Thus, the electric-regulatory questions presented by Brazos's Complaint are uniquely within the State's purview. *See also* PURA § 31.001(a) (establishing a "comprehensive and adequate regulatory system for electric utilities").

**4.      Texas needs a coherent policy regarding its electricity grid and market.**

56.      In explaining Texas's need for coherent policy in *Burford*, the Supreme Court paid special attention to the special characteristics of oil and gas fields, which are not only usually intrastate but "must be regulated as a unit" because the actions of each operator in the field affect all of the other operators. 319 U.S. at 319–20. Similarly, in *Sierra Club*, the Fifth Circuit explained Texas's need for a coherent policy regarding water rights in the Edwards Aquifer by pointing to

the "need for unified management and decision-making" because "allowing one party to take water necessarily affects other parties." 112 F.3d at 794–95.

57.    This same reasoning applies here. Texas operates a wholly intrastate electricity grid and market, which are overseen by ERCOT. The Fifth Circuit has recognized that the need for a coherent state policy favors abstention when it would "avoid recurring and confusing federal intervention in an ongoing state scheme." *Wilson*, 8 F.3d at 315.

**5.    Texas has established special state fora for judicial review.**

58.    In *Burford*, the Supreme Court found it significant that, "[t]o prevent the confusion of multiple review of the same general issues," the Texas Legislature had "provided for concentration of all direct review of the [Railroad] Commission's orders in the state district courts of Travis County." 319 U.S. at 326. Similarly, in *Wilson*, the Fifth Circuit pointed to a state constitutional provision "centraliz[ing] appeals in the state district court in the state capital." 8 F.3d at 316. The same is true here.

59.    Depending on whether the PUCT's orders are considered an order or a "competition rule," any challenge to the order must be filed in either the state district court in Travis County or the Third Court of Appeals based in Austin. *See* Tex. Gov't Code § 2001.176(b)(1); PURA §§ 11.007(a), 15.001 (together, permitting judicial review of PUCT orders in Travis County district court); *see also* PURA § 39.001(e) (providing that a "competition rule" must be challenged directly in the Third Court of Appeals). The Legislature provided the forum in which an attack on a PUCT order or competition rule should be heard, and challenges identical to Brazos's are already pending in those venues. This Court should, accordingly, abstain from hearing Brazos's collateral attack. Furthermore, the PUCT is specifically empowered to "resolve disputes between an affected person and [ERCOT]." *Id.* § 39.151(d-4)(6); *see id.* § 11.003(1)(A) (defining "affected person" to

include an "electric cooperative affected by an action of a regulatory authority"). This factor also strongly favors abstention.

60.     *Burford* and Supreme Court precedent regarding judicial abstention compel this Court to abstain from hearing Brazos's attacks on the PUCT's orders and Texas's regulation of electricity. *See also In re Republic Reader's Serv., Inc.*, 81 B.R. 422, 429 (Bankr. S.D. Tex. 1986) ("[I]f a proof of claim had been filed against the estate, I would not be reluctant to, in essence, bifurcate the action with liability and damages to be determined in a nonbankruptcy forum and status and enforcement to be left to this court."); *see also Eubanks v. Esenjay Petroleum Corp.*, 152 B.R. 459, 466 (E.D. La. 1993) (staying adversary proceeding on abstention grounds until Texas state court can decide matters arising under state law).

**C.     Brazos's Complaint should be dismissed because the relief sought requires eschewing the PUCT's Orders, and full and consistent relief cannot be granted without the PUCT's joinder to this proceeding.**

61.     The PUCT is an indispensable party to Brazos's claims relating to electricity prices during Winter Storm Uri. While Brazos avoids specifically referencing the PUCT orders in its Complaint, Brazos repeatedly refers to the perceived impropriety of the $9,000/MWh price. *See, e.g.,* Complaint ¶¶ 62, 63, 65, & 67. In fact, Brazos references the system-wide cap amount of $9,000/MWh required by the scarcity conditions and the PUCT orders no less than 25 times in its Complaint. *See also* 16 TEX. ADMIN. CODE § 25.505(g) ("Scarcity pricing mechanism (SPM).") ERCOT will administer the SPM. The SPM will operate as follows: . . . (6) System-Wide Offer Caps. . . . (B) The high system-wide offer cap (HCAP) will be $9,000 per MWh and $9,000 per MW per hour."). But the relief requested by Brazos—determining the validity or applicability of the PUCT orders and then repricing the $9,000/MWh rate—implicates the PUCT and its role in regulating Texas electric utilities.

25

62.     The PUCT's purpose is to "establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." PURA § 31.001(a). The Texas Supreme Court has stated that "the statutory description of PURA as 'comprehensive' demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations involving electric utilities operating in Texas." *In re Entergy Corp.,* 142 S.W.3d at 323. Requests to revise or correct rates charged by ERCOT which are not settled between the market participant and ERCOT must be appealed to the PUCT, and the PUCT has exclusive jurisdiction over such disputes and may issue an order granting the relief it deems appropriate. 16 TEX. ADMIN. CODE § 22.251(b); PURA § 32.001(a). Thus, Brazos's claims requesting this Court overturn or reprice the rates charged during Winter Storm Uri are a direct challenge to the PUCT's authority under PURA.

63.     As discussed above, Texas law provides that ERCOT is "*directly responsible and accountable*" to the PUCT, and the PUCT has "*complete authority*" over ERCOT's "operations as necessary to ensure . . . [ERCOT] adequately performs" its "functions and duties." *See supra* at ¶¶ 4-8 (citing PURA).

64.     The PUCT's orders required ERCOT to set the price for electricity at $9,000/MWh consistent with the scarcity conditions during Winter Storm Uri. ERCOT had no discretion in deciding the prices charged pursuant to the PUCT orders, and Brazos's challenges to the enforcement of those prices are challenges to the PUCT's authority and actions, including the PUCT orders.

     **1.    The PUCT is an indispensable party under Rule 19(a).**

65.     Federal Rule of Civil Procedure 19(a)(1)(B) provides that a person is necessary to be joined if either the absence of the person will impair that person's ability to protect its interest

26

relating to the subject matter of the action or that person's absence will leave an existing party

subject to a substantial risk of incurring "multiple, or otherwise inconsistent obligations." Both

prongs are satisfied in this matter.

### i. First prong: the PUCT's interest.

66.     A party is necessary if the judgment would "effectively preclude [the nonparty]

from enforcing its rights" and its rights would be "injuriously affected." *See HS Res.,* 327 F.3d at

439 (citing *Hilton v. Atlantic Refining Co.*, 327 F.2d 217, 219 (5th Cir. 1964)). Stated another way,

a party is necessary if "the party faces prejudice through a disposition in its absence." *Texas v.

Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 U.S. Dist. LEXIS 223055, at *17 (W.D.

Tex. Aug. 27, 2018). Here, a ruling regarding the rates charged to Brazos would affect the PUCT's

ability and authority to carry out the regulatory scheme established by PURA. Not only would it

impair the PUCT's rights in this proceeding, but it potentially would also affect other pending

actions regarding the PUCT orders. *See supra* at ¶¶ 16-17, 22-23 (discussing actions brought by

market participants).

67.     These pending state court actions demonstrate the indispensability of the PUCT and

that the PUCT has an interest in the fundamentally similar claims and requests for relief Brazos

asserts in this matter. Furthermore, the Fifth Circuit has held that "the establishment of a negative

precedent can provide the requisite prejudice to the absentee." *Pulitzer-Polster*, 784 F.2d at 1310.

Thus, a negative ruling in this court regarding the enforceability of the PUCT orders and the rates

charged during Winter Storm Uri would constitute prejudice to the PUCT and ERCOT.

68.     Finally, the comments from counsel for the Official Committee of Unsecured

Creditors (the "Committee") during the August 2, 2021 Status Conference before this Court

confirm that the Committee agrees that the PUCT is a necessary and indispensable party to this

proceeding. In discussing the need for discovery from the PUCT, the Committee stated it needed to obtain the discovery because "[w]e need to understand how and why ERCOT and the PUC decided to raise energy prices."[16]  Counsel for the Committee further stated that ERCOT's claim filed in this bankruptcy is "indisputably related to the PUC's order to raise the [rate] to $9,000 per megawatt hour during Uri."[17]   In probably its most transparent comment, counsel for the Committee stated:

> And we acknowledge that the PUC is not the Debtor. We acknowledge that the PUC is not a creditor. But let's not fool ourselves. They are the wizard behind the curtain here. They are a significant part of this case. They are the ones who directed ERCOT to raise the price, the $9,000 per megawatt hour. They're not some bystander; they're a very, very important participant here.[18]

Thus, Brazos and the Committee recognize that the PUCT and its actions are inextricably intertwined with this proceeding. The PUCT's actions and the PUCT's statutory authority to comprehensively regulate the Texas energy system dictate that it is an indispensable party to this proceeding.

### ii.    Second prong: ERCOT's risk.

69.    The second prong is satisfied because ERCOT will be exposed to multiple or inconsistent obligations related to the rates it set and must collect resulting from Winter Storm Uri, and its statutorily-mandated task of carrying out the PUCT's requirements and exercising the authority which the PUCT delegates to ERCOT. As explained above, ERCOT does not have discretion to disobey PUCT orders, and the PUCT can fine or even decertify ERCOT. PURA § 39.151(d). A ruling by this Court to alter the prices set by ERCOT pursuant to the PUCT orders

---

[16] August 2, 2021 Hearing Transcript [ECF No. 981] at 10:17-18.

[17] *Id.* at 33:17-21.

[18] *Id.* at 48:3-9.

would require ERCOT to act in contravention to the PUCT. But this Court's ruling cannot be controlling over the PUCT. As such, ERCOT will face obligations stemming from the Court's judgment and the PUCT orders.

70.     ERCOT will also be subject to inconsistent obligations in connection with its role as the clearinghouse for all wholesale energy transactions in the ERCOT market. ERCOT is the "central counterparty for all transactions settled by ERCOT," and it "is deemed to be the sole buyer to each seller, and the sole seller to each buyer, of all energy." ERCOT Protocols § 1.2(4).

71.     This Court neither has jurisdiction over the PUCT nor the ERCOT market participants that are not parties to this proceeding. This Court cannot, therefore, reprice the ERCOT market. It could, at most, declare that Brazos owes less than is stated on its unpaid invoices. But such judgment would nevertheless have far-ranging effects on hundreds of parties not before this Court. If Brazos pays less than it owes pursuant to ERCOT's invoices, the protocols require ERCOT to uplift the amount of that reduction to the rest of the ERCOT market.

72.     Other federal courts have required joinder of state public services commissions and federal agencies. In *Kalinsky v. Long Island Lighting Co.*, 484 F. Supp. 176, 177 (E.D.N.Y. 1980), the plaintiff was an individual customer who purchased a household electrical space heating unit from his energy service provider, Long Island Lighting Company ("LILC"). Not long after the plaintiff purchased the unit, the Public Service Commission of the State of New York ("PSC") passed a rate order requiring increases in pricing for "peak-load pricing," which resulted in LICL being required to charge plaintiff higher energy rates. *Id.* at 177. Plaintiff refused to pay the higher rates and filed suit in federal court requesting a declaratory judgment that the PSC order is not applicable to him or that he be exempted from the rate increase. *Id.* The LILC filed a motion to dismiss citing Rule 19 as one of the bases for dismissal. *Id.* at 178. In making its determination,

the court noted that LILC had discretion in setting the rate or authority to act contrary to the PSC order, it could not exempt the plaintiff from the peak-load pricing order unless the PSC modified its order. *Id.* at 180. Thus, the court ruled that the PSC was a necessary party under Rule 19, and the action could not proceed unless the PSC was joined. *Id.*; *see Associated Gen. Contractors, Inc., etc. v. Laborers Int'l Union*, 476 F.2d 1388, 1407 (Temp. Emer. Ct. App. 1973) (holding that "no order of an economic stabilization program agency should be mandated or subjected to invalidation in any judicial proceedings unless that agency has been made party to such proceedings"). Because ERCOT is mandated to follow the PUCT orders setting rates, just as LILC was in *Kalinsky*, any ruling on the enforceability of the PUCT-mandated rates charged by ERCOT to Brazos requires the PUCT as a party.

73.    The PUCT is a necessary party, because the Court cannot provide complete relief among all existing parties. ERCOT can only exercise the authority delegated to it by the PUCT, and it cannot act in contravention of the PUCT's direction. Furthermore, ERCOT does not have the authority to retroactively change the rates set during Winter Storm Uri.

**2.     Brazos's claims regarding the prices set during Winter Storm Uri should be dismissed pursuant to Rule 19(b).**

74.    Once a person is established as an indispensable party under Rule 19(a), the analysis shifts to whether joinder will be feasible. If joinder is not feasible, the court should determine whether the action should be dismissed pursuant to Rule 19(b). In this case, joinder of the PUCT is not feasible because the PUCT has sovereign immunity pursuant to the Eleventh Amendment. *See AT&T Communs. v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 650-51 (5th Cir. 2001) (holding that the Eleventh Amendment covers "all federal causes of action arising out of Congress's Article 1 powers—thereby barring suit . . . against a State commission").

75.     Courts routinely hold that when an indispensable party is immune from suit in federal court, this factor is sufficient to require dismissal on its own, regardless of the four factors listed in Rule 19(b). *See, e.g., Enter. Mgmt. Consultants, Inc. v. United States*, 883 F.2d 890, 894 (10th Cir. 1989) ("When, as here, a necessary party under Rule 19(a) is immune from suit, 'there is very little room for balancing of other factors' set out in Rule 19(b), because immunity ''may be viewed as one of those interests "compelling by themselves."'") (quoting *Wichita & Affiliated Tribes v. Hodel*, 788 F.2d 765, 777 n.13 (1986)).

76.     Even if the Court chooses to analyze the factors listed in Rule 19(b), these factors support dismissal of any claim regarding the PUCT's orders: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

77.     Courts have held the first factor is "essentially the same as the inquiry under Rule 19(a)." *See Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) (stating prejudice analysis in FRCP 19(b) "stems from the same legal interests" as the necessary party analysis in FRCP 19(a)); *Enter. Mgmt. Consultants,* 883 F.2d at 894 n.4 (stating prejudice inquiry under FRCP 19(b) "is essentially the same as the inquiry under Rule 19(a)(2)(i) into whether continuing the action without a person will, as a practical matter, impair that person's ability to protect his interest")). As explained above, the absence of the PUCT will prejudice ERCOT by exposing it to inconsistent obligations to both the PUCT and energy providers and requiring ERCOT to take actions which are beyond its statutory authority. *See Kalinsky*, 484 F. Supp. at 180 (stating disposition of an action ruling on an agency order would

31

"most certainly impair or impede the PSC's interest and would make [Defendant] subject to inconsistent obligations").

78.     Furthermore, a negative ruling in this case would prejudice ERCOT and the PUCT in the ongoing state-court lawsuits and PUCT administrative proceedings. *See Pulitzer-Polster, 784 F.2d at 1310.* Any judgment which reforms the rates charged to Brazos during Winter Storm Uri could call into question the applicability and enforceability of the PUCT orders, and the PUCT would be prejudiced by not being able to protect its interest.

79.     Under the second factor, there is no method by which a judgment rendered without the PUCT can lessen the prejudice or inconsistent obligations levied on ERCOT. Additionally, the rates during Winter Storm Uri were set pursuant to the PUCT orders, which applied across the entire market.

80.     The third factor encompasses "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Caytrans Project Servs. Ams., Ltd. v. BBC Chartering & Logistics GmbH & Co. KG*, No. 20-50449, 2021 U.S. App. LEXIS 18051, at *17 (5th Cir. June 17, 2021). Courts favor a forum where the dispute can be adjudicated "in whole by joining all parties," especially early in the litigation. *JPMorgan Chase Bank, N.A. v. Sharon Peters Real Estate, Inc*, Civil Action No. 5:12-cv-1172-XR, 2013 U.S. Dist. LEXIS 98174, at *13 (W.D. Tex. July 15, 2013). Here, the controversies making up the subject matter of this action cannot be completely resolved; any judgment which does not include the PUCT will leave open the question of the controversy's finality as to the Texas wholesale power market.

81.     The fourth factor is satisfied because Brazos has an adequate remedy by pursuing its claims regarding the enforceability of the rates set during Uri by filing in a state forum pursuant to the Texas statutory framework already established for challenging rate orders and rates charged.

Courts have held that state court constitutes an adequate forum under this analysis. *See, e.g.*, *Pulitzer-Polster*, 784 F.2d at 1313 (holding state forum where "[a]ll the parties and witnesses will be available" constituted adequate relief); *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 706–707 (3d Cir. 1996) (holding state forum constituted adequate relief under FRCP 19(b) analysis); *Oncor Elec. Delivery Co. LLC v. Chaparral Energy, LLC*, 546 S.W.3d 133, 141 (Tex. 2018) ("In light of section 32.001(a)'s express language and the comprehensive regulatory scheme PURA creates, we conclude that PURA grants the PUC exclusive jurisdiction over all matters involving an electric utility's rates, operations, and services."). Thus, all four factors support the dismissal of Brazos's claims regarding the rate pricing.

## V.     CONCLUSION

Defendant ERCOT respectfully requests this Court enter the Order attached as Exhibit "F" granting the relief sought herein and thus: (1) dismissing Counts 1 and 3 for failure to state a claim; (2) dismissing the Complaint based on abstention under *Burford*; and (3) dismissing Counts 1-5 because an indispensable party exists which cannot be joined in this forum.

Dated: September 14, 2021          Respectfully submitted,

                                   **MUNSCH HARDT KOPF & HARR, P.C.**

                                By: */s/ Jamil N. Alibhai*
                                     Kevin M. Lippman
                                     Texas Bar No. 00784479
                                     klippman@munsch.com
                                     Deborah Perry
                                     Texas Bar No. 24002755
                                     dperry@munsch.com
                                     Jamil N. Alibhai
                                     Texas Bar No. 00793248
                                     jalibhai@munsch.com
                                     Ross H. Parker
                                     Texas Bar No. 24007804
                                     rparker@munsch.com

                                   3800 Ross Tower
                                   500 N. Akard Street
                                   Dallas, Texas 75201-6659
                                   Telephone: (214) 855-7500
                                   Facsimile: (214) 855-7584

                                   **COUNSEL FOR DEFENDANT
ELECTRIC RELIABILITY COUNCIL OF
TEXAS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 14, 2021, I caused a copy of the foregoing document to be served via CM/ECF and email on the following counsel of record for Brazos and the Committee of Unsecured Creditors:

Lino Mendiola
linomendiola@eversheds-sutherland.us

Jason L. Boland
jason.boland@nortonrosefulbright.com

Michael Boldt
michaelboldt@eversheds-sutherland.us

Julia G. Harrison
julie.harrison@nortonrosefulbright.com

Jim Silliman
jimsilliman@eversheds-sutherland.us

Maria Mokrzycka
maria.mokrzycka@nortonrosefulbright.com

Louis R. Strubeck, Jr.
lstrubeck@omm.com

Paul Trahan
paul.trahan@nortonrosefulbright.com

Nick Hendrix
nhendrix@omm.com

Michael M. Parker
michael.parker@nortonrosefulbright.com

Megan Young-John
myoung-john@porterhedges.com

Steve E. Peirce
steve.peirce@nortonrosefulbright.com

John F. Higgins
jhiggins@porterhedges.com

Eric D. Wade
ewade@porterhedges.com

Heather K. Hatfield
hhatfield@porterhedges.com

M. Shane Johnson
sjohnson@porterhedges.com

Thomas Moers Mayer
tmayer@kramerlevin.com

Ronald S. Greenberg
rgreenberg@kramerlevin.com

Amy Caton
acaton@kramerlevin.com

Jennifer Sharret
jsharret@kramerlevin.com

/s/  Jamil N. Alibhai
Jamil N. Alibhai