IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER, COOPERATIVE, INC.[1]<br><br>     Debtor. | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.,<br><br>     Defendant. | Adv. Proc. No. 21-03863 (DRJ) |

**MOTION OF CALPINE CORPORATION, TENASKA POWER SERVICES CO., NRG ENERGY, INC., ENGIE ENERGY MARKETING NA, INC., LOWER COLORADO RIVER AUTHORITY, TALEN ENERGY SUPPLY, LLC, GOLDEN SPREAD ELECTRIC COOPERATIVE, INC., SOUTH TEXAS ELECTRIC COOPERATIVE, INC., AND NEXTERA ENERGY MARKETING, LLC TO INTERVENE**

---

[1] The Debtor in this chapter 11 case, along with the last four digits its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's proposed claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

JURISDICTION AND VENUE ..............................................................................5

BACKGROUND ......................................................................................................5

    A.    Movants Are Wholesale Power Providers And Electric And Ancillary Service Providers That Are Subject To The ERCOT Nodal Protocols. .................5

        1.    Calpine. ...............................................................................5

        2.    TPS. ....................................................................................6

        3.    NRG ....................................................................................7

        4.    ENGIE. ................................................................................8

        5.    LCRA. .................................................................................8

        6.    Talen. ..................................................................................9

        7.    STEC. ................................................................................10

        8.    GSEC. ...............................................................................10

        9.    NextEra. ............................................................................11

    B.    The ERCOT Wholesale Market And Winter Storm Uri. ......................................12

    C.    The Debtor Failed To Pay For Electricity And Ancillary Services It Received In February 2021, Resulting In "Uplift" Charges To Market Participants. ...............................................................................17

    D.    The Bankruptcy Filing And This Adversary Proceeding. ....................................19

    E.    Movants Are Coordinating Their Efforts And Have Sought Consensual, Stipulated Intervention, With ERCOT's Support. ...............................................21

    F.    The Claims The Debtor Seeks To Litigate Are Already Subject To Active, Ongoing Litigation That Involve And Impact Movants. ......................................22

ARGUMENT ..........................................................................................................24

I.    MOVANTS MAY INTERVENE AS A MATTER OF RIGHT. ..................................24

    A.    The Motion is Timely. .........................................................................24

    B.    Movants Have A Significant And Direct Interest In The Outcome Of The Adversary Proceeding. ........................................................................26

        1.    The Movants Have A Legally Protected Interest In The Issues Being Adjudicated. .................................................................27

        2.    The Movants Are Effectively An Insurer Of ERCOT's Losses And This Gives Them A Legally Protected Interest Warranting Intervention. ................................................................29

    C.    Movants' Interests Will Be Impaired Absent Intervention. ...................................30

    D.    Movants' Interests Are Not Adequately Represented By The Parties. ......................31

**II.      PERMISSIVE INTERVENTION IS ALSO WARRANTED.** ......................................34

**III.     IF THE COURT PERMITS INTERVENTION, MOVANTS WILL WORK COOPERATIVELY WITH EACH OTHER, THE DEBTOR, AND ERCOT TO STREAMLINE AND COORDINATE THE ADVERSARY PROCEEDINGS.** .................................................................................................37

**RESERVATION OF RIGHTS** ........................................................................................38

**CONCLUSION** .................................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Stewards of Liberty v. Dep't of the Interior*,
  No. 1:15-CV-1174-LY, 2016 WL 11272149 (W.D. Tex. Apr. 26, 2016)........................35, 36

*Atlantis Dev. Corp. v. United States*,
  379 F.2d 818 (5th Cir. 1967) ...............................................................................................31

*In re Babcock & Wilcox Co.*,
  No. Civ. A. 01-917, Civ. A. 01-1187, 2001 WL 1095031 (E.D. La. 2001) ...........................32

*Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*,
  260 F.R.D. 1 (D.D.C. 2009)..................................................................................................36

*Brumfield v. Dodd*,
  749 F.3d 339 (5th Cir. 2014) ...............................................................................30, 31, 32

*In re Charter Co.*,
  50 B.R. 57 (Bankr. W.D. Tex. 1985)....................................................................................25

*Edwards v. City of Hous.*,
  78 F.3d 983 (5th Cir. 1996) ................................................................................................24

*Ellender v. Schweiker*,
  550 F. Supp. 1348 (S.D.N.Y. 1982).....................................................................................36

*Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*,
  762 F.2d 1283 (5th Cir. 1985) .............................................................................................26

*John Doe No. 1 v. Glickman*,
  256 F.3d 371 (5th Cir. 2001) ...........................................................................................24, 25

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
  884 F.2d 185 (5th Cir. 1989) ...............................................................................................34

*Lelsz v. Kavanagh*,
  710 F.2d 1040 (5th Cir. 1983) .............................................................................................25

*United States v. Metro. St. Louis Sewer Dist.*,
  569 F.3d 829 (8th Cir. 2009) ...............................................................................................36

*Mich. State AFL-CIO v. Miller*,
  103 F.3d 1240 (6th Cir. 1997) .............................................................................................31

*Newby v. Enron Corp.*,
    443 F.3d 416 (5th Cir. 2006) ....................................................................34, 35

*In re Nitschke*,
    No. 05-74861, 2008 WL 141510 (Bankr. N.D. Ohio Jan. 11, 2008)......................................31

*In re PG&E Corp. and Pacific Gas and Elec. Co.*,
    No. BR 3:19-ap-03003, ECF No. 85 (Bankr. N.D. Cal. Feb. 14, 2019)................................21

*Ross v. Marshall*,
    456 F.3d 442 (5th Cir. 2006) ....................................................................29, 30

*Rotstain v. Mendez*,
    986 F.3d 931 (5th Cir. 2021) ...........................................................................24

*Sierra Club v. Espy*,
    18 F.3d 1202 (5th Cir. 1994) ....................................................24, 25, 31, 33

*Sierra Club v. Glickman*,
    82 F.3d 106 (5th Cir. 1996) ..............................................................28, 31

*Smith Petroleum Serv. Inc. v. Monsanto Chem. Co.*,
    420 F.2d 1103 (5th Cir. 1970) .........................................................................25

*Team Worldwide Corp. v. Wal-Mart Stores, Inc.*,
    No. 2:17-CV-00235-JRG, 2017 WL 6059303 (E.D. Tex. Dec. 7, 2017) ................................38

*Terrell v. DeConna*,
    877 F.2d 1267 (5th Cir. 1989) .........................................................................27

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972)....................................................................................25, 32

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ...........................................................26, 27, 29

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) ..............................................................26, 30

**Texas Cases**

*Exelon Generation Co. LLC et al. v. Public Utility Commission of Texas*,
    No. D-1-GN-21-001772 (Tex. Dist. Ct. Apr. 19, 2021) ...........................................23

*Luminant Energy Company LLC v. Public Utility Commission of Texas*,
    No. 03-21-00098-CV (Tex. Ct. App. 3d 2021).........................................................23

*RWE Renewables Americas LLC, et al. v. Arthur D'Andrea and Public Utility
  Commission of Texas, et al.,*
  No. D-1-GN-21-001839 (Tex. Dist. Ct. Apr. 21, 2021) .......................................................23

**Federal Statutes**

11 U.S.C. Chapter 11 ..................................................................................................... *passim*

11 U.S.C. § 503(b)(9) ..................................................................................................... *passim*

11 U.S.C. § 1109 ...................................................................................................................5

28 U.S.C.
  § 157.....................................................................................................................................5
  § 1334...................................................................................................................................5
  § 1408...................................................................................................................................5
  § 1409...................................................................................................................................5

Uniform Commercial Code........................................................................................... *passim*

**Federal Rules**

Fed. R. Bankr. P. 3001(f) ..................................................................................................28

Fed. R. Bankr. P. 7024 ...........................................................................................1, 5, 24

Fed. R. Civ. P. 24 .......................................................................................................... *passim*

**Texas Statutes**

16 Tex. Admin. Code § 25.501(a) .................................................................................13, 22

16 Tex. Admin. Code §§ 25.505(g)(6)(B) and (E) ...........................................................14

31 Tex. Reg. 7317 (2006) .....................................................................................................14

31 Tex. Reg. 7335 (2006) .......................................................................................................2

31 Tex. Reg. 7335 (2006) ................................................................................................14, 15

Tex. Util. Code § 39.151(a)(2)........................................................................................33, 35

Tex. Util. Code § 39.151(d) ...........................................................................................13, 22

**Other Authorities**

*Collapsing*, KUT (Feb. 24, 2021), https://www.kut.org/energy-environment/2021-
  02-24/texas-power-gridwas-4-minutes-and-37-seconds-away-from-collapsing-
  heres-how-it-happened.............................................................................................................18

ERCOT, M-B090121-01 Estimated Cumulative Aggregate Short Pay Amount
(Sep. 1, 2021), available at
http://www.ercot.com/services/comm/mkt_notices/archives/6032 ..........................................17

Testimony of Chris Edmonds, Global Head of Clearing and Risk for the
Intercontinental Exchange, to the Tex. House Committee on State Affairs
(Mar. 16, 2021),
https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=19666......................16

Testimony of Bill Magness, ERCOT CEO, to the Tex. Senate Committee on
Business and Commerce (Feb. 25, 2021),
https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=15392 ......................................14, 15

Testimony of Former PUC Chair Deann Walker to Tex. Senate Committee on
Business and Commerce (Feb. 25, 2021),
https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=15392 ......................................14, 15

Testimony of Bill Magness, ERCOT CEO, to the Tex. Senate Committee on
Jurisprudence (Mar. 11, 2021),
https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15446 ...............14, 15

*Make Invoice Payments*, March 3, 2021 06:22 PM,
http://www.ercot.com/services/comm/mkt_notices/archives/5276 (last
accessed Aug. 24, 2021) ........................................................................................................17

Matt Largey, *Texas' Power Grid was 4 Minutes and 37 Seconds Away from* .............................18

Operations, "High DAM Responsive Reserve Service Market Clearing Prices for
Capacity for Operating Day February 15, 2021" (February 14, 2021)...................................13

Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation
11-12
http://www.ercot.com/content/wcm/lists/226271/Texas_Legislature_Hearings
_2-25-2021.pdf; ....................................................................................................................18

Calpine Corporation, on behalf of itself and each of its affiliates, including but not limited to Calpine Energy Services, L.P., Calpine Energy Solutions, LLC, and Cavallo Energy Texas, LLC (collectively, "Calpine"); Tenaska Power Services Co. ("TPS"); NRG Energy, Inc., on behalf of itself and each of its affiliates, including but not limited to Direct Energy LP, NRG Cedar Bayou Development Company, LLC, NRG South Texas LP, NRG Texas Power LLC, NRG Power Marketing LLC, and Cirro Group, Inc. (collectively, "NRG"); ENGIE Energy Marketing NA, Inc., on behalf of itself and each of its affiliates, including but not limited to Anson Solar Center LLC, Live Oak Wind Project LLC, Engie Long Draw Solar LLC, Las Lomas Wind Project LLC, Jumbo Hill Wind Project, LLC, Prairie Hill Wind Project, LLC, Solaire Holman 1 LLC, Seymour Hills Wind Project LLC and Engie Resources LLC (collectively, "ENGIE"); the Lower Colorado River Authority ("LCRA"); Talen Energy Supply, LLC, on behalf of itself and each of its affiliates, including but not limited to Talen Energy Marketing, LLC (collectively "Talen"), Golden Spread Electric Cooperative, Inc. ("GSEC"), South Texas Electric Cooperative, Inc. ("STEC"), and NextEra Energy Marketing, LLC, on behalf of itself and certain of its affiliates ("NEM") (together with Calpine, TPS, NRG, ENGIE, LCRA, GSEC, and STEC, the "Movants"), hereby file this motion (the "Motion") for entry of an order pursuant to Rule 24 of the Federal Rules of Civil Procedure (the "FRCP"), made applicable to the above-captioned adversary proceeding (the "Adversary Proceeding") by Rule 7024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), permitting Movants to intervene in the Adversary Proceeding.

## PRELIMINARY STATEMENT

1.      Each of the Movants and the above-captioned debtor and debtor in possession (the "Debtor"), who is the plaintiff in this action (the "Adversary Proceeding"), are subject to the ERCOT Nodal Protocols (the "Protocols") promulgated by the Electric Reliability Council of

1

Texas, Inc. ("ERCOT") governing the rights and obligations of participants in the Texas Interconnection wholesale electricity market, the authority of the Public Utility Commission of Texas ("PUCT"), which regulates ERCOT, and the Public Utility Regulatory Act ("PURA"). Several of the Movants also have direct contractual relationships with the Debtor and are owed amounts from the Debtor.

2.      To avoid a potential collapse of the electric grid during Winter Storm Uri, the PUCT issued orders directing ERCOT to properly implement the scarcity pricing mechanism in the ERCOT Protocols to "ensure that firm load that is being shed in [Emergency Alert Level 3] is accounted for in ERCOT's scarcity pricing signals."  ERCOT accordingly took actions to set the wholesale price at $9,000/MWh, the appropriate market price of power when forced power outages are imminent or occurring, to implement the PUCT's policy of providing "generation with strong incentives to be available on short notice" and "load with strong incentives to voluntarily curtail," all to minimize or avoid rolling blackouts.  31 Tex. Reg. 7335 (2006).  The Debtor, along with many other ERCOT Market Participants, then purchased wholesale power at $9,000/MWh.  Rather than pay a more than $2 billion bill for electricity and ancillary services provided and/or generated by Movants and other suppliers, on March 1, 2021, the Debtor filed for bankruptcy protection.

3.      Certain of the Movants generated, sold, and/or transmitted electric power and ancillary services into the ERCOT market, which the Debtor accepted, received, and re-sold to its members in the 20 days leading up to the filing of its chapter 11 petition, without making payment for the goods and services received.  Other of the Movants sold and transmitted electric power and ancillary services directly to the Debtor, which the Debtor accepted, received, and re-sold to its members in the 20 days leading up to the filing of its chapter 11 petition, without making full payment for the goods and services received.  In total, Movants are currently owed nearly four

hundred million dollars as a result of the Debtor's failure to pay its ERCOT invoices. Even after accounting for ERCOT's collection of the Debtor's posted collateral, the Debtor has short-paid (underpaid) its ERCOT invoices by nearly $1.9 billion.  Accordingly, ERCOT filed a proof of claim in these proceedings pursuant to Section 503(b)(9) of the Bankruptcy Code (the "<u>ERCOT Proof of Claim</u>").

4.     Through this Adversary Proceeding, the Debtor attempts to cast what it really seeks— repricing electricity and ancillary services for the entire Texas market—as a simple contract dispute.  It is not.  The Debtor's multi-faceted challenge to ERCOT's $1.9 billion claim is an aggressive request to invalidate (and a collateral attack on) the actions of ERCOT and its regulator, the PUCT, in an effort to reduce ERCOT's claim and payments to Movants.  Moreover, the Debtor selectively targeted ERCOT and its $1.9 billion claim, knowing full well that ERCOT is not the economic beneficiary of its claim.  Rather, if it remains unpaid, the Debtor's short-pay will result in reduced payments to Movants and force an "uplift" charge to the remaining ERCOT Market Participants, including Movants, as set forth in the Protocols, which will result in the remaining ERCOT Market Participants, and their customers, parties who paid their debts and met their obligations during Winter Storm Uri, ultimately bearing the full cost of ERCOT's claim. Moreover, any findings of fact or conclusions of law made by this Court with respect to the validity of the PUCT's actions, ERCOT's pricing, or imposition of any retroactive repricing could significantly impact Movants' rights in subsequent proceedings regarding the proofs of claim filed by the Movants, and could influence arguments and potential remedies in legal proceedings regarding repricing currently pending in other forums that have specialized and exclusive jurisdiction to address these matters.  Additionally, the Adversary Proceeding could implicate issues of concern to Movants in potential subsequent proceedings regarding the Movants' proofs

of claim. The Court should not have to address these factual and legal issues more than once. Nor should Movants be subject to future arguments regarding issue preclusion or the "law of the case" doctrine based on proceedings in which they are not permitted to participate.

5.    Movants are entitled to intervention as of right as the real parties-in-interest in these proceedings for two independent reasons. First, most of the Movants have filed direct Section 503(b)(9) claims against the Debtor, all of which have yet to receive objections and as such have a clear and direct legal and economic interest in this proceeding. In effect, many of the Section 503(b)(9) claims being asserted by ERCOT in the Adversary Proceeding actually belong to such Movants. Second, with respect to all Movants, given the pass-through nature of ERCOT, similar to insurance carriers, Movants have legal and economic interests that will be directly and adversely impacted by the outcome of this proceeding, due to the imposition of uplift charges as a result of the Debtor's non-payment of the claims being litigated in the Adversary Proceeding. Those interests are separate and apart from the interest of the Debtor, the Official Committee of Unsecured Creditors ("UCC"), and ERCOT, but are squarely implicated by this Adversary Proceeding.

6.    Intervention is accordingly warranted as of right: the Motion is timely, the Movants have an interest that is the subject of this Adversary Proceeding, and the disposition of this Adversary Proceeding may impair or impede the Movants' interests without adequate representation. Separately, permissive intervention is likewise appropriate because the Movants' independent claims share multiple common questions of law and fact raised in this Adversary Proceeding.[1] Allowing this Adversary Proceeding to progress without the participation of the

---

[1]    Movants are cognizant of the need for efficient and streamlined briefing with respect to the Adversary Proceeding. If the relief requested herein is granted, Movants will work cooperatively among themselves and with any other intervening party to ensure the submission of consolidated briefs to the fullest extent possible.

Movants would be inequitable, inefficient, and incompatible with the principles of mandatory and permissive intervention.

## JURISDICTION AND VENUE

7. To the extent the Adversary Proceeding continues and is not dismissed pursuant to ERCOT's Motion to Dismiss and For Abstention (Docket No. 23), this Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested herein are § 1109 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 24 of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rule 7024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A. Movants Are Wholesale Power Providers And Electric And Ancillary Service Providers That Are Subject To The ERCOT Nodal Protocols.

#### 1. Calpine.

8. Calpine, headquartered in Houston, is America's largest generator of electricity from natural gas and geothermal resources with operations in competitive power markets with nearly 26,000 megawatts of generation capacity, enough to power approximately 20 million homes. Through wholesale power operations and retail businesses, Calpine serves customers in 22 states, Canada and Mexico, including customers that are responsible for serving their own retail load. In Texas, Calpine owns and operates 12 power plants. It also owns and operates retail electric providers who serve over 168,000 residential, commercial, and industrial end-use customers throughout Texas.

9. As of the date of this Motion, Calpine's short-pay from ERCOT totals over $300 million, of which approximately 63% is attributable to the Debtor's short payments to ERCOT. Accordingly, Calpine has a claim against the Debtor for at least approximately $192 million

5

reflecting its portion of the Debtor's short payments for electricity purchased by the Debtor in the 20 days preceding the petition date. *See* Claim No. 420, June 15, 2021.

10.    Separately, Calpine has a claim against the Debtor in the amount of $367,200.00 for electricity delivered by Calpine Energy Services, L.P. to the Debtor within 20 days of the Debtor's chapter 11 filing, pursuant to that certain Edison Electric Institute Master Power Purchase and Sale Agreement, version 2.1 (modified 04/25/00) between Brazos Electric Power Cooperative, Inc. and Calpine Energy Services, L.P. dated as of January 21, 2015. *See* Claim No. 309, June 7, 2021.

      **2.**    **TPS**

11.    TPS is an electrical energy marketing company focused on electrical energy management and optimization, both physically and financially. Among other services, TPS purchases and sells electrical energy and energy products at wholesale, and sells such products to companies responsible for serving retail loads. TPS is a private, independent energy company headquartered in Omaha, Nebraska with offices in Irving, Texas. TPS is an affiliate of Tenaska Marketing Ventures, Inc. ("TMV"), which also has claims against the Debtor in the above-captioned bankruptcy case.

12.    TPS is also a Qualified Scheduling Entity ("QSE") that submits offers to sell and/or bids to buy electrical energy in the ERCOT Day-Ahead Market and Real-Time Market as required or directed by the Resources and Loads (consumers)[2] represented by the TPS QSE. As a QSE, TPS also offers for sale ancillary services from the Resources represented by the TPS QSE, and

---

[2]    Under the ERCOT Protocols, Resource refers to either a Generation Resource or a Load Resource. A Generation Resource is a generator capable of providing electrical energy or ancillary services to the ERCOT system, and registers with ERCOT as a Generation Resource. A Load Resource is a Load capable of providing ancillary services to the ERCOT system and/or energy in the form of demand response, and is registered with ERCOT as a Load Resource. A Load is the amount of electricity or ancillary services sold to an entity that purchases such products for its own consumption.

procures ancillary services as needed to serve Loads represented by the TPS QSE.[3]   QSEs are responsible for settling financially with ERCOT for all market activities of the Resources and Loads represented by the QSE. TPS, as QSE, was short paid by ERCOT for products provided by the Resources within the TPS QSE. TPS estimates that, due solely to the Debtor's failure to pay ERCOT, the TPS QSE suffered roughly $180 million in short payments for products provided by the Resources within the TPS QSE to ERCOT during Winter Storm Uri.  Should TPS be assessed an uplift charge, TPS will be passing through and attempting to collect from its customers, including the Loads, a proportionate share of these uplift charges.[4]

13.    TPS filed a proof of claim against the Debtor for $84,090,140.38,[5] reflecting the value of unpaid electrical energy in the form of Responsive Reserve Service ("RRS") capacity, an Ancillary Service, provided by TPS to the Debtor during the month of February 2021.  The bulk of TPS's proof of claim amount reflects the aggregate amount attributable to the Debtor's non-payment to TPS for this product provided to the Debtor in the 20 days preceding the petition date under a direct contractual relationship between TPS and the Debtor.[6]

   **3.    NRG**

14.    NRG is a large American energy company headquartered in Houston, Texas.  NRG's

---

[3]   All QSEs must demonstrate to ERCOT that the QSE has Responsive Reserve Service (RRS) capacity, an Ancillary Service, in quantities required by ERCOT.

[4]   This shortfall in payments has been absorbed by the Resources for whom TPS serves as QSEs, but TPS will pass any future recoveries through to its Resources, if it can do so.

[5]   On May 24, 2021 (as revised on June 15, 2021), TPS filed its proof of claim (the "TPS Claim"). Later, the TPS Claim was sold to Chase Lincoln First Commercial Corporation ("Chase"). TPS now pursues the TPS Claim on behalf of TPS and Chase, as both parties have continuing economic interests in the TPS Claim.

[6]   TPS directly contracted with the Debtor to sell RSS capacity to the Debtor for the price of 73% of the ERCOT market price.  But TPS purchased the RSS capacity it sold to the Debtor from a third party that was also indexed to the ERCOT market price.  Obviously, if repricing occurs as a result of a ruling by this Court, TPS could find itself in the position of having paid the third party for the RSS Capacity at the higher price that was effective at the time of the transaction, but only being able to recover from the Debtor at the new price resulting from this Court's decision.

portfolio includes natural gas generation, coal generation, oil generation, nuclear generation, wind generation, utility scale solar generation, and distributed solar generation. NRG's portfolio includes generation assets with approximately 22,000 MW in capacity. NRG serves 6 million retail customers across 24 states and the District of Columbia, including the largest share of competitively served residential customers in Texas.

15.    NRG filed a proof of claim against the Debtor for at least $52,816,169. *See* Claim No. 415, June 15, 2021. Like Calpine's proof of claim, this amount reflects the 63% of NRG's aggregate short payments, which is the amount of the aggregate short payment attributable to the Debtor's non-payment to ERCOT for electricity provided to the Debtor in the 20 days preceding the petition date.

### 4.    ENGIE.

16.    ENGIE is the North American affiliate of Engie SA, a French multinational utility company, headquartered in La Défense, Courbevoie, which operates in the fields of energy transition, electricity generation and distribution, natural gas, nuclear, renewable energy and petroleum.

17.    ENGIE filed a proof of claim against the Debtor for at least $22,896,099.14. *See* Claim No. 416, June 15, 2021. Like Calpine and NRG's proof of claim, this amount reflects 63% of ENGIE's aggregate short payments, which is the amount of the aggregate short payment attributable to the Debtor's non-payment to ERCOT for electricity provided to the Debtor in the 20 days preceding the petition date.

### 5.    LCRA.

18.    LCRA is a political subdivision of the State of Texas and a nonprofit public utility created by the Texas Legislature. LCRA provides, among other things, electric power generation and transmission services within the ERCOT market and to customers across the state, including

the Debtor and certain of its members.  LCRA's wholesale power customers include 29 city utilities and 4 electric cooperatives that serve predominantly rural areas.

19.    LCRA filed a proof of claim against the Debtor for approximately $18,270,824.43. LCRA's claim concerns (i) electricity sold to the Debtor in the amount of $654,080.00, (ii) substation inspection services in the amount of $600.00, (iii) electricity sold pursuant to LCRA's Amended and Restated Wholesale Power Agreement with Hamilton County Electric Cooperative Association in the amount of $11,651,996.96, (iv) electric power sold and delivered by Debtor to Hamilton within LCRA's service area in an unliquidated amount, (v) a claim for any ERCOT uplift obligations in an unliquidated amount, and (vi) short-pays attributed to the Debtor in the amount of $9,418,449.39.

### 6.    Talen.

20.    Talen is one of the largest privately-owned independent power generation infrastructure companies in North America, with approximately 13,000 MWs of generating capacity.  Talen generates and sells electricity, capacity and related products from a fleet of power plants that use diverse fuel sources including zero-carbon nuclear, clean and flexibly dispatched natural gas, and efficient, resilient coal with various facilities possessing fuel switching capabilities.  Talen's power generation assets and commercial capabilities empower it to grow its platform and create value across multiple markets and customers.

21.    Talen filed a proof of claim against the Debtor for approximately $7,662,857.  See Claim No. 397, June 15, 2021.  As with Calpine, NRG, and ENGIE, this amount reflects 63% of Talen's aggregate short payments, which is the amount of the aggregate short payment attributable to the Debtor's non-payment to ERCOT for electricity provided to the Debtor in the 20 days preceding the petition date.

### 7.   STEC.

22.   STEC is a not-for-profit Generation and Transmission Cooperative based in Victoria, Texas providing a diverse portfolio of affordable energy, a reliable infrastructure, and services to deliver electric power to its residential and business customers.  STEC was formed in 1944 to provide wholesale electric services to member distribution cooperatives.  STEC's membership consists of nine distribution cooperatives, which in turn serve more than 270,000 retail customer members in forty-seven South Texas counties.  STEC's headquarters facility is located at the Sam Rayburn Power Plant Complex on the Guadalupe River just outside Nursery, Texas.  Transmission line and substation service facilities are also located in Pearsall, Texas and Donna, Texas.  STEC's more than 270,000 end-use customers will be significant and adversely affected by what the Debtor seeks to promote through its case—the forced allocation of the sizeable debt the Debtor alone incurred.

23.   Power provided by STEC to its members is generated from a variety of energy sources, including wind, solar, lignite, natural gas (NG), diesel fuel, and hydroelectric generation.

24.   STEC filed a Proof of Claim asserting unsecured claims against the Debtor for unpaid prepetition transmission charges in the amount of $261,973.42 and $1,297.50 comprised of certain other charges pursuant to agreements between STEC and the Debtor as of the Petition Date.

### 8.   GSEC.

25.   GSEC is a not-for-profit Generation and Transmission Cooperative organized in 1984 to supply low cost, reliable electric power to its sixteen (16) not-for-profit, consumer-owned rural distribution cooperative members.  GSEC's distribution cooperative members in turn serve about 310,000 retail electric meters serving their member-consumers located over an expansive area covering twenty-four percent (24%) of the land mass of Texas, the Panhandle of Oklahoma, and small portions of Southwestern Kansas and Southeastern Colorado.  Ten (10) of its sixteen

(16) member distribution cooperatives serve member consumers in ERCOT. GSEC owns and operates a total of 1,972 MW of nameplate generating capacity, 750 MW of which is connected to and sells electricity into the ERCOT wholesale power market. The remainder of its generation fleet is dedicated to supply power in the Southwest Power Pool ("SPP"). GSEC's generation fleet is predominantly fueled by natural gas (86%) with the remainder fueled by wind resources. All of its generation supplying power in ERCOT is fueled by natural gas.

26.    GSEC filed a Proof of Claim for $3,696,086.92 plus transmission cost of services, which reflects: (a) the aggregate short payments to GSEC attributable to Debtor's non-payment to ERCOT for electricity provided to the Debtor as of the Petition Date; (b) uplift attributable to the Debtor's non-payment; and (c) unpaid transmission cost of services.

        **9.    NextEra.**

27.    NEM is one of the nation's leading electricity and natural gas marketers and is an indirect, wholly-owned subsidiary of NextEra Energy, Inc. ("NextEra"). NextEra is one of the largest electric power and energy infrastructure companies in North America and a leader in the renewable energy industry. NextEra invests in generation, transmission and distribution facilities. NextEra's principal subsidiaries are Florida Power & Light Company, which is the largest rate-regulated electric utility in the United States and serves more than 5.6 million customer accounts or more than 11 million residents across Florida, and NextEra Energy Resources, LLC, which, together with its affiliated entities, is the world's largest generator of renewable energy from the wind and sun and a world leader in battery storage.

28.    NEM filed proofs of claim against the Debtor on two separate bases. First it filed a 503(b)(9) administrative expense claim in an amount of $283,187.00 on account of electricity delivered to the Debtor in accordance with trade confirmations entered into under that certain Master Power Purchase and Sale Agreement dated January 22, 2004 between the Debtor and

NEM.  Second, NEM, along with certain of its affiliates, asserted contingent and unliquidated claims resulting from the Debtor's non-payment to ERCOT of electricity delivered in February 2021.

**B.    The ERCOT Wholesale Market And Winter Storm Uri.**

29.    Winter Storm Uri's force and impact are well known to Texas residents.  Beginning on or about February 13, 2021 a powerful winter storm moved over the state of Texas, resulting in several days of temperatures below 20° F in a state where many homes and businesses rely on electricity for heating.  The cold weather remained in Texas through at least February 21, causing blackouts and strain to infrastructure.

30.    Energy price impacts in Texas were felt as early as February 12, when natural gas prices jumped from $3/MMBtu to over $150/MMBtu in anticipation of short gas supply as a result of the forecast winter storm.  Customer demand for power grew as temperatures dropped from February 13 and throughout the day on February 14, pushing the Texas power grid to a new winter peak demand record, topping 69 gigawatts between 6:00 p.m. and 7:00 p.m.—more than 3,200 MW higher than the previous winter peak set in January 2018.  At the same time, demand for gas for heating also grew.

31.    In the early hours of February 15, ERCOT responded to the storm by declaring an Energy Emergency Alert Level 1, urging consumers to conserve power and calling on all load-responsive reserve resources to curtail usage to reduce the overall demand for electricity.  Later, ERCOT elevated to an Energy Emergency Alert Level 2, and finally to Energy Emergency Alert Level 3 ("EEA3"), the highest alert level possible, which reflects a severe lack of reserve generation availability.

32.    With the grid stressed to near catastrophic failure, ERCOT ordered transmission operators to implement deep cuts in load in the form of rotating outages, a measure intended to

reduce the strain on the grid and avoid a complete grid collapse, which could have taken weeks or even months to restore.  While demand soared, supply plummeted as power plants went out of service, many of them because their natural gas supply failed.  Natural gas prices spiked and gas heating demand surged. As a result, the cost to generate electricity from gas-fueled power plants increased dramatically as the ERCOT grid desperately needed the generation output.

33.    The prior day, ERCOT had sent a notification to all Market Participants reminding them of the ERCOT rules providing that Ancillary Services ("AS") pricing was designed to increase in price above the market price cap, creating the potential for high AS prices, and stating that ERCOT "had not identified a need" to change that pricing.[7]  The fact that ERCOT reminded Market Participants of what had long been the rule—that AS prices would exceed the cap—demonstrates that AS charges were correctly assessed above the cap, as permitted by the ERCOT Protocols.

34.    By statute, ERCOT determines the market clearing prices of energy and other ancillary services in the market unless "otherwise directed by the [PUCT]."  16 Tex. Admin. Code § 25.501(a).  On February 15, the PUCT issued its First Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (the "February 15 Order") and on February 16, the PUCT issued its Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (the "February 16 Order" and together with the February 15 Order, the "Orders").[8]  In both Orders, the PUCT directed ERCOT to adjust prices "to ensure that firm Load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals . . ." noting that,

---

[7]    *See* ERCOT Notice M-D021421-01 Operations, *High DAM Responsive Reserve Service Market Clearing Prices for Capacity for Operating Day February 15, 2021*, February 14, 2021, available at http://www.ercot.com/services/comm/mkt_notices/archives/5188.

[8]    The PUCT issued these orders pursuant to its "complete authority" over ERCOT.  See Tex. Util. Code § 39.151(d).

"[i]f customer load is being shed, scarcity is at its maximum, and the market price to serve that load should also be at its highest[.]"  February 16 Order at 1.

35.    The PUCT issued the Orders in response to a potentially catastrophic issue identified by ERCOT and various Market Participants in the early hours of the crisis.[9]  Specifically, the PUCT, ERCOT, the Independent Market Monitor, and various Market Participants understood that under existing regulations, consistent with economic principles, when power supply was so low that rolling blackouts were in place, prices would be at $9,000/MWh.[10]  That is because ERCOT is an "energy-only market," meaning that the economic incentive to supply electricity and maintain reserve generation capacity comes from prices paid for wholesale power, particularly during times of scarcity, rather than from direct payments to generators in a separate "capacity market," as is done in other parts of the country.  *See* 31 Tex. Reg. 7317 (2006).  To ensure that the ERCOT market had sufficient generation, the PUCT adopted the "scarcity pricing mechanism" rule.  *Id.* This rule establishes the framework for ERCOT to ensure that wholesale power prices reflect scarcity conditions, including the requirement that "the value of the lost load will be equal to the value of the system-wide offer cap in effect."  16 Tex. Admin. Code §§ 25.505(g)(6)(B) and (E) (setting the high system-wide offer cap at $9,000 per MWH and stating that the value of the lost load is equal to the value of the system-wide offer cap).  As the PUCT explained when it first

---

9    Testimony of Former PUC Chair Deann Walker to Tex. Senate Committee on Business and Commerce (Feb. 25, 2021) (hereinafter "Walker Testimony") at 317:21-25, 352:17-21 (https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=15392 (at 6:52:40-56, 7:33:05-18)), attached hereto as Exhibit 1; Testimony of Bill Magness, ERCOT CEO, to the Tex. Senate Committee on Jurisprudence (Mar. 11, 2021) (hereinafter "Magness Testimony II") at 147:4-13, 19-25 (https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15446 (at 2:58:25-59, 2:59:16-33)) ("[W]e were certainly hearing it from our participants, wait a minute, our expectation would be that the system would work such that you would be at 9,000 if you were in EEA3 load shed"), attached hereto as Exhibit 2.

10    Testimony of Bill Magness, ERCOT CEO, to the Tex. Senate Committee on Business and Commerce (Feb. 25, 2021) (hereinafter "Magness Testimony I") at 79:20-80:1 (https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=15392 (at 2:21:21-40)) ("The way the system is designed, when we gointo scarcity conditions, the prices go … dramatically higher."), attached hereto as Exhibit 3.

implemented scarcity pricing many years ago, "[t]he possibility of high prices in the ERCOT-real-time market provides generation with strong incentives to be available on short notice." 31 Tex. Reg. 7335 (2006). "It also provides load with strong incentives to voluntarily curtail on short notice to save money." *Id.*

36.    Yet, during the early hours of the crisis, prices were far below $9,000/MWh. This is because ERCOT's pricing system accounted only for demand *currently* being served, rather than total demand, when ERCOT-directed blackouts reduced the immediate demand on the grid. This caused ERCOT's software systems to act as if that demand no longer existed and to conclude that generation supply was sufficient, or at least not at crisis conditions.[11] Thus, the ERCOT system did not "see" the customers affected by the mandatory blackouts necessary to prevent the collapse of the ERCOT system.[12] Instead, ERCOT's system showed artificially or unrealistically high reserves (above emergency levels) and did not reflect the $9,000/MWh price as designed. Said differently, the ERCOT system failed to recognize and respond to the *actual* energy emergency that was occurring.

37.    When ERCOT and Market Participants brought this issue to the attention of the PUCT, the PUCT convened an emergency meeting on February 15, 2021. The Commissioners voted unanimously to issue the February 15 Order directing ERCOT to "ensure that firm Load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." In compliance with the February 15 Order, and consistent with PURA, the Texas Administrative Code, and the terms

---

[11]   Exhibit 1, Walker Testimony at 348:17-23
(https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=15392 (at 7:29:09-32)).

[12]   Exhibit 1, Walker Testimony at 315:22-317:20 (at 6:50:02-6:52:41)
(https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=15392); Exhibit 2, Magness Testimony II" at 141:23-142:17; 146:12-147:13 (https://tlcsenate.granicus.com/Media Player.php?view_id=49&clip_id=15446 (at 2:52:17-53:11, 2:57:30-58:59)); ERCOT Protocol 6.5.9.4.2(1).

15

of the SFA,[13] ERCOT made an administrative adjustment in its scarcity pricing mechanism to account for the load that had been shed, which had the effect of pricing electricity at the proper level: the high System Wide Offer Cap of $9,000 per MWh.  ERCOT did not unilaterally or arbitrarily set the prices the Debtor now challenges, but rather acted consistently with the PUCT's Orders and the scarcity pricing rules in the Texas Administrative Code.

38.    After the Orders were issued, Market Participants, including Movants, "relied on these key market price points [under the Orders] and made business decisions accordingly."[14]  As Winter Storm Uri moved across Texas, natural gas prices jumped nearly 90-fold from $4.50/MMBtu the Wednesday before the Storm to $400/MMBtu on February 16, and even over $1,000/MMBtu on February 17.  Gas suppliers cut deliveries to gas-powered generation facilities; generators procured gas at extremely high prices, relying on the fact that the price of fuel could be recovered in the market by selling power at $9,000/MWh; generators put strain on their equipment; Market Participants refinanced loans, issued bonds, obtained new credit, and bought hedging contracts; all in reliance on the $9,000/MWh market price.  Those decisions, including gas and power contracts bought and sold bilaterally or through the Intercontinental Exchange, are "irreversible," so the generators will be squeezed by a decision here to excuse the Debtor's obligation to pay, effectively repricing a segment of the market.[15]

---

[13]   To the extent the Debtor asserts ERCOT's action pursuant to the Orders were inconsistent with the SFA, the SFA provides that in the event of conflict between the SFA and an "order of any Governmental Authority," the order of the Governmental Authority "shall prevail . . ."  SFA at § 11(L).

[14]   Texpo Energy's Comments Regarding the February 2021 Winter Weather Events at 1, Issues Related to the State of Disaster for the February 2021 Winter Weather Event, No. 51812, (PUC of Texas, Mar. 4, 2021), Doc. No. 69.

[15]   Testimony of Chris Edmonds, Global Head of Clearing and Risk for the Intercontinental Exchange, to the Tex. House Committee on State Affairs (Mar. 16, 2021) (hereinafter "Edmonds Testimony") at 98:3-7 (https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=19666 (at 1:40:37-51)), attached hereto as Exhibit 4.  As Edmonds explained, this kind of "repricing" action would be disastrous not just for the Movants, but

16

39.    The $9,000/MWh price, and the certainty of having it in place for the duration of the emergency, adjusted incentives not only for energy producers, but also for consumers.  It provided a price incentive for industrial consumers to rapidly reduce their electricity use, and even sell power that they had already purchased back into the grid, freeing that supply for residential customers.  In short, the PUCT's Orders and the scarcity pricing implemented in compliance therewith enabled the ERCOT market to work exactly as designed, to provide the right incentives for Market Participants operating under strained conditions to maximize the availability of supply at the rate set by the Texas Utility Code and incorporated into the ERCOT Protocols.

### C.    The Debtor Failed To Pay For Electricity And Ancillary Services It Received In February 2021, Resulting In "Uplift" Charges To Market Participants.

40.    Following Winter Storm Uri, the Debtor short paid ERCOT by approximately $1.9 billion for electricity and ancillary services it purchased on ERCOT's wholesale market, corresponding to unpaid balances on invoices dated February 23 and February 24, 2021.[16] Remarkably, though all Market Participants suffered the same winter storm and impact upon their operations and customers, and despite the Debtor's relatively small market share as a Market Participant, the Debtor accounts for a super majority of all of the storm-related debt left that remains.[17]

41.    In its papers, ERCOT explains that it acts as a *clearinghouse* through which funds are exchanged between buyers and sellers in the ERCOT market.  Taken as true, ERCOT's role is

---

also for "Texas consumers [who] will pay the price of any attempt to" reprice the market.  *Id.*

[16]  ERCOT Notice W-A030221-02, *Short Payments for Failure to Make Invoice Payments*, March 3, 2021 06:22 PM, available at http://www.ercot.com/services/comm/mkt_notices/archives/5276.

[17]  *See* ERCOT Notice M-B090121-01, *Estimated Cumulative Aggregate Short Pay Amount*, Sep. 1, 2021, available at http://www.ercot.com/services/comm/mkt_notices/archives/6032.

akin to a commodity exchange, facilitating transactions between willing buyers and sellers and overseeing the smooth operation of the transfer of goods, in this case electrons and ancillary services transmitted across miles of wire, from suppliers to users.[18]   Ultimately, ERCOT acts as the central counter-party for transactions in the ERCOT market between buyers and sellers, and ERCOT must maintain revenue neutrality in serving this function.

42.   When an ERCOT Market Participant with a payment obligation short pays an invoice and goes into default, Market Participants that are due payments from short-paid invoices cannot be paid in full.   In these circumstances, ERCOT's Protocols dictate that the entity failing to pay the amounts owed to ERCOT must exit the market, and that a Default Uplift Invoice process is implemented to collect outstanding short pay amounts from other Market Participants so that ERCOT can fully pay the Market Participants due and owing.   *See* Protocols § 9.19.1.[19]   In other words, each Market Participant must pay a share of the amount due from the defaulting entity in order to keep ERCOT revenue neutral; the result is a reduction in the net amount collected by those

---

[18]   The physics of the electric grid are more nuanced.  At a basic level, the electric grid operates to pull electrons from the places of highest resistance to the places of lowest resistance.  A drop in the frequency below 60 Hz can cause physical damage to equipment that moves electricity around Texas and, if severe enough, can also damage the generation facilities connected to the transmission grid.  On Monday, February 15, 2021, at 1:51 a.m., the electric grid's frequency fell below 59.4 Hz for mere minutes.  Had the frequency remained at that threshold for another four minutes and 37 seconds, it would have triggered the cascading failure of the entire electric grid, cutting power supply to the 90% of Texas consumers served by ERCOT and initiating a series of events that would have taken days and possibly even weeks to restore power supply for the state.  *See* Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation 11-12 http://www.ercot.com/content/wcm/lists/226271/Texas_Legislature_Hearings_2-25-2021.pdf; *see also* Matt Largey, *Texas' Power Grid was 4 Minutes and 37 Seconds Away from Collapsing*, KUT (Feb. 24, 2021), https://www.kut.org/energy-environment/2021-02-24/texas-power-gridwas-4-minutes-and-37-seconds-away-from-collapsing-heres-how-it-happened.

[19]   On a high level, a Market Participant's obligation to cover for a defaulting Market Participant is based on the non-defaulting Market Participant's share of the total volumetric activity in the ERCOT market for the month preceding the default, such that non-defaulting Market Participants with greater activity will have a proportionately greater share of the uplift burden.  So, for example, if you have a Market Participant who is owed $100 million from short pays, and that Market Participant's share of market activity in the prior month was 10%, that Market Participant would *pay* an uplift share of $10 million, resulting in a net recovery of $90 million, instead of the $100 million it is owed.  In addition, the Movants, as non-defaulting Market Participants are further disadvantaged because any recovery through the Default Uplift mechanism currently can only be made at a rate of $2.5 million every 30 days under ERCOT's Protocols, so the recovery would take place gradually over decades.

18

who were short-paid as a result of the defaulting entity's actions.  Notwithstanding these short-pay procedures, it should not be lost on the Debtor that all Market Participants have agreed that amounts due to ERCOT must be fully paid as a requirement to continued participation in the ERCOT market as a Market Participant.

43.   Consequently, as a result of the Debtor's and others' failure to pay invoices—and while the Debtor seeks to short pay all or some as-yet unknown portion of the almost $1.9 billion that is owed—Movants have been short paid hundreds of millions of dollars by ERCOT for electricity supplied to ERCOT's wholesale energy market during and after Winter Storm Uri.

**D.     The Bankruptcy Filing And This Adversary Proceeding.**

44.   On March 1, 2021, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Following the Debtor's petition for relief, the below entities filed proofs of claim in the Debtor's bankruptcy proceeding for the amounts listed, currently due and liquidated, which do not not take into account other damages that may arise from executory contracts and other agreements:

| Claimant | Date Proof of Claim Filed | Amounts |
| --- | --- | --- |
| ERCOT | June 14, 2021 | $1,899,152,990.64 |
| Calpine | June 15, 2021 | $192,000,000.00 |
|  | June 7, 2021 | $367,200 |
| ENGIE | June 15, 2021 | $22,896,099.14 |
| STEC | June 4, 2021 | $263,270.92 |
| LCRA | June 15, 2021 | $13,279,984.27 |
|  | (Amended September 3, 2021) | $18,270,824.43 |
| NRG | June 15, 2021 | $52,816,169.10 |

19

| GSEC | June 15, 2021 | $3,696,086.92 plus transmission cost of services |
| Talen | June 15, 2021 | $7,662,857.00 |
| TPS | May 24, 2021 (Amended June 15, 2021) | $84,090,140.38 |
| NEM | June 11, 2021 | $283,187.00 |

45.   On July 25, 2021, the Debtor filed an objection to ERCOT's Proof of Claim.  (Docket No. 930; the "ERCOT Claim Objection").   On August 18, 2021, the Debtor filed *Debtor's Complaint Objecting To Electric Reliability Council Of Texas, Inc.'s Proof of Claim and Other Relief* (the "Complaint") (Docket No. 1044).  Among other things, the Complaint (i) objects to the allowance and classification of the ERCOT Claim as an administrative priority claim; (ii) alleges that ERCOT violated the ERCOT Nodal Protocols and caused an error in the price of electricity; (iii) alleges that ERCOT's claim is excessive, exceeds the value received, and constitutes constructive fraud; (iv) argues that electricity and ancillary services are not "goods" within the meaning of 11 U.S.C. § 503(b)(9); and (v) claims that goods received by the Debtor were not sold in the ordinary course of business within the meaning of 11 U.S.C. § 503(b)(9).  The Complaint also asserts defenses based on force majeure and failure to mitigate, and seeks to reclassify ERCOT's claim as a general unsecured claim.  *See id.* ¶¶ 122-163.

46.   On September 1, 2021, the Debtor and ERCOT filed a *Stipulation and Agreed Order Authorizing Intervention* (the "UCC Intervention Stipulation") that consented to the intervention of the UCC in the Adversary Proceeding to avoid the cost, expense and inherent delay that would be incurred by the Debtor's estate in connection with the UCC filing an intervention motion. (Docket No. 18).  The UCC's duty in the Debtor's bankruptcy and in this Adversary Proceeding is solely to general unsecured creditors, many of whom do not have administrative claims or face

20

the liability for short pay and uplift charges that Market Participants do.  In fact, the UCC is comprised mostly of tort claimants, none of whom are trade creditors like Movants, and the UCC's interests remain derivative to the Debtor.

      **E.**      **Movants Are Coordinating Their Efforts And Have Sought Consensual, Stipulated Intervention, With ERCOT's Support.**

      47.    Movants have successfully coordinated their intervention efforts to date and are committed to participating in the Adversary Proceeding on a coordinated and efficient basis.  This coordination includes:  the joint preparation of a proposed stipulation consenting to intervention; joint communication with the Debtor regarding intervention; the joint preparation of this Motion; and an agreement to coordinate future discovery, motions, briefing, and argument.[20]

      48.    ERCOT has consented to Movants' intervention in the Adversary Proceeding and is willing to stipulate to the same for these Movants.  Movants have also sought the Debtor's consent to their intervention, in the interest of judicial economy and to preserve the resources of the Debtor's estate.  The Debtor has not yet consented.  On August 23, Movants contacted the Debtor to request that the Debtor stipulate to their intervention.  The Debtor did not consent at that time, and instead filed a briefing schedule with the Court proposing a September 1 intervention deadline. The Debtor's proposed briefing schedule would have required Movants to seek intervention before ERCOT responded or answered in the Adversary Proceeding.  Following the UCC's intervention, on September 8, 2021, Movants contacted the Debtor and ERCOT jointly to note ERCOT's consent and to request the Debtor stipulate to the Movants' intervention in the Adversary Proceeding.  On September 15, 2021, Movants submitted to the Debtor a draft stipulation and

---

    [20]  Calpine and NRG have successfully coordinated intervention previously in similar circumstances in the PG&E bankruptcy.  *See In re PG&E Corp. and Pacific Gas and Elec. Co.,* No. BR 3:19-ap-03003, ECF No. 85 (Bankr. N.D. Cal. Feb. 14, 2019).

agreed order authorizing intervention (the "Market Participant Intervention Stipulation"),
incorporating the provisions of the UCC Intervention Stipulation.  The Debtor has not consented
to Movants' intervention.

> F.    **The Claims The Debtor Seeks To Litigate Are Already Subject To Active,
> Ongoing Litigation That Involve And Impact Movants.**

49.    The Debtor's substantive claims rely on a number of factual and legal assertions that
are subject to active litigation across Texas courts, and in certain instances administrative
proceedings, litigation in which many Movants are participants and intervenors.

50.    The Debtor's primary objection to ERCOT's claims, and its first cause of action, is
that ERCOT's charges to the Debtor violate the ERCOT Protocols, and therefore the Standard
Form Market Participant Agreement ("SFA"), because the version of Protocol 6.5.7.3.1 in effect
during Winter Storm Uri did not include firm load shed as a trigger for scarcity pricing.  Compl.
¶¶ 57-73, 122-26.  The fundamental question the Debtor is asking the Court to consider is whether
ERCOT actually violated the terms of the SFA when it implemented the PUCT's Orders requiring
prices to reflect actual scarcity in the marketplace, resulting in the $9,000/MWh price.

51.    The Complaint, while complaining of ERCOT's response to Winter Storm Uri and
effect it had on the Debtor, largely ignores the PUCT's emergency orders, as if ERCOT unilaterally
and arbitrarily decided to set prices at the system wide offer cap.  But the Texas Utilities Code
gives the PUCT "complete authority" over ERCOT.  Tex. Util. Code § 39.151(d).  Additionally,
the Texas Administrative Code provides that ERCOT determines market clearing prices of energy
and other ancillary services in the market unless "otherwise directed by the [PUCT]."  16 Tex.
Admin. Code 25.501(a).  And the SFA states that in the event of a conflict between the SFA and
an "order of any Governmental Authority," the order of the Governmental Authority "shall prevail
. . ."  *See* SFA at § 11(L).  Thus, to determine whether ERCOT violated the ERCOT Protocols and

the terms of the SFA when it corrected its system to set prices at the system wide offer cap *at the direction of the PUCT*, what the Debtor is really asking the Court to consider is the validity of the PUCT's Orders.[21]

52.   Whether the PUCT's emergency Orders were validly issued is being directly challenged in *Exelon Generation Co. LLC et al. v. Public Utility Commission of Texas*, No. D-1-GN-21-001772, petition filed, (Tex. Dist. Ct. Apr. 19, 2021) ("Exelon Appeal"), *Luminant Energy Company LLC v. Public Utility Commission of Texas*, No. 03-21-00098-CV (Tex. Ct. App. 3d 2021) ("Luminant Appeal"), *RWE Renewables Americas LLC, et al. v. Arthur D'Andrea and Public Utility Commission of Texas, et al.*, No. D-1-GN-21-001839 (Tex. Dist. Ct. Apr. 21, 2021) ("RWE Appeal"), and a host of other cases not involving Movants.  Movants Calpine and Talen have intervened in all three proceedings and are actively disputing the appellants' positions that the PUCT's Orders were or are invalid.

53.   Similarly, the Debtor's cause of action asserting that ERCOT failed to mitigate its claim turns on questions of law currently at issue in these other proceedings.  Specifically, the Debtor asserts that ERCOT should have ceased its pricing adjustment and allowed prices to fall below $9,000/MWh once ERCOT ceased shedding firm load, "[h]aving failed to correct the problem in real time, ERCOT could have mitigated [its claim] by at least hundreds of millions of dollars through the exercise of its repricing powers under the protocols."  Compl. ¶ 80.  Whether ERCOT should have removed the price adders sooner, and whether ERCOT should reprice the market, is actively being litigated by Calpine and Talen in the Luminant Appeal, and is squarely

---

[21]   Debtor also argues that ERCOT could have mitigated its damages by purchasing power from suppliers, and selling power to the Debtor, at the "protocol-determined price" because "under the SFA and the ERCOT protocols, ERCOT was not entitled to set a $9,000/MWh price for electricity purchased by the Debtor during Winter Storm Uri for all intervals."  Compl. ¶ 78.  Like the first claim and cause of action above, these arguments fail because they rest on the flawed premise that ERCOT's actions, taken at the direction of the PUCT's orders, violated the Protocols and the SFA.

at issue in multiple other pending state court proceedings.

## ARGUMENT

## I.    MOVANTS MAY INTERVENE AS A MATTER OF RIGHT.

54.    Federal Rule of Civil Procedure 24(a), which applies in adversary proceedings through Bankruptcy Rule 7024, governs intervention as a matter of right.  Intervention must be permitted if a timely motion is filed and the movant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  *Rotstain v. Mendez*, 986 F.3d 931, 936 (5th Cir. 2021).  In the Fifth Circuit, "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained."  *John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001) (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)).  Each of these elements is satisfied.

### A.    The Motion is Timely.

55.    Four factors inform whether a motion to intervene is timely: (i) the length of time the movant waited to file, (ii) the prejudice to the existing parties from any delay, (iii) the prejudice to the movant if intervention is denied, and (iv) any unusual circumstances.  *Rotstain*, 986 F.3d at 936-37.  The timeliness requirement "is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner."  *Espy*, 18 F.3d at 1205.  Under these factors, the Motion is timely.

56.    ***First***, Movants acted without undue delay.  Delay is measured "*either* from the time the applicant knew or reasonably should have known of his interest *or* from the time he became aware that his interest would no longer be protected by the existing parties to the lawsuit."  *Edwards v. City of Hous.*, 78 F.3d 983, 1000 (5th Cir. 1996) (internal citations omitted) (emphasis

24

added).  Movants moved to intervene in the adversary proceeding a mere 30 days after it began, consistent with the schedule agreed upon by the Debtor and ERCOT, and ordered by the Court.  *See* Docket No. 13.  Parties have been found to have a right to intervene despite much longer delays in filing a motion.  *See Espy*, 18 F.3d at 1205 (finding a motion to intervene to be timely where the motion was made within two months of the issuance of a preliminary injunction that affected the interest of the proposed intervenors).  This is particularly true when, as here, substantive litigation had not yet begun.  *See Smith Petroleum Serv. Inc. v. Monsanto Chem. Co.*, 420 F.2d 1103, 1115 (5th Cir. 1970) (finding intervention to be timely 19 months after the action was filed where substantial litigation of issues had not yet begun).

57.  ***Second***, the Parties will not suffer prejudice from Movants' intervention.  "[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation."  *Espy*, 18 F.3d at 1206.  Prejudice "that would have occurred whether the delay was one week or one year" is not relevant to the timeliness inquiry. *Glickman*, 256 F.3d at 378.  As Movants did not delay in seeking intervention, the parties are not prejudiced here.  *See In re Charter Co.*, 50 B.R. 57, 63-64 (Bankr. W.D. Tex. 1985) (finding a committee's intervention in an adversary proceeding would not unduly delay or prejudice the rights of the original parties where the committee sought to raise no new issues and no discovery had yet been taken).

58.  ***Third***, the prejudice Movants will suffer if the motion is denied outweighs any minimal prejudice the parties would experience if the motion is granted.  "Critical to the third *Stallworth* inquiry is adequacy of representation. If the proposed intervenors' interests are adequately represented, then the prejudice from keeping them out will be slight."  *Lelsz v. Kavanagh*, 710 F.2d 1040, 1046 (5th Cir. 1983).  The United States Supreme Court has held that

a movant's burden to show that its interests are not adequately protected is "minimal" and "satisfied if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Here, and critically, the Debtor has chosen to litigate with ***the one claimant—ERCOT—that is balance-sheet neutral,*** and who can and is required to recoup (absent PUCT intervention) any short pay on its claims directly from Movants through "uplift" charges pursuant to the Protocols. This reality creates a stark divergence of interests with respect to fully litigating—and bearing the costs of litigating—the Movants' claims.

59.     ***Fourth***, there are no unusual circumstances weighing against timeliness. Shortly after the Adversary Proceeding was initiated, Movants conveyed their interest in intervening to the Debtor and filing this Motion consistent with the Court's scheduling order, which was drafted by the Debtor in consultation with ERCOT. The absence of unusual circumstances in this case favors a finding of timeliness.

> **B.      Movants Have A Significant And Direct Interest In The Outcome Of The Adversary Proceeding.**

60.     This Court's adjudication of the Debtor's Complaint directly affects, among others, certain Movants' similarly-situated 503(b)(9) claims, the short payments ERCOT has already passed on to many of the Movants, and all of the Movants' potential exposure to "uplift" charges resulting from any ultimately crystalized short pay. In the Fifth Circuit, "an interest that is concrete, personalized, and legally protectable is sufficient to support intervention." *Texas v. United States*, 805 F.3d 653, 658 (5th Cir. 2015). The relevant inquiry is whether the party has a significant "stake in the outcome" of the proceeding. *Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1287 (5th Cir. 1985); *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016) ("[A]n interest is sufficient if it is of the type

26

that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim."). And "although an asserted interest must be 'legally protectable,' it need not be legally *enforceable*." *Texas*, 805 F.3d at 659. Movants have such an interest here.

61.    In fact, Movants have a legally protectable interest in the outcome of the Adversary Proceeding for two independent reasons. First, the Court's adjudication may impair the Movants' interest in asserting their own valid claims against the Debtor.[22] Second, through short payments and uplift payments, many of the Movants in effect indemnify ERCOT for the Debtor's default, rendering ERCOT economically neutral. Such a dynamic creates a legally protectable interest for the Movants.

### 1.    The Movants Have A Legally Protected Interest In The Issues Being Adjudicated.

62.    An adverse ruling would implicate the Movants' ability to pursue their own claims. Certain of the Movants have filed 503(b)(9) claims for the value of the electricity and ancillary services provided (i) to the Debtor through ERCOT, or (ii) to the Debtor directly in the twenty days prior to the Debtor's chapter 11 proceeding. *See* 11 U.S.C. § 503(b)(9) (granting administrative priority to claims for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business"). Movants LCRA and Calpine also have agreements directly with the Debtor under which additional claims related to the Adversary

---

[22]   It should be noted that absent intervention, an adverse ruling may not conclusively resolve the Movants' proofs of claim, as the ruling will not have preclusive effect on the Movants. *See Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989) ("The imposition of a preclusive bar against a non-party to the original adjudication is limited for obvious reasons: a non-party has had no day in court."). However, even if this is true, this fact supports intervention as a matter of judicial economy as discussed in Part II *infra*.

Proceeding have been asserted.[23]  As to the remaining Movants, STEC and NEM have filed proofs of claim seeking payment for electricity provided to the Debtor pursuant to separate agreements between STEC, NEM, and the Debtor.   Additionally, GSEC filed a Proof of Claim for $3,696,086.92 plus transmission cost of services, which reflects: (a) the aggregate short payments to GSEC attributable to Debtor's non-payment to ERCOT for electricity provided to the Debtor as of the Petition Date; (b) uplift attributable to Debtor's non-payment; and (c) unpaid transmission cost of services.  Movants' claims, until objected to by the Debtor, are presumptively valid.  *See* FED. R. BANKR. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").  The Debtor has selectively challenged only ERCOT's claim in this Adversary Proceeding, Compl. ¶¶ 148–63.  As a result Movants' Section 503(b)(9) claims are presumed valid.

63.    Further, Movants share a common legal interest in the adjudication of issues central to the Adversary Proceeding.  Specifically, the success of Movants' claims depends on the Court's ruling as to whether: (i) ERCOT's charges conflicted with the SFA and ERCOT Protocols, see Compl. ¶ 124; (ii) there was a pricing "error" requiring ERCOT to "reprice the real time market," Compl. ¶ 129; (iii) the at-issue electricity and/or ancillary services are "goods," for purposes of Section 503(b)(9) of the Bankruptcy Code, *see* Compl. ¶ 150; (iv) these goods were sold in the "ordinary course" of the Debtor's business, for purposes of Section 503(b)(9), *id.* ¶ 158; and (v) the "value" of the goods received by the Debtor is equal to ERCOT's proof of claim amount, for purposes of Section 503(b)(9), *id.* ¶ 162.  An unfavorable decision on any of these issues could preclude Movants from litigating their own Section 503(b)(9) claims against the Debtor and could

---

[23]    *See* Proof of Claim of Calpine Energy Services, L.P., Claim No. 309; Lower Colorado River Authority Schedule Nos. 2296895, 2296896, 2296894.

influence active litigation in Texas and before the PUCT, including cases in which Movants are parties, as well as ongoing regulatory proceedings in the PUCT regarding securitization of costs related to Winter Storm Uri. *See Sierra Club v. Glickman*, 82 F.3d 106, 109-10 (5th Cir. 1996) (*stare decisis* effect of an adverse judgment is sufficient to warrant intervention).

64. Given the possibility for preclusive effect in this bankruptcy, overlap with ongoing litigation in other jurisdictions, and potential for the Movants being functionally estopped from making important arguments down the road with respect to their own claims in this proceeding, Movants each have a sufficient interest "that is concrete, personalized, and legally protectable" in the outcome of the Adversary Proceeding. *See Texas*, 805 F.3d at 658. Indeed, it is difficult to fathom how the Movants—who have filed 503(b)(9) claims and/or the amount and priority of whose claims depend on this Court declining to overturn or override the PUCT and ERCOT's actions—can be shut out of this Adversary Proceeding as they watch their interest in hundreds of millions of dollars adjudicated without the opportunity to participate. Unless Movants can intervene, their arguments to protect their claims in this proceeding will go unheard.

**2.      The Movants Are Effectively An Insurer Of ERCOT's Losses And This Gives Them A Legally Protected Interest Warranting Intervention.**

65. The Movants may separately intervene as of right because they have a direct legal interest in the claim at issue. Indeed, since ERCOT's settlement procedures are designed to keep it revenue neutral, the Movants are the true parties-in-interest here. *See* Protocols § 9.11.3(d) ("The reductions shall be based on a pro rata basis of monies owed to each CARD Invoice Recipient, to the extent necessary to clear ERCOT's accounts on the payment due date to achieve revenue neutrality for ERCOT."). These settlement procedures, through either short payments or uplift invoices, provide that all Market Participants bear the economic loss of a default in the market. Protocols § 9.19.1(3) ("The uplifted short-paid amount will be allocated to the Market

Participants."). Thus, in practice, the Movants indemnify any losses ERCOT sustains from the Debtor's default in a manner similar to an insurer. Such a relationship constitutes a direct relationship sufficient to support an intervention as of right. *See Ross v. Marshall*, 456 F.3d 442, 444 (5th Cir. 2006) ("Once Allstate accepted coverage over any negligence liability on the part of [the insured], they had a direct interest in the liability lawsuit."). Here, the facts go beyond *Ross*, as Movants, in conjunction with parties similarly situated to them, do not merely accept "any" liability stemming from the Debtor's default. These parties collectively accept the *entire* liability. Thus, they have a direct interest in the litigation.

66.    Even if the Movants had only "economic interests" in the outcome of the Adversary Proceeding, the Movants would still be entitled to intervene. "*NOPSI* did not create a bar preventing all intervention premised on 'economic interests.' Such a rule would be inconsistent with Supreme Court precedent permitting intervention based on economic interests." *Wal-Mart Stores, Inc.*, 834 F.3d at 567 (citations omitted). Specifically, the Movants' interests are not "too removed from the dispute" in the Adversary Proceeding and will not "only be vindicated by a separate legal action." *Id.* at 568 (citations omitted). The Movants' economic interests, therefore, "can justify intervention" because "they are directly related to the litigation." *Id.* (citation omitted).

     **C.    Movants' Interests Will Be Impaired Absent Intervention.**

67.    If successful, the Debtor's challenges to ERCOT's claim would inevitably and directly impair the Movants' interests. The Fifth Circuit has held that "[t]he impairment requirement does not demand that the movant be bound by a possible future judgment, and the current requirement is ***a great liberalization*** of the prior rule." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (emphasis added). A party seeking to intervene does "not need to establish that [its] interests *will* be impaired. Rather, they must demonstrate only that the disposition of the action 'may' impair or impede [its] ability to protect [its] interests." *Id.*

68.    Here, the Complaint seeks a ruling from this Court that effectively would reprice almost $2 billion in wholesale electricity transactions, which is a subset of the larger repricing efforts that are subject of ongoing litigation involving the Movants implicating the Movants' shared interest against repricing.  Moreover, a ruling here on repricing separately may affect all of the Movants' direct claims against the Debtor as well as those claims relating to the "uplift" mandates, and the Movants need only show that the Adversary Proceeding *may* impair their ability to protect their interests.  *See Brumfield*, 749 F.3d at 344.

69.    Because an adverse ruling in the Adversary Proceeding may in this case preclude Movants from litigating the issues directly related to the electricity and/or services provided to the Debtor, and may also implicate matters in issue in other litigation and regulatory proceedings, impairment to the Movants' interest absent intervention is plain.  *See Glickman*, 82 F.3d at 109-10 (*stare decisis* effect of an adverse judgment is sufficient to warrant intervention); *Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 829 (5th Cir. 1967) (possibility of judgment with preclusive effect may satisfy this element where intervenor has "claim to and interest in the very property and the very transaction which is the subject of the main action"); *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997) (intervenor sufficiently established impairment of interest in adversary proceeding where "an adverse ruling in the district court could hinder its own efforts to litigate . . . both in currently ongoing cases and in future challenges"); *In re Nitschke*, No. 05-74861, 2008 WL 141510, at *2 (Bankr. N.D. Ohio Jan. 11, 2008) (potential impairment of intervenor's ability to re-litigate adverse findings in adversary proceeding due to collateral estoppel was sufficient to satisfy third prong of intervention test).

### D.    Movants' Interests Are Not Adequately Represented By The Parties.

70.    Absent intervention, the Movants' interests will not be adequately represented by the Parties in the Adversary Proceeding.  An intervenor need only make a "minimal" showing that its

31

interests "may be" inadequately represented by the original parties. *Sierra Club v. Espy*, 18 F.3d at 1207; *see also Brumfield*, 749 F.3d at 345 (an intervenor "need not show that the representation by existing parties will be, for certain, inadequate" (quotations and citations omitted)). This "minimal" burden is satisfied when, as here, an existing party may have or serve interests that may ultimately be adverse to those of the proposed intervenor. *See Trbovich*, 404 U.S. at 539; *In re Babcock & Wilcox Co.*, No. Civ. A. 01-917, Civ. A. 01-1187, 2001 WL 1095031, at *5 (E.D. La. 2001) (finding that claimants satisfied their burden showing debtor's representation of their interests was inadequate where present and future claimants' interests "may diverge" on insurance issue and so, in this hypothetical scenario, "the debtor cannot represent both of their interests at the same time"). The Fifth Circuit has held intervention to be appropriate even when the intervenor's and original party's interests substantially overlap but do "not align precisely." *Brumfield*, 749 F.3d at 345.

71. This minimal standard is met here, as ERCOT and Movants have different interests. ERCOT, as a non-profit operator serving as a centralized clearinghouse, has no ultimate stake in the reduction of its claim.[24] While ERCOT has a duty to enforce the SFA and Protocols, and to follow the PUCT's direction pursuant to PURA, ERCOT will simply pass any non-recovery of its claim to the Market Participants—*i.e.*, those Movants subject to short-pays and "uplift" payments—who have filed proofs of claim totaling hundreds of millions of dollars in the case or have otherwise been impacted by the Debtor's short pay. In fact, the ERCOT Protocols themselves contrast ERCOT from Movants explaining, "ERCOT may not profit financially from its activities

---

[24] The Debtor itself recognizes this distinction between ERCOT and the generators, noting that ERCOT serves largely as a clearinghouse. *See* ERCOT Claim Objection ¶ 71 ("ERCOT is not a real buyer or seller; instead, through the SFA and similar agreements, it provides critical services for market participants throughout Texas by matching supply with demand and otherwise managing the electrical grid.") Given the Debtor explicitly recognizes this distinction, it would be all the more perplexing for it to oppose intervention by the real parties in interest.

as the Independent Organization in the ERCOT Region.  ERCOT may not use its discretion in the procurement of Ancillary Service capacity or deployment of energy to influence, set or control prices."  ERCOT Protocols §1.2(8). Ultimately, ERCOT is likely interested in ensuring that: its authority and administrative decision making are upheld, it is not decertified, and it is not subject to other enforcement action by the PUCT.  ERCOT will not bear the true financial consequences if it fails to recover on its claim.  Instead, those consequences will be borne by the Market Participants, including Movants.

72.    Such a divergence of interests by a government directed entity not subject to any of the losses represented by its proof of claim is sufficient for Movants to show inadequate representation.[25]  *See Espy*, 18 F.3d at 1208 (reversing denial of motion to intervene as of right, in part, because government did not adequately represent economic concerns of timber industry).  In *Espy*, where environmental groups challenged the United States Forest Service's use of logging procedures, timber purchasers' associations sought to intervene, and would have been subject to "the district court's preliminary injunction to all future timber sales[.]"  *Id.*  The Fifth Circuit ruled the movants had demonstrated inadequate representation by the government, explaining: "The government must represent the broad public interest, not just the economic concerns of the timber industry.  Given the minimal burden on the movants to satisfy this requirement, we conclude that the government's representation of the intervenors' interest is inadequate."  *Id.*  So too here, the Movants have met this minimal burden.  Because ERCOT's balance sheet neutrality can be achieved through payment from the Debtor *or* passing through the short payments to generators

---

[25]   Irrespective of whether ERCOT is a governmental body, it takes on responsibilities traditionally associated with a governmental body. See, e.g., Tex. Util. Code § 39.151(a)(2) (providing that ERCOT is to "ensure the reliability and adequacy of the regional electrical network").  Thus, the case law on intervention as it relates to governmental bodies is instructive for this intervention motion.

as it has already done *or* by issuing uplift invoices to all Market Participants, the Movants' interests cannot be adequately protected by ERCOT.

73.    Movants' claims are directly implicated by the Adversary Proceeding.  As such, intervention is the appropriate remedy to ensure adequate representation.  The Adversary Proceeding raises multiple questions that bear directly on Movants' claims, including whether: ERCOT's pricing violated the Protocols, Compl. ¶ 124; there is a pricing "error" that can be addressed by ERCOT, *id.* ¶ 129; electricity and ancillary services are "goods," for purposes of Section 503(b)(9) of the Bankruptcy Code, *see id.* ¶ 150; electricity and ancillary services were sold in the "ordinary course" of the Debtor's business, for purposes of Section 503(b)(9), *id.* ¶ 158, and the "value" the Debtor received is equal to the amount of ERCOT's claim, for purposes of Section 503(b)(9), *id.* ¶ 162.  The Debtor's litigation strategy—objecting to ERCOT's claims for which ERCOT has no ultimate exposure, but not objecting to those with such a clear commonality of law and facts—is unfortunate and problematic.  All of these claims and issues should be litigated in one place, at one time.

74.    Finally, while there is concern about the orders issued in the Adversary Proceeding having preclusive effect on the Movants, equal consideration should be given to what might occur if this Motion is denied. In other words, if the Court denies intervention and it is later determined that the Movants were not adequately represented by the parties in the Adversary Proceeding, including ERCOT, then the Court will most certainly face the future re-litigation of nearly identical legal and factual issues by the Movants.

## II.    PERMISSIVE INTERVENTION IS ALSO WARRANTED.

75.    In the alternative, Movants respectfully request that the Court grant permissive intervention.  Even if a party cannot intervene by right, "courts are given broad discretion in granting motions to intervene [by permission] under Rule 24(b)[(1)(B)]."  *See League of United*

34

*Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989); FED. R. CIV.

P. 24(b)(1).  Permissive intervention is "within a court's discretion," *Newby v. Enron Corp.*, 443

F.3d 416, 424 (5th Cir. 2006), when an intervenor, upon a "timely motion,"[26] presents "a claim or

defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P.

24(b)(1)(B).  The common "'claim or defense' portion of Rule 24(b)(2)[(1)(B)] has been construed

liberally. " *Newby*, 443 F.3d at 422 (affirming permissive intervention).

76.    Movants have presented claims that share several common questions of law and fact

with the Debtor's claims against ERCOT in the Adversary Proceeding.  Allowing Movants'

intervention would aid in an efficient resolution of the Debtor's chapter 11 case.  As discussed

above, the Adversary Proceeding places the elements of Section 503(b)(9) claims directly at issue.

Like ERCOT, many of the Movants have filed their own Section 503(b)(9) claims for the

electricity and ancillary services they provided to the Debtor, either directly or through ERCOT.

All Movants have an interest in the threshold legal questions, raised in Counts 1 and 2, of whether

ERCOT violated the SFA and Protocols and whether there was a pricing "error" allowing for

ERCOT to reprice the real-time market and thereby pass massive uplift charges through to

Movants.  And as the sources of the electricity and ancillary services at issue in the Adversary

proceeding, Movants will substantially contribute to the full development of the necessary factual

issues.  Accordingly, ERCOT's claim and Movants' claims can and should be resolved together

in this Adversary Proceeding.

77.    Moreover, in considering permissive intervention, the Court may consider factors

such as "whether the intervenors' interests are adequately represented by other parties and whether

---

[26] As detailed above, the Motion is timely, *see* section I.A, *supra*, and no parties are prejudiced by any delay
(there was no delay), *id.*

intervenors will significantly contribute to full development of the underlying factual issues in the suit." *Am. Stewards of Liberty v. Dep't of the Interior*, No. 1:15-CV-1174-LY, 2016 WL 11272149, at *3 (W.D. Tex. Apr. 26, 2016) (granting permissive intervention); *see also Ellender v. Schweiker*, 550 F. Supp. 1348, 1360 (S.D.N.Y. 1982) (granting intervention where intervenors presented "questions of fact and law virtually identical" to existing parties and would "add to the Court's understanding of the facts").   While neither factor is dispositive, both considerations counsel in favor of allowing Movants to intervene. *See Am. Stewards of Liberty*, 2016 WL 11272149, at *3 (granting permissive intervention where movants had "not shown that they will contribute significantly to the development of factual issues").   Courts may also consider whether permissive intervention will further its core purpose "to promote the efficient and orderly use of judicial resources." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 840 (8th Cir. 2009); *see also Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*, 260 F.R.D. 1, 4 (D.D.C. 2009) (allowing permissive intervention where it would "promote judicial efficiency and consistency").

78.   First, as discussed in Section I(C) *supra*, none of the parties to the Adversary Proceeding adequately represents the Movants' interests due to adversity of interests.   Second, Movants will significantly contribute to the full development of the underlying factual issues by presenting the expertise and perspective of Market Participants seeking to uphold the PUCT's and ERCOT's pricing actions during Winter Storm Uri, with claims made pursuant to Section 503(b)(9) and with claims based on privity of contract with the Debtor.   Unlike the Debtor and UCC, who seek to reprice February electricity without regard to potential knock-on effects within the ERCOT market, Movants will fully develop the underlying issues in the Adversary Proceeding as parties who sold electricity and/or ancillary services to the Debtor, either directly or through

36

ERCOT, and who are entitled to the value thereof as provided by the PUCT and ERCOT.  Without Movants' participation in the Adversary Proceeding, they will be voiceless.

79.    Finally, intervention will promote judicial economy and consistency by allowing for decisions that will be binding on all parties.  Intervention will contribute to the efficient and expeditious administration of the Debtor's estate, since substantial resolution of Movants' claims is very likely required for the Debtor to establish feasibility of any plan of reorganization.  Absent participation by the Movants, the Court's efforts in the Adversary Proceeding may not have preclusive effect for purposes of the Movant's claims and the claim allowance process.  Given the overlap of factual and legal issues, such duplication violates principles of judicial economy.  The Debtor's litigation strategy is particularly perplexing given this Court's admonishments that this case be administered efficiently.  Movants have taken this guidance to heart, by agreeing to coordinate their intervention in a manner that will reduce the administrative burden on all parties. The Debtor clearly has not.  The Court should not accede to the Debtor's inefficient process and instead use permissive intervention as a tool to promote an efficient resolution of this chapter 11 case.

**III.    IF THE COURT PERMITS INTERVENTION, MOVANTS WILL WORK COOPERATIVELY WITH EACH OTHER, THE DEBTOR, AND ERCOT TO STREAMLINE AND COORDINATE THE ADVERSARY PROCEEDINGS.**

80.    As evidenced by the fact that Movants are parties to this Motion, Movants have already engaged with, and will continue to engage with, each other, ERCOT, the UCC, and the Debtor regarding ways to streamline this Adversary Proceeding, including through coordination of further briefing and arguments in opposition to this Motion and the Complaint to avoid duplication and minimize expenditure of court and party resources.[27]

---

[27]  Movants' grounds for intervention in the Adversary Proceeding have been exhaustively detailed in this

## RESERVATION OF RIGHTS

81.    Nothing contained herein is intended to or should be construed as: (i) an admission of the validity of any claim asserted by the Debtor in the Adversary Proceeding; (ii) a waiver of any right of rights of any Movant under the Bankruptcy Code or any other applicable law; or (iii) consent by any Movant to the jurisdiction of the Bankruptcy Court with respect to the subject matter of the Adversary Proceeding, or any other proceeding commenced in connection with the subject matter hereof.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant the Motion.

*[Signature page follows.]*

---

Motion.  Each of the Movants, as well as the Debtor, are subject to the Protocols promulgated by ERCOT and which govern the rights and obligations of participants in the Texas Interconnection wholesale electricity market.  For the reasons outlined in this Motion, Movants have significant and direct interests in the outcome of the Adversary Proceeding.  In compliance with Federal Rule of Civil Procedure 24(c), Movants attach to this Motion, and file as Exhibit 5, their *Proposed Joinder of Calpine Corporation, Tenaska Power Services Co., NRG Energy, Inc., Engie Energy Marketing NA, Inc., Lower Colorado River Authority, Talen Energy Supply LLC, Golden Spread Electric Cooperative, Inc., South Texas Electric Cooperative, Inc., And NextEra Energy Marketing, LLC to the Electric Reliability Council of Texas, Inc.'s Motion to Dismiss or, in The Alternative, Partial Joinder to The Electric Reliability Council of Texas, Inc.'s Answer* ("Proposed Joinder").  The Proposed Joinder does not reflect the position of each of the Movants on each of the discrete matters raised in the Adversary Proceeding.  Subject to the Court's entry of an Order granting Movants' intervention, Movants will formally file a joinder or other responsive pleading stating specifically any diverse positions on any of the matters raised in the Adversary Proceeding.  The Fifth Circuit, however, does not require the filing of such a proposed joinder as an exhibit.  *See Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, No. 2:17-CV-00235-JRG, 2017 WL 6059303, at *7, n.6 (E.D. Tex. Dec. 7, 2017) (declining to preclude intervention on grounds that intervenor "did not attach an intervenor's answer as an exhibit" to motion to intervene).

Houston, Texas
September 17, 2021

By: */s/ Bruce Ruzinsky*
**JACKSON WALKER**
Bruce Ruzinsky
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:   (713) 752-4204
Email:          bruzinsky@jw.com

-and-

J. Scott Rose
112 East Pecan Street, Suite 2400
San Antonio, TX 78205
Telephone:   (210) 978-7760
Email:          srose@jw.com

*Counsel to Lower Colorado River Authority*

By: */s/ Judith Ross*
**ROSS & SMITH, PC**
Judith Ross
700 North Pearl Street, Suite 1610
Dallas, TX 75201
Telephone:   (214) 377-8659
Email:          judith.ross@judithwross.com

*Counsel to Tenaska Power Services Co.*

By: */s/ Annapoorni R. Sankaran*
**HOLLAND & KNIGHT LLP**
Annapoorni R. Sankaran
TX Bar No. 24071918
1100 Louisiana Street, Suite 4300
Houston, TX 77002
Telephone:   (713) 821-7000
Facsimile:   (713) 821-7001
Email:          anna.sankaran@hklaw.com

*Counsel to Golden Spread Electric Cooperative,*
*Inc.*

By: */s/ Mark McKane*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
David R. Seligman, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:          david.seligman@kirkland.com

-and-

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:   (415) 439-1400
Facsimile:   (212) 439-1500
Email:          mark.mckane@kirkland.com

-and-

Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:          aparna.yenamandra@kirkland.com

*Counsel to Calpine Corporation*

By: */s/ Patrick L. Hughes*

**HAYNES AND BOONE, LLP**
Patrick L. Hughes
Texas State Bar No. 10227300
David Trausch
Texas State Bar No. 24113513
1221 McKinney, Suite 4000
Houston, TX 77010
Telephone:     (713) 547-2000
Facsimile:     (713) 547-2600
Email:          patrick.hughes@haynesboone.com
Email:          david.trausch@haynesboone.com

***Counsel to South Texas Electric Cooperative, Inc.***

By: */s/ Luckey McDowell*

**SHEARMAN & STERLING**
Luckey McDowell (SBT 24034565)
Ian E. Roberts (SBT 24056217)
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:     (214) 403-0649
Email:          luckey.mcdowell@shearman.com
Email:          ian.roberts@shearman.com

-and-

Joel Moss (*pro hac vice* pending)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:     (212) 848-4693
Email:          joel.moss@shearman.com

-and-

Jonathan M. Dunworth (*pro hac vice* pending)
599 Lexington Avenue
New York, NY 10022
Telephone:     (212) 848-5288
Email:          jonathan.dunworth@shearman.com

***Counsel to NRG Energy, Inc., ENGIE Energy
Marketing NA, Inc., Talen Energy Supply LLC,
and NextEra Energy Marketing, LLC***

## CERTIFICATE OF SERVICE

I certify that on September 17, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Mark McKane*
Mark McKane