**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.,<br><br>    Defendant. | Adv. Proc. No. 21-03863 (DRJ) |

**OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' RESPONSE AND OBJECTION TO MOTION OF
ELECTRIC RELIABILITY COUNCIL OF TEXAS TO DISMISS AND FOR
ABSTENTION AND BRIEF IN SUPPORT OF THE COMMITTEE'S MOTION
<u>FOR LEAVE TO FILE A MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**
[Relates to Docket No. 23]

Intervening Plaintiff the Official Committee of Unsecured Creditors (the "**Committee**") of

Brazos Electric Power Cooperative, Inc. ("**Brazos**" or the "**Debtor**") submits this (1) Response

and Objection to *Electric Reliability Council of Texas, Inc.'s Motion to Dismiss and for Abstention*

(the "**Motion**") [Adv. Dkt. No. 23], and (2) Brief in Support of the Committee's Motion for Leave

to File a Motion for Partial Summary Judgment, and in support thereof, respectfully states as

follows.[2]

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Complaint.

13022051

## PRELIMINARY STATEMENT

1.      The Complaint contains nine counts seeking to disallow ERCOT's proof of claim in whole or in part and objecting to ERCOT's assertion of administrative expense priority for such claim. The ERCOT Motion raises no defense at all to Counts 6-9 (which seek to deny administrative expense priority), no defense on the merits to Counts 4 and 5 (which seek to disallow the ERCOT Claim as a fraudulent transfer), and only an irrelevant defense on the merits to Count 1 (which seeks to disallow the ERCOT Claim as without foundation under the Protocols).[3]  Instead, ERCOT focuses most of its Motion on meritless procedural defenses of abstention (apparently only to Counts 1, 2, and 3[4]) and failure to join the Public Utility Commission of Texas ("**PUCT**") as a necessary party (to Counts 1 through 5).

2.      ERCOT devotes scant attention to the real issue: the substantive validity of its $1.9 billion claim in this case.  ERCOT's only *substantive* defense of its Claim is that it was purportedly directed by PUCT order to charge the Debtor four times the market price of power even if doing so breached the Standard Form Market Participant Agreement (the "**SFA**") and the Protocols, which are the sole permissible basis for ERCOT's Claim.  But the PUCT's actions and orders are irrelevant.  By the PUCT's own admission, its orders do not apply to any party other than ERCOT.[5]  Thus, whether or not the PUCT had the power to compel ERCOT to *invoice* overcharges in violation of ERCOT's agreement with Brazos, the PUCT order could neither impose on Brazos

---

[3] The Motion also raises no defense on the merits to Count 2 regarding ERCOT's failure to mitigate its Claim.  With respect to Count 3, *see* below at n.10.  The Committee joins in and hereby incorporates by reference the Debtor's response to ERCOT's Motion.

[4] The Motion ends with a prayer for abstention without identifying what Counts ERCOT requests that the Court abstain from hearing in favor of adjudication in another forum.  Counts 1 through 3 are the only Counts with respect to which another forum could have jurisdiction.  The Committee therefore assumes that ERCOT's prayer for abstention applies only to Counts 1, 2, and 3.

[5] Brief of PUCT as Appellee in *Luminant Energy Company, LLC v. Public Utility Commission of Texas*, No. 03-21-00098-CV (Tex. App.—Houston), dated Sept. 2, 2021, at 24 (excerpt attached as **Exhibit A**).

13022051

any obligation to *pay* amounts that violated its agreement, nor insulate overcharges by ERCOT from avoidance as fraudulent transfers.  The order could not and did not change private party Brazos's contract with ERCOT, which set out in detail the exclusive mechanism for changing the way ERCOT could establish pricing – and which on its face is subject only to laws and regulations existing when the parties entered into the contract (except as revised pursuant to detailed procedures that ERCOT and Brazos included in the contract).  Indeed, the Texas Legislature has now expressly confirmed the primacy of the pricing mechanism set forth in the Protocols by amending the Utility Code to require payments by market participants of amounts owed for electricity purchased during Winter Storm Uri to be "calculated solely according to the protocols in effect during the period of emergency."  Neither ERCOT's Motion nor its contemporaneous Answer provides any basis to depart from well-established contract interpretation principles or the mandate of the recent legislation.

3.      For these reasons, not only should the ERCOT Motion to dismiss Count 1 be denied, but the Committee also should be granted leave to move for summary judgment in their favor on that count.  ERCOT's gross overcharges, imposed in violation of the specific market-determined pricing protocols binding on both parties, are unenforceable against Brazos as a matter of law.

4.      The Court can quickly dispatch ERCOT's procedural defenses, which are all based on a misreading of the Complaint.  ERCOT argues for abstention based on groundless assertions that the Complaint challenges PUCT orders and implicates Texas's regulatory scheme by seeking a "repricing" of power.  In fact, the Complaint raises no issue at all with respect to any PUCT order or Texas's regulatory scheme and seeks no "repricing" of any kind.  The Complaint seeks only disallowance of ERCOT's Claim under principles of contract law clearly within the jurisdiction of

this Court, and adjudication of fraudulent transfer and administrative expense priority – matters within the *sole* jurisdiction and competence of this Court.

5.      ERCOT also contends that the PUCT is a "necessary party" to this dispute.  Not so. To the extent PUCT orders are valid and binding on ERCOT, they will remain so no matter how this Court adjudicates ERCOT's claim against the Debtor or interprets the Debtor's rights against ERCOT.  The Complaint applies solely to ERCOT's *claim* against the estate – it does not seek to compel ERCOT to do or not do anything contrary to any order of the PUCT.

6.      In sum, ERCOT's Motion should be denied and the Committee should be granted leave to move for summary judgment on Counts 1, 6, and 7 of the Complaint, as set forth herein and in the Motion for Leave to File a Motion for Partial Summary Judgment that the Committee intends to file shortly.

## BACKGROUND

7.      Effective April 1, 2015, the Debtor and ERCOT entered into ERCOT's required 14-page SFA, which governs their relationship.  The SFA incorporated ERCOT's "Nodal Protocols," consisting of more than 1,800 pages of rules, guidelines, and the like (the "**Protocols**"), including hundreds of pages that determine the price of power bought and sold by ERCOT to and from market participants, including the Debtor.  This price is usually a "market clearing price," reflecting offers to sell power *to* ERCOT and bids to buy power *from* ERCOT.  The Protocols also prescribed in detail how either SFA party could seek to amend the Protocols.

8.      On February 15, 2021, in the wake of widespread power shortages during Winter Storm Uri, the PUCT issued an Order (the "**PUCT Order**") stating its view that the market-clearing price set under the Protocols did not adequately reflect scarcity of supply because prices were settling "as low as approximately $1,200" which it noted was less than "the current system-wide offer cap" ("**SWOC**") of $9,000.  The PUCT directed ERCOT "to ensure that firm load that

13022051

is being shed" in the then-current state of emergency "is accounted for in ERCOT's scarcity pricing signals." Based on this direction, ERCOT determined to charge Brazos the SWOC, even though generators were offering to sell power under the Protocols at considerably less than $9,000." The Protocols use the SWOC as a *cap* on prices that can be charged if otherwise authorized by the Protocols; the Protocols nowhere use the SWOC as a *peg* or authorize ERCOT to peg the price of power at an amount tied to the SWOC.

9.      In choosing to boost the price to $9,000 per megawatt hour ("**MWh**"), ERCOT violated the Protocols and thus its SFA with Brazos, in at least two ways. First, there are hundreds of pages in the Protocols laying out how energy prices are to be determined in the energy marketplace (*see, e.g.*, Protocols §§ 6 & 7). ERCOT disregarded these agreed terms when it increased the price it charged Brazos to the SWOC. Second, ERCOT (and the PUCT) can revise the Protocols, but only by following an agreed procedure in which Brazos would have the opportunity to comment, object, and appeal to the PUCT and the courts (*see* Protocols § 21). That procedure was ignored.

10.      As a result, during the week of February 22, 2021, ERCOT invoiced the Debtor for more than $2.2 billion in settlement charges.

11.      Days later, on March 1, 2021, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has remained in possession of its property and continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13022051

12.     The U.S. Trustee appointed the Committee on March 15, 2021.  *See* Bankr. Dkt. No. 216.  The Committee was reconstituted by the U.S. Trustee on March 24, 2021.  *See* Bankr. Dkt. No. 285.

13.     On June 14, 2021, ERCOT filed its Claim alleging that the Debtor is liable to ERCOT in the amount of $1,899,152,990.64, with approximately $1,877,591,506.10 of that amount allegedly subject to administrative expense priority status.[6]

14.     On July 25, 2021, the Debtor commenced a contested matter by filing the *Debtor's Objection to Electric Reliability Council of Texas, Inc.'s Proof of Claim* [Bankr. Dkt. No. 930] (the "**Claim Objection**") seeking, among other things, the disallowance and reduction of the ERCOT Claim and the reclassification of the administrative priority portion of the ERCOT Claim as a general unsecured claim in its entirety.

15.     Upon the record of the hearings held by the Court on July 26, 2021 and August 4, 2021, the Debtor withdrew the Claim Objection on the record, and, on August 18, 2021, filed the Complaint [Adv. Dkt. No. 1], commencing this adversary proceeding.

16.     The Committee intervened in the adversary proceeding as a co-plaintiff pursuant to a stipulation signed by the Debtor and ERCOT and so ordered by the Court on September 2, 2021 [Adv. Dkt. No. 20].

17.     ERCOT responded to the Complaint by filing the instant Motion, and an Answer, on September 14, 2021.

---

[6] The ERCOT Claim is Stretto Claim Number 403 and ECF Claim Number 115.

13022051

## SUMMARY OF ERCOT'S MOTION

18.     The Complaint and the ERCOT Motion's response to each of the Complaint's nine

Counts may be summarized as follows:

| Complaint | ERCOT Motion to Dismiss |
|---|---|
| Count 1: Claim should be disallowed under § 502(b)(1) as violating Protocols | Abstention per *Burford*[7], 28 USC § 1334(c) <br> Dismiss for failure to join PUCT (Rule 7019(b)) <br> Dismiss for failure to state a claim (Rule 7012(b)(6)) |
| Count 2: Claim should be reduced for failure to mitigate | Abstention <br> Dismiss for failure to join PUCT |
| Count 3: Claim should be disallowed because force majeure excused default | Abstention <br> Dismiss for failure to join PUCT <br> Dismiss for failure to state a claim |
| Count 4: Claim should be avoided as a fraudulent transfer under § 548 | Dismiss for failure to join PUCT |
| Count 5: Claim should be avoided as a fraudulent transfer under Texas law & § 544(b) | Dismiss for failure to join PUCT |
| Count 6: No § 503(b)(9) priority because electricity is a service | Not addressed |
| Count 7: No § 503(b)(9) priority for ancillary services | Not addressed |
| Count 8: No § 503(b)(9) priority because debt not incurred in the ordinary course of business | Not addressed |
| Count 9: No § 503(b)(9) priority for claim exceeding value of power | Not addressed |

---

[7] *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

13022051

## ARGUMENTS AND AUTHORITY

I.   **ERCOT's Motion to Dismiss Count 1 for Failure to State a Claim Should Be Denied, and Brazos Should Be Granted Leave to Move for Summary Judgment Because Brazos Has No Obligation to ERCOT Other Than as Set Forth in the SFA and Protocols.**

19.     Count 1 asserts that ERCOT overcharged Brazos in violation of the SFA and the Protocols.  ERCOT's Motion argues that it was *entitled* to violate the SFA at the direction of the PUCT because SFA § 11(L) provides that the SFA is "subject to" orders of the PUCT.  This argument has neither merit nor relevance.  It mistakes (and misstates) the contractual nature of the ERCOT/Brazos relationship.  And it exalts (and misreads) one paragraph of inapplicable general boilerplate plucked from more than 1,800 pages of detailed contract provisions specifically setting forth the terms of the Debtor's agreement to buy, and ERCOT's agreement to sell, power.

20.     As explained below, ERCOT's argument fails as a matter of law, based on the plain language of the parties' contract.  As a result, not only should the Motion be denied, but the Committee also should be granted leave to request summary judgment on Count 1.  Summary judgment may be appropriate whenever the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In cases involving contract interpretation, summary judgment is appropriate if the contract in question is unambiguous and can be given a certain or definite legal meaning or interpretation.  *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir. 1992).  Such is the case with respect to Count 1.

21.     ERCOT's Motion is replete with references to a regulatory scheme and PUCT reserved jurisdiction, none of which is relevant to the Claim.  The Debtor's relationship with ERCOT is contractual through the SFA, which incorporates the Protocols.  The price of power is determined under that contract.  ERCOT does not assert that the PUCT has the jurisdiction or

8

power to order the Debtor to pay $9,000 per MWh, or that the PUCT attempted to exercise such jurisdiction or power.   Indeed, the PUCT itself has stated in recent court filings that its Order did not apply to the Debtor in any way:

> the Price-Adjustment Orders apply to ERCOT and solely to ERCOT.  As such they are not "applicable to all ERCOT participants."  At no point did the Price-Adjustment Orders direct any market participant to do anything, nor did the PUCT make self-executing statements applicable to market participants that "electricity will be automatically priced at the $9,000 system-wide offer cap."

Exhibit A hereto (internal citations omitted).  Thus, whatever the effect of the PUCT Order on *ERCOT*, it did not and could not create a legal obligation for *the Debtor* to pay ERCOT's inflated, non-market invoices.  If the Debtor had an alternative source for power, it would have been free to pay a market rate, because it never agreed to mechanisms allowing prices to be unilaterally pegged at the SWOC.

22.     ERCOT *admits* that its invoices charging $9,000 per MWh were not authorized in the SFA and Protocols themselves.  *See* Motion ¶ 13 ("the [Protocols-based] system ERCOT uses to set prices kept the clearing price for energy below the [SWOC]").  ERCOT does not even allege that the Debtor agreed to pay $9,000 in the SFA, the Protocols, or anywhere else.  The PUCT Order directing ERCOT to deviate from the market-based pricing embodied in the contract is *irrelevant* unless, under some provision in the SFA or the Protocols, Brazos agreed to pay whatever the PUCT ordered ERCOT to charge.  There is no such provision.

23.     The only provision that ERCOT cites is SFA § 11(L), which is found not in the Protocols' detailed pricing mechanisms but in the SFA's "Miscellaneous" section:

> This Agreement is subject to applicable federal, state and local laws, ordinances, rules, regulations, order of any Governmental Authority and tariffs.  Nothing in this Agreement may be construed as a waiver of any right to question or contest any federal, state and local law, ordinance, rule, regulation order of any Governmental Authority or tariff.  In the event of a conflict between this Agreement and an applicable federal, state and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff, the applicable federal, state and local law,

9

ordinance, rule, regulation, order of any Governmental Authority or tariff shall prevail, provided that Participant shall give notice to ERCOT of any such conflict affecting Participant.  In the event of a conflict between ERCOT Protocols and this Agreement, the provisions expressly set forth in this Agreement shall control.

24.     ERCOT argues that Count 1 fails because § 11(L) results in the "express incorporation" into the SFA of any rule or order that the PUCT enacts, even if it were to issue years after the SFA's execution (Motion ¶ 38), and thus the PUCT Order became part of the contract, permitting Brazos to ignore the pricing mechanisms actually included in the Protocols and charge Brazos $9,000 per MWh (*id.* ¶¶ 39-41).

25.     First, with respect to the PUCT's February 15 Order, there is nothing to "expressly incorporate."  As the PUCT itself argued in the *Luminant* appeal, the February 15 Order does not order ERCOT to set any particular price or adopt any particular rule.  It simply recites that pricing under the Protocols was not (in the PUCT's view) reflecting the condition of maximum scarcity – and leaves to ERCOT the actual setting of prices, without actually directing ERCOT to do so or providing any specifics as to how prices are to be set.  Thus the PUCT Order contained no specific provisions that could be "expressly incorporated" into the Protocols.

26.     Second, § 11(L) does not "expressly incorporate" anything.  It simply acknowledges (among other things) that the PUCT has jurisdiction over *ERCOT*.  It does not create jurisdiction and power that the PUCT otherwise lacks to require Brazos to do anything, as the PUCT has itself has acknowledged in the *Luminant* litigation.

27.     Moreover, on its face, § 11(L) speaks in the present tense only, providing that the SFA "*is* subject" to applicable law, tariffs, orders, and the like, not that the SFA "*will be* subject" to such authority.  The term "applicable" denotes PUCT orders now in existence, not those that may be promulgated anytime in the future.  Section 11(L) thus reflects a choice by the parties that the SFA and Nodal Protocols were subject to applicable law (and PUCT orders) *existing at the*

*time Brazos signed the SFA*.  The paragraph thus contains customary boilerplate language consistent with the default rule that a contract is read in the context of and subject to existing law. If the parties intended the more unusual result of permitting *future* changes in the law to alter the parties' contract rights, they *could have* expressly provided that the contract between Brazos and ERCOT would be subject to future PUCT orders.  They did not.

28.     And, in fact, cases interpret "subject to law" or similar phrases as *not* allowing subsequent law to impair pre-existing contracts.  "A substantive right conferred by the existing law constitutes a part of the agreement by implication and may not be defeated by a subsequent amendment of the law." *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 231 (Tex. Civ. App.—San Antonio, 1980 writ ref'd n.r.e.) (citing *Click v. Seale*, 19 S.W.2d 913, 920 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.); *Chesser v. Murphy*, 386 S.W.2d 164, 168 (Tex. Civ. App.—Houston 1965, no writ); 13 Tex. Jur.2d Contracts § 165 (1960); 17 C.J.S. Contracts § 22 (1963); 17A C.J.S. Contracts § 330 (1963).[8]

29.     *Texas Workers' Compensation Ins. Facility v. State Bd. Of Ins.*, 894 S.W.2d 49, 53 (Tex. App.—Austin 1995), *jugm't withdrawn by agr.*, 910 S.W.2d 176 (Tex. App.—Austin 1995, no writ), illustrates these principles.[9]  The dispute in that case centered on whether service contracts executed by the Texas Workers' Compensation Facility (the "**Facility**") and insurance servicing

---

[8] Other jurisdictions share this view.  *See, e.g., Condel v. Bank of Am., N.A.*, No. 3:12CV212-HEH, 2012 WL 2673167, at *8 (E.D. Va. July 5, 2012) ("General precepts of contract law dictate that, absent clear language to the contrary, courts should not interpret contracts to incorporate future changes to the law") (emphasis in original); *Rutherford Farmers Coop. v. MTD Consumer Group, Inc.*, 124 Fed. Appx. 918, 920 (6th Cir. 2005) (rejecting argument that because all contracts incorporate existing law, the contract must also be read to incorporate future law, such as later-enacted statutes).

[9] The judgment was withdrawn by agreement due to the parties' settlement.  However, at least one other decision cites the case. *See Al Boenker Ins. Agency Inc. v. Texas Fair Plan Ass'n*, No. 03-04-00050-CV, 2004 WL 1686598, at *6 n.5 (Tex. App.—Austin July 29, 2004, pet. denied) ("The fact that the Agreement was in effect before the Plan of Operation does not affect our disposition. The original terms of a contract incorporate the relevant law at the time the contract is made.").

companies (the "**Servicing Companies**") required the Facility to indemnify the Servicing Companies. The service contracts, executed in the 1970's, required the Facility to "indemnify Carrier as set out in the Pool's By-Laws and Rules and Regulations." *Id.* at 51.

30.     In 1992, the Servicing Companies submitted bills for indemnity to the Facility, but the Facility refused to pay, citing a recent change to the Texas Insurance Code that prohibited the Facility from indemnifying servicing companies. *Id.* The Servicing Companies argued that their right to indemnification represented a vested legal right that future changes in law could not remove. *See id.* at 53. The Facility, on the other hand, argued that "the phrase 'as set out in the bylaws' included in the servicing company agreements *gives the Facility the right to amend its bylaws at any time and thus change or eliminate the right to indemnification granted in the contract.*" *Id.* (emphasis added).

31.     The court disagreed, holding that an amendment to bylaws, *or other change in law*, cannot effect a substantive change to the parties' original contractual rights. *Id.* at 54 (citing *Estate of Griffin*, 604 S.W.2d at 230). "To deprive the Servicing Companies of the right to indemnification would impair their vested rights and impose a new duty or disability on the Servicing Companies—the duty or obligation to defend a lawsuit at their own expense, an obligation that was not anticipated at the time the agreements were entered." *Id.* at 55.

32.     Just as the Texas Workers Compensation Facility's power to amend by-laws did not give it the power to replace by-laws containing indemnities with by-laws omitting indemnities, ERCOT cannot invoke the PUCT Order and Miscellaneous § 11(L) to eliminate the hundreds of pages of Protocols setting prices and set a market-flouting $9,000 per MWh charge.

33.     Other courts have come to similar conclusions with respect to legislation purporting to impair a party's contractual rights, for example, with regard to bonds. *See Pierce County v.*

*State of Washington*, 148 P.3d 1002, 1015 (Wash. 2006) (reservation of legislature's right to change tax policy did not permit legislature to impair tax pledge to bonds); *Kurrus v. Priest*, 29 S.W.3d 669, 676 (Ark. 2000) (bond offering statement's language disclosing Arkansas's right to grant tax exemptions did not permit elimination of taxes pledged to bonds); *cf. Davies v. The City of Minneapolis*, 316 N.W. 498, 503-04 (Minn. 1982) (notice to bondholders that charter amendments could repeal sales tax did not permit charter amendment to eliminate sales tax pledged to bonds).

34.     The single case ERCOT cites to argue that the SFA incorporates the PUCT Order, *Cockrell v. Texas Gulf Sulphur Co.*, 299 S.W.2d 672, 676 (Tex. 1956), is consistent with the case law discussed above. *Cockrell* examined the effect of a deed provision that was made "subject to the terms and conditions 'of each and all of the existing leases and conveyances." *Id. Cockrell* held that the inclusion of the "subject to" clause in the deed incorporated the leases and defined the estate conveyed. *Id.*  Notably, the incorporated leases in *Cockrell* were ascertainable and in "full force and effect" when the party conveyed the deed. *Id.* at 674-76.

35.     ERCOT's strained reading is also in tension with the structure of the contract and basic principles of contract construction.   Section 11(L), a single paragraph in the SFA's "Miscellaneous" section, says nothing about prices.  It makes no sense that the parties would intend this paragraph of boilerplate to supersede hundreds of pages on pricing mechanisms by authorizing ERCOT to change prices in disregard of those agreed mechanisms whenever the PUCT tells it to do so.  Such an intention would have been prominently stated.  Contracts, like statutes, do not "hide elephants in mouse holes." *In re PB&R*, 380 P.3d 234, 240 (Kan. Ct. App. 2016) (quoting

*Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001)).  Yet Miscellanous § 11(L) is the elephant ERCOT seeks to summon here.

36.     ERCOT's interpretation further improperly reads the SFA to permit a general provision to control over much more detailed and specific provisions governing pricing.  It is well-settled that no single phrase, sentence, or section of a contract should be read in isolation and considered apart from the other provisions, and that a specific contract provision controls over a general one.  *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019).  When a court perceives a conflict between two provisions, specific provisions control over general provisions.  *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 531 (Tex. 2015).   This is particularly true where, as here, the specific provisions are unambiguous.  *Kartsotis v. Bloch*, 503 S.W.3d 506, 518 (Tex. App.—Dallas 2016, pet. denied).

37.     ERCOT's reading would also have a single paragraph overrule and render irrelevant Protocol § 21's detailed procedures for revising the Protocols, violating hornbook law against interpreting one contract clause to make others meaningless.  *See Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002); *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).  The parties agreed that changes in the law would validly control only if promulgated pursuant to these procedures; permitting the PUCT to circumvent them with unilateral orders would not just violate the parties' intent, but also render § 21 meaningless.

38.     Finally, ERCOT's argument that § 11(L) of the *SFA* allowed ERCOT to ignore the *Protocols* has been foreclosed by the Legislature's recent amendment of the Texas Utility Code.  As the Debtor shows in its opposition to the Motion, Senate Bill 1580, effective June 18, 2021 ("**SB 1580**"), requires the Debtor to securitize the amount owed to ERCOT due to Winter Storm Uri – with such amount "*calculated solely according to the [ERCOT] protocols . . . in effect*

14

*during the period of emergency*." 76th Leg., SB 1580 *codified at* TEX. UTIL. CODE § 41.151(b) (emphasis added); *see also id*. at § 39.160(a) (requiring all market participants to make "full and prompt payment of amounts owed *calculated solely according to the protocols in effect during the period of emergency"*) (emphasis added).

39.     In sum:  ERCOT contends that § 11(L) states, in effect, that Protocols govern "subject to PUCT orders."  SB 1580 renders such a reading untenable in connection with any calculation of the ERCOT Claim.  Even if the "subject to" language somehow included *future* PUCT orders, it does not include the February 15 PUCT Order.  The Legislature has confirmed the primacy of the Protocols' pricing requirements over any PUCT order, rendering irrelevant the February 15 PUCT Order and ERCOT's purported reliance on it as a defense.  Thus, ERCOT's Claim may be allowed "solely" according to the Protocols.

40.     For all of these reasons, ERCOT's attempts to legitimize its non-market invoices to the Debtor fail as a matter of law.  As a result, not only should the motion to dismiss Count 1 be denied, but the Committee also should be granted leave to move for partial judgment against ERCOT on Count 1 as to liability.   Here, the applicable contract provisions on their face preclude a finding that Brazos is liable to pay any ERCOT invoice based on a price of $9,000 per MWh. No  potentially  disputed  facts  will  alter  that  result.   Plaintiffs  are  thus  entitled  to  summary judgment.[10]

---

[10] The portion of the Motion seeking dismissal of Count 3 should also be denied.  Count 3 alleges that the Debtor was not in "Default" under the SFA prior to the Petition Date because it properly gave notice of a "Force Majeure Event" under Section 8 of the SFA (with capitalized terms in quotes defined in the SFA).  Cmplt. ¶ 137.  As a result, Count 3 further alleges: "to the extent that the ERCOT Claim asserts any amounts *resulting from the Debtor's alleged default under the SFA*, such as amounts based on the default uplift process, among others, those amounts should be disallowed in their entirety."  *Id*. ¶ 138 (emphasis added).  ERCOT seeks to dismiss Count 3 due to the limitation in Section 8(C)(2) of the SFA stating that: "a Force Majeure Event does not relieve a Party affected by a Force Majeure Event of its obligations to make payments or of any consequences of non-performance."  While the language upon which ERCOT relies might preclude a claim seeking to avoid, based on a Force Majeure Event, payment of amounts *generally owed under the SFA*, amounts owed thereunder "*resulting from the Debtor's alleged default*" fall into a different category.  Because the Debtor properly noticed a Force Majeure Event, it was not in Default under the SFA

## II.  **There is No Basis For Abstention Under Either _Burford_ or 28 U.S.C. § 1334(c).**

41.    The last paragraph of ERCOT's Motion appears to ask the Court to abstain from the entire adversary proceeding.  However, all of ERCOT's arguments for abstention appear to relate to Brazos's denial of liability under the Protocols in Counts 1, 2, and 3.  None of the arguments relates to the fraudulent transfer claims in Counts 4 and 5 or the determination of administrative expense priority in Counts 6, 7, 8, and 9.  In all events, even the arguments for abstention on Counts 1, 2, and 3 lack merit.

### A.  **Permissive abstention under 28 U.S.C. § 1334(c)(1) is not warranted.**

42.    Although it is not entirely clear, it appears ERCOT is arguing that abstention under the 1943 decision of _Burford v. Sun Oil Co._, 319 U.S. 315 (1943), is a distinct abstention doctrine separate from § 1334(c)(1) of Title 28.  _See_ Motion to Dismiss, ¶¶ 28, 46-60.  In paragraph 28 and footnote 12 of its Motion, ERCOT cites to a couple of bankruptcy cases that have analyzed _Burford_ abstention  separately  from  permissive  abstention  under  28  U.S.C. § 1334(c)(1).[11]

43.    However, other courts have held that _Burford_ has been superseded in bankruptcy cases by Section 1334(c)(1).  _See In re Super Van, Inc._, 161 B.R. 184, 190 (Bankr. W.D. Tex. 1993) ("Superimposing _Burford_ over what Congress has already written would only defeat congressional intent by adding a judicial gloss of abstention onto the provisions for legislative

---

in the first place and, therefore, it cannot be liable for "default damages" – _i.e._, damages arising solely from an alleged default as distinguished from amounts otherwise owed under the SFA – because there has been no Default.  For this reason, the portion of the Motion seeking to dismiss Count 3 should be denied.

[11] ERCOT did not invoke mandatory abstention under section 1334(c)(2) because a claim objection is a core proceeding and there is currently no pending state court action.  _See_ 28 U.S.C. § 1334(c)(2); _see also In re Lambert_, No. CIV. A. 97-2082, 1998 WL 188935, at *4 (E.D. La. Apr. 20, 1998) (mandatory abstention inappropriate where state law issues arose in context of claim objection, which is core proceeding), _aff'd_, 194 F.3d 679 (5th Cir. 1999); _Houston Baseball Partners LLC v. Comcast Corp. (In re Houston Reg'l Sports Network, L.P.)_, 514 B.R. 211, 214 (Bankr. S.D. Tex. 2014) (M. Isgur) (citing _Special Value Continuation Partners, L.P. v. Jones_, No. ADV 11-3304, 2011 WL 5593058, at *2 (Bankr. S.D. Tex. Nov. 10, 2011) (Isgur, J.) ("Section 1334(c)(2) requires that a state court action be commenced prior to the bankruptcy proceedings.")).

13022051

abstention already built into the statute."); *see also, e.g.*, *Personette v. Kennedy (In re Midgard Corp.)*, 204 B.R. 764, 774 (B.A.P. 10th Cir. 1997) ("Unlike general federal court practice where abstention is founded exclusively on common law, courts presiding over bankruptcy cases are required to apply the abstention standards set forth in section 1334(c).") (citing *Cathedral of Incarnation v. Garden City Co. (In re Cathedral of the Incarnation)*, 99 F.3d 66, 68-69 (2d Cir. 1996); *Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.)*, 950 F.2d 839, 845 (2d Cir. 1991) (Section 1334(c)(1) "intended to codify judicial abstention doctrines); *Bricker v. Martin*, 348 B.R. 28, 32 (W.D. Pa. 2006) ("[T]he grounds for abstention in bankruptcy cases have been codified and [bankruptcy courts] are not strictly bound by these [judicially created abstention doctrines].") (quoting *Southwinds Assocs. v. Reedy (In re Southwinds Assocs.)*, 115 B.R. 857, 861 n.5 (Bankr. W.D. Pa. 1990)).

44.     Permissive abstention in a bankruptcy proceeding is governed by 28 U.S.C. § 1334(c)(1), which provides:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

45.     Although entirely absent from the Motion, courts in the Fifth Circuit, including this Court, typically use a flexible, factors-based analysis to determine if permissive abstention is appropriate, which includes examining the following non-exclusive factors:

(1)     the effect or lack thereof on the efficient administration of the estate if the court abstains;

(2)     extent to which state law issues predominate over bankruptcy issues;

(3)     difficult or unsettled nature of applicable law;

(4)     presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(5)   jurisdictional basis, if any, other than 28 U.S.C. § 1334;

(6)   degree of relatedness or remoteness to main bankruptcy case;

(7)   the substance, rather than the form, of an asserted core proceeding;

(8)   the feasibility of severing state law claims from core bankruptcy matters to allow judgment to be entered in state court with enforcement left to the bankruptcy court;

(9)   the burden of the court's docket;

(10)  the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11)  the existence of a right to a jury trial;

(12)  the presence in the proceeding of non-debtor parties;

(13)  comity; and

(14)  the possibility of prejudice to other parties in the action.

*Bustamante v. J. Moss Investments, Inc. (In re J. Moss Investments, Inc.)*, Adv. No. 12-5002, 2012 WL 2150346, at *4 (Bankr. S.D. Tex. June 12, 2012) (D. Jones); *Special Value Continuation Partners, L.P.*, Adv. No. 11-3304, 2011 WL 5593058 at *7-8 (Bankr. S.D. Tex. Nov. 10, 2011) (citing *Sabre Techs., L.P. v. TSM Skyline Exhibits, Inc.*, No. CIV.A. H-08-1815, 2008 WL 4330897, at *4 (S.D. Tex. Sept. 18, 2008)). "Courts have broad discretion when considering abstention . . . under these provisions." *Special Value Continuation Partners, L.P.*, 2011 WL 5593058, at *8.

46.    Importantly, ERCOT cannot establish at least four of *Bustamante*'s key factors for abstention under §1334(c)(1) – specifically that:

- Abstention contributes to efficient administration of the estate,

- Abstention is sought with respect to an action not critical to the main bankruptcy case,

- The presence of a pending state court proceeding that would determine the amount of ERCOT's claim, and

13022051

- Abstention is sought with respect to an action which can be severed from actions over which the bankruptcy court has exclusive jurisdiction.[12]

47.     This Court's decision in *Bustamante* is instructive.  In that case, before bankruptcy, Bustamante and the debtor entered into a lease agreement under which Bustamante agreed to lease a tract of land in Zapata County, Texas to the debtor for use as an oil and gas waste treatment facility.  A dispute arose between the parties and Bustamante filed a lawsuit against the debtor in the 49th Judicial District Court of Zapata County, Texas.  2012 WL 2150346, at *1.  The debtor filed its bankruptcy case while the proceedings in state court were pending.  A day after filing bankruptcy, the debtor removed the state court case to bankruptcy court.  *Id.*  Bustamante filed a motion for abstention, or in the alternative, remand, seeking an order transferring the case back to state court.  *Id.* at *2.

48.     In denying the request for permissive abstention, this Court held that the resolution of the adversary proceeding would have a significant impact on the administration of the estate because the bankruptcy law issues were "substantial and decisive" while the state law issues did not predominate and the claims did not implicate any area of unsettled state law.  *Id.* at *4-5. In addition, severing the state law claims from the core bankruptcy matters would prove "exceedingly difficult, if not impossible."  *Id.* at *5.

49.     Here, similarly, abstention would not contribute to the efficient administration of the estate.  Of the nine counts in the Complaint, ERCOT argues for abstention of only the three counts relating to the Debtor's alleged contractual liability under the SFA.  ERCOT makes no argument that the Court should abstain from the fraudulent transfer actions in Counts 4 and 5 or

---

[12] The only factors that even arguably favor abstention are the presence of state law issues and the jurisdictional basis for the claim objection.  However, at least one court has held that "[t]he adjudication of contested proofs of claim which commonly requires the determination of disputed state law issues is a responsibility of this Court for which abstention would be inappropriate."  *Asousa P'ship v. Pinnacle Foods, Inc. (In re Asousa P'ship),* 276 B.R. 55, 75 (Bankr. E.D. Pa. 2002).  In any event, these factors are outweighed by the other factors discussed herein.

from determining the priority of ERCOT's claim under § 503(b)(9).  Actions to void fraudulent transfers and determine priority involve many of the same legal and fact issues as those implicated by the contract-based Counts 1, 2, and 3.  The value of the power bought by the Debtor is just one such fact issue:  Count 1 would limit allowance of the ERCOT claim to the value of power bought; Counts 4 and 5 would void the claim to the extent it exceeds the value of power bought; and Count 9 would limit any § 503(b)(9) priority to the value of power bought.  It makes no sense for the Court to abstain and allow another forum to determine the value of power bought under Count 1 when the Court would still have to determine the value of power bought under Counts 4, 5, and 9.

50.     Abstention fails the second factor as well:  the adversary proceeding is critical to the main bankruptcy case.  In fact, the ERCOT Claim is the very reason that the Debtor filed for bankruptcy.  *See Declaration of Clifton Karnei in Support of Chapter 11 Petition and Emergency First-Day Motions* [Bankr. Dkt. No. 3], ¶¶ 56-64.  ERCOT's $1.9 billion proof of claim is the largest in the case, and its allowance or disallowance will determine how much money the Debtor has to raise to pay its creditors.  Fixing the Claim's priority will determine the design of any plan and any post-effective date securitization or securities issuance.  *See, e.g.*, *Sabre Techs., L.P. v. TSM Skyline Exhibits, Inc.*, No. CIV.A. H-08-1815, 2008 WL 4330897, at *5 (S.D. Tex. Sept. 18, 2008) (holding that bankruptcy court was best court to adjudicate claims asserted by debtor's largest creditor); *see also In re Dreier*, 438 B.R. 449, 459 (Bankr. S.D.N.Y. 2010) (permissive abstention not warranted where "resolution of the acceleration question in the context of the Claim Objection will have a significant impact on the estate").

51.     In addition, if the Court grants abstention, there will be no pending proceeding to determine the contract questions raised in the Complaint because, as discussed below, the

*Luminant* appeal does not address these issues, and the Complaint does not challenge the validity of any PUCT orders.

52.     Finally, Count 1's contract action cannot be severed from the fraudulent transfer actions in Counts 4 and 5 or the administrative priority objections in Counts 6-9, which only this Court has jurisdiction to hear.  *Riley v. Simmons*, 45 F.3d 764, 777 (3d Cir. 1995); *Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Grp., Inc.)*, 331 B.R. 580, 590 (Bankr. D. Del. 2005) (abstention not warranted where state court lacked jurisdiction over preference and fraudulent conveyance claims).  Because the arguments in Count 1 and Counts 4-9 "arise from a common core of operative facts such that they 'form part of the same case or controversy . . .' severance is impracticable." *Sabre Techs., L.P.*, 2008 WL 4330897, at *5 (internal citation omitted).

### B. ERCOT's Motion also fails the *Burford* test.

53.     Even if *Burford* abstention survived as a separate analysis under 28 U.S.C. § 1334(c)(1), the relevant factors would not warrant abstention here.  ERCOT argues that *Burford* compels abstention because the adversary proceeding involves major unsettled issues of Texas regulatory and utility law that must be adjudicated by the PUCT and Texas state courts.  However, nothing in the Complaint requires this Court to rule on, or interfere with, Texas's utility regulation, PUCT orders, or PUCT jurisdiction.  There are no "unsettled questions" of Texas law, or legal issues with public policy implications, to be decided in this adversary proceeding.  Counts 1, 2, and 3 simply call on the Court to determine the scope of Brazos's liability under established contract law – something this Court does in every case.  Counts 4 and 5 call on the Court to apply and interpret fraudulent transfer law – something only this Court has jurisdiction and competence to do.  Even if ERCOT contended that its claim was somehow exempt from fraudulent transfer law – an argument it has not made – such contention would be decided in this Court and nowhere else.  Finally, Counts 6 through 9 call on this Court to adjudicate the priority of ERCOT's claim

13022051

under the Bankruptcy Code – an adjudication that no other court could conceivably have jurisdiction to consider.

54.     ERCOT argues that pending challenges to PUCT orders before the PUCT and on appeal to Texas courts require this Court to abstain from conflicting with decisions in those state fora.  But the Complaint raises none of the challenges to PUCT orders pending in state court, and none of those state court challenges raises any of the issues before the Court in this adversary proceeding.  The litigation in state court involves the propriety of actions by the PUCT under Texas's Administrative Procedure Act and the Public Utility Reform Act.  The litigation in this Court involves the propriety of actions by ERCOT under its contract with the Debtor and the Bankruptcy Code.   There is no possibility of conflicting decisions because the courts are considering how to apply different laws to different parties in different contexts.

### III. The PUCT is Not a Necessary Party Under Rule 19(a) and There is No Ground for Dismissal Under Rule 19(b).

55.     ERCOT argues that the PUCT must be joined as a necessary party under Fed. R. Civ. P. 19(a) in Counts 1, 2, and 3 on the grounds that adjudicating those counts (1) puts ERCOT at risk of conflicting orders of this Court and the PUCT, and (2) prejudices the interests of the PUCT.  ERCOT then concludes that the PUCT has sovereign immunity, joinder is thus prohibited, and therefore the Complaint must be dismissed pursuant to Rule 19(b).  Motion ¶¶ 65-81.

56.     There is no merit to these arguments, all of which trace to ERCOT's misstatement of the relief sought by the Complaint and the nature of this adversary proceeding.  The Complaint does not challenge the validity of any statute or regulation, or any PUCT order.  It does not seek "repricing" or any alteration of the market for power.  The Complaint challenges only the allowance and priority of a bankruptcy claim.  The Complaint seeks no relief from ERCOT that could put ERCOT in conflict with PUCT orders.  The Complaint seeks no relief that prejudices

the PUCT, which has not claimed an interest in the litigation, and ERCOT lacks standing to assert any prejudice on the PUCT's behalf.

### A. Rule 19(a)(1)(A): The Court can afford complete relief among existing parties.

57.     The PUCT need not be joined under Rule 19(a)(1)(A) because complete relief can be accorded among existing parties.  Though the circumstances that gave rise to this matter are by no means trivial, this adversary proceeding is a straightforward dispute:  ERCOT filed a claim, and the Debtor and Committee as intervening plaintiff object to the claim.  "Complete relief" would be afforded by an order that allows or disallows the claim and determines its priority.  Thus, Rule 19(a)(1)(A) does not apply:  the Court can afford complete relief between the Debtor and ERCOT without joining the PUCT.

### B. Rule 19(a)(1)(B):  The PUCT does not claim an interest relating to the subject of the adversary proceeding.

58.     The PUCT need not be joined under Rule 19(a)(1)(B) either, both because the PUCT does not claim an interest relating to the subject of this action, and because resolution of this adversary proceeding will not leave ERCOT subject to a substantial (or indeed, any) risk of inconsistent obligations.

59.     ERCOT's argument that the PUCT must be joined under Rule 19(a)(1)(B) ignores the language of this rule, which provides that a person can be a necessary party only if "that person claims an interest relating to the subject of the action."  The PUCT claims no interest relating to the subject of this adversary proceeding.  The PUCT has appeared in numerous hearings and status conferences relating to discovery;[13] it has zealously preserved its ability to seek intervention.  But

---

[13] ERCOT quotes Committee counsel's arguments for discovery from the PUCT as somehow "admitting" that it is a necessary party.  These arguments were made in conjunction with discovery under Rule 2004, which enables discovery of *anyone* – parties, necessary parties, unnecessary parties, and bystanders.  Asking for discovery from the PUCT under Rule 2004 is irrelevant to whether or not it is a necessary party.  Even in adversary proceedings or ordinary civil litigations, a third-party subpoena does not establish the recipient as a "necessary party."

13022051

at no time has the PUCT "claimed an interest relating to the subject of the action," and ERCOT does not allege that the PUCT has done so.[14]

60.     If the PUCT is to be a necessary party because of its "interest in the subject matter," it is the PUCT, not ERCOT, that must claim such an interest.  *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) ("It is the absent party that must 'claim an interest'."); *Conntech Dev. Co. v. Univ. of Conn. Educ. Props. Inc.*, 102 F.3d 677, 683 (2d Cir. 1996) (defendant's self-serving attempts to assert interests on behalf of non-party fall outside language of Rule 19(a)(2) and thus cannot be basis for necessary party argument).  Indeed, ERCOT has no standing to assert a PUCT interest that the PUCT itself does not claim.  As the Fifth Circuit observed in *Federal Insurance Co. v. Singing River Health System*, 850 F.3d 187, 201 (5th Cir. 2017), absent parties who are aware of litigation and able to intervene in a suit "have means to protect their interest."  *See also Texas v Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 U.S. Dist. LEXIS 223055, at *18 (W.D. Tex. Aug. 27, 2018) (denying Rule 19 dismissal; nonparty's interest is not impaired under Rule 19(a)(1)(B) where it "is aware of the litigation and able to intervene if it believes that [the defendant] does not sufficiently protect its interests").

61.     It also appears that the PUCT in fact has *no* interest in the "subject matter of the action."  The PUCT has asserted no property right or other interest in the Claim.  An order disallowing or allowing the Claim has no effect on any PUCT order or regulation.  Indeed, no

---

[14] The cases ERCOT cites (at ¶ 66) *denied* motions to dismiss for failure to join indispensable parties.  *HS Resources, Inc. v Wingate*, 327 F.3d 432, 439 (5th Cir. 2003), affirmed denial of a motion to dismiss where "the outcome of this litigation will not affect" the other parties. *Texas v Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 U.S. Dist. LEXIS 223055, at *18 (W.D. Tex. Aug. 27, 2018), denied a motion to dismiss under Rule 19, finding that the nonparty's interest was not impaired where, like the PUCT here, it was "aware of the litigation and able to intervene" but chose not to.

count in the Complaint calls upon the Court even to *interpret* a PUCT order, much less to challenge the validity of any PUCT order.

62.     ERCOT contends that the PUCT's defense of its orders in Texas state court litigation shows that the PUCT has an interest in the defense of those orders in this Court.  As noted above, however, this adversary proceeding does not challenge any PUCT orders.  This adversary proceeding has not raised the issues or cited the statutes at issue in the Texas litigation, and conversely, the appellants in the Texas litigation have not raised the issues or cited the statutes at issue in this adversary proceeding.[15]

63.     ERCOT admits (Motion ¶ 71) that the Court could "declare that Brazos owes less than is stated on its unpaid invoices" without ruling on the validity of the PUCT Order, but contends that "such judgment would nevertheless have far-ranging effects on hundreds of parties not before this Court."  But such "effects" do not make anyone an indispensable party.  *See, e.g.*, *Samuel Goldwyn, Inc. v. United Artists Corp.*, 113 F.2d 703, 707 (3d Cir. 1940) ("[T]he 'interest' referred to both in Rule 19 and the decided cases is one which must be directly affected legally by the adjudication."); *Nat. Res. Defense Council, Inc. v. Berklund*, 458 F. Supp. 925, 933 (D.D.C. 1978) (where environmental organization sought declaratory and injunctive relief against defendant Secretary of Interior in regard to his issuance of preference right coal leases on federal land, numerous lease applicants who could be adversely affected not indispensable parties), *aff'd*, 609 F.2d 553 (D.C. Cir. 1979); *ACLU v. Bd. of Public Works*, 357 F. Supp. 877, 884 (D.

---

[15] ERCOT cites *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305 (5th Cir. 1986) (*see* Motion ¶¶ 35, 67, 78), but that case only highlights – by way of contrast – how little Rule 19 applies here.  There, Carol, Susan, and Lillian Pulitzer, all shareholders in a family-owned corporation, had sued in state court alleging corporate mismanagement.  When Carol then brought a second suit in federal district court making comparable allegations and seeking comparable relief, but did not join Susan and Lillian, the district court dismissed the action under Rule 19, as "both the federal and state lawsuits seemed to be seeking the same objectives," *id.* at 1307, and the Fifth Circuit affirmed.

Md. 1972) (Rule 19 "does not require a court to join all persons whose interests might conceivably be affected by the decision in the case").

64.     Far from being a "necessary party," the PUCT does not appear even to have standing with respect to the disallowance of a Claim in which it has no interest, or to "protect" a PUCT order that does not apply to the Debtor, is not challenged by the Debtor, and whose terms this Court is not called upon to enforce or interpret.

### C.  Rule 19(a)(1)(B)(ii): ERCOT is not subject to a substantial risk of incurring inconsistent obligations.

65.     ERCOT argues that this adversary proceeding puts ERCOT at substantial risk of inconsistent obligations under separate orders from the Court and the PUCT.  As a technical matter, Rule 19(a)(1)(B)(ii) applies only if the PUCT has "claimed an interest" in the subject of the proceeding, so the PUCT's failure to do so dooms ERCOT's argument that it would be subject to inconsistent orders.

66.     Beyond that, ERCOT bears no risk of inconsistent obligations. The Complaint seeks no affirmative relief from ERCOT.  It does not seek damages.  It does not seek an injunction. It seeks no relief from ERCOT that could put ERCOT in conflict with any order of the PUCT.  All it does is seek disallowance of the ERCOT Claim under theories of contract law and fraudulent transfer, and denial of priority under §503(b)(9).  And entering an order disallowing the claim or denying its priority would not cause ERCOT to be in violation of any PUCT order, rule, or regulation.

13022051

### D. Rule 19(b): There is no basis to dismiss the Complaint even if the PUCT were a necessary party.

67.     ERCOT argues that if the PUCT is a necessary party, the Complaint must be dismissed because the PUCT's sovereign immunity precludes its joinder.  As noted above, the PUCT is not a necessary party, so this argument fails.[16]

### E. Bankruptcy Rule 9014: Judicial efficiency favors denial of ERCOT's Rule 19 arguments.

68.     Even if the Court agreed with ERCOT that under Rule 19 the PUCT is a necessary party to the adversary proceeding, it would not finally resolve plaintiffs' claim objection.  Count 1 could be immediately refiled in a claim objection and Bankruptcy Rule 9014 does not incorporate Rule 12 or 19 to contested matters.  Thus, dismissing Count 1 based on Rule 19 would elevate form over substance and result only in delays.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Committee respectfully requests that the Court (1) deny ERCOT's Motion in its entirety, and (2) grant the Committee's forthcoming motion seeking leave to move for summary judgment on Counts 1, 6 and 7 of the Complaint.

---

[16] The Committee reserves its right to seek to amend the complaint to join the PUCT if the Court determines joinder is necessary or if the Committee seeks to amend the Complaint to assert additional claims.  Any issue of sovereign immunity can be determined at such time as relief is sought from the PUCT.

13022051

Dated: September 28, 2021

Respectfully submitted,

**PORTER HEDGES LLP**

*/s/      John F. Higgins*
John F. Higgins (TX 09597500)
Eric D. Wade (TX 00794802)
Heather K. Hatfield (TX 24050730)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
jhiggins@porterhedges.com
ewade@porterhedges.com
hhatfield@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

- and –

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Thomas Moers Mayer (admitted *pro hac vice*)
Amy Caton (admitted *pro hac vice*)
Jennifer Sharret (admitted *pro hac vice*)
John P. Coffey (admitted *pro hac vice*)
Ronald S. Greenberg (admitted *pro hac vice*)
Seth F. Schinfeld (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
(212) 715-8000
tmayer@kramerlevin.com
acaton@kramerlevin.com
jsharret@kramerlevin.com
jcoffey@kramerlevin.com
rgreenberg@kramerlevin.com
sschinfeld@kramerlevin.com

*Counsel to the Official Committee of Unsecured Creditors*

13022051

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the foregoing document was forwarded by electronic transmission to all registered ECF users appearing in the case on September 28, 2021.

/s/ <i>John F. Higgins</i>
John F. Higgins

13022051