IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| BRAZOS ELECTRIC POWER | § | |
| COOPERATIVE, INC. | § | CASE NO. 21-30725 (DRJ) |
| | § | |
| DEBTOR. | § | |
| | § | |

---

| | | |
|---|---|---|
| BRAZOS ELECTRIC POWER | § | |
| COOPERATIVE, INC., | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| | § | |
| V. | § | |
| | § | Adv. Pro. No. 21-03863 (DRJ) |
| ELECTRIC RELIABILITY COUNCIL OF | § | |
| TEXAS, INC. | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |
| | § | |
| | § | |

**THE PUBLIC UTILITY COMMISSION OF TEXAS'S BRIEF IN SUPPORT OF
THE ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.'S
<u>MOTION TO DISMISS AND FOR ABSTENTION</u>**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................................ 1

II.   PROCEDURAL BACKGROUND ...................................................................................... 2

  A.   The Public Utility Commission of Texas ................................................................... 2

  B.   The Relationship Between the PUCT and ERCOT.................................................... 2

  C.   Winter Storm Uri ....................................................................................................... 4

  D.   The Bankruptcy Proceeding ...................................................................................... 6

     (1)   Administrative Matters, Discovery Requests, and the ERCOT Claim ........................ 6
     (2)   The ERCOT Claim Objection ................................................................................... 7

  E.   The Adversary Proceeding ......................................................................................... 8

     (1)   The Motions to Intervene ........................................................................................ 8
     (2)   The ERCOT Motion to Dismiss and the Responsive Pleadings.................................. 9
     (3)   The PUCT's Actions in the Case To-Date and Role in the Adversary Proceeding.... 10

III.  ARGUMENTS AND AUTHORITIES ............................................................................. 10

  A.   Pursuant to State Law, the PUCT Has Exclusive Original Jurisdiction Over the ERCOT Claim ........................................................................................................... 10

  B.   Sovereign Immunity Precludes the Adjudication of the ERCOT Claim in this Court....... 13

     (1)   Constitutional Underpinnings – Sovereign Immunity is on Equal Constitutional Footing as the Bankruptcy Clause ............................................................... 14
     (2)   The Bankruptcy Clause's Waiver of Sovereign Immunity is Limited ...................... 16
     (3)   Casting Aside PURA Would be an Affront to Texas Sovereignty ............................ 19
     (4)   The PUCT Has Not Waived Sovereign Immunity ................................................... 21
     (5)   Section 106 is Not at Issue ...................................................................................... 22

  C.   The Johnson Act Precludes This Court From Asserting Jurisdiction Over the ERCOT Claim ........................................................................................................... 24

  D.   This Court Should Abstain From Litigating the ERCOT Claim Because Litigating in Isolation is Not Possible and is Certain to Have Negative Consequences Far Beyond This Bankruptcy Case ...................................................................................... 25

(1)     A Ruling in This Bankruptcy Case Would Affect the Texas Energy Market and,
        Ultimately, Texas Consumers ..................................................................... 26
(2)     A Ruling in This Bankruptcy Case Would Have Lasting Effects on Futures Markets
        and the Economy of the State of Texas .................................................... 27

## **TABLE OF AUTHORITIES**

**Cases**

*Alden v. Maine*, 527 U.S. 706, 713 (1999) .................................................................. 17

*Am. Zurich Ins. Co. v. Jasso*, 598 Fed.Appx. 239, 244 (5th Cir. 2015) (per curiam)................... 13

*Bellsouth Telecomms., LLC v. Halo Wireless*,
    No. 11-801620-dd, 2011 WL 6010248, at *2 (Bankr. D. S.C. Nov. 30, 2011)............... 14

*Central Virginia Community College v. Katz*,
    546 U.S. 356 (2006)........................................................... 16, 19, 20, 22, 23, 26

*Chisolm v. Georgia*, 2 U.S. 419 (1793) ...................................................................... 17

*College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666, 675 (1999)................................................................................. 24

*Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 467 (1945)................................ 25

*Franchise Tax Board of California v. Hyatt*, 139 S.Ct. 1485 (2019) .................................... 17, 18

*Gulf Water Benefaction Co. v. Pub. Utility Commission of Tex.*,
    674 F.2d 462, 468 (5th Cir. 1982) (per curiam)............................................... 28

*Hans v. La.*, 134 U.S. 1 (1890) .................................................................................. 18

*Hoffman v. Conn. Dept. of Income Maint.*, 492 U.S. 96 (1989) .................................. 15

*In re Cajun Elec. Power Coop, Inc.*, 185 F.3d 446, 452 n.7 (5th Cir. 1999).............................. 28

*In re Cox*, 433 B.R. 911, 919 (Bankr. N.D. Ga. 2010) ............................................ 21, 24

*In re Entergy Corp.*, 142 S.W. 3d 316, 232 (Tex. 2004). ........................................ 2, 13

*In re Fernandez*, 123 F.3d 241, 243 (5th Cir. 1997)................................................ 26

*In re Hickman*, 260 F.3d 400, 406 (5th Cir. 2001). .................................................. 21

*In re La Paloma Generating Co.*, 588 B.R. 695, 720 (Bankr. D. Del. 2018)............................. 25

*In re PEAKSolutions Corp.*, 168 B.R. 918, 923 (Bankr. D. Minn. 1994) .................. 18

*In re Soileau*, 488 F.3d 302, 307-08 (5th Cir. 2007). .......................................... 20, 21

*In re Southwestern Bell Telephone Co.*, 235 S.W.3d 619, 625-26 (Tex. 2007) .......................... 13

*In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 256 (5th Cir. 2006).................. 26

*In re Venoco, LLC*, 998 F.3d 94 (3rd Cir. 2021) ...................................................... 22

*In re William Ross, Inc.*, 199 B.R. 551, 554 (Bankr W.D. Pa. 1996) ...................... 27

*McGuire v. United States*, 550 F.3d 903, 914 (9th Cir. 2008)................................. 24

*Penn. v. Union Gas*, 491 U.S. 1 (1989) ................................................................. 15

*Pennhurst State School & Hosp. v. Halderman*, 265 U.S. 89, 98 (1984)................... 18

*Public Utility Commission of Texas v. Southwestern Bell Telephone Co.*,
 960 S.W.2d 116 (Tex. App. – Austin 1997, no pet.) ....................................... 13

*Railway Labor Executives Assn'n v. Gibbons*, 455 U.S. 457, 466 (1982)................................... 16

*Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44 (1996) ................................................ 16, 18

*Sullivan v. Texas A&M Univ.*, 986 F.3d 593, 595 (5th Cir. 2021)................................ 15

*Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004)............... 18, 19, 21, 22, 23, 26

*Union Pacific R. Co. v. Louisiana Public Service Comm'n*,
 662 F.3d 336 (5th Cir. 2011). ........................................................ 25

*Wood v. Wood*, 825 F.2d 90, 93 (5th Cir. 1987) ................................................................. 29

## Statutes

16 Tex. Admin. Code § 22.251(a). ........................................................................... 11

16 Tex. Admin. Code § 22.251(b). ........................................................................... 11

16 Tex. Admin. Code § 22.251(o). ........................................................................... 11

28 U.S.C. § 1334 ..................................................................................................... 24

28 U.S.C. § 1342 ..................................................................................................... 24

28 U.S.C. § 1342(1) ........................................................................................... 24, 25

28 U.S.C. § 1342(2)-(4) ........................................................................................... 25

Tex. Admin. Code § 25.505(g). ............................................................................... 5

Tex. Util. Code § 17.157(a) .................................................................................... 12

Tex. Util. Code § 31.001(a) .................................................................................... 12

Tex. Util. Code § 39.151(a). ..................................................................................... 2

Tex. Util. Code § 39.151(d). ............................................................................ 3, 6, 11

Tex. Util. Code § 39.151. .................................................................................... 3, 12

Tex. Util. Code § 41.151(b) ..................................................................................... 13

Tex. Util. Code § 41.151(b)(1) ................................................................................ 13

## Other Authorities

Brubaker, *Explaining Katz's New Bankruptcy Exception to State Sovereign Immunity: The Bankruptcy Power as a Federal Forum Power*,
 15 Am. Bankr. Inst. L. Rev. 95, 112 (2007).................................................. 20

Clinton A. Vince and John S. Moot, *Energy Federalism, Choice of Forum, and State Utility Regulation*, 42 Admin. L. Rev. 323, 358 (1990). ........................................... 24

Federalist No. 42 ..................................................................................................... 15

*The Timeline and Events of the February 2021 Texas Electric Grid Blackouts*,
 The University of Texas at Austin Energy Institute, July 2021........................ 5

**Treatises**

2 COLLIER ON BANKRUPTCY ¶ 106.01 (16th ed. Rev. 2021) ......................................................... 23

**News Articles**

Bob Sechler, *ERCOT Pricing Glitch May Have Played Role in Texas Electricity Shortage*, AUSTIN AMERICAN STATESMAN, Feb. 26, 2021 .................................................... 4

Matt Largey, *Texas' Power Grid was 4 Minutes and 37 Seconds Away from Collapsing. Here's How It Happened,* KUT 90.5 (Feb. 24, 2021) ..................................................... 4

Taylor Goldstein, *Texas House Rejects Bill to Reprice Electricity Sold During Winter Storm*, HOUSTON CHRONICLE, March 16, 2021 ............................................................... 28

TO THE HONORABLE DAVID R. JONES
CHIEF UNITED STATES BANKRUPTCY JUDGE:

The Public Utility Commission of Texas (the "PUCT"), by and through the Office of the Attorney General of Texas, and subject to the assertion of sovereign immunity as set forth herein, files this brief (the "Brief") in support of the *Motion to Dismiss and for Abstention* [Doc. No. 23] (the "Motion to Dismiss") filed by the Electric Reliability Council of Texas, Inc. ("ERCOT"). In support of the Brief, the PUCT respectfully states as follows:

## I. <u>INTRODUCTION</u>

1.      The sovereignty of the State of Texas is directly implicated in this Adversary Proceeding.[1] The Debtor would have this Court believe that the ERCOT Claim can be addressed in isolation. In fact, any such determination will have effects rippling far beyond the Adversary Proceeding and the Bankruptcy Case.

2.      Texas law provides the PUCT exclusive original jurisdiction over the ERCOT Claim. This exclusive jurisdiction is protected through sovereign immunity from challenges like those asserted by the Debtor in this Adversary Proceeding. Despite the Debtor's post hoc attempts to obfuscate its true intentions, the Debtor is asking this Court to use the ERCOT Claim as the basis for unilaterally redesigning the Texas energy market. Such intervention into the heart of state policy by a federal court would be contrary to the carefully constructed regulatory scheme governing the Texas energy market and would be an affront to the sovereignty of the State of Texas. Sovereign immunity precludes such intervention by a federal court.

3.      Moreover, the doctrine of abstention provides this Court with an additional – and proper – basis for granting the ERCOT Motion to Dismiss based on comity with Texas courts, respect for Texas law, and considerations of potentially negative effects of taking the matter up in

---

[1] Capitalized terms have the meanings ascribed to them below.

this Court. Specifically, the reduction or disallowance of ERCOT's Claim in this proceeding will directly affect other market participants. Moreover, it would be seen as effectively resetting the February energy prices, which could lead to a domino effect of other market participants filing bankruptcy to seek similar relief. Worse still, because direct and derivative financial transactions have relied upon the February pricing, resetting such prices could have catastrophic effects on the U.S. financial system. These facts support the Court abstaining from taking up the ERCOT Claim.

4.    For these reasons, the PUCT supports ERCOT's Motion to Dismiss.

## II.    PROCEDURAL BACKGROUND

### A.    The Public Utility Commission of Texas

5.    The PUCT was created in 1975, following the enactment by the Texas Legislature of the Public Utility Regulatory Act ("PURA"), to protect the public interest inherent in the rates and services of public utilities, and to regulate the State of Texas's electric, telecommunication, and water and sewer utilities. The Legislature "intended PURA to be the exclusive means of regulating electric utilities in Texas."[2] In 1995, the role of the PUCT changed following the creation by the Texas Legislature of a competitive electric wholesale market. In 1999, the Texas Legislature provided for further restructuring of the electric utility industry and opened much of Texas to competitive retail electric provider choice. The PUCT currently employs approximately 200 individuals and has four active Commissioners.

### B.    The Relationship Between the PUCT and ERCOT

6.    As part of the competitive electric wholesale market created by the Texas Legislature in 1999, the PUCT was required to certify an entity to serve as the independent organization to ensure "the reliability and adequacy of the regional electric network."[3] That entity

---

[2] *In re Entergy Corp.*, 142 S.W. 3d 316, 232 (Tex. 2004).
[3] TEX. UTIL. CODE § 39.151(a).

is ERCOT, which, while an independent organization, falls under the PUCT's authority.[4] ERCOT is directly responsible and accountable to the PUCT, and the PUCT has "complete authority to oversee" ERCOT to ensure that it adequately performs its functions and duties.[5]

7.      ERCOT is the "central counterparty for all transactions" and "is deemed to be the sole buyer to each seller, and the sole seller to each buyer, of all energy."[6] ERCOT essentially functions as a clearing house for willing buyers and sellers of electricity, a market conducted within the vital context of the reliable operation of the transmission system in the power region. ERCOT "manages the flow of electric power" for approximately 90% of the State of Texas, and "also performs financial settlement for the competitive wholesale bulk-power market."[7]

8.      ERCOT also has the authority to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity" where the PUCT has "delegate[d] responsibilities for establishing or enforcing such rules."[8] ERCOT maintains and publishes a compilation of the rules, known as the "Nodal Protocols."[9]

9.      The Nodal Protocols provide that entities must enter into the Standard Form Market Participate Agreement ("SFA") to participate in the energy market.[10] The Debtor entered into an SFA with ERCOT on January 14, 2015.[11] Section 11 (L) of the SFA between Brazos and ERCOT provides in part that the agreement is "subject to applicable federal, state, and local laws, ordinances, rules, regulations, order of any Governmental Authority and tariffs."[12]

---

[4] *Id.* at § 39.151.
[5] TEX. UTIL. CODE § 39.151(d).
[6] Nodal Protocols at § 1.2(4). *See* discussion below for the definition of the ERCOT Protocols.
[7] TEX. UTIL. CODE § 39.151.
[8] *Id.* at § 39.151(g-l).
[9] *See* http://www.ercot.com/mktrules/nprotocols/current.
[10] *See* Nodal Protocols § 22.
[11] The Debtor's SFA is attached as Exhibit A to the ERCOT Proof of Claim, Claim No. 115.
[12] SFA § 11(L). The PUCT is considered a "governmental authority" as defined by the Nodal Protocols § 2.

C.      **Winter Storm Uri**

10.      Winter Storm Uri arrived in early February, bringing record-setting, sub-freezing temperatures to Texas. This severe and historic winter event resulted in an increased demand for electricity, as well causing equipment and pipelines to freeze and power plants to go offline. Early on February 15th, ERCOT declared its highest state of emergency, Emergency Alert Level 3 ("EEA3"), due to exceptionally high electric demand that exceeded available electric supply. Within minutes of declaring EEA3, ERCOT began ordering load-shed, which is an industry reference to cutting off electricity, to ensure that the power grid did not suffer catastrophic damage due to the extreme demand and lack of sufficient supply of power. This load-shedding continued over the course of the next few days, ending on February 18th, with the Emergency Energy Alert Level eventually reaching normal operations by 10:30 a.m. on February 19th.[13]

11.      As ERCOT began ordering load-shedding to balance the energy grid during the winter storm, it faced an unprecedented situation regarding market prices. In light of the load shedding to a large percentage of customers, the algorithms used to set pricing did not reflect the level of scarcity of power in the market, which in turn reduced prices of energy and necessary generation as a result.[14]

12.      The PUCT issued two orders (the "February Orders") during the winter storm that impacted ERCOT energy market pricing on February 15th and February 16th, 2021.[15] In the first

---

[13] It has been widely reported that at one point during the storm, the ERCOT grid was "just 4 minutes and 37 seconds away from a cascading series of events that could have left Texas in the dark for weeks – if not longer." *See, e.g.,* Matt Largey, *Texas' Power Grid was 4 Minutes and 37 Seconds Away from Collapsing. Here's How It Happened,* KUT 90.5 (Feb. 24, 2021), *available at* https://www.kut.org/energy-environment/2021-02-24/texas-power-grid-was-4-minutes-and-37-seconds-away-from-collapsing-heres-how-it-happened.

[14] Bob Sechler, *ERCOT Pricing Glitch May Have Played Role in Texas Electricity Shortage*, AUSTIN AMERICAN STATESMAN, Feb. 26, 2021, *available at* https://www.statesman.com/story/business/2021/02/26/ercot-grid-pricing-glitch-texas-electricity-shortage/6837201002/.

[15] The second order was virtually identical to the first order issued, but removed a provision that retroactively raised prices in the market if they had been below that value between the start of the load shed event and entry of the order.

part of the February Orders, the PUCT determined that prices during the load shedding that began on February 15th were not reflective of scarcity of electricity on the market, because prices were clearing below the system-wide offer cap of $9,000 per MWh. "If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest.[16] This declaration in the Order reflected a provision of PUCT's scarcity pricing mechanism, established by the PUCT's scarcity pricing rule adopted in 2006, that requires the value of lost load – the price attributed to consumer demand that cannot be served due to insufficient supply – to be equal to the system-wide offer cap.[17] As such, the PUCT directed ERCOT to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[18]

13.     The second part of the February Orders addressed the low system-wide offer cap ("LCAP"), also a component of the PUCT's scarcity pricing mechanism. The LCAP provides that once peaker net margin is reached, the price of energy is priced at the greater of either $2,000 per MWh, or *50 times* the natural gas price index value determined by ERCOT.[19] Because of the extreme demand for natural gas and constraints on natural gas supply during the winter storm, the price of natural gas was significantly higher than normal, averaging near $400/MMBTU, with one quote as high as $1,100/MMBTU.[20] The resulting LCAP price, without the February Orders, could have exceeded $20,000 per MWh. This second part of the February Orders has yet to be challenged in this or any other court.

---

[16] *See Order Directing ERCOT to Take Action and Granting Exception to Commission Rules*, February 15, 2021, *available at* https://interchange.puc.texas.gov/Documents/51617_3_1111656.PDF.
[17] 16 Tex. Admin. Code § 25.505(g).
[18] *See Order Directing ERCOT to Take Action and Granting Exception to Commission Rules*, February 15, 2021, *available at* https://interchange.puc.texas.gov/Documents/51617_3_1111656.PDF.
[19] *Id.*
[20] *See The Timeline and Events of the February 2021 Texas Electric Grid Blackouts*, pg. 62, The University of Texas at Austin Energy Institute, July 2021.

14.     After the PUCT issued the February Orders, ERCOT set prices for electricity at the "System Wide Offer Cap" of $9,000 per MWh.[21] It is worth noting that had ERCOT failed to comply with the February Orders, the PUCT could have taken appropriate action for that failure to perform, including assessing administrative penalties on ERCOT or decertifying ERCOT as the independent organization.[22]

## D.     The Bankruptcy Proceeding

### (1)     *Administrative Matters, Discovery Requests, and the ERCOT Claim*

15.     On March 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Bankruptcy Case,") under Chapter 11 of the Bankruptcy Code.

16.     On March 15, 2021, the United States Trustee formed the Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case.

17.     On May 28, 2021, the Committee filed the *Notice of the Official Committee of Unsecured Creditors of Rule 2004 Examination and Document Production Requests to PUCT* [Doc. No. 691] (the "Committee Document Requests").

18.     On June 14, 2021, ERCOT filed an approximately $1.9 billion proof of claim in the Bankruptcy Case (the "ERCOT Claim"). The ERCOT Claim is based largely on the Debtor's alleged "short pay" of the Debtor's payment obligations to ERCOT under the SFA.

19.     On June 18, 2021, the PUCT filed its *Motion to Quash and Protective Order* in response to the Committee Document Requests [Doc. No. 798] (the "Motion to Quash").

20.     On July 29, 2021, the Debtor served the PUCT with its Requests for Production (the "Debtor Document Requests").

---

[21] *See* TEX. UTIL. CODE § 39.151(d).
[22] *Id.*.

21.     On August 6, 2021, after a hearing on the matter, the Court entered an order denying the Motion to Quash [Doc. No. 1007].

22.     The PUCT has been actively producing documents on a rotating basis following entry of the order denying the Motion to Quash, and will continue to produce documents until production is complete.

### *(2)     The ERCOT Claim Objection*

23.     On July 25, 2021, the Debtor filed its *Objection to the ERCOT Claim* [Doc. No. 930] (the "Claim Objection"). By the Claim Objection, the Debtor accused ERCOT of assorted malfeasance as a basis for arguing that ERCOT's Claim should be reduced or disallowed. By no means, however, did the Debtor limit its invective to ERCOT in the Claim Objection. Rather, the Debtor took multiple opportunities to directly and indirectly accuse the PUCT of acting inappropriately.[23]

24.     Following the filing of the Claim Objection, it ultimately became apparent to the parties in interest that the complicated disputes related to the ERCOT Claim were better suited for an adversary proceeding. Accordingly, the Debtor withdrew the Claim Objection.

---

[23] The instances include the following: "The ERCOT Claim for approximately $1.9 billion was based on an exorbitant and unconscionable $9,000/MWh price set by the PUCT in a February 15, 2021 order . . . in a process that ignored the procedures for price setting that the Debtor and ERCOT were required to following in the SFA and as set forth in the protocols." Claim Objection at ¶ 33; "Yet, on February 15, 2021, during a six-minute discussion taken up on an hour's notice . . . the then-presiding commissioners of the PUCT adopted an order that impermissibly changed ERCOT's rules for calculating energy prices . . . . Tellingly, all three PUCT commissioners who under this action have since resigned." *Id.* at ¶ 34; "ERCOT's overseer, the PUCT, unilaterally and without an input from market participants other than ERCOT, changed they way pricing of energy was to be calculated during Winter Storm Uri and artificially raised the price to $9,000/MWh with little more than the stroke of a pen." *Id.* at ¶ 40; "The PUCT and ERCOT's actions in raising the energy price to $9,000/MWh violated the fundamental principles on which the ERCOT market is based." *Id.* at ¶ 41.

E.     **The Adversary Proceeding**

25.     On August 18, 2021, the Debtor filed a complaint against ERCOT (the "Complaint"), initiating this adversary proceeding concerning the ERCOT Claim (the "Adversary Proceeding").

26.     In the Adversary Proceeding, the Debtor seeks the same result as it sought in the Claim Objection: reduction or disallowance of the ERCOT Claim. In notable contrast to the Claim Objection, however, the Complaint mentions the PUCT only in passing. It seems that at some point between the filing of the Claim Objection and the filing of the Complaint, the Debtor determined that it was to the Debtor's litigation advantage to avoid challenging  –  that is, to avoid *directly* challenging – the actions taken by the PUCT.

*(1)     The Motions to Intervene*

27.     On September 1, 2021, the Debtor and the Committee filed the *Stipulation and Agreed Order Authorizing Intervention* [Doc. No. 18] whereby the Committee intervened in the Adversary Proceeding as an intervenor-plaintiff.

28.     Thereafter, on September 17, 2021 and September 20, 2021, a number of parties filed motions seeking to intervene in the Adversary Proceeding (collectively, the "Motions to Intervene").[24] The Motions to Intervene were filed by market participants who intimately understand the Texas electricity industry. Such market participants have expressed concern that any determination of the ERCOT Claim will have direct, and negative, implications on them.[25]

---

[24] The Motions to Intervene are filed at Docket Nos. 28-34.

[25] *See, e.g., Motion of Calpine Corporation, Tenaska Power Services Co., NRG Energy, Inc., Engie Energy Marketing NA, Inc., Lower Colorado River Authority, Talen Energy Supply, LLC, Golden Spread Electric Cooperative, Inc., South Texas Electric Cooperative, Inc., and Nextera Energy Marketing, LLC to Intervene* [Doc. No. 28] at ¶ 51 ("[W]hat the Debtor is really asking the Court to consider is the validity of the PUCT's Orders."); *Luminant Energy Company LLC and Exelon Generation Company, LLC's Moton to Intervene* [Doc. No. 29] at ¶ 21 ("[A]ny decision by this Court reducing the amount that Brazos owes ERCOT might lead ERCOT, wrongfully, to include the reduction in any forthcoming Default Uplift procedures.").

29.     On October 4, 2021, various parties filed responses to the Motions to Intervene.[26]

**(2)     *The ERCOT Motion to Dismiss and the Responsive Pleadings***

30.     On September 14, 2021, ERCOT filed its Motion to Dismiss in the Adversary Proceeding [Doc. No. 23]. By the Motion to Dismiss, ERCOT asserts, among other things, that the PUCT is an indispensable party to the Adversary Proceeding based on the Debtor's collateral attack on the February Orders.[27] ERCOT further argues that it is not feasible to join the PUCT and thus the Adversary Proceeding must be dismissed pursuant to Federal Rule of Civil Procedure 19(b).

31.     On September 28, 2021, the Committee filed its *Response and Objection* to the ERCOT Motion to Dismiss [Doc. No. 41] (the "Committee Objection"). By the same pleading, the Committee also seeks leave to file a motion for partial summary judgment on certain of the counts in the Complaint.

32.     Also on September 28, 2021, the Debtor filed its *Response in Opposition* [Doc. No. 42] (the "Debtor Objection"). By these objections, the Committee and the Debtor each take the position that the ERCOT Claim can be adjudicated by this Court, free from any implications on the market and entirely divorced from the PUCT and its February Orders.[28]

33.     On September 29, 2021, the Debtor filed its *Emergency Motion for Leave to File Motion for Partial Summary Judgment* [Doc. No. 44] (the "Debtor Motion for Leave"), by which the Debtor seeks a determination on the "pure question of law" as to "[w]hether this Court should

---

[26] *See* Doc. Nos. 60, 61, 63, 64, and 65.
[27] "Here, a ruling regarding the rates charged to Brazos would affect the PUCT's ability and authority to carry out the regulatory scheme established by PURA. Not only would it impair the PUCT's rights in this proceeding, but it potentially would also affect other actions regarding the PUCT orders." ERCOT Motion to Dismiss at ¶ 66.
[28] *See, e.g.,* Committee Objection at ¶ 2 ("[T]he PUCT's actions and orders are irrelevant") and ¶ 61 ("An order disallowing or allowing the Claim has no effect on any PUCT order or regulation"); and Debtor Objection at ¶ 13 ("The Complaint does not challenge the validity of the PUCT Orders, either directly or indirectly") and ¶ 106 ("[T]he Complaint and the ERCOT claim focus solely on the contractual relationship between the Debtor and ERCOT.").

calculate the ERCOT Claim pursuant to the protocols in effect during Winter Storm Uri, as the Debtor alleges, or according to the PUCT Orders, as ERCOT alleges . . . ." *Id.* at ¶ 14.

34.     Also on September 28, 2021, the Committee filed its *Emergency Motion for Leave to File Motion for Partial Summary Judgment* [Doc. No. 45] (the "Committee Motion for Leave"), seeking to file a summary judgment on counts 1, 6, and 7 of the Complaint.

35.     On October 1, 2021, the Court entered the *Confidentiality Agreement and Stipulated Protective Order* [Doc. No. 51] (the "Protective Order").

### *(3)     The PUCT's Actions in the Case To-Date and Role in the Adversary Proceeding*

36.     Prior to the filing of this Brief, the PUCT has not filed any pleadings in the Adversary Proceeding. However, the PUCT has appeared at regularly-scheduled status conferences and hearings relating to the Adversary. Moreover, the PUCT has produced – and is continuing to produce – documents to the Debtor and the Committee that are responsive to the Debtor and the Committee's respective requests for production.[29] The PUCT also participated in negotiating the terms of the agreed-upon Protective Order.

## III.     ARGUMENTS AND AUTHORITIES

### A.     Pursuant to State Law, the PUCT Has Exclusive Original Jurisdiction Over the ERCOT Claim

37.     The Texas Legislature enacted PURA to establish a pervasive regulatory scheme for the PUCT to regulate and manage Texas's electric markets and ensure system reliability. Under this regulatory structure, the PUCT oversees ERCOT's performance as its designated independent organization and addresses any issues with its work. The Legislature set out the framework under

---

[29] Both the Committee Document Request and the Debtor Document Request were filed in the Bankruptcy Case. That said, the current understanding among the parties is that the discovery solely relates to matters in the Adversary Proceeding. *See* Protective Order.

which the PUCT regulates ERCOT's activities in connection with the State's electric markets in

PURA:

> An independent organization certified by the commission is directly responsible and accountable to the commission. *The commission has complete authority to oversee and investigate the organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties.* The organization shall fully cooperate with the commission in the commission's oversight and investigatory functions.[30]

38.     In carrying out its duties, ERCOT's actions must be "consistent with any rules or

orders of the commission."[31] Moreover, PURA grants the PUCT the specific authority to "resolve

disputes between an affected person and [ERCOT]."[32] To that end, the PUCT has adopted its Rule

22.251, setting out in detail how the PUCT reviews ERCOT's actions.[33]

39.     In addition to the administrative scheme set forth in PURA, Texas law provides

means for parties to have their disputes adjudicated in state court.[34] These provisions work in

harmony to further the Texas Legislature's objectives regarding the regulation of the Texas energy

market.

40.     The PUCT thus has "complete" authority to address any allegations about

ERCOT's performance as part of the pervasive regulatory scheme. The PUCT's broad authority

over ERCOT is analogous to the authority that the PUCT has over utilities under PURA. The Texas

---

[30] TEX. UTIL. CODE § 39.151(d) (emphasis added).

[31] *Id.* at § 39.151(h).

[32] *Id.* at § 39.151(d-4)(6).

[33] 16 TEX. ADMIN. CODE § 22.251(a). "The scope of permitted complaints includes ERCOT's performance as an independent organization under the PURA including, but not limited to, ERCOT's promulgation and enforcement of procedures relating to reliability, transmission access, customer registration, and accounting for the production and delivery of electricity among generators and other market participants." 16 TEX. ADMIN. CODE § 22.251(b). If the PUCT finds merit in a complaint and that "corrective action" is required, the PUCT shall issue an order granting appropriate relief. 16 TEX. ADMIN. CODE § 22.251(o). In addition to the administrative scheme set forth in PURA, Texas law provides means for parties to have their disputes adjudicated in state court. *See* ERCOT Motion to Dismiss at ¶¶ 22-24 (accurately describing such provisions). These provisions of Texas law work in harmony to further Texas Legislature's directives regarding the regulation of the Texas energy market.

[34] *See* ERCOT Motion to Dismiss at ¶¶ 22-24 (accurately describing such provisions).

Supreme Court has recognized that the enactment of such a regulatory scheme by the Texas Legislature demonstrated an intention "for the regulatory process to be the exclusive means for remedying the problem to which the regulation is addressed." *In re Entergy Corp.*, 142 S.W.3d 316 (Tex. 2004). Thus, the PUCT has "exclusive original jurisdiction" over disputes. *Id.* at 323 (citing TEX. UTIL. CODE § 31.001(a)).[35] The Texas Supreme Court has further recognized that the PUCT's authority extends to private agreements. The *Entergy Corp.* case involved a "merger agreement," which did not include the PUCT as a party. The Texas Supreme Court specifically addressed a party's argument that the PUCT did not have jurisdiction over such a "mere private contract." The court held that there was jurisdiction under PURA because such a contract "was more than a private agreement [because it] affected directly the public interest." *Id.* at 324. In so finding, the court quoted with approval a Texas Court of Appeals case wherein the PUCT was found to have jurisdiction under PURA in relation to an attorneys' fee agreement between a regulated entity and a municipality. *Id.* (discussing *Public Utility Commission of Texas v. Southwestern Bell Telephone Co.*, 960 S.W.2d 116 (Tex. App. – Austin 1997, no pet.)). Similarly, the Texas Supreme Court found in *In re Southwestern Bell Telephone Co.*, 235 S.W.3d 619 (Tex. 2007) that the PUCT's authority "is even more comprehensive" than otherwise might be the case when a billing dispute is at issue. *Id.* at 625-26 (citing TEX. UTIL. CODE § 17.157(a), which provides the PUCT with the same broad authority over a telecommunications entity as § 39.151 provides over ERCOT).[36]

---

[35] *See also Am. Zurich Ins. Co. v. Jasso*, 598 Fed.Appx. 239, 244 (5th Cir. 2015) (per curiam) (citing *Entergy* and noting that "the Texas Legislature does, in certain circumstances, put limits on what tribunals can hear certain disputes.").

[36] *See also Bellsouth Telecomms., LLC v. Halo Wireless*, No. 11-801620-dd, 2011 WL 6010248, at *2 (Bankr. D. S.C. Nov. 30, 2011) (remanding a claim dispute to the Public Service Commission of South Carolina because it "had jurisdiction over the claims currently before the Court, and is in the best position, with expertise in such matters, to decide this dispute . . . .").

41.     Without acknowledging that this Adversary Proceeding implicates a mere contract dispute (because there is much more at stake than that), disputes between ERCOT and market participants are well within the PUCT's jurisdiction for the same reason provided by the Texas Supreme Court in the *Entergy* case: the outcome of the dispute affects the public interest. Moreover, Senate Bill 1580, codified at TEX. UTIL. CODE § 41.151(b), only strengthens the PUCT's assertion that the PUCT has exclusive jurisdiction over this dispute. Whether or not payments were calculated "solely according to the protocols in effect during the period of emergency" certainly is as much an issue of public interest as any of the other matters addressed by the Texas Supreme Court in the cases cited above.[37] Additionally, the protocols to which this clause refers are "subject to the approval of the commission."[38]

## B.     Sovereign Immunity Precludes the Adjudication of the ERCOT Claim in this Court

42.     The doctrine of sovereign immunity preserves and protects the PUCT[39] from having its exclusive jurisdiction over the ERCOT Claim wrested away. The ERCOT Claim cannot be adjudicated without addressing matters that come within the exclusive original jurisdiction of the PUCT. Moreover, the PUCT cannot lawfully be joined as a party to the Adversary Proceeding, and the dispositive issues cannot otherwise be taken up, because the PUCT is protected by sovereign immunity. Thus, the Adversary Proceeding must be dismissed.

43.     The PUCT is entitled to the protections of sovereign immunity notwithstanding the fact that the Debtor filed bankruptcy. It is true that the competing priorities underlying bankruptcy

---

[37] In addition, the Committee's assertion that the PUCT somehow made an admission in the *Luminant Energy* litigation that is any way meaningful here does not stand up to even cursory scrutiny. *See* Committee Response at ¶ 2. While it is true that the brief referred to by the Committee acknowledges that the February Orders applied "solely to ERCOT," it does not follow that therefore the PUCT's jurisdiction under PURA comes to an end. The Texas Supreme Court has made clear that the PUCT's broad authority under the PURA regulatory scheme does not begin or end on an analysis of who is, and who is not, a party to a particular agreement.

[38] Tex. Util. Code § 41.151(b)(1)

[39] The PUCT is a state agency and thus is entitled to assert Eleventh Amendment sovereign immunity. *Sullivan v. Texas A&M Univ.*, 986 F.3d 593, 595 (5th Cir. 2021).

and state sovereign immunity make for a complicated affair. The simplest solution to this thorny problem would be an overarching statement that, based on the Bankruptcy Clause in Article I of the Constitution, the States waived any ability to assert sovereign immunity in bankruptcy cases. But, like every other specious solution to a complicated problem, that statement would be wrong. It would be wrong based on a proper understanding of the Constitutional principles at hand. It would also be directly contrary to how Congress has approached the issue and contrary to the Supreme Court's interpretations.

44.     Congress did not choose to abolish all state sovereign immunity rights in bankruptcy. Instead, Congress in 1994 enacted Bankruptcy Code section 106, which purports to provide only for a limited abrogation of sovereign immunity.[40] Following such enactment, Congress has taken no further efforts to erode the States' retained immunity, even when it undertook an extensive rewriting of the Code in 2005. Given this perspective, it thus stands to reason that no court, by judicial fiat, should attempt to broaden the limited Congressional incursions of sovereign immunity.

### *(1)     Constitutional Underpinnings – Sovereign Immunity is on Equal Constitutional Footing as the Bankruptcy Clause*

45.     The Bankruptcy Clause authorizes Congress to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." Bankruptcy was scarcely mentioned at the Constitutional Convention.[41] The only mention in the Federalist Papers is a statement by James

---

[40] Bankruptcy Code section 106 was enacted in 1994. As of that time, it would have been reasonable to assume, based on Supreme Court precedent, that Congress had broad authority to completely abrogate state sovereign immunity in bankruptcy under its Article I powers. *See, e.g., Hoffman v. Conn. Dept. of Income Maint.*, 492 U.S. 96 (1989) and *Penn. v. Union Gas*, 491 U.S. 1 (1989). Such an assumption of Congress's broad Article I would later be further informed by subsequent Supreme Court cases including *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44 (1996). But, the point remains that, as of 1994, Congress had an opportunity to address state sovereign immunity in bankruptcy and Congress chose a limited approach.

[41] *See Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 369 (2006) (noting the "absence of extensive debate over the text of the Bankruptcy Clause or its insertion [into the Constitution].").

Madison that "[t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." *Railway Labor Executives Association v. Gibbons*, 455 U.S. 457, 466 (1982) (quoting FEDERALIST NO. 42).

46.     The States' retention of their sovereign immunity equally has its foundation in the Constitution. Furthermore, the matter of States' sovereign immunity engendered far greater concern than the minor extent to which bankruptcy may have intruded into the States' affairs. The Supreme Court recently expounded on the topic in *Franchise Tax Board of California v. Hyatt*, 139 S.Ct. 1485 (2019).[42] The Framers' original understanding was that, while the States understood ratification of the Constitution would subject the States to suit by the United States, they never surrendered their immunity against suits in federal courts by various parties and entities including other states,[43] a citizen of another state, or a citizen of the state itself. Shortly after the enactment of the Constitution, however, the Supreme Court did authorize such a suit in *Chisolm v. Georgia*, 2 U.S. 419 (1793), leading to "immediate 'furor' and 'uproar' across the country." Hyatt, 139 S.Ct. at 1495. "Congress and the States accordingly acted swiftly to remedy the Court's blunder by drafting and ratifying the Eleventh Amendment." *Id.* at 1496. Moreover, "[i]n proposing the [Eleventh] Amendment, 'Congress acted not to change but to restore the original constitutional design.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999) (emphasis added)).

47.     The Supreme Court's understanding of the Eleventh Amendment also factors into this analysis. The Eleventh Amendment provides:

---

[42] While *Hyatt* is not a bankruptcy-related case, it provides guidance on the Court's general understanding of the doctrine.
[43] Suits between states is subject to the very limited exception of original actions in the neutral forum of the Supreme Court.

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

48.    "The Supreme Court has repeatedly emphasized that the Eleventh Amendment is a cornerstone of the federal system of government under the constitution." *In re PEAKSolutions Corp.*, 168 B.R. 918, 923 (Bankr. D. Minn. 1994) (citing case law).[44] "For over a century, [the Court] has grounded [its] decisions in the oft-repeated understanding of state sovereign immunity as an essential part of the Eleventh Amendment." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 68 (1996).

49.    Thus, from a foundational perspective, sovereign immunity is just as much grounded in the Constitution as the Article I Bankruptcy Clause. *Id.* at 1497 ("The Constitution does not merely allow States to afford each other immunity as a matter of comity; it embeds interstate sovereign immunity within the constitutional design").[45] The key question is how these equally important doctrines can reasonably co-exist. Supreme Court case law provides the answer.

### (2)    *The Bankruptcy Clause's Waiver of Sovereign Immunity is* <u>*Limited*</u>

50.    The Supreme Court's guidance on the scope of sovereign immunity in bankruptcy cases is set forth in two cases: *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004) and *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006). In *Hood*, a Chapter 7

---

[44] It is also clear that the Eleventh Amendment applies to suits from a state's own citizens. *See Hans v. La.*, 134 U.S. 1 (1890).

[45] *See also Pennhurst State School & Hosp. v. Halderman*, 265 U.S. 89, 98 (1984) (This Court has recognized that [the Eleventh Amendment's] greater significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III. [In a prior decision,] after reviewing the constitutional debates concerning the scope of Art. III, the Court determined that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States."). In that regard, it should be noted that the Eleventh Amendment does not purport to *change* the wording of Article III. Rather, it prescribes that the language "shall not be *construed*" to extend to certain suits. And, even though its wording appears to only apply to suits by citizens of another state or foreign entity, *Hyatt* explains in detail why the history of the Eleventh Amendment makes clear that it is a guidepost as to the proper interpretation of Article III, not a cribbed and cabined statement of the full extent to which the Constitution protects state sovereign immunity. *Hyatt*, 139 S.Ct. at 1492-93.

debtor filed an adversary proceeding seeking to discharge student loan debt guaranteed by a state entity. The Court concluded that the proceeding was an in rem proceeding that did not constitute "a suit against the State for the purposes of the Eleventh Amendment." The Court defined a bankruptcy court's in rem jurisdiction as permitting the court to "determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is one against the world." *Hood*, 541 U.S. at 448 (internal quotation marks deleted). The Court determined that the action did not impermissibly tread on sovereign immunity because the debtor did "not seek monetary damages or any affirmative relief . . . nor [did the debtor] subject an unwilling State to a coercive judicial process." *Id.* at 450. At most, it simply directed the state (like all other parties) to cease pursuing a debtor to whom the bankruptcy court had awarded the in rem relief of discharge.

51.     The Court followed with the following critically important statement:

**This is not to say, "a bankruptcy court's in rem jurisdiction overrides sovereign immunity. . . but rather that the court's exercise of its in rem jurisdiction to discharge a student loan debt is not an affront to the sovereignty of the State. Nor do we hold that every exercise of a bankruptcy court's in rem jurisdiction will not offend the sovereignty of the State. No such concerns are present here, and we do not address them.**

*Id.* at 1913 n.5 (emphasis added).

52.     The Court provided further guidance on the status of state immunity in bankruptcy in *Katz*. That case involved a Chapter 11 trustee who filed preference actions against state entities which would have resulted in an affirmative monetary order against the state. In order to put the Bankruptcy Clause into proper perspective, the Court analyzed case law prior to the adoption of the Constitution. This included concerns that had arisen with respect to whether one state's discharge of a person's debts (and/or his discharge from debtor's prison in that state) would be recognized if a separate bankruptcy was filed against the person in another state. *Katz*, 546 U.S. at

366-69 (discussing one case decided in 1786 and another in 1788). The Court concluded that these cases, together with legislation enacted immediately after the adoption of the Constitution, demonstrated that the "Framer's primary goal was to prevent competing sovereigns' interference with the debtor's discharge." *Id.* at 373. As a result, the Court held that state sovereignty is subordinated "within [the] limited sphere" of bankruptcy-related matters such as discharge. *Id.* at 377. The reason to allow such subordination was because bankruptcy's in rem jurisdiction is "a narrow jurisdiction that does not implicate state sovereignty to nearly the same degree as other kinds of jurisdiction." *Id.*

53.     Courts following *Katz* have distilled the holding to provide that the following are exercises of a bankruptcy court's in rem jurisdiction contemplated by the Bankruptcy Clause: "(1) exercise of jurisdiction over the estate of the debtor; (2) equitable distribution of the estate's property among creditors; and (3) discharge." *In re Soileau*, 488 F.3d 302, 307-08 (5th Cir. 2007). However, not every action a bankruptcy court might take under those criteria could, and should, fall within a bankruptcy court's ability to override state sovereign immunity. For example, a bankruptcy court granting a debtor's divorce may well further the equitable distribution of estate assets.[46] Notwithstanding the potential positive effect it may have on the bankruptcy case, a bankruptcy court has no authority to wade into the adjudication of family law and other matters belonging exclusively to state courts and policy makers.

54.     Instead, the combination of *Hood* and *Katz* provide that, to the extent matters do fall within the broad scope of the bankruptcy court's in rem jurisdiction, the exercise of such powers must still look to the question of whether it would be an "affront" to a state's sovereign

---

[46] *See* E. Plank, *State Sovereignty In Bankruptcy After* Katz, 15 AM. BANKR. INST. L. REV. 59, 92 (2007) ("As Alfred Hill once remarked more than fifty years ago, Congress could not enable a bankruptcy court to grant a divorce to a debtor from his or her spouse. Any attempt to do so would implicate a State's sovereignty over domestic relations.").

immunity. *In re Cox*, 433 B.R. 911, 919 (Bankr. N.D. Ga. 2010) (recognizing the "affront" standard set forth by the Supreme Court in *Hood*, but finding no such affront in fraudulent transfer matter). This limiting factor has also been discussed by Judge Edith Jones wherein she stated – in concurrence – that a bankruptcy court cannot "utilize its in rem jurisdiction to ride roughshod over [a] traditional bastion of state sovereignty." *Soileau*, 488 F.3d at 315 (dealing with the discharge of bail bondsman debt in an individual Chapter 7 case). Fifth Circuit precedent holds that a default on such obligation is a contractual, rather than criminal, matter. *See In re Hickman*, 260 F.3d 400, 406 (5th Cir. 2001). Judge Jones concurred in the *Soileau* judgment based on precedent, but stated in her concurrence that she believed *Hickman* to be wrongly decided and that such debt implicates state criminal law issues. Judge Jones further pointed out that the "right to formulate and enforce penal sanctions is an important aspect of the sovereignty retained by the States." *Id.* at 314 (quoting *Kelly v. Robinson*, 479 U.S. 36, 47 (1986)). Moreover, while these issues were raised in a Fifth Circuit concurrence, the majority opinion in the case also acknowledged the Supreme Court's statement in *Hood* that it is possible for the exercise of bankruptcy court in rem jurisdiction to "offend the sovereignty of [a] state." *Id.* at 308 (citing *Hood*, 541 U.S. at 451 n.5).

### (3)   *Casting Aside PURA Would be an Affront to Texas Sovereignty*

55.    On its face, the Adversary Proceeding concerns the amount and priority of ERCOT's Claim. Determining such creditor matters would initially seem to fit within the bankruptcy court *in rem* jurisdiction of both the court exercising jurisdiction over an estate and of the equitable distribution of an estate's property among creditors. The PUCT does not dispute that claim litigation is, in fact, an exercise of a bankruptcy court's *in rem* jurisdiction. But, concluding the analysis at that stage would require ignoring the Supreme Court case law discussed above. Under such a flawed analysis, it would not be necessary to consider in any way whether the federal

court's actions concerning non-bankruptcy law was an affront to state sovereignty.[47] Moreover, it would require ignoring the Supreme Court' directive in *Hood* to consider whether it is an affront, as well the Court's directive in both *Hood* and *Katz* that the bankruptcy *in rem* jurisdictional waiver of sovereign immunity is limited.

56.     In addition, in both *Hood* and *Katz* – and in subsequent case law – the courts have addressed fundamental bankruptcy issues such as discharge, fraudulent transfers, and preferences. Moreover, a large portion of recent case law deals with a state filing a proof of claim and seeking payment alongside other creditors. None of those facts are present here. As the Court made clear in *Katz*, core bankruptcy concerns such as discharge gave rise to the Bankruptcy Clause. It cannot be the case that the Framers anticipated that state sovereign immunity would be waived to a degree that would allow federal courts to rewrite policies affecting literally every resident in a state.[48]

57.     The PUCT anticipates the Debtor and Committee warning of dire long-term consequences if the PUCT is permitted to enforce sovereign immunity in this case. But, there is little risk that acknowledging Texas's sovereign immunity in this case will upend the federal bankruptcy system. In fact, it will be the rare case where a bankruptcy court does have *in rem* jurisdiction, but also where state sovereign immunity remains enforceable. This is that rare case. While permitting the PUCT to assert sovereign immunity may be unsatisfying from a bankruptcy

---

[47] This appears to be the approach taken recently by the Third Circuit in *In re Venoco, LLC*, 998 F.3d 94 (3rd Cir. 2021) where the court stated: "[T]he effect on state sovereign immunity is not the focus of our analysis. The focus is instead on ensuring that sovereign immunity will not interfere with the bankruptcy court's jurisdiction over the estate's property as well as its orderly administration." *Id.* at 107. The power to administer a bankruptcy estate is, of course, important. But, this approach would seem to elevate bankruptcy administration to a higher priority over any sovereign immunity concern. With due respect to the Third Circuit, that approach is contrary to the Supreme Court's directive that any bankruptcy waiver of sovereign immunity is limited.

[48] *See* Ralph Brubaker, *Explaining Katz's New Bankruptcy Exception to State Sovereign Immunity: The Bankruptcy Power as a Federal Forum Power*, 15 AM. BANKR. INST. L. REV. 95, 112 (2007) ("It simply does not follow, however, that because the Framers may have contemplated that states would have no sovereign immunity in certain bankruptcy proceedings (such as in rem proceedings) that the Framers must have contemplated that states would have no sovereign immunity in any and all bankruptcy proceedings.").

administration standpoint, it is the legally correct determination from the standpoint of our constitutional system of self-governance.

### *(4)     The PUCT Has Not Waived Sovereign Immunity*

58.     The PUCT anticipates that the Debtor – or other parties – may raise certain issues in an attempt to avoid such a substantive sovereign immunity analysis. That is, either: (1) alleged waiver by the PUCT, or (2) alleged abrogation under Bankruptcy Code section 106.   Neither assertion stands up to scrutiny.

59.     Sovereign immunity "acts as an affirmative defense, while also containing traits of subject-matter jurisdiction." *Union Pacific Railroad Co. v. Louisiana Public Service Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). Like other affirmative defenses, sovereign immunity can be waived. It is equally well-established, though, that the waiver of sovereign immunity must be unequivocally expressed. Specifically, waiver of sovereign immunity "can be found only if the State 'voluntarily invokes . . . jurisdiction or else if the state makes a clear declaration that it intends to submit itself to . . . jurisdiction." *In re Cox*, 433 B.R. 911, 917-18 (quoting *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Bd.*, 527 U.S. 666, 675 (1999)). The "ordinary practice" of federal courts is to narrowly construe waivers of sovereign immunity. *McGuire v. United States*, 550 F.3d 903, 914 (9th Cir. 2008).

60.     Several courts have found that the filing of a proof of claim in a bankruptcy case can be interpreted as such a declaration and therefore a waiver of sovereign immunity. But, actions short of filing a claim do not constitute waiver. Notably, the Fifth Circuit has held that a state did not waive sovereign immunity even where the state substantively litigated the issues at trial and did not raise sovereign immunity until the appeal. *See Union Pacific Railroad Co. v. Louisiana Public Service Commission*, 662 F.3d 336 (5th Cir. 2011). The state did not choose to litigate in a federal forum; it was haled therein involuntarily at the instance of a private suit.  "While the State

may have defended on the merits below, it never chose to litigate this suit in a federal forum." *Id.* at 341; *see also In re La Paloma Generating Co.*, 588 B.R. 695, 720 (Bankr. D. Del. 2018) (finding that the "critical fact" pointing to non-wavier of sovereign immunity was that the state did not chose to litigate in bankruptcy court). And, as stated in *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 467 (1945), the "Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court." Accordingly, nothing short of an affirmative invocation of federal jurisdiction can serve as a waiver.

61.     In this case, the PUCT has not made any declaration that could reasonably be interpreted as a waiver of sovereign immunity. In fact, the opposite is true. Prior to filing this Brief, the only pleading filed by the PUCT in either the Bankruptcy Case or the Adversary Proceeding was the Motion to Quash. In the Motion to Quash, the PUCT made the affirmative statement that "the PUCT, which is a state agency, in no way waives or declines to assert its sovereign immunity through the filing of this Motion to Quash. The PUCT fully reserves all such rights." In addition, the PUCT has not filed a proof of claim in the Bankruptcy Case and has no intention of doing so. Under these facts, it cannot reasonably be asserted that the PUCT has either unequivocally expressed its intention to waive sovereign immunity or that the PUCT has taken any action indicating that the PUCT is choosing to litigate in federal court.

### (5)     *Section 106 is Not at Issue*

62.     Bankruptcy Code section 106 states that sovereign immunity is "abrogated as to a governmental unit" related to enumerated sections of the Code that describe specific federally-created rights for parties in a bankruptcy proceeding. In this case, section 106 is irrelevant for at least two reasons. First, the Fifth Circuit has previously held section 106 to be an unconstitutional

attempt by Congress "to circumvent Eleventh Amendment restrictions on judicial power." *In re Fernandez*, 123 F.3d 241, 243 (5th Cir. 1997). While the *Fernandez* case was decided prior to *Hood* and *Katz*, courts have recognized that such Supreme Court rulings did not take up the general issue of section 106's constitutionality. *See In re Sarfani, Inc.*, 527 B.R. 241, 249 (Bankr. N.D. Miss. 2015).

63.    Second, by its own terms, section 106 does not apply in this case. Section 106 is a limited provision of the Bankruptcy Code. It "does not provide a structure or independent basis for asserting a claim against the government . . . [and] it is not a freestanding waiver of sovereign immunity." *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 256 (5th Cir. 2006).

64.    Section 106 lists certain Bankruptcy Code sections with respect to which Congress purported to abrogate sovereign immunity. Notably absent is Bankruptcy Code section 541. Courts have recognized that, based on specific statements in the legislative history, the absence of section 541 means that there is no abrogation for "causes of action belonging to the debtor that become property of the estate under section 541." *In re William Ross, Inc.*, 199 B.R. 551, 554 (Bankr W.D. Pa. 1996) (quoting H.R.Rep. No. 834, 103rd Cong., 2nd Sess., 13-15 (1994)).[49]

65.    The types of claims that come within the scope of Bankruptcy Code section 106 are bankruptcy-created claims, for example, preferences (section 547) and fraudulent transfers (section 548). In contrast, any claim held by the Debtor relating to the lawfulness or propriety of the ERCOT Claim (or any other claim under the PURA regulatory scheme) was a claim that the Debtor held prior to the Petition Date. Such a claim – which would only become property of the Debtor's estate via section 541 – is not governed or otherwise affected by section 106.

---

[49] *See also* 2 COLLIER ON BANKRUPTCY ¶ 106.01 (16th ed. Rev. 2021) ("Section 106(a)(1), as amended, allowing the application of those provisions of the Code to governmental units, but specifically excluding a debtor's prepetition causes of action that become property of the sate under section 541.").

C.      **The Johnson Act Precludes This Court From Asserting Jurisdiction Over the ERCOT Claim**

66.      For the reasons set forth above, the constitutionally critical doctrine of sovereign immunity is sufficient in and of itself to preclude this Court from adjudicating the ERCOT Claim. That said, an additional provision of federal law even further demonstrates that neither this Court – nor any federal court – should interfere with the pervasive regulatory scheme set forth in PURA. The Johnson Act restricts federal court jurisdiction over "any order affecting rates chargeable by a public utility and made by a State administrative agency or rate-making body of a State political subdivision . . . ."[50] The act was passed in 1934 in reaction to "a quarter century of agitation resulting from federal intervention in state regulatory policy [and it] instituted a 'hands-off' policy for the federal courts in state utility rate matters."[51] The act requires four conditions to be met in order to preclude federal court jurisdiction, including that the federal court's jurisdiction "is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution . . . ."[52] In a 1982 decision, the Fifth Circuit considered the case of a utility that filed bankruptcy under the pre-Code Bankruptcy Act. The court held that the Johnson Act precluded the debtor from having its rate challenging case in federal court.[53] Under the current Bankruptcy Code regime, the Fifth Circuit more recently took note of the Johnson Act in the *Cajun Electric Power Coop* bankruptcy case. Therein, the court stated that the act did not apply because jurisdiction of the case was under 28 U.S.C. § 1334 rather than the diversity jurisdiction mentioned in 28 U.S.C. § 1342(1).[54]

---

[50] 28 U.S.C. § 1342.

[51] Clinton A. Vince and John S. Moot, *Energy Federalism, Choice of Forum, and State Utility Regulation*, 42 ADMIN. L. REV. 323, 358 (1990).

[52] 28 U.S.C. § 1342(1).

[53] *Gulf Water Benefaction Co. v. Pub. Utility Commission of Tex.*, 674 F.2d 462, 468 (5th Cir. 1982) (per curiam) (stating that the "clear intent of this Act is to channel normal rate litigation into the state courts; and, as in the present action, <u>federal judicial review is particularly inappropriate where state proceedings are pending</u>." (emphasis added)).

[54] *See In re Cajun Elec. Power Coop, Inc.*, 185 F.3d 446, 452 n.7 (5th Cir. 1999).

67.     In the small number of cases dealing with the Johnson Act and bankruptcy, including the *Cajun* case, courts did not have cause to consider the complete text of 28 U.S.C. § 1342(1). The Johnson Act prohibition of federal jurisdiction applies when jurisdiction is based solely on diversity of citizenship <u>or</u> "repugnance of the order to the Federal Constitution." Here, unlike in *Cajun*, the federal constitutional issue of sovereign immunity is directly implicated. Violating Texas's sovereignty under these circumstances would be contrary to (that is, repugnant to) the Constitution. Therefore, the requirement of 28 U.S.C. § 1342(1) has been met. The PUCT further asserts that the other three provisions have also been met in this case.[55] As such, this Court lacks jurisdiction to take up the interwoven utility state law issues implicated in the Adversary Proceeding. Moreover, to the extent that this Court may find that the elements of the Johnson Act are not strictly met, it should inform both the Court's sovereign immunity and abstention analysis that Congress enacted legislation specifically designed to keep federal courts from interfering with state utilities.

**D.     This Court Should Abstain From Litigating the ERCOT Claim Because Litigating in Isolation is Not Possible and is Certain to Have Negative Consequences Far Beyond This Bankruptcy Case**

68.     The Fifth Circuit has recognized that "bankruptcy courts have broad power to abstain whenever appropriate 'in the interest of justice, or in the interest of comity with State courts or respect for State law.'" *Wood v. Wood*, 825 F.2d 90, 93 (5th Cir. 1987) (quoting 1334(c)(1)). For the reasons set forth above, this Court should respect the Texas law providing the PUCT with original exclusive jurisdiction over the ERCOT Claim. Aside from the issue of sovereign immunity, however, abstention pursuant to 28 U.S.C. § 1334(c)(1) provides this Court with an

---

[55] The February Orders did not interfere with interstate commerce, they were made after reasonable notice and hearing (considering the circumstances of Winter Storm Uri), and market participants are currently participating in a "plain, speedy, and efficient" state court process. *See* 28 U.S.C. § 1342(2)-(4).

independent, valid, and just basis for granting the Motion to Dismiss. Moreover, in addition to comity and respect for Texas law, the negative effects of litigating the ERCOT Claim in this Court weigh heavily in favor of abstention.

### (1)    A Ruling in This Bankruptcy Case Would Affect the Texas Energy Market and, Ultimately, Texas Consumers

69.    Despite the argument that this Court's adjudication of this mere "contract dispute" would have no effect on any party other than the Debtor, a ruling on the issue of the amount of ERCOT's claim, whether the claim is allowed, whether the underlying SFA was breached or void, or whether the claim is administrative or unsecured in nature, will have lasting effects on the energy market and Texas consumers. These considerations support ERCOT's assertion that this Court should abstain from litigating the ERCOT Claim.

70.    As argued by ERCOT in its Motion to Dismiss at paragraph 11, to ensure the continued liquidity and function of the energy market, ERCOT's protocols provide that should a market participant fail to pay an amount owed, that debt is then socialized across the market as a whole through a short-payment and default uplift procedure provided for in the Nodal Protocols.[56] Thus, if the claim owed to ERCOT is disallowed or reduced in this bankruptcy case based upon a finding of this court, other market participants, and ultimately their customers, will be forced to bear the consequences of that decision.

71.    Further, should this court determine that the February Orders were not in effect, or, as the Debtor and Committee have argued, are "irrelevant," and the ERCOT claim against this Debtor is disallowed or reduced, other market participants who were subject to the same $9,000 per MWh price, and possibly subject to subsequent uplift charges as well, may seek refuge by filing bankruptcy and seeking a similar decision, which would further damage the ERCOT market.

---

[56] ERCOT Protocols §§ 9.19(1)(d, e), 9.19.1, 9.19.9(1)(e), 9.19.1(2).

72.     Additionally, if the Court determines that the issue in question is truly only a matter of interpreting the SFA between the Debtor and ERCOT, there is a distinct risk that other market participants who have entered into an SFA with ERCOT will also seek redress before this court – or another bankruptcy court – to interpret such terms. As indicated above, every market participant is required to enter into an SFA with ERCOT to be able to participate in the ERCOT energy market. Should this Court determine that the Debtor's SFA was breached or void pursuant to state law, every entity with an executed SFA that experienced increased prices during Winter Storm Uri may seek to have a bankruptcy court adjudicate the issue, rather than having it addressed by the regulatory scheme created by the State of Texas through PURA. As stated by one of the market participants seeking to intervene in this matter, "[a]ll market participants, including Movant, sign similar contracts with ERCOT, so interpretation of Brazos's contract could impact the interpretation of Movant's own contract."[57] Even if the Court's actions were based on the best of intentions, it truly would be an unfavorable result if such actions directly triggered bankruptcy filings by other ERCOT market participants.

### (2)     *A Ruling in This Bankruptcy Case Would Have Lasting Effects on Futures Markets and the Economy of the State of Texas*

73.     In addition to the possible effects on the Texas energy market and market participants as discussed above, a determination by this Court on the appropriateness of the price imposed during the winter storm, and ultimately, any reduction in the claim amount owed to ERCOT, will have lasting effects on financial markets.

74.     During the Texas legislative session, Senate Bill 2142 was approved by the Texas Senate, which would have forced ERCOT to reprice and claw back a portion of the charges

---

[57] *See Luminant Energy Company LLC and Exelon Generation Company, LLC's Motion to Intervene* [Doc. No. 29] at ¶ 31.

incurred during Winter Storm Uri. However, the legislation failed to pass successfully through the

Texas House of Representatives, with the House Speaker Dade Phelan calling the bill "an

extraordinary government intervention into the free market, which may have major consequences

for both residential and commercial consumers going forward."[58]

75.     The effect of what essentially would be a re-pricing by this Court in its adjudication

of the ERCOT claim would result in an extraordinary and inappropriate intervention into the free

market, with potentially devastating effects, including an effect on investments in the state energy

market and in its market participants.

76.     On March 3, 2021, Intercontinental Exchange Futures US provided written

testimony before the Texas Senate Committee on Business and Commerce, including the

comments below:

> Critical to good markets is the reliability of pricing information. Market
> participants must have complete confidence the price will remain the price. Very
> rarely do governments get involved in price setting in the markets because the
> results are inevitably catastrophic. . . Removing one domino by repricing ERCOT
> for the outage week will have cascading effects in other markets and may cause
> bigger problems than the repricing solves.[59]

77.     The Debtor and the Committee would have this Court believe that the issues in this

case are issues of law, are narrow, and are solely based on "pure contract interpretation." [60] The

adjudication of a claim in a "normal" Chapter 11 proceeding may be just that – a simple issue of

law. However, in this case, much more is involved. The parties and this Court have routinely

agreed that the issues in this case are complex and rife with unintended potential consequences.

And while the Debtor and the Committee position themselves (of late) that the actions and orders

---

[58] Taylor Goldstein, *Texas House Rejects Bill to Reprice Electricity Sold During Winter Storm*, HOUSTON CHRONICLE, March 16, 2021.
[59] A full transcript of the testimony is available at https://legacy assets.eenews.net/open_files/assets/2021/03/09/ document_ew_01.pdf
[60] *See* Committee *Motion for Leave* at ¶ 11.

of the PUCT are irrelevant and that no other party or entity will be affected as a result of the decisions made by this court – this is simply not the case. Any decision of this Court will have broad and long-lasting effects on the Texas energy market and investment markets as a whole.

78.     The PUCT respectfully urges this Court to grant the Motion to Dismiss.

WHEREFORE, the PUCT respectfully requests that the Court grant the Motion to Dismiss and grant such other and further relief to which the PUCT may be entitled.

Dated: October 5, 2021                    Respectfully submitted,

                                          KEN PAXTON
                                          Attorney General of Texas

                                          BRENT WEBSTER
                                          First Assistant Attorney General

                                          GRANT DORFMAN
                                          Deputy First Assistant Attorney General

                                          SHAWN E. COWLES
                                          Deputy Attorney General for Civil Litigation

                                          SEAN O'NEILL
                                          Assistant Attorney General
                                          Deputy Chief, Bankruptcy & Collections Division

                                          */s/ Jason Binford*
                                          JASON B. BINFORD
                                          Texas State Bar No. 24045499
                                          Southern Dist. Bar No. 574720
                                          LAYLA D. MILLIGAN
                                          Texas State Bar No. 24026015
                                          Southern Dist. Bar No. 38000
                                          Office of the Attorney General of Texas
                                          Bankruptcy & Collections Division
                                          P. O. Box 12548 MC008
                                          Austin, Texas 78711-2548
                                          Telephone: (512) 463-2173
                                          Facsimile: (512) 936-1409
                                          jason.binford@oag.texas.gov
                                          layla.milligan@oag.texas.gov

                                          ATTORNEYS FOR THE PUBLIC UTILITY COMMISSION
                                          OF TEXAS

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been served via the Court's Electronic Filing System on all parties requesting notice in this proceeding on October 5, 2021.

*/s/ Jason Binford*
JASON B. BINFORD
Assistant Attorney General
