**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | Case No. 21-30725 (DRJ) |
| Debtor. | |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | |
| Plaintiff, | Adv. Proc. No. 21-03863 (DRJ) |
| v. | |
| ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC., | |
| Defendant. | |

**ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.'S REPLY**
**IN SUPPORT OF ITS MOTION TO DISMISS AND FOR ABSTENTION**

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT .................................................................................... 1

II.    ARGUMENT AND AUTHORITIES ........................................................................... 2

    A.    Brazos's claims go well beyond a narrow contract dispute between two parties. ...... 2

    B.    Brazos's contract claims should be dismissed for failure to state a plausible claim.  6

        1.    The UCC's and Brazos's contract construction arguments are unavailing. ..... 6

        2.    Brazos and the UCC misconstrue Senate Bill 1580 ......................................... 9

        3.    Count three should also be dismissed. ........................................................... 14

    C.    The Court must abstain from deciding Brazos's pricing claims. ............................. 15

        1.    Factor 3: The difficult or unsettled nature of applicable state law ................ 17

        2.    Factors 2 and 5: Extent to which state law issues predominate over bankruptcy issues and the jurisdictional basis of the claims, other than § 1334 ............... 18

        3.    Factor 13: Comity .......................................................................................... 19

        4.    Factor 4: Presence of related proceedings commenced in state court ............ 19

    D.    Brazos's Complaint should be dismissed for failure to join a necessary party. ...... 20

        1.    The PUCT is a necessary party. ..................................................................... 20

        2.    The PUCT is an indispensable party pursuant to Rule 19(b) ......................... 22

III.   CONCLUSION ........................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*In re Baker Hughes Secs. Litig.*,
    136 F. Supp. 2d 630 (S.D. Tex. 2001) ..................................................................14

*Baumgart v. Fairchild Aircraft Corp.*,
    981 F.2d 824 (5th Cir. 1993) ..............................................................................16

*Burford v. Sun Oil Co.*,
    319 U.S. 315 (1943) ..................................................................................... *passim*

*Chesser v. Murphy*,
    386 S.W.2d 164 (Tex. App.—Houston [1st Dist.] 1965, no writ) ............................7

*In re Chi., Milwaukee, St. Paul & Pac. R.R.*,
    6 F.3d 1184 (7th Cir. 1993) ...............................................................................16

*Click v. Seale*,
    519 S.W.2d 913 (Tex. App.—Austin 1975, writ ref'd n.r.e.) ...................................7

*Cruz v. Coronado*,
    2013 U.S. Dist. LEXIS 194785 (N.D. Tex. Apr. 24, 2013)....................................14

*Eastport Assocs. v. City of L.A. (In re Eastport Assocs.)*,
    935 F.2d 1071 (9th Cir. 1991) .............................................................................16

*Energy Rsrvs. Grp. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983)............................................................................................8

*In re Entergy Corp.*,
    142 S.W.3d 316 (Tex. 2004)............................................................................5, 6

*Exelon Generation Co. v. Pub. Util. Comm'n of Tex.*,
    D-11-GN-21-002099 (261st Dist. Travis County—May 7, 2021, abated)............................20

*Fed. Ins. Co. v. Singing River Health Sys.*,
    850 F.3d 187 (5th Cir. 2017) ..............................................................................21

*G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*,
    458 S.W.3d 502 (Tex. 2015)................................................................................8

*Estate of Griffin v. Sumner*,
    604 S.W.2d 221 (Tex. App.—San Antonio 1980, no writ) ......................................7

*In re Hassell*,
    2020 Bankr. LEXIS 23 (Bankr. S.D. Tex. Jan. 7, 2020) ..................................18, 19

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*,
  269 F.3d 494 (5th Cir. 2001) ........................................................................8

*Luminant v. PUC*,
  03-21-000108-CV (Tex. App.—Austin 2021).........................................20

*Luminant v. PUC*,
  03-21-00098-CV (Tex. App.—Austin 2021)...........................................20

*In re N.Y.C. Off-Track Betting Corp.*,
  434 B.R. 131 (Bankr. S.D.N.Y. 2010) ...................................................19

*Norwood v. Raytheon Co.*,
  2006 U.S. Dist. LEXIS 75159 (W.D. Tex. Sept. 19, 2006)....................14

*Oncor Elec. Delivery Co., LLC v. Chapparal Energy, LLC*,
  546 S.W.3d 133 (Tex. 2018)......................................................................5

*Oncor Elec. Delivery Co., LLC v. Giovanni Homes Corp.*,
  438 S.W.3d 644 (Tex. App.—Fort Worth 2014, pet. denied) ...................6

*In re Pan Am. Corp.*,
  950 F.2d 839 (2d Cir. 1991).....................................................................16

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
  390 U.S. 102 (1968)..................................................................................22

*Quackenbush v. Allstate Ins. Co.*,
  517 U.S. 706 (1996)............................................................................17, 19

*Ranger Ins. Co. v. United Hous. of N.M., Inc.*,
  488 F.2d 682 (5th Cir. 1974) ...................................................................21

*In re Republic Reader's Serv., Inc.*,
  81 B.R. 422 (Bankr. S.D. Tex. 1986) .................................................16, 20

*Schutten v. Shell Oil Co.*,
  421 F.2d 869 (5th Cir. 1970) ..............................................................22, 23

*Sierra Club v. City of San Antonio*,
  112 F.3d 789 (5th Cir. 1997) ..............................................................17, 20

*Smallwood v. New Orleans City*,
  2016 U.S. Dist. LEXIS 728 (E.D. La. Jan. 4, 2016)...............................14

*In re Super Van, Inc.*,
  161 B.R. 184 (Bankr. W.D. Tex. 1993).............................................15, 16

*Texas Workers' Compensation Insurance Facility v. State Board of Insurance*,
    894 S.W.2d 49 (Tex. App.—Austin 1995, no writ), *withdrawn*, 910 S.W.2d
    176 (Tex. App.—Austin 1995, no writ) ...................................................................7

*Tips v. Hartland Developers, Inc.*,
    961 S.W.2d 618 (Tex. App.—San Antonio 1998, no pet.) ......................................7

*United Healthcare Ins. Co. v. Davis*,
    602 F.3d 618 (5th Cir. 2010) ................................................................................8

*Wilson v. Valley Elec. Membership Corp.*,
    8 F.3d 311 (5th Cir. 1993) ......................................................................17, 18, 19

**Statutes**

16 Tex. Admin. Code ..............................................................................................3, 7, 19

28 U.S.C. § 1334(c) .................................................................................................... *passim*

Tex. Gov't Code § 2001.176(b)(1) ..............................................................................18

Tex. Util. Code § 32.001(a) .........................................................................................19

Tex. Util. Code § 39.151 ........................................................................................3, 21

Tex. Util. Code § 41.151 ...................................................................................9, 10, 11

TO THE HONORABLE DAVID R. JONES, CHIEF U.S. BANKRUPTCY JUDGE:

Electric Reliability Council of Texas, Inc. ("ERCOT") submits this *Reply in Support of ERCOT's Motion to Dismiss and for Abstention* [Dkt. No. 23] ("Reply").[1]

## I.   PRELIMINARY STATEMENT

1.     Debtor Brazos Electric Power Cooperative, Inc. ("Brazos") and the Official Committee of Unsecured Creditors ("UCC") misconstrue this proceeding as a simple contract dispute between two private parties. In reality, ERCOT is a regulator that exercises delegated state power, and its standard-form participant agreement with Brazos has an administrative character and is one piece of a pervasive regulatory regime governing the Texas electricity market. Brazos asks this Court to decide (or ignore) issues simultaneously pending in state courts. Any decision on Brazos's claims will necessarily involve complex issues of state law and will impact the entire market.

2.     Brazos's contract claims must be dismissed for failure to state a claim. The ERCOT invoices that Brazos challenges in its Complaint as violating the Standard Form Market Participant Agreement ("SFA") and ERCOT's Nodal Protocols ("Protocols") were calculated according to the Protocols, including an energy price mandated by the Public Utility Commission of Texas ("PUCT"). And contrary to Brazos's and the UCC's assertions, the SFA and the Protocols contemplate that the PUCT may issue orders that would affect the parties' relationship. Those

---

[1] This Reply addresses both *Debtor's Response in Opposition to Electric Reliability Council of Texas, Inc.'s Motion to Dismiss and for Abstention* [Dkt. No. 42] ("Brazos's Response") and *Official Committee of Unsecured Creditors' Response and Objection to Motion of Electric Reliability Council of Texas to Dismiss and for Abstention and Brief in Support of the Committee's Motion for Leave to File a Motion for Partial Summary Judgment* [Dkt. No. 41] ("UCC's Response").

orders were incorporated into and made part of the SFA. Brazos's and the UCC's attempts to argue otherwise by relying on irrelevant statutes and rules of contract construction are unavailing.

3.       Moreover, the Court should abstain from deciding Brazos's pricing claims under *Burford v. Sun Oil Co.* and 28 U.S.C. § 1334(c). To decide Brazos's claims, the Court would have to determine the validity and applicability of the PUCT's orders, the propriety of ERCOT's interpretation and implementation of those orders, and a host of other issues under Texas's comprehensive and complex regulatory scheme for electric utilities. Both *Burford* and the related factors enumerated in § 1334(c) counsel that federal courts should abstain from deciding such issues.

4.       Finally, Brazos's claims that implicate the PUCT's orders and their pricing should be dismissed for failure to join a necessary party—the PUCT. Complete relief cannot be afforded without the PUCT's direct involvement as a party. The fact that the PUCT enjoys sovereign immunity and thus cannot be joined requires dismissal of Brazos's claims that collaterally attack the PUCT orders.

## II.    ARGUMENT AND AUTHORITIES

### A.    Brazos's claims go well beyond a narrow contract dispute between two parties.

5.       Brazos's and the UCC's arguments against each of ERCOT's grounds for dismissal are founded on the premise that ERCOT's claim is a simple contract dispute between two private parties. This myopic view is flawed for two reasons. First, it ignores the practical consequences of this case:  resolution of ERCOT's claim has wide-sweeping regulatory impact and affects every participant in the ERCOT energy market. Second, Brazos's interpretation is contrary to Texas Supreme Court case law.

6.      Resolution of ERCOT's claim implicates a comprehensive regulatory scheme and would impact the entire Texas energy market. Texas's Public Utility Regulatory Act ("PURA") vested the PUCT with the power and the obligation to adopt and enforce rules for the wholesale electric market.[2] Using that authority, the PUCT delegated to ERCOT the general power to determine energy prices.[3] The PUCT retained a supervening authority to "otherwise direct[]" ERCOT to set prices according to the PUCT's direction.[4] The PUCT also retained the authority to "tak[e] actions necessary to protect the public interest, including actions that are otherwise inconsistent with the other provisions in this section," such as overriding ERCOT's Protocols in times of emergency.[5]

7.      The Legislature commanded all market participants, including Brazos, to follow the PUCT's and ERCOT's market rules.[6] And while the Legislature allowed the PUCT to delegate rulemaking to ERCOT—which the PUCT did—the "[r]ules adopted by [ERCOT] . . . are subject to [PUCT] oversight," "review," and "enforcement."[7]

8.      Both Brazos and the UCC assert that this proceeding should not be dismissed because this Court need not analyze the applicability of the PUCT orders.[8] Yet, the relief requested

---

[2] TEX. UTIL. CODE § 39.151(d).

[3] 16 TEX. ADMIN. CODE § 25.501(a).

[4] *Id.*

[5] *Id.* § 25.505(h); 31 Tex. Reg. 7317.

[6] TEX. UTIL. CODE § 39.151(j).

[7] *Id.* § 39.151(d).

[8] UCC's Resp. at 2–3 (stating "the PUCT Order could neither impose on Brazos any obligation to *pay*," that the orders "could not and did not change . . . the way ERCOT could establish pricing," and that the SFA "is subject only to laws and regulations existing when the parties entered into the contract," which would exclude the PUCT orders); *id.* at 26 (concluding the PUCT orders "do[] not apply to the Debtor"); Brazos's Resp. at 16 ("[T]he PUCT Order is irrelevant to the calculation of Debtor's payment obligations[.]").

by Brazos and the UCC is contingent on a preliminary finding that the PUCT orders do not apply. In other words, the fact that Brazos and the UCC argue that the PUCT orders do not apply *means* that this Court must determine whether or not they apply. To make this determination, the Court would have to delve into Texas's comprehensive regulatory scheme—in particular the interplay among PURA, the Protocols, the PUCT's orders, and the SFA.[9]

9.      Brazos tries to downplay the market-wide impact of the relief it seeks by suggesting that it if this Court reduces ERCOT's claim, ERCOT will not have to uplift the reduction to the rest of the market:

> While ERCOT warns of a potential "uplift" of any difference between what the Court determines the Debtor owes on the ERCOT Claim and the $1.9 billion ERCOT seeks, the Debtor disagrees that there will be anything left to uplift once the amount owed is adjudicated, unless the Debtor fails to pay that allowed claim.[10]

10.      Brazos's assertion would only be true if the Court *waded* further into the regulatory scheme by ruling on ERCOT's authority to issue Default Uplift invoices.

11.      Brazos's and the UCC's position that this case involves a mere contract dispute is also contrary to Texas Supreme Court jurisprudence. Contracts implementing a pervasive

---

[9] Multiple parties seeking to intervene in this proceeding recognize Brazos's and the UCC's position exactly for what it is—a collateral attack and attempt to reprice the energy market. *See* Calpine Mot. to Intervene [Dkt. No. 28] at 22–23 ("Thus, to determine whether ERCOT violated the ERCOT Protocols and the terms of the SFA when it corrected its system to set prices at the system wide offer cap at the direction of the PUCT, what the Debtor is really asking the Court to consider is the validity of the PUCT's Orders." (emphasis omitted)); *id.* at 26 ("This Court's adjudication of the Debtor's Complaint directly affects, among others, certain Movants' similarly-situated 503(b)(9) claims, the short payments ERCOT has already passed on to many of the Movants, and all of the Movants' potential exposure to 'uplift' charges resulting from any ultimately crystalized short pay."); Luminant and Exelon Mot. to Intervene [Dkt. No. 29] at 1–2 ("Moreover, this adversary proceeding will determine the amount and priority of ERCOT's claim, which might impact not only the amount of Movants' claims against the Brazos estate but also Movants' recovery on account of such claim, and could result in a large Default Uplift (as defined below) liability imposed by ERCOT against other market participants such as Movants, which would further impair Movants' interests.").

[10] Brazos's Resp. at 16–17.

regulatory scheme take on an administrative character, and disputes arising under those contracts must be adjudicated within the framework established by that pervasive regulatory scheme.[11]

12.     In *Entergy*, a utility agreed as part of the settlement of a merger dispute to file three rate cases over a number of years to share merger-related savings with ratepayers.[12] The PUCT ultimately excused the utility from filing the third suit contemplated by the parties' agreement.[13] A group of ratepayers filed suit in state district court seeking to compel the utility to file the third rate case.[14]

13.     On appeal, the Texas Supreme Court considered whether the PUCT had exclusive jurisdiction over the dispute (and thus whether the district court lacked jurisdiction) because the agreement the ratepayers sought to enforce was "a mere private contract," and the ratepayers were not challenging the PUCT's order excusing the utility from filing the third rate case.[15] Because the agreement at issue "affected the public interest," and because it was the basis for the PUCT's approval of the earlier merger, the court held that the PUCT had exclusive jurisdiction over the dispute.[16] As the court noted, the "very administrative character that gives the Merger Agreement effect also gives the PUC the authority to adjudicate disputes arising from the agreement."[17]

14.     Texas courts have followed *Entergy* and found that litigants cannot avoid the PUCT's exclusive original jurisdiction by couching a claim as a mere breach of contract.[18]

---

[11] *See In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004).

[12] *Id.* at 319.

[13] *Id.* at 320.

[14] *Id.*

[15] *Id.* at 323.

[16] *Id.* at 324.

[17] *Id.*

[18] *See, e.g.*, *Oncor Elec. Delivery Co., LLC v. Chapparal Energy, LLC*, 546 S.W.3d 133, 139–40 (Tex. 2018) (finding the PUCT had exclusive jurisdiction over a customer's breach-of-contract

15.     So it is with the SFA. Although nominally a contract between Brazos and ERCOT, the SFA is a standard form of agreement that the ERCOT stakeholders developed—and the PUCT approved—to implement a uniform set of terms and conditions for market participants.[19] Consequently, the SFA is not merely a private contract.

16.     Thus, far from a mere private contract, the SFA is an exercise of the PUCT's regulatory authority over the market and the participants in it. More so than the contract at issue in *Entergy* (which the PUCT merely approved), the SFA's administrative nature brings it within the PUCT's exclusive jurisdiction. It is an integral part of the pervasive regulatory scheme that governs the interrelationships among Brazos, ERCOT, the PUCT, and the other market participants.

**B.     Brazos's contract claims should be dismissed for failure to state a plausible claim.**

**1.     The UCC's and Brazos's contract construction arguments are unavailing.**

17.     Brazos's claim premised on ERCOT's alleged failure to comply with the Protocols and the SFA should be dismissed under Rule 12(b)(6) because it ignores that under the terms of the SFA, the PUCT orders control.

18.     The UCC argues that the PUCT Orders cannot be incorporated into the SFA because they were enacted after Brazos and ERCOT entered the SFA.[20] In making this argument,

---

claim for monetary damages against a utility because of PURA's comprehensive regulatory scheme over utilities in Texas); *Oncor Elec. Delivery Co., LLC v. Giovanni Homes Corp.*, 438 S.W.3d 644, 657–58 (Tex. App.—Fort Worth 2014, pet. denied) (holding that the PUCT had exclusive jurisdiction over a breach-of-contract claim because the utility's tariff and the PUCT rules governed the provision of service for which the plaintiff had contracted).

[19] ERCOT Nodal Protocols, § 22(A): Standard Form Market Participant Agreement § 5(A). Protocol § 16.1(1) also provides that ERCOT "shall require" each market participant to enter the SFA. Thus, signing the SFA is a prerequisite for a market participant such as Brazos to participate in the ERCOT wholesale market.

[20] UCC's Resp. at 10–11.

the UCC contends that law enacted after parties enter a contract cannot alter the parties' obligations and duties under the contract.[21]

19.     The UCC cites *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 230 (Tex. App.—San Antonio 1980, no writ), *Chesser v. Murphy*, 386 S.W.2d 164, 168 (Tex. App.—Houston [1st Dist.] 1965, no writ), and *Texas Workers' Compensation Insurance Facility v. State Board of Insurance*, 894 S.W.2d 49, 53 (Tex. App.—Austin 1995, no writ), *withdrawn*, 910 S.W.2d 176 (Tex. App.—Austin 1995, no writ), for this proposition.[22] Reliance on these cases is not persuasive. Each of them stands for the proposition that a substantive right existing in the law at the time a contract is entered cannot be displaced if the law is repealed or amended after contract execution.[23] But there is no statutory right at issue here that was extinguished via a repeal of or amendment to a statute following entry of the SFA. Instead, subsequent orders by the PUCT—the body that exercises complete control over the Texas energy market—altered the parties' obligations. These orders were contemplated by the contracting parties, including Brazos.

20.     Brazos entered into the SFA cognizant of the PUCT's supervening authority to set prices[24]—authority that was incorporated into the SFA.[25] Brazos also agreed that PUCT orders would control over inconsistent contractual terms.[26]

---

[21] *See id.* at 11.

[22] *Id.* at 11.

[23] *Griffin*, 604 S.W.2d at 230 (citing *Click v. Seale*, 519 S.W.2d 913, 919–20 (Tex. App.—Austin 1975, writ ref'd n.r.e.)); *Chesser*, 386 S.W.2d at 168; *Tex. Workers' Comp.*, 894 S.W.2d at 54.

[24] 16 TEX. ADMIN. CODE §§ 25.501(a), 25.505(h).

[25] *See Tips v. Hartland Devs., Inc.*, 961 S.W.2d 618, (Tex. App.—San Antonio 1998, no pet.) ("Every contract incorporates existing laws, and a party's obligation under a contract is measured by the standard of the laws existing at the time the contract is made.").

[26] SFA § 11(L).

21.     Cases involving the Contracts Clause[27] hold that a state action is valid despite its effect on a contract if the state action serves a legitimate public purpose and the parties reasonably expect the state action.[28] For example, where a contract "expressly recognize[s] the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law," such future changes in the law can and, in fact, *do* impact the contract.[29] And the PUCT's Orders were for a legitimate public purpose: addressing the crisis caused by the winter storm by encouraging supply and discouraging demand. Brazos cannot argue that its contractual rights were impaired by the PUCT's orders when it entered into the contract aware of the PUCT's authority and agreed that the PUCT could exercise it.

22.     In addition, the UCC argues that the Protocols' detailed provisions regarding pricing the energy market should prevail over Section 11(L) of the SFA (providing that the SFA is subject to the PUCT's orders) because the Protocols are specific, while Section 11(L) is a general, contract provision.[30] But, as the UCC's own case law acknowledges, the canon of construction requiring specific contract provisions to trump general contract provisions only applies in the event of a conflict between the provisions resulting in ambiguity.[31] There is no

---

[27] U.S. CONST. art. I, § 10, cl. 1.

[28] *See United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010).

[29] *Energy Rsrvs. Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 416 (1983) (upholding Kansas statute imposing price controls on natural gas on grounds that natural gas market was heavily regulated and the contract included terms that accounted for that regulation); *see also Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504 (5th Cir. 2001) ("Particularly relevant to [the Contracts Clause] inquiry is whether the subject matter of the contracts had been subject to regulation at the time the contracts were made.").

[30] UCC's Resp. at 14.

[31] *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 532 (Tex. 2015) ("There is thus no ambiguity, and we need not rely on canons of construction like the rules that earlier or more specific provisions prevail.").

conflict or ambiguity here, as the Protocols and Section 11(L) can be read together: The Protocols regarding pricing of the energy market dictate the price of energy *absent* an order by the PUCT otherwise directing the price.

23.    Relatedly, Brazos argues that Section 11(L) of the SFA must be disregarded because it conflicts with Section 2(B), which reads, in part:

> For the purposes of determining responsibilities and rights at a given time, the ERCOT Protocols, as amended in accordance with the change procedure(s) described in the ERCOT Protocols, in effect at the time of the performance or nonperformance of an action, shall govern with respect to that action.[32]

24.    Brazos mischaracterizes Section 2(B). Section 2 is the definition section of the SFA, and Subpart (B) defines "ERCOT Protocols."[33] Section 2(B) provides that when the SFA refers to "ERCOT Protocols," it means the Protocols, as "amended from time to time," in effect at the time of a particular event.[34] The provision does not purport to give the Protocols precedence over PUCT orders or otherwise resolve conflicts between the Protocols and supervening law. Rather, that is the role of Section 11(L). Read in harmony, Sections 2(B) and 11(L) provide that the Protocols in effect at the time of the events giving rise to a dispute are applicable, and they govern absent a supervening order by the PUCT.

**2.    Brazos and the UCC misconstrue Senate Bill 1580.**

25.    Brazos and the UCC argue that Brazos has stated a plausible claim that the ERCOT charges are contrary to the SFA and the Protocols because Senate Bill 1580, codified at Tex. Util.

---

[32] Brazos's Resp. at 33 (quoting SFA § 2(B)).

[33] SFA § 2(B).

[34] *Id.*

CODE § 41.151(b) ("SB 1580"), renders the PUCT orders irrelevant.[35] Both Brazos and the UCC

misinterpret SB 1580.

26.     Brazos and the UCC argue that SB 1580 effectively abrogates the PUCT's orders.

Brazos and the UCC rely on the following provision:

> A cooperative that owes [ERCOT] for the ERCOT power region amounts incurred
> as a result of operations during the period beginning 12:01 a.m., February 12, 2021,
> and ending at 11:59 p.m., February 20, 2021, shall: (1) use all means necessary to
> securitize the amount owed [ERCOT], calculated solely according to the protocols
> of [ERCOT] in effect during the period of emergency promulgated subject to the
> approval of the commission; and (2) fully repay the amount described in
> Subdivision (1) immediately upon receipt of the securitized amount along with any
> additional mounts necessary to fully satisfy the amount owed.[36]

27.     Brazos and the UCC seize upon the language in Subdivision (1) of SB 1580

instructing that securitized amounts be calculated under the Protocols, asserting that this means

the price absent implementation of the PUCT's pricing orders.[37] SB 1580, along with HB 4492,

were enacted after the Legislature *refused* to reprice the energy market. SB 1580 did not reprice

the market using the words "calculated solely according to the Protocols in effect during the period

of emergency." Instead, the Legislature's intent was to permit the prices charged during the storm,

pursuant to the PUCT's orders, to be securitized—and to prevent stakeholders in the ERCOT

market from trying to later revise the Protocols to avoid their obligations. Indeed, it is the prices

resultant from the PUCT's orders that make securitization necessary. As SB 1580's sponsor stated,

it "provides electric cooperatives the option to utilize the financial tool of securitized financing to

---

[35] Brazos's Resp. at 7–8; UCC's Resp. at 14–15. Interestingly, Brazos contends that the PUCT orders that came after the SFA are not binding but that somehow legislation passed over the summer can modify the SFA.

[36] TEX. UTIL. CODE § 41.151(b). SB 1580 was effective June 18, 2021. Brazos's Resp. at 7; UCC's Resp. at 14; TEX. UTIL. CODE § 41.151.

[37] Brazos's Resp. at 7; UCC's Resp. at 14–15.

fund the *unprecedented impact* of winter storm Uri"[38]—i.e., the prices charged pursuant to the PUCT's orders.

28.     SB 1580 does not contemplate recalculating what the price of electricity would have been during the storm absent the PUCT's orders. ERCOT's Protocols do not, themselves, determine the price of electricity; rather, they prescribe a pricing *mechanism* and calculations that determine prices based upon real-time inputs.

29.     Thus, nothing in the language of SB 1580 suggests it was intended to retroactively arrive at a price "calculated solely according to the Protocols," if that means a price calculated while ignoring the PUCT's orders. Tellingly, SB 1580 does not use the word "price," but "amount owed."[39]

30.     Not only does the plain language of SB 1580 not support Brazos's arguments, the legislative history also demonstrates that the statutory language was intended to prevent Brazos from reducing the amounts owed to ERCOT. The statutory language that Brazos relies upon was added to SB 1580 as an amendment by Representative Paddie on May 24, 2021.[40] Similar language appeared in an amendment by Senator Hancock to House Bill 4492 on May 26, 2021.[41] The HB 4492 amendment, like the SB 1580 amendment, added PURA § 39.159 requiring all market participants to pay all amounts owed to ERCOT calculated solely according to the Protocols in effect during the period of emergency.[42] Representative Paddie's reading of the bill noted that co-

---

[38] Sen. Kelly Hancock, Senate Comm. on Bus. & Com. Committee Report, S.B. 1580 (emphasis added).

[39] Tex. Util. Code § 41.151(b).

[40] https://capitol.texas.gov/tlodocs/87R/amendments/pdf/SB01580H21.PDF

[41] https://capitol.texas.gov/tlodocs/87R/amendments/pdf/HB04492S2F1.PDF

[42] *Id.*

ops were $2 billion in default to ERCOT and that securitization would allow them to pay these costs with the least burden on ratepayers.[43] Representative Paddie went on to offer his amendment, noting that its intent was to require co-ops that are in default to ERCOT to use the securitization mechanism "to pay their debts to ERCOT."[44] Contemporaneously, in the Senate Committee on Business and Commerce, Senator Hancock addressed both his amendment to HB 4492 and Representative Paddie's amendment to SB 1580, noting they had included the same provisions in both because they did not know what might happen to HB 4492.[45] Notably, the amendments were added because state lawmakers had heard rumors that co-ops might not use the securitization tools the Legislature was giving them and would, instead, look for ways to reduce amount of their defaults:

> **Senator Hancock:** We will also be maintaining ancillary and adder charges just as the current, the House Bill came across.  There are some small tweaks that we are adding to tighten things up in there.  One of them is to make sure—in fact the amendment just went on the co-op bill—a provision within there that if you don't take advantage of this securitization  and you owe ERCOT money that you will then be forced into a competitive market, which is to encourage coops to utilize the tools that we provided for them.
>
> So are there any questions on that before we move forward?
>
> **Senator:** On the Coops, they already had that.
>
> **Senator Hancock:** Yes they just  . . .
>
> **Senator:** . . . in 1580?
>
> **Senator Hancock:** So what we did we worked with the House, they've added that provision into 1580 in the house because we weren't sure what would happen with 4492.  **That was a provision we thought about afterwards because we heard some rumors that some might not use the tools we're giving them and look for other ways of reducing their payments.**  So that's kinda where we are so that you know on that and with that, Senator Menendez.[46]

---

[43] https://tlchouse.granicus.com/MediaPlayer.php?view_id=47&clip_id=20896 at 2:13:3.

[44] *Id*. at 2:14:20.

[45] https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=16218 at 00:40-01:50.

[46] *Id*. (emphasis added).

Contrary to Brazos's interpretation of SB 1580, in enacting the language on which Brazos relies, the Legislature was attempting to preclude co-ops from doing exactly what Brazos is attempting here.[47]

31.     Tellingly, Brazos understood SB 1580 to do exactly that when it met with Governor Abbott and asked him to veto SB 1580.[48] Its counsel had the same concerns that SB 1580 fixed the PUCT-set prices, preventing this Court from deciding different prices for Brazos.[49] Backed into a corner, Brazos now proclaims that the law it sought to veto was actually a legislative re-pricing of Brazos's invoices in disguise. Brazos's interpretation leads to the absurd result that those market participants that failed to pay their bills are to be treated better than those that did pay their bills by allowing them to pay dramatically reduced, non-PUCT-set prices. The Legislature could not have intended this discriminatory result.

32.     In any event, SB 1580 is not applicable here because it applies only to amounts securitized by an electric cooperative, and Brazos has not securitized anything. Instead, the basis for Brazos's contract claim is that ERCOT's prices during the winter storm were contrary to the

---

[47]   *See also*   https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=16262   at 3:24:26–3:25:35.

[48]   *See* Case 21-30725 Dkt. 786, June 11 Transcript at 13:22-14:11; *see also* Exhibit A, Letter from Brazos to Governor Abbott.

[49]   *See*   https://www.wsj.com/articles/brazos-urges-texas-governor-to-veto-winter-storm-finance-legislation-11623452943   ("A bankruptcy lawyer for the electricity cooperative says legislation will compel full payment to the Texas grid operator on a disputed $2 billion bill."), copy attached as Exhibit B; *see also* Case 21-30725 Dkt. 786, June 11, 2021 transcript at 12:13-25 ("The final version of these bills that were passed by the House and the Senate contained significant changes from some of the prior iterations of them. And from Brazos' perspective, those changes were not good changes for us as a market participant. And in fact, that's probably an understatement. We think that, if those bills are signed into law or become law, that may have some serious consequences for Brazos that I want to touch upon just for a second. The reason for that, Judge, is that both of these bills contain language that say that the charges that were assessed against Brazos and other market participants by ERCOT need to be determined in accordance with ERCOT protocol, nothing else but ERCOT protocols.").

SFA and the Protocols detailing the mechanisms for setting a market price.[50] Brazos's Complaint *does not* seek relief from ERCOT's prices on the basis that it will securitize the amounts owed.[51] SB 1580 has no bearing on whether ERCOT's charges were legitimate under the SFA and the Protocols: It is not relevant to this adversary proceeding.

### 3.  Count three should also be dismissed.

33.     Lastly, both Brazos and the UCC argue that Count 3 (Brazos's claim that it is not in default under the SFA) should not be dismissed because Brazos has established that it properly gave notice of a force majeure event under the SFA.[52]

34.     ERCOT seeks dismissal of this claim because the force majeure provision in the SFA does not excuse payment of amounts owed under the SFA.[53] Acknowledging that, Brazos and the UCC argue that Count 3 should not be dismissed because it only seeks disallowance of the amounts of the ERCOT claim derived from the Default Uplift process.[54] But ERCOT is not invoking the Default Uplift process at this time. Brazos's timely notice of a force majeure event is irrelevant and seeks an advisory opinion. Count 3 should be dismissed.

---

[50] Compl. ¶¶ 124–26.

[51] *See generally id.*; *Smallwood v. New Orleans City*, 2016 U.S. Dist. LEXIS 728, at *17 (E.D. La. Jan. 4, 2016) ("Additional information put forth in a plaintiff's response cannot cure defects in the complaint itself.") (alterations incorporated) (quoting *Norwood v. Raytheon Co.*, 2006 U.S. Dist. LEXIS 75159, at *3 (W.D. Tex. Sept. 19, 2006)); *see also Cruz v. Coronado*, 2013 U.S. Dist. LEXIS 194785, at *20 n.8 (N.D. Tex. Apr. 24, 2013) ("Pleading may not be amended by arguments contained in a response to a dispositive motion.") (citing *In re Baker Hughes Secs. Litig.*, 136 F. Supp. 2d 630, 646 (S.D. Tex. 2001)).

[52] Brazos's Resp. at 34–35; UCC's Resp. at 15 n.10.

[53] ERCOT's Mot. to Dismiss and for Abstention [Dkt. No. 23] at 19.

[54] *See* Brazos's Resp. at 34–35; UCC's Resp. at 15 n.10.

**C.      The Court must abstain from deciding Brazos's pricing claims.**

35.      Brazos's pricing claims arise from and implicate unsettled questions of Texas law. This Court's resolution of such claims would undermine Texas's need for coherent electric-regulatory law and step on the toes of the state's specially chosen fora for judicial review. And as explained above, the PUCT Orders at issue are the heart of this dispute, and they cannot be separated or disregarded in the way Brazos and the UCC suggest. Accordingly, the Court should abstain from hearing Brazos's pricing claims under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

36.      Brazos and the UCC incorrectly argue *Burford* does not apply here, relying on *In re Super Van, Inc.*, 161 B.R. 184, 190 (Bankr. W.D. Tex. 1993), for the proposition that *Burford* does not apply in bankruptcy court.[55]

37.      In *In re Super Van*, "the debtor filed an action under § 505 of the Bankruptcy Code, for determination of the amount or legality of certain taxes owed the Internal Revenue Service and Texas Employment Commission."[56] The "gravamen" of the motion dealt with whether the debtor's workers were employees or independent contractors under the Texas Unemployment Compensation Act.[57] It also sought "a determination of federal unemployment tax liability," which required resolution of the same issue.[58] The court declined to apply *Burford* abstention, not because it is *per se* inapplicable to bankruptcy cases, but because Congress designated bankruptcy courts to decide tax liability under 11 U.S.C. § 505, the Bankruptcy Code's mechanism for determining

---

[55] Brazos's Resp. at 13; UCC's Resp. at 16.

[56] 161 B.R. at 186.

[57] *Id.*

[58] *Id.*

tax liability in a bankruptcy notwithstanding state administrative schemes.[59] Indeed, § 505 itself incorporated abstention principles applicable to taxing authorities.[60]

38.     *In re Super Van* did not hold that § 1334(c)(1) abrogated *Burford* in bankruptcy courts. To the contrary, *In re Super Van* recognized what numerous circuit courts, including the Fifth Circuit, have: "discretionary abstention provisions found in section 1334(c)(1) are but a codification of the case law on abstention developed by the Supreme Court over the last fifty years."[61]  Indeed, the § 1334(c)(1) factors "incorporate[] federal non-bankruptcy abstention doctrines."[62]

39.     Section 1334 provides bankruptcy courts with even greater latitude to abstain than traditional judicial abstention.[63] Thus, "abstention even over a core proceeding, such as one involving a claim formally asserted against the estate, is not only authorized, but often appropriate."[64]

---

[59] *Id.* at 189.

[60] *Id.* at 190.

[61] *Id.* at 187; *see also Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 832 (5th Cir. 1993) (noting that § 1334(c) "summarizes and incorporates federal non-bankruptcy abstention doctrines" (citation omitted)); *In re Chi., Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d 1184, 1189 (7th Cir. 1993) ("[D]iscretionary abstention under section 1334(c)(1) is informed by principles developed under the judicial abstention doctrines, and courts have usually looked to these well-developed notions of judicial abstention when applying section 1334(c)(1)." (quotations omitted)); *In re Pan Am. Corp.*, 950 F.2d 839, 846 (2d Cir. 1991) ("Congress thus intended that section 1334(c)(1) be informed by decisions under the judicial abstention doctrines, and courts have usually looked to these well-developed notions of judicial abstention when applying section 1334(c)(1)."); *Eastport Assocs. v. City of L.A. (In re Eastport Assocs.)*, 935 F.2d 1071, 1079 n.7 (9th Cir. 1991) ("Section 1334(c) encompasses the bases for all judicially created abstention doctrines: an interest in justice or comity or respect for state law.").

[62] *In re Pan Am. Corp.*, 950 F.2d at 846.

[63] *See In re Republic Reader's Serv., Inc.*, 81 B.R. 422, 425 (Bankr. S.D. Tex. 1986) (noting Congress intended for section 1334 to "play a far more significant role" in bankruptcy court's abstention than in district courts observing traditional abstention doctrines).

[64] *Id.* at 427.

40.     Furthermore, it makes little sense to suggest that Congress's intent in broadening bankruptcy courts' discretion to abstain was to *abrogate* their duty to abstain under one of the Supreme Court's primary abstention doctrines. If this Court *may* abstain in circumstances in which a district court in a non-bankruptcy matter could not, it *should* abstain in circumstances in which that Article III court would be required to do so.[65]

41.     In any event, despite Brazos's and the UCC's bold claims that *every single one* of the § 1334(c)(1) factors favor denial of the motion to dismiss, a more deliberate analysis shows that the factors that derive from *Burford*-related considerations (plus others) counsel in favor of abstention.

1.     **Factor 3: The difficult or unsettled nature of applicable state law**

42.     One of the factors courts consider under *Burford* is "whether the case requires inquiry into unsettled issues of state law."[66] Factor 3 under § 1334(c), the extent to which the case presents unsettled issues of state law, derives from this *Burford* factor. And this factor favors abstention. The applicability of the PUCT orders to Brazos (and other market participants) has not been decided by Texas courts. As explained above, this Court should not decide it.[67]

---

[65] Moreover, contrary to Brazos's assertions, Brazos's Resp. at 14, 15, the Supreme Court has "not strictly limited abstention to 'equitable cases,' but rather ha[s] extended the doctrine to all cases in which a federal court is asked to provide some form of discretionary relief." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 730 (1996). And *Burford* does not require pending state court litigation; it only requires that timely and adequate state court review be available. *See Sierra Club v. City of San Antonio*, 112 F.3d 789, 797 (5th Cir. 1997).

[66] *Wilson v. Valley Elec. Membership Corp.*, 8 F.3d 311, 314 (5th Cir. 1993).

[67] It is also worth noting that Brazos asks this Court to interpret SB 1580, which became law less than four months ago and has not been interpreted by any court. Thus, Brazos injects a collateral, unsettled issue into this case (should the Court decide SB 1580 is relevant to resolution of the ERCOT claim).

2.      **Factors 2 and 5: Extent to which state law issues predominate over bankruptcy issues and the jurisdictional basis of the claims, other than § 1334**

43.      Factors 2 and 5 under § 1334(c) are the extent to which state law issues predominate over bankruptcy issues and the jurisdictional basis for the claims, respectively.[68] Similarly, the *Burford* factors ask "whether the cause of action arises under federal law or state law" and "the presence of a special state forum for judicial review[.]"[69] Both these factors weigh in favor of abstention.

44.      Try as they might, Brazos's and the UCC's attempts to cast this case as a simple contract dispute are futile. At the heart of this case is the threshold question: do the PUCT orders apply to the SFA? This purely state-law question implicates Texas's regulatory scheme established by PURA.

45.      Moreover, PURA provides a comprehensive process for challenging prices charged on the ERCOT market as well as the PUCT's orders: the PUCT's orders must be challenged in state district court in Travis County, while invoices may be challenged through ERCOT's ADR process, with appeal to the PUCT followed by judicial review in state district court.[70] It is only because of its bankruptcy filing that Brazos is able to bring these claims in federal court rather than in the designated state fora.

---

[68] *E.g.*, *In re Hassell*, 2020 Bankr. LEXIS 23, at *7 (Bankr. S.D. Tex. Jan. 7, 2020).

[69] *See Wilson*, 8 F.2d at 314.

[70] Tex. Gov't Code § 2001.176(b)(1); Tex. Util. Code §§ 11.007(a), 15.001; *see also* ERCOT Nodal Protocols § 20.

### 3.    Factor 13: Comity

46.     Section 1334(c) asks courts to consider issues of comity, just as *Burford* asks courts to consider the "importance of the state interest involved" and "the state's need for coherent policy in that area."[71]

47.     Comity weighs heavily in favor of abstention. The state of Texas has established a comprehensive regulatory scheme for the administration of its electric utilities, which grants exclusive jurisdiction to the PUCT and Texas state courts in the event of a dispute.[72] Allowing states to administer and control regulatory systems of vital public interest is a fundamental tenet of comity. The need for comity is especially heightened here because any order affecting the amount owed by Brazos to ERCOT has downstream effects on the entire regulated electricity market.

### 4.    Factor 4: Presence of related proceedings commenced in state court

48.     The final *Burford* factor is "the presence of a special state forum for judicial review."[73] Similarly, § 1334(c)'s fourth factor is the "[p]resence of related proceedings commenced in state court."[74] This factor weighs also in favor of abstention.

---

[71] *Wilson*, 8 F.3d at 314; *see also In re N.Y.C. Off-Track Betting Corp.*, 434 B.R. 131, 155 (Bankr. S.D.N.Y. 2010) ("[T]he *Burford* doctrine emanates 'from the discretion historically enjoyed by courts of equity,' and . . . courts must look to 'principles of federalism and comity' when exercising discretion to abstain under *Burford*.") (quoting *Quackenbush*, 517 U.S. at 727–28).

[72] 16 TEX. ADMIN. CODE § 22.251(b); TEX. UTIL. CODE § 32.001(a).

[73] *Wilson*, 8 F.3d at 314.

[74] *In re Hassell*, 2020 Bankr. LEXIS 23, at *7.

49.     First, market participants have asked a Texas court of appeals to decide the validity of the PUCT orders.[75] There is no reason to ignore this concurrent litigation simply because Brazos is not a party to it.

50.     Second, importing principles from *Burford's* progeny, concurrent state court litigation is not actually required. *Burford* only requires that timely and adequate state court review be available.[76]

51.     The relevant § 1334(c) factors rooted in *Burford* all weigh in favor of abstention.[77] Accordingly, this Court should abstain from hearing Brazos's pricing claims.

**D.     Brazos's Complaint should be dismissed for failure to join a necessary party.**

**1.     The PUCT is a necessary party.**

52.     Brazos and the UCC summarily state complete relief can be granted among the existing parties; however, they ignore the far-ranging implications of what Brazos and the UCC request. ERCOT neither has discretion to act in contravention of the PUCT orders nor the authority to retroactively change the rates charged. Furthermore, Brazos, the UCC, and those seeking to intervene in this case (such as Luminant and Exelon) request that the Court prohibit ERCOT from uplifting any disallowed amount. Even if such relief were within this Court's jurisdiction, it would

---

[75] *See Luminant v. PUC*, 03-21-00098-CV (Tex. App.—Austin 2021); *Luminant v. PUC*, 03-21-000108-CV (Tex. App.—Austin 2021); *see also Exelon Generation Co. v. Pub. Util. Comm'n of Tex.*, D-11-GN-21-002099 (261st Dist. Travis County—May 7, 2021, abated).

[76] *See Sierra Club*, 112 F.3d at 797.

[77] At least two additional § 1334(c) factors not relevant to a *Burford* analysis also weigh in favor of abstention. Factor 8, the feasibility of severing state law claims, favors abstention because "a claim [involving predominantly state law] can be litigated in state court to the point of judgment, with enforcement of the judgment stayed until further order of the bankruptcy court." *In re Republic Reader's Serv., Inc.*, 81 B.R. at 426. This is true even if the matter constitutes a core proceeding. *Id.* Additionally, Factor 7, the substance, rather than the form, of an asserted core proceeding, favors abstention. As ERCOT has explained, this proceeding presents an issue with broad market and regulatory implications.

either eviscerate generators' claims for money owed for energy sold during the storm or it would destroy ERCOT's revenue neutrality by leaving ERCOT on the hook without a means of collecting the money to pay the generators. The relief requested by Brazos would not be limited to Brazos and ERCOT. Because only the PUCT has the authority to implement market-wide relief, it is indispensable.

53.     Similarly, Brazos and the UCC argue that the PUCT does not have an interest in this action. This contention is premised on their unconvincing argument that the PUCT's orders speaking to the very issue before this Court—the price of energy during the storm—can simply be ignored. But the validity and applicability of those Orders must be *adjudicated*, and that requires the PUCT's presence. Moreover, the PUCT has explicit statutory authority over the enforcement of ERCOT's Protocols, including the SFA, as well as "complete authority" over ERCOT's performance of its statutory functions and its budget and funding.[78] Brazos's claims directly implicate this authority, further demonstrating the need for the PUCT's presence.

54.     The UCC contends that the PUCT is the only party with standing to raise an argument under Rule 19(a)(1)(B);[79] however, its argument is inconsistent with Fifth Circuit precedent. The Fifth Circuit case the UCC cites distinguishes between a necessary party that could intervene because its presence would not destroy jurisdiction and a party that "could not intervene in the federal action because [its] presence would divest the court of diversity jurisdiction."[80] Furthermore, the Fifth Circuit has upheld dismissal where a defendant, who was a lessee of property, argued the owner of the property was a necessary party who could not be joined because

---

[78] TEX. UTIL. CODE §§ 39.151(d), (d-4)(5), (e), (j).

[79] *See* UCC's Resp. at 24.

[80] *Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 201 (5th Cir. 2017) (citing *Ranger Ins. Co. v. United Hous. of N.M., Inc.*, 488 F.2d 682, 682–83 (5th Cir. 1974)).

the court could not exercise jurisdiction over the owner.[81] Similarly, the PUCT is immune from suit—immunity that would divest this Court of jurisdiction.[82]

55.     Brazos and the UCC also claim the PUCT's interests will not be impaired if it is excluded and that ERCOT will not be exposed to inconsistent obligations. But as explained above, Brazos's requested relief will have broad ramifications for the entire PURA regulatory scheme and affect the PUCT and ERCOT's ability to regulate and enforce the market, as required by Texas law. The inability of regulatory bodies to collect the amounts Brazos owes will create disparities in the market and inconsistent obligations for ERCOT because it purchased energy at the $9,000/MWh rate in reliance on Brazos's agreement to buy at the same rate. Similarly, ERCOT will be forced to eschew its statutory obligation to follow the PUCT's orders, which mandated the rates charged. Thus, both prongs of Rule 19(a)(1)(B) are fulfilled.

### 2.     The PUCT is an indispensable party pursuant to Rule 19(b).

56.     Similar to Brazos's and the UCC's analyses of Rule 19(a), they once again repeat their claim that they seek narrow relief, a notion that ERCOT has rebutted.[83] This focus is in direct contravention to the Fifth Circuit's guidance in applying Rule 19(b): "The distilled essence of these 'criteria' of subdivision (b) is the attempt to balance the rights of all concerned."[84] In determining whether to dismiss a claim under Rule 19(b), courts are instructed to take into account

---

[81] *Schutten v. Shell Oil Co.*, 421 F.2d 869, 874 (5th Cir. 1970).

[82] Brazos does not dispute, and the UCC tacitly concedes, that the PUCT enjoys sovereign immunity. *See generally* Brazos's Resp.; UCC's Resp. at 27 & n.16.

[83] *See* Brazos's Resp. at 40.

[84] *Schutten v. Shell Oil Co.*, 421 F.2d 869, 873 (5th Cir. 1970) (citing *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 124–25 (1968)).

the movant's right "to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations" as well as "the interests of the outsider who cannot be joined."[85]

57.     The most efficient and effective method to resolve the applicability of the PUCT orders to the market is through the process provided in PURA, which meets the requirements of Rule 19(b)(4) by providing Brazos with a state forum to have its claims heard.

58.     Thus, this Court should dismiss the challenged counts so they may be heard in a forum where all necessary parties may be involved and complete relief may be granted.

### III.     CONCLUSION

ERCOT respectfully requests that the Court grant its Motion to Dismiss and for Abstention.

Dated: October 5, 2021

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Jamil N. Alibhai*
Kevin M. Lippman
Texas Bar No. 00784479
klippman@munsch.com
Deborah Perry
Texas Bar No. 24002755
dperry@munsch.com
Jamil N. Alibhai
Texas Bar No. 00793248
jalibhai@munsch.com
Ross H. Parker
Texas State Bar No. 24007804
rparker@munsch.com

3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**ATTORNEYS FOR THE ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.**

---

[85] *Id.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 5, 2021, I caused a copy of the foregoing document to be served via the Court's CM/ECF system on all counsel of record.


*/s/ Jamil N. Alibhai*
Jamil N. Alibhai


24