## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BRAZOS ELECTRIC POWER, COOPERATIVE, INC.[1] | |
| Debtor. | Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | |
| Plaintiff, | Adv. Proc. No. 21-03863 (DRJ) |
| v. | |
| ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC., | |
| Defendant. | |

**REPLY IN SUPPORT OF CALPINE CORPORATION, TENASKA POWER SERVICES CO., NRG ENERGY, INC., ENGIE ENERGY MARKETING NA, INC., TALEN ENERGY SUPPLY, LLC, GOLDEN SPREAD ELECTRIC COOPERATIVE, INC., SOUTH TEXAS ELECTRIC COOPERATIVE, INC., AND NEXTERA ENERGY MARKETING, LLC'S <u>MOTION TO INTERVENE</u>**

---

[1]    The Debtor in this chapter 11 case, along with the last four digits its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the website of the Debtor's proposed claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

## TABLE OF CONTENTS

Page

INTRODUCTION..........................................................................................................1

ARGUMENT .................................................................................................................2

I.     THE OBJECTORS' CONSENT TO THE INTERVENTION OF SOME
DEFENDANT INTERVENORS REVEALS THE NEED FOR ALL TO
FULLY PARTICIPATE IN THE ADVERSARY PROCEEDING. ...........................2

    A.     Concessions Made By The Debtor, ERCOT, And The UCC Counsel In
Favor Of Mandatory And Permissive Intervention. ....................................2

    B.     Defendant Intervenors Must Be Permitted To Fully Intervene As Parties
To The Adversary Proceeding. ....................................................................4

II.     DEFENDANT INTERVENORS ARE NOT ADEQUATELY
REPRESENTED IN THE ADVERSARY PROCEEDING. .........................................8

III.     DEFENDANT INTERVENORS' INTEREST IN THE ADVERSARY
PROCEEDING WARRANTS MANDATORY INTERVENTION. .........................10

    A.     There Is No Economic Interest Bar To Intervention. .............................10

    B.     Defendant Intervenors Have A Sufficient Independent Interest In The
Adversary Proceeding. ..............................................................................13

    C.     The Debtor's Concern For The Owner Cooperatives' Customers Supports
Defendant Intervenors' Intervention.........................................................15

IV.     THE OBJECTORS RAISE NO APPRECIABLE CONCERNS FOR
DEFENDANT INTERVENORS' INTERVENTION. ...............................................16

    A.     ERCOT's Concerns About Expanding The Scope Of The Adversary
Proceeding Apply To Luminant And Exelon, Not Defendant Intervenors. .........16

    B.     Defendant Intervenors Will Aid The Court With Developing The Factual
Record And Presenting Expert Testimony. ...............................................18

    C.     The Debtor's Unsupported Allegation That Defendant Intervenors "Won
A Lottery" Is Wrong, Distracting, And An Attempt To Insert Irrelevant
Factual Issues Into The Adversary Proceeding..........................................18

V.     THE UCC'S OBJECTIONS ARE ALSO MISPLACED AND
UNDERSCORE DEFENDANT INTERVENORS' RIGHT TO
INTERVENE. ...............................................................................................................20

CONCLUSION ...........................................................................................................22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bear Ranch, LLC v. HeartBrand Beef, Inc.*,
    286 F.R.D. 313 (S.D. Tex. 2012) ...........................................................................................11

*Beauregard, Inc. v. Sword Servs. L.L.C.*,
    107 F.3d 351 (5th Cir. 1997) .........................................................................................5, 6, 7

*Bouchard v. Union Pac. R.R. Co.*,
    No. Civ. A. H-08-1156, 2009 WL 1506677 (S.D. Tex. May 28, 2009) ...................................13

*Brown v. Demco, Inc.*,
    792 F.2d 478 (5th Cir. 1986) ..................................................................................................4

*City of Houston v. Am. Traffic Sols., Inc.*,
    668 F.3d 291 (5th Cir. 2012) ..................................................................................................9

*Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*,
    974 F.2d 450 (4th Cir. 1992) ..................................................................................................5

*Franciscan Alliance, Inc. v. Azar*.
    414 F. Supp. 3d 928 (N.D. Tex. 2019) ...................................................................................7

*Fund For Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ...............................................................................................7

*In re Babcock & Wilcox Co.*,
    No. CIV. A. 01-1187, 2001 WL 1095031 (E.D. La. Sept. 18, 2001) .....................................12

*In re Penn Central Commercial Paper Litigation*,
    62 F.R.D. 341 (S.D.N.Y. 1974) ...........................................................................................13

*In re Pilgrim's Pride*,
    421 B.R. 231 (Bankr. N.D. Tex. 2009) .................................................................................14

*In re Smith*,
    521 B.R. 767 (Bankr. S.D. Tex. 2014) ..................................................................................11

*In re World Imports*,
    862 F.3d 338 (3d Cir. 2017) ..................................................................................................14

*Lincoln Gen. v. Aisha's Learning*,
    No. Civ. A. 3:04–CV–0063B, 2004 WL 2533575 (N.D. Tex. Nov. 9, 2004) ........................11

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia*,
    No. CV G-12-304, 2014 WL 12616098 (S.D. Tex. Aug. 13, 2014) ......................................13

*Mountain Top Condo. Ass'n. v. Dave Stabbert Master Builder, Inc.*,
    72 F.3d 361 (3d Cir. 1995)......................................................................................................10

*National Silver Co. v. Nicholas*,
    205 F.2d 52 (5th Cir. 1953) .....................................................................................................14

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*,
    732 F.2d 452 (5th Cir. 1984) ...................................................................................................11

*Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*,
    110 F.R.D. 180 (N.D. Tex. 1986) ............................................................................................11

*Ross v. Marshall*,
    426 F.3d 745 (5th Cir. 2005) .............................................................................................12, 13

*Texas v. Dep't of Energy ("DOE")*,
    754 F.2d 550 (5th Cir. 1985) ...................................................................................................13

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ...................................................................................................12

*United States v. 936.71 Acres of Land*,
    418 F.2d 551 (5th Cir. 1969) ...................................................................................................13

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) .............................................................................................10, 12

*Westlands Water Dist. v. United States*,
    700 F.2d 561 (9th Cir. 1983) ...................................................................................................13

**Statutes**

Fed. R. Civ. P. 24 ........................................................................................................3, 6, 21

Fed. R. Bankr. P. 3001(f).................................................................................................13

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Other Authorities**

Black's Law Dictionary, *Insurance*, (11th ed. 2019).....................................................................13

TO THE HONORABLE DAVID R JONES
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Calpine Corporation, on behalf of itself and each of its affiliates, including but not limited to Calpine Energy Services, L.P., Calpine Energy Solutions, LLC, and Cavallo Energy Texas, LLC (collectively, "Calpine"); Tenaska Power Services Co. ("TPS"); NRG Energy, Inc., on behalf of itself and each of its affiliates, including but not limited to Direct Energy LP, NRG Cedar Bayou Development Company, LLC, NRG South Texas LP, NRG Texas Power LLC, NRG Power Marketing LLC, and Cirro Group, Inc. (collectively, "NRG"); ENGIE Energy Marketing NA, Inc., on behalf of itself and each of its affiliates, including but not limited to Anson Solar Center LLC, Live Oak Wind Project LLC, Engie Long Draw Solar LLC, Las Lomas Wind Project LLC, Jumbo Hill Wind Project, LLC, Prairie Hill Wind Project, LLC, Solaire Holman 1 LLC, Seymour Hills Wind Project LLC and Engie Resources LLC (collectively, "ENGIE"); Talen Energy Supply, LLC, on behalf of itself and each of its affiliates, including but not limited to Talen Energy Marketing, LLC (collectively "Talen"); Golden Spread Electric Cooperative, Inc. ("GSEC"); South Texas Electric Cooperative, Inc. ("STEC"); and NextEra Energy Marketing, LLC, on behalf of itself and certain of its affiliates ("NEM") (together with Calpine, TPS, NRG, ENGIE, GSEC, and STEC, the "Defendant Intervenors"), hereby file this reply (the "Reply") in support of Defendant Intervenors' Motion to Intervene (Dkt. No. 28) (the "Motion to Intervene"). In support of the Reply,[2] the Defendant Intervenors respectfully state as follows:

## INTRODUCTION

1.      The Defendant Intervenors' intervention in the Adversary Proceeding will avoid unnecessary duplication of efforts. As a group of electricity and ancillary services suppliers that

---

[2]     Capitalized terms used but not otherwise defined shall have the meanings set forth in the Motion to Intervene.

collectively serve millions of customers, the Defendant Intervenors seek to intervene as defendants to ensure the adequate representation of their independent, legally protectable interests. Such interests share common questions of law and fact with the existing claims and defenses in the Adversary Proceeding. If intervention is not granted, such common questions of law and fact would need to be addressed again by the Court after the ERCOT Claim is resolved. Defendant Intervenors do not raise additional causes of action or requests for relief, nor do their interests pose a risk of unnecessarily expanding the scope of discovery and related burdens in the Adversary Proceeding. Contrary to Debtor's characterization, Defendant Intervenors' commitment to efficiently coordinating and speaking with one voice, when possible, is not a mere platitude—it is a serious representation to the Court that has not been made lightly, and is evidenced by Defendant Intervenors' actions to date.

2.     ERCOT and the Debtor (together with the UCC, the "Objectors") consent to the intervention of some but not all Defendant Intervenors. For the reasons set forth below and in the Motion to Intervene, the Court should grant Defendant Intervenors' Motion to Intervene in full as to *all* claims in the Adversary Proceeding.

## ARGUMENT

## I.     THE OBJECTORS' CONSENT TO THE INTERVENTION OF SOME DEFENDANT INTERVENORS REVEALS THE NEED FOR ALL TO FULLY PARTICIPATE IN THE ADVERSARY PROCEEDING.

### A.     Concessions Made By The Debtor, ERCOT, And The UCC Counsel In Favor Of Mandatory And Permissive Intervention.

3.     ERCOT advocates for the full intervention of certain Defendant Intervenors. *See* Dkt. No. 63 ¶ 6; Dkt. No. 63-1. The Debtor argues limited intervention is appropriate for other Defendant Intervenors. *See* Dkt. No. 64 ¶¶ 59-60. The UCC acknowledges that some Defendant Intervenors are not adequately represented in the Adversary Proceeding. *See* Dkt. No. 65 ¶ 7. The

Objectors' concessions collectively evidence the Defendant Intervenors' right to intervene in the Adversary Proceeding. As such, these concessions counsel in favor of permissive intervention, and further support Defendant Intervenors' arguments for mandatory intervention.

4.      Both ERCOT and the Debtor acknowledge that Defendant Intervenors' legal interests in the Adversary Proceeding may be impaired absent their intervention. For example, the Debtor calls for the intervention of certain Defendant Intervenors because "they should in fairness have a voice in respect of common legal issues that would likely bind them; specifically, whether electricity and/or ancillary services are 'goods' under section 503(b)(9)." Dkt. No. 64 ¶ 59. Although cabined in the Debtor's discussion of permissive intervention, the Debtor's recognition that Defendant Intervenors "will likely [be bound]" by findings made in the Adversary Proceeding strongly supports *mandatory* intervention under Rule 24(a). *Id.* All Defendant Intervenors remain exposed to the outcome favored by the Debtor and favored by at least some, if not all, of the insider member co-ops, whose goal appears to be to avoid payment on the amounts due and thereby foist this liability on the market, including these intervenors. These common issues of law and fact plainly implicate *all* Defendant Intervenors who have filed proofs of claim under Section 503(b)(9).

5.      Separately, ERCOT supports intervention of certain Defendant Intervenors who "filed direct section 503(b)(9) claims arising from their own legally protectable interests for electricity they sold to ERCOT and that was then sold to Brazos." Dkt. No. 63 at ¶ 6. By arguing that Defendant Intervenors should be allowed to intervene in the Adversary Proceeding, the Debtor and ERCOT acknowledge the existence of common questions of law and fact between the Defendant Intervenors' interests and the Adversary Proceeding. This acknowledgement weighs in favor of the permissive intervention of *all* Defendant Intervenors, especially where the Debtor

3

seeks to invite in its insider members that already are aligned with it, and which have received favorable abatements on their obligations regarding the amounts in controversy.  It is also a tacit admission that intervention will not unreasonably hinder the proceeding, burden existing parties, or jeopardize the existing scheduling order.

**B.     Defendant Intervenors Must Be Permitted To Fully Intervene As Parties To The Adversary Proceeding.**

6.     Upon the Court's grant of intervention, Defendant Intervenors will be true parties for ***all*** purposes of the Adversary Proceeding.  *See Brown v. Demco, Inc.*, 792 F.2d 478, 480–81 (5th Cir. 1986) ("[A]n intervenor of right is treated as if he were an original party and has equal standing with the original parties." (quotations and citations omitted)).  This is particularly important here because of the extraordinary relief sought by the Debtor:  the drastic reduction of a $1.9 billion debt that will have tremendous ripple effects throughout the Texas energy markets and beyond.[3]  Equally extraordinary is the Debtor's position that Defendant Intervenors should be allowed to participate in such litigation only if they subject themselves to certain conditions, including the waiver of settlement and appeal.  In effect, the Debtor demands that Defendant Intervenors litigate in name only.  This will not suffice.  Defendant Intervenors' intervention should not be conditioned on such onerous restrictions and waivers.  As discussed above, the Debtor acknowledges that certain Defendant Intervenors have a ***right*** to intervene.  Conditioning

---

[3]     As the PUCT argues in support of ERCOT's Motion to Dismiss and for Abstention, "a ruling on the issue of the amount of ERCOT's claim . . . will have lasting effects on the energy market and Texas consumers."  Dkt. 69 ¶ 69.  Going further, the PUCT further warns that the "effect of what essentially would be a repricing by this Court in its adjudication of the ERCOT claim would result in an extraordinary and inappropriate intervention into the free market, with potentially devastating effects, including an effect on investments in the state energy market and in its market participants."  *Id.* ¶ 75.

such a right on such a complex web of restrictions raises serious due process and practical concerns.[4]

7.      Any limitations placed on Defendant Intervenors' participation in the Adversary Proceeding must be "reasonable." *Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, n.9 (5th Cir. 1997).  It is unreasonable to impose significant limitations to participation, such as proceeding to trial without discovery.  *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir. 1992) (holding that trial court abused discretion by denying intervenors discovery and forcing them "to begin trial without any opportunity of any discovery").  The *Columbus-America* court explained that "[w]hile the efficient administration of justice is always an important consideration, fundamental fairness to every litigant is an even greater concern."  *Id.*

8.      The Debtor's request for limited intervention is premised on numerous errors of fact and unfounded assumptions.  First, the Debtor's desire for the Objectors to control every aspect of the claims raised in the Adversary Proceeding ignores Defendant Intervenors' independent interests and amounts to intervention in name only.  *See* Dkt. No. 64 at ¶ 64.  Concerns for "undoubtedly overlapping" discovery and "duplicative pleadings," are imagined.  *See id.*  It is not in the Defendant Intervenors' interests to hinder the Adversary Proceeding, and they seek intervention in the interest of efficiency and reducing duplicate efforts.

9.      The Debtor's assertion that "Movants have no special insight into the relevant facts or law" is also mistaken, at least as to Defendant Intervenors.  *Id.*  In their role as Market Participants, Defendant Intervenors are ***uniquely*** equipped to aid the Court's adjudication of the

---

4   For example, it is difficult to imagine a scenario in which Defendant Intervenors are allowed to intervene on the purported legal issue of whether electricity and ancillary services are "goods" under Section 503(b)(9), but not the factual issues of what such claims are worth and the circumstances behind those goods' generation, delivery, and consumption.

Adversary Proceeding, including through the presentation of fact and expert testimony.  By way of example, Defendant Intervenors can assist the court in developing a factual record as to the electricity and ancillary services provided by Defendant Intervenors to the Debtor as well as the impact to Defendant Intervenors (and all market participants) of any failure by Debtor to pay ERCOT in full.  Moreover, and importantly, they can assist the Court in understanding **why** the Debtor accounts for the majority of the entire market shortfall arising from Winter Storm Uri, while other Market Participants in a similar situation, like STEC, did not have this problem—same storm and freeze, different outcomes.  Neither the Debtor nor ERCOT identifies a concrete risk of unnecessary delay or prejudice that would result from Defendant Intervenors' intervention for these purposes.  Avoiding a subsequent re-litigation of common facts and issues raised in both the Adversary Proceeding and Defendant Intervenors' claims in the main bankruptcy case serves judicial efficiency, preserves the resources of the Debtor's estate, and far outweighs any minimal burden caused by Defendant Intervenors' intervention.

10.     Moreover, the legal standards governing intervention and precedent applying Rule 24 do not support a limited or conditional intervention here, and the authorities the Debtor cites are not on point.  For example, the Debtor cites *Beauregard* as support for limiting the scope of intervention.  Debtor Opp. ¶ 63.  But in *Beauregard*, an *in rem* admiralty case, the court conditioned the intervenors' participation on paying their fair share of maintenance expenses for a barge at issue in the case, ***a condition imposed on every party***.  *See Beauregard*, 107 F.3d at 352. The Fifth Circuit found this condition reasonable, explaining:

> [I]n this case, the district court allowed the intervenor full participation in the case. The district court merely imposed the same conditions upon Sword, that were imposed upon the original party, and all subsequent parties to this action. . . . It is hardly unreasonable to demand that as a party, the intervenor abides by the same rules as every other party to the action

*Id.* at 353, n.9 (internal citations omitted).

11.     The Debtor also cites *Franciscan Alliance, Inc. v. Azar*. 414 F. Supp. 3d 928, 941 (N.D. Tex. 2019).  In *Azar*, the court placed "reasonable limitations [that were] necessary to avoid further delay" because: (i) there was "no need for factual discovery" as the plaintiffs and intervenors "agree[d] that the issues in this case are primarily legal"; and (ii) there was no need for further summary judgment briefing because the "[i]ntervenors ha[d] been allowed to participate in nearly every stage of the litigation, including . . . summary judgment[.]" *Id.* at 940–41.  In contrast, the issues in the Adversary Proceeding are not primarily legal, and there is no such agreement that fact discovery is unnecessary.  Indeed, the Debtor has pushed for extensive fact discovery at several status conferences.  Yet the Debtor proposes walling off Defendant Intervenors at every stage of discovery, restricting rights to notice depositions and propound discovery requests.  Dkt. No. 64 at ¶¶ 41–43, 65.  This is not reasonable.

12.     Moreover, the Debtor's vague concerns for delay lack specificity and ignore the Court's gatekeeping function in managing the schedule of the Adversary Proceeding.  In *Fund For Animals, Inc. v. Norton,* for example, the court dismissed concerns for delay caused by the possibility of intervenors raising additional claims.  322 F.3d 728 (D.C. Cir. 2003).  At oral argument, the party opposing intervention conceded that the district court was able to prevent such delay or prejudice without denying intervention.  *Id.* at 737 n.11.  After concluding that the trial court erred in denying intervention, the court remanded with instructions to grant the appellant's motion to intervene as of right.  *Id.* at 738.  In light of Defendant Intervenors' specific interests in the Adversary Proceeding—all directly related to claims asserted by the original parties—no gateway limitations on Defendant Intervenors' intervention are necessary here.  As further

7

explained herein and in the Motion to Intervene, Defendant Intervenors satisfy the elements for both mandatory and permissive intervention.

## II.     DEFENDANT INTERVENORS ARE NOT ADEQUATELY REPRESENTED IN THE ADVERSARY PROCEEDING.

13.     As to some Defendant Intervenors, the UCC readily acknowledges that ERCOT is not an adequate representative.  *See* Dkt. No. 65 ¶ 7.   Protocol 9.19, which establishes steps ERCOT must take to attempt collection on amounts due and owing, places no burden on ERCOT to recover such amounts.   Nor does ERCOT bear the harm if it is unable to recover from a short-paying party.   As detailed in Protocol 9.19, ERCOT must: (1) make a reasonable effort to collect from the short-paying party by the payment date; (2) draw on available financial security ERCOT holds from the short-paying party (which ERCOT may or may not have done); (3) offset amounts owed against payables due to the short-paying party; (4) pay its own administrative fees, then reduce payout to all parties owed money to ensure that ERCOT remains revenue neutral; (5) attempt to enter into a payment plan for the short-paying party to pay back the amount owed over time; and (6) use the Default Uplift process for any amounts that remain unpaid.   In addition, ERCOT may revoke the right of a defaulting party to participate in the ERCOT market.[5]

14.     As made clear in Protocol 9.19, ERCOT's stake in the Adversary Proceeding is not the same as a party subject to true economic loss because ERCOT is guaranteed revenue neutrality. If ERCOT is not paid by the Debtor, ERCOT will simply seek to collect that amount from other

---

[5]     Failing to pay any payment when due is also a Default and material breach under the ERCOT Standard Form Market Participant Agreement unless cured within one bank business day after ERCOT delivers written notice of such breach.  *See* ERCOT Standard Form Market Participant Agreement § 8(A)(1).  As discussed further below, the remedies for such an event of default include termination of the Standard Form Market Participant Agreement.  The ERCOT Protocols also contain a separate obligation requiring each market participant to ensure that all amounts due to ERCOT are paid in full when due.  *See* ERCOT Protocols § 16.11.6.  The Protocols provide a number of remedies, including revoking the market participant's rights to conduct activities under the Protocols and terminating the market participant's agreements with ERCOT, which apply even if the payments are only late.  *See id.* §§ 16.11.6.1.6, 16.11.6.2.

Market Participants.   ERCOT argues that "[r]evenue neutrality does not obviate ERCOT's obligations to collect the amounts due." Dkt. 63 ¶ 22.   The Debtor similarly argues that if "ERCOT is to remain revenue neutral and satisfy short-pay claims, it must pursue every cent that it is legally entitled to[6] under the Debtor's SFA and the protocols." Dkt. 64 ¶ 47 (emphasis omitted).   This partial framing of ERCOT's obligations, stated without a reference to any statutory authority, misses the mark.   It is correct to say that ERCOT must make a reasonable effort to collect the amounts due.   However, it has already achieved revenue neutrality via short payments.

15.     As outlined in Protocol 9.19, ERCOT will collect the amounts due from the Debtor or socialize the losses currently being borne by the short-paid parties across all Market Participants. ERCOT's duty to "make every reasonable attempt" to recover from the Debtor prior to recovering from Market Participants, *see* Protocol § 9.19(1)(a), cannot guarantee that Defendant Intervenors' interests will be adequately represented, because **any amount ERCOT does not recover from the Debtor has already been short paid to certain Market Participants and will subsequently be sought from all Market Participants via the Default Uplift process**, see Protocol §§ 9.19(1)(e) and 9.19.a-9.19.4 (describing the Default Uplift process).   The tangible economic harms from this adversary fall squarely on these intervenors as Market Participants.   As economically affected parties, they want to protect their rights.

16.     A party does not adequately represent an intervenor's interest when that party can accept an outcome that fails to make the intervenor whole.   *See City of Houston v. Am. Traffic Sols., Inc.*, 668 F.3d 291, 294 (5th Cir. 2012) (holding that intervenors were not adequately represented by a city government that might "be inclined to settle the litigation on terms that . . .

---

[6]     Defendant Intervenors have scoured the Debtor's Opposition for authority supporting "ERCOT's statutory directive to pursue the Debtor" and found none.   *See* Dkt. 64 at ¶ 48.

preserve its flexibility" to act in the future); *see also Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016) (holding that "given the broad policy favoring intervention in our precedent," intervenors were not adequately represented by a regulatory agency willing to accept a limited victory). Because ERCOT can accept lesser recovery from the Debtor secure in the knowledge that full recovery is available in the form of short payments and uplift charges borne by Market Participants, Defendant Intervenors' interests are not adequately represented by ERCOT.

## III.    DEFENDANT INTERVENORS' INTEREST IN THE ADVERSARY PROCEEDING WARRANTS MANDATORY INTERVENTION.

### A.    There Is No Economic Interest Bar To Intervention.

17.    Defendant Intervenors have direct and independently cognizable interests in the Adversary Proceeding on account of their claims, including those arising under Section 503(b)(9). There is no "economic interest" bar to intervention; such a rule would be "inconsistent with Supreme Court precedent permitting intervention based on economic interests." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n.*, 834 F.3d 562, 567 (5th Cir. 2016). Even if predominating economic interests counseled against intervention (and they do not), such concerns do not apply to Defendant Intervenors.

18.    Defendant Intervenors' interest is distinct from a generalized "economic interest" in the outcome of the Adversary Proceeding. *Mountain Top Condo. Ass'n. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995) ("While a mere economic interest may be insufficient to support the right to intervene, an intervenor's interest in a specific fund is sufficient to entitle intervention in a case affecting that fund."). Because Market Participants must backstop the Debtor's defaults, Defendant Intervenors have a direct and immediate interest in any proceeds from the ERCOT Claim. Further, cases cited by the Debtor finding that a would-be intervenor

possessed only an "economic interest" have generally done so where realization of the intervenor's interest was contingent upon subsequent litigation or events. *See, e.g.*, *In re Smith*, 521 B.R. 767, 776 (Bankr. S.D. Tex. 2014) (holding an unsecured creditor had "purely economic" interest in outcome of turnover action brought by trustee against third-party); *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180 (N.D. Tex. 1986) (denying shareholders' intervention in bankrupt corporation's breach of contract action against third party); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452 (5th Cir. 1984) (holding potential intervenor had only an economic interest in outcome of litigation where intervention was predicated on third-party beneficiary theory that contractual breach by fuel supplier increased electricity rates of customers); *Lincoln Gen. v. Aisha's Learning*, No. Civ. A. 3:04–CV–0063B, 2004 WL 2533575, at *2 (N.D. Tex. Nov. 9, 2004) (finding would-be intervenor's interest to be purely economic because such interest was predicated solely on ability to recover from insurance company in a separate suit against insured); *Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 286 F.R.D. 313, 316 (S.D. Tex. 2012) (intervention sought based on claim that potential intervenor would be at competitive disadvantage if it did not receive benefits Plaintiff already possessed under its contract with Defendant or would receive from the disposition of the suit).

19.    These cases are inapposite for two reasons.  First, Defendant Intervenors not only have a basis to assert legal claims against the Debtor, but a subset has "independently assert[ed] . . . cause[s] of action."  In this case, those causes of action are Section 503(b)(9) claims for the value of the electricity and/or ancillary services provided to the Debtor through ERCOT, or to the Debtor directly, in the twenty days before the Debtor's chapter 11 proceeding.  Second, Defendant Intervenors have a direct and non-contingent stake in the disposition of ERCOT's claims arising from the Protocols.  Every dollar recovered by ERCOT ***directly*** results in a lower uplift charge in

proportion to each Movant's market share.[7]  Finally, in the case of short paid Market Participants, such Defendant Intervenors have already been short paid hundreds of millions of dollars as a result of the Debtor's default.  The Debtor's statements that these interests are "contingent" or due to "speculation," are wrong and misguided.  These Defendant Intervenors have already realized a substantial economic loss directly traceable to the Debtor's default.  Defendant Intervenors therefore have a significant, direct and immediate interest in the outcome of this Adversary Proceeding, and thus a right to intervene.

20.     The remaining cases cited by the Debtor and ERCOT are no more persuasive.  As a preliminary matter, the courts in a number of Debtor's cited cases ultimately determined that interests asserted by potential intervenors were **_sufficient_** to warrant intervention.  *See In re Babcock & Wilcox Co.*, No. CIV. A. 01-1187, 2001 WL 1095031, at *4-5 (E.D. La. Sept. 18, 2001) (determining that "[s]imply because an interest involves financial concerns does not render the interest purely economic" and holding that potential intervenors could intervene as a matter of right); *Ross v. Marshall*, 426 F.3d 745, 758 (5th Cir. 2005) (finding insurance company's interest in minimizing liability of insured was sufficient for intervention); *Wal–Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 567–68 (5th Cir. 2016) (reasoning "that economic interests can justify intervention when they are directly related to the litigation" and allowing intervention); *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (allowing intervention).

---

[7]     For example, if a Market Participant has approximately 10% market share, each dollar recovered by ERCOT reduces its future uplift payments by ten cents.  Further, as discussed more fully in paragraph 36 of this brief, at least one party, TPS purchased the ancillary services it sold to the Debtor from a third party at a price indexed to the ERCOT market price.  If repricing occurs as a result of a ruling by this Court, TPS could find itself in the unbalanced position of having paid the third party at the higher price effective at the time of the transaction, but only being able to recover from the Debtor at the new price resulting from this Court's decision.  TPS is one example of the many Defendant Intervenors that hedged.

21.     The Debtor cites a potpourri of cases that are inapplicable.  Parties asserting rights

belonging to someone else,[8] parties that lacked an independent basis for bringing a claim,[9] and

parties with speculative interests.[10]  None of these scenarios is present here.  Rather, as noted in

the Motion to Intervene, the Defendant Intervenors are akin to an insurer.[11]  Under Fifth Circuit

precedent, this relationship creates a right of intervention.  *Ross*, 426 F.3d at 748.  This gives the

Defendant Intervenors a direct interest in the "transaction" at issue in the Adversary Proceeding.

### B.     Defendant Intervenors Have A Sufficient Independent Interest In The Adversary Proceeding.

22.     All Defendant Intervenors filed proofs of claim.  Such claims are presumed valid.

*See* Fed. R Bankr. P. 3001(f).  At some point, these claims must be resolved.  As conceded by the

Objectors, certain of Defendant Intervenors' claims involving direct agreements with the Debtor

overlap with claims and defenses in the Adversary Proceeding.  Such claims must be litigated

regardless of the resolution of the ERCOT Claim.  If the ERCOT Claim is paid in full, then the

---

[8]     *See United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir. 1969) (Potential intervenor lacked standing to advance the rights of the state of Florida); *In re Penn Central Commercial Paper Litigation*, 62 F.R.D. 341, 346 (S.D.N.Y. 1974) (Potential intervenor would be asserting claim belonging to existing party).

[9]     *See Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia*, No. CV G-12-304, 2014 WL 12616098, at *1 (S.D. Tex. Aug. 13, 2014), report and recommendation adopted, No. CV G-12-304, 2015 WL 12837647 (S.D. Tex. Jan. 27, 2015) (Would-be intervenor "ha[d] no claim whatsoever to assert against [Plaintiff]"); *Bouchard v. Union Pac. R.R. Co.*, No. Civ. A. H-08-1156, 2009 WL 1506677 at *1-2 (S.D. Tex. May 28, 2009) (Potential intervenor lacked standing for wrongful death action and could not intervene based on agreement with plaintiffs that she would receive 20% of any recovery)

[10]    *See Texas v. Dep't of Energy ("DOE")*, 754 F.2d 550, 552 (5th Cir. 1985) (Claiming interest in proceeding because unfavorable outcome might lead to significant delays, which in turn could lead to higher costs for potential intervenors), or seeking to enact policy preferences rather than protect a legally cognizable interest, *Westlands Water Dist. v. United States*, 700 F.2d 561, 563 (9th Cir. 1983).

[11]    The Debtor responds to this contention by making the naked assertion that Defendant Intervenors are not insurers. Dkt No. 64 ¶ 36.  Defendant Intervenors are not insurance companies, but that does not mean they do not insure ERCOT.  An insurance contract is nothing more than "one party (the *insurer*) undertak[ing] to indemnify another party (the *insured*) against risk of loss[.]" *Insurance*, Black's Law Dictionary (11th ed. 2019).  Under the Protocols the Market Participants insure ERCOT against risk of loss.  Indeed, if ERCOT faced risk of loss it would not be revenue neutral.

path for resolution for certain of Defendant Intervenors' claims becomes clearer.  But because the Debtor has yet to share its position on those claims, the Debtor cannot say how resolution of the ERCOT Claim will affect independent, short-pay-based Section 503(b)(9) claims.

23.     Without objection to the claims themselves, the Debtor and UCC seem to challenge the short-paid parties' Section 503(b)(9) claims on account of lack of privity with the Debtor.  *See* Dkt No. 64 ¶ 35; Dkt No. 65 ¶ 2.  This is no reason to deny intervention; section 503(b)(9) imposes no privity requirement.  As courts in this circuit have stated, a valid claim must merely be "(1) for goods, (2) that are received by the debtor within the 20 days prior to case commencement, and (3) that are sold to the debtor in the ordinary course of its business."  *In re Pilgrim's Pride*, 421 B.R. 231, 235 (Bankr. N.D. Tex. 2009).[12]  Furthermore, the Fifth Circuit has expressly held that reclamation does not require privity between the claimant and the debtor.  *See National Silver Co. v. Nicholas*, 205 F.2d 52, 55 (5th Cir. 1953) (applying the former Bankruptcy Act and holding that "[t]here was no privity of contract between the seller and the bankrupt.  Of course such privity is not an essential to the maintenance of a petition for reclamation[.]").  Given that section 503(b)(9) "provides 'an alternative remedy to reclamation', it should be read and interpreted consistent with section 546."  *In re World Imports*, 862 F.3d 338, 343 (3d Cir. 2017) (quoting *In re Momenta, Inc.*, 455 B.R. 353, 357 (Bankr. D.N.H. 2011)).[13]  Thus, it would be inappropriate to interpose a non-statutory privity requirement on a 503(b)(9) claim when none exists under section 546(c) nor the plain text of section 503(b)(9).

---

[12] The UCC cites *Pilgrim's Pride* in its motion for leave to seek summary judgment for the proposition that electricity is not a good.  As the Defendant Intervenors intend to show with the aid of expert testimony—electricity ***is a good*** for purposes of Section 503(b)(9).  But the Court does not need to adjudicate this now.  The Defendant Intervenors note this only to disclaim any notion that they intend to endorse the proposition the electricity is not a good.

[13]    As described in the Motion, some of the Defendant Intervenors are in contractual privity with the Debtors.

24.     In any event, neither the Debtor nor UCC has challenged the Defendant Intervenors' claims yet so they are presumed valid and lack of privity is not a basis to deny intervention.  An adverse ruling, however, would effectively preclude these short-paid parties from litigating the amount or priority of their own 503(b)(9) claims.  If the ERCOT Claim is not paid in full, these claims, as well as all of Defendant Intervenors' claims will need to be litigated.  Thus, Defendant Intervenors claims create various independent interests in the subject matter of the Adversary Proceeding meriting intervention.

**C.     The Debtor's Concern For The Owner Cooperatives' Customers Supports Defendant Intervenors' Intervention.**

25.     The Debtor contorts to take a contradictory position with respect to its equity holders.  It argues in favor of its insider Owner Cooperatives' intervention because the Owner Cooperatives have customers.  But by that logic, the Defendant Intervenors' must also be allowed to intervene.

26.     The Debtor claims that "[h]owever indirect or indefinite the [Owner Cooperatives'] interests may be, their customers are important parties whose interest in the Chapter 11 Case (and by extension, the Adversary Proceeding) is more personal than most others."  Dkt. No. 63 ¶ 29.  Those customers have not sought to intervene, and as set forth in the Opposition to Plaintiff Intervention, are adequately represented in the Adversary Proceeding by the Debtor, which is controlled by the Owner Cooperatives.  *See* Dkt. No. 61 ¶¶ 4-5, 8-9.

27.     In other words, the Debtor argues that the insider Member Cooperatives "are differently situated" as they "sit closer to the actual people and businesses that will . . . bear the ultimate burden of the ERCOT Claim and the administrative cost of this Chapter 11 Case."  Dkt. No. 64 ¶ 58.  Defendant Intervenors sit no farther from the people and businesses that will bear the ultimate burden of the ERCOT Claim should the Debtor not pay in full, and should the Debtor

prevail on its argument that electricity and ancillary services provided to the Debtor were not "goods" sold "in the ordinary course" under Section 503(b)(9).  As discussed in the Motion to Intervene, Defendant Intervenors, like the Owner Cooperatives, have customers and constituents. Calpine serves 168,000 *retail customers* in Texas alone.  Motion at ¶ 8.  NRG serves 6 million *retail customers*.  Mot., ¶ 14.  STEC serves more than 270,000 *retail customers* in forty-seven South Texas counties.  Mot., ¶ 22.  GSEC serves 310,000 retail electric meters.  Mot., ¶ 25.  If having customers who may be impacted by a proceeding opens the door to intervention, then the door must not be closed on Defendant Intervenors.[14]

28.      Furthermore, the Debtor asserts that "there is value in amplifying ratepayers' voices and particular concerns."  Dkt. No. 64 at ¶ 29.  Defendant Intervenors agree.  The Debtor's stated goal of respecting both customers and the implications of the ERCOT claim will be served through granting intervention to the Defendant Intervenors.

## IV.     THE OBJECTORS RAISE NO APPRECIABLE CONCERNS FOR DEFENDANT INTERVENORS' INTERVENTION.

### A.      ERCOT's Concerns About Expanding The Scope Of The Adversary Proceeding Apply To Luminant And Exelon, Not Defendant Intervenors.

29.      Unlike Luminant and Exelon, Defendant Intervenors have not asserted additional requests for relief or inserted new legal claims into the Adversary Proceeding.  Defendant Intervenors oppose the intervention of Luminant and Exelon because of their request to expand the Adversary Proceeding to non-Debtor, third-party claims.

30.      As raised in Defendant Intervenors' Opposition to Motions for Intervention of Luminant, Exelon, and the Owner Cooperatives, Luminant and Exelon seek intervention in part to

---

[14]    With respect to the Defendant Intervenors who were short paid by ERCOT, the Debtor is correct in one respect. These parties are different than the Member Cooperatives.  Unlike the Debtor, ERCOT did not mitigate harms via a "Temporary Affordability Adjustment."  Because the Member Cooperatives' liability is predicated on the Debtor rescinding this adjustment, their interests *actually are contingent*.

expand the scope of the Adversary Proceeding and obtain relief for pure third-party, non-Debtor claims. *See* Dkt. No. 61 at ¶ 11. Defendant Intervenors seek nothing of the sort and should not be conflated with Luminant and Exelon, whose intervention here would be an offshoot or end-around of their Texas State Court litigation against the PUCT.

31.     Unlike the twelve Owner Cooperatives who filed five separate motions to intervene, Defendant Intervenors have demonstrated their commitment to coordination and efficiency. The Debtor's concern for "[p]romises and platitudes" is misplaced considering Defendant Intervenors' concrete actions to date. See Dkt. 64 ¶ 57. Defendant Intervenors have filed a joint motion to intervene (Dkt. No. 28); coordinated a proposed joinder to ERCOT's answer and motions to dismiss and for abstention (Dkt No. 28-5); secured ERCOT's consent to stipulated intervention; prepared a stipulation for intervention for which they sought the Debtor's consent;[15] filed a joint opposition to Motions for Intervention of Luminant, Exelon, and the Owner Cooperatives (Dkt. No. 61); and coordinated this joint reply despite the divergent treatment of the Defendant Intervenors' claims by the Objectors. These coordinated actions thus far speak louder than words. This demonstrated coordination was deliberate and required material effort. If Defendant Intervenors truly threatened to overburden the Adversary Proceeding, ERCOT would not have consented to their intervention even in the limited manner both ERCOT and the Debtor propose. And if the Debtor genuinely was concerned about the burdens to the Adversary Proceeding it would not have consented to intervention by the Owner Cooperatives, who have not coordinated as a group as the Defendant Intervenors have.

---

[15] Despite Defendant Intervenors' attempts to discuss consensual intervention with the Debtor, in the interests of efficiency and preserving the Debtor's estate, the Debtor has not responded.

**B.      Defendant Intervenors Will Aid The Court With Developing The Factual Record And Presenting Expert Testimony.**

32.      The Adversary Proceeding undeniably needs the development of a strong factual record and expert testimony.  In fact, the Debtor and UCC have flagged numerous issues on which Defendant Intervenors can provide expert testimony and lend their perspective as Market Participants.  These issues include whether electricity and ancillary services are "goods," whether the sale of electricity and ancillary services in February 2021 were "in the ordinary course," and whether parties can establish that their electricity was provided to the Debtor, among many others.

33.      In particular, expert testimony is essential for the Court to have a complete record.  By seeking summary judgment prior to the close of discovery, the Debtor and UCC have simultaneously signaled (1) the import of core questions to resolving Defendant Intervenors' Section 503(b)(9) claims and (2) a desire to close the door on key expert discovery on these contested issues, which have potentially far-reaching implications.

34.      By contrast, the Objectors identify no discovery that Defendant Intervenors will insert into the Adversary Proceeding that could delay or burden the parties.  The Defendant Intervenors stand ready to meet court deadlines, including the expert disclosure deadlines set by the Court's Scheduling Order.  The Scheduling Order provides that expert disclosures will occur on December 9, 2021, and the completion of expert discovery by January 28, 2022.  *See* Dkt. No. 13.  In light of this schedule, it is difficult to imagine how the participation of Defendant Intervenors' expert witnesses will jeopardize the trial.

**C.      The Debtor's Unsupported Allegation That Defendant Intervenors "Won A Lottery" Is Wrong, Distracting, And An Attempt To Insert Irrelevant Factual Issues Into The Adversary Proceeding.**

35.      The allegations that Defendant Intervenors "won a lottery" and seek to "collect a portion of their storm profits" has no factual basis, evidences a fundamental misunderstanding of

the functioning of the Texas power market, and needlessly uses inflammatory language while seeking to expand the scope of the Adversary Proceeding. Debtor's Opp. ¶¶ 47, 63 n.38. These serious allegations are made without factual support, or any legal relevance, and in an apparent attempt to drum up new discovery burdens to weaponize as a means of justifying excluding the Defendant Intervenors. If anything, they stand in stark contrast to how virtually all other Market Participants avoided the liability that led Brazos alone to file for bankruptcy. There is no lottery winner here.

36.     As detailed in public testimony before the Texas Legislature, there were no clear "winners" from Winter Storm Uri. Generators used hedging tools bought and sold on the Intercontinental Exchange, with domestic and international counterparties, to manage risk in ERCOT before, during, and after the February event. These prudent risk management tools helped some Market Participants manage their losses more effectively than others. However, the efforts of parties like the Debtor to resettle the markets poses significant additional risk. If, for example, a generator had the ability to sell into ERCOT for $8,000/MW and used a financial instrument that hedged at $6,500/MW, retroactively repricing that electricity to any less than $6,500 would result in a loss. At least one Defendant Intervenor, TPS, could be similarly impacted. This is because TPS purchased the ancillary services it sold to the Debtor from a third party at a price indexed to the ERCOT market price. Like such hedging parties, if retroactive repricing occurs as a result of a ruling by this Court, TPS could find itself in the unbalanced position of having paid the third party at the higher price effective at the time of the transaction, but only being able to recover from the Debtor at a different, lower price resulting from this Court's decision. These types of scenarios were discussed at length in public testimony, impacting financial futures markets as far away as

New York and England, which have long since been settled.[16]  TPS is only one example of the Defendant Intervenors that hedged.  Moreover, the Debtor says nothing about the high cost of **generating** electricity during Winter Storm Uri and the record high natural gas costs incurred to generate the electricity the Debtor received.  The Debtor's narrow view of the ERCOT electricity market is yet another example of how Defendant Intervenors will aid the Court in developing a complete factual record.

## V.   THE UCC'S OBJECTIONS ARE ALSO MISPLACED AND UNDERSCORE DEFENDANT INTERVENORS' RIGHT TO INTERVENE.

37.    The UCC's partial joinder to the Debtor's objection to Defendant Intervenors' Motion to Intervene further demonstrates the need for Defendant Intervenors' full participation in the Adversary Proceeding.  For example, the UCC's standing argument, made without any factual support, fails.  It is not a "factual matter" that Defendant Intervenors cannot show that their power was sold to the Debtor.  Dkt. No. 65 ¶ 2.  The UCC's misunderstanding of the facts underscores the need for Defendant Intervenors' intervention and the probative value Defendant Intervenors will contribute to the fair resolution of the Adversary Proceeding.

38.    The UCC's fear of Defendant Intervenors raising new claims against ERCOT is unfounded.  The UCC claims that "it is not clear whether each such party seeks to intervene as a defendant with respect to its own claim against ERCOT - or whether intervention submits to this Court's determination the validity of the intervenor's claims against ERCOT."  *See id.* ¶ 3.  To the

---

[16]    *See* Testimony of Chris Edmonds, Global Head of Clearing and Risk for the Intercontinental Exchange, to the Tex. House Committee on State Affairs (Mar. 16, 2021) (hereinafter "Edmonds Testimony") at 221:20-25; 228:13-16; 229:3-14; 284:13-24 (https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=19666), attached hereto as Exhibit 1; Testimony of Former PUC Chair Arthur D'Andrea to the Tex. Senate Committee on Jurisprudence (Mar. 11, 2021) (hereinafter "D'Andrea Testimony") at 30:6-31:11 (https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15446), attached hereto as Exhibit 2.

contrary, it *is* clear on the face of the Motion to Intervene that Defendant Intervenors raise no claim against ERCOT and instead seek to intervene as defendants.

39.     Defendant Intervenors' asserted interests, which include Section 503(b)(9) claims, go far beyond each Defendant Intervenor's "own agreement with ERCOT and its performance thereunder," as the UCC mischaracterizes the Defendant Intervenors' claims.  As discussed in the Motion to Intervene, Defendant Intervenors have asserted various claims arising from the Debtor's non-payment.

40.     Further, the UCC argues that this "is a two-party dispute between ERCOT and the Debtor, and ERCOT's relationship with its own counterparties raises facts and issues irrelevant to this Adversary Proceeding; intervention by such counterparties would introduce unnecessary complexity, confusion, and delay." *Id.* ¶ 4.  It is worth noting that the UCC is itself a third party in this "two-party" dispute.  Even if this were, at present, a two-party dispute (which it is not, especially in light of the Objectors' consent to the intervention of nearly 20 additional parties), Rule 24 exists to expand the number of parties to a dispute when necessary or proper.  The UCC's inability to articulate how Defendant Intervenors' intervention would create "unnecessary complexity, confusion, and delay" speaks volumes to the legitimacy of this concern.

41.     Finally, the UCC actually acknowledges common questions of law and fact between Defendant Intervenors' Section 503(b)(9) claims and the Adversary Proceeding. *Id.* ¶ 7. And that certain Defendant Intervenors are not adequately represented by the parties currently in the Adversary Proceeding.  *Id.*  The Objectors' universal agreement as to such common questions of law and fact counsels in favor of, at minimum, permissive intervention by Defendant Intervenors in the Adversary Proceeding.

## **<u>CONCLUSION</u>**

42.     For the reasons set forth herein and in the Motion to Intervene, Defendant

Intervenors hereby requests that the Court grant its Motion to Intervene.

Houston, Texas
October 11, 2021

By: /s/ Judith W. Ross
**ROSS & SMITH, PC**
Judith W. Ross
TX Bar No. 21010670
700 North Pearl Street, Suite 1610
Dallas, TX 75201
Telephone:    (214) 377-8659
Email:          judith.ross@judithwross.com

*Counsel to Tenaska Power Services Co.*

By: /s/ Annapoorni R. Sankaran
**HOLLAND & KNIGHT LLP**
Annapoorni R. Sankaran
TX Bar No. 24071918
1100 Louisiana Street, Suite 4300
Houston, TX 77002
Telephone:    (713) 821-7000
Facsimile:     (713) 821-7001
Email:          anna.sankaran@hklaw.com

*Counsel to Golden Spread Electric Cooperative, Inc.*

By: /s/ Patrick L. Hughes
**HAYNES AND BOONE, LLP**
Patrick L. Hughes
Texas State Bar No. 10227300
David Trausch
Texas State Bar No. 24113513
1221 McKinney, Suite 4000
Houston, TX 77010
Telephone:    (713) 547-2000
Facsimile:     (713) 547-2600
Email:          patrick.hughes@haynesboone.com
Email:          david.trausch@haynesboone.com

*Counsel to South Texas Electric Cooperative, Inc.*

By: /s/ Mark McKane
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
David R. Seligman, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200
Email:          david.seligman@kirkland.com

-and-

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:     (212) 439-1500
Email:          mark.mckane@kirkland.com

-and-

Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:          aparna.yenamandra@kirkland.com

*Counsel to Calpine Corporation*

By: */s/ C. Luckey McDowell*

**SHEARMAN & STERLING**
C. Luckey McDowell (SBT 24034565)
Ian E. Roberts (SBT 24056217)
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:   (214) 403-0649
Email:        luckey.mcdowell@shearman.com
Email:        ian.roberts@shearman.com

-and-

Joel Moss (*pro hac vice* pending)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:   (212) 848-4693
Email:        joel.moss@shearman.com

-and-

Jonathan M. Dunworth (*pro hac vice* pending)
599 Lexington Avenue
New York, NY 10022
Telephone:   (212) 848-5288
Email:        jonathan.dunworth@shearman.com

***Counsel to NRG Energy, Inc., ENGIE Energy Marketing NA, Inc., Talen Energy Supply LLC, and NextEra Energy Marketing, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 11, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Mark McKane*               
Mark McKane
