**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,[1]<br><br>    Debtor. | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC., *et al.*,[2]<br><br>    Plaintiffs,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF<br>TEXAS, INC., *et al.*,[3]<br><br>    Defendants. | Adv. Proc. No. 21-03863 (DRJ) |

**ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's proposed claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

[2] The Plaintiff-Intervenors in this Adversary Proceeding are: the Official Committee of Unsecured Creditors, Mid-South Electric Cooperative Association; Denton County Electric Cooperative, Inc., d/b/a CoServ Electric; United Electric Cooperative Services, Inc., d/b/a United Cooperative Services; Tri-County Electric Cooperative, Inc.; Bartlett Electric Cooperative, Inc.; Comanche County Electric Cooperative Association; Cooke County Electric Cooperative Association, Inc. d/b/a PenTex Energy; Hamilton County Electric Cooperative Association; Heart of Texas Electric Cooperative, Inc.; J-A-C Electric Cooperative, Inc.; Navasota Valley Electric Cooperative, Inc.; and Wise Electric Cooperative, Inc.

[3] The Defendant-Intervenors in this Adversary Proceeding are: Calpine Corporation; Tenaska Power Services Co.; NRG Energy, Inc.; ENGIE Energy Marketing NA, Inc.; Talen Energy Supply, LLC; Golden Spread Electric Cooperative, Inc.; South Texas Electric Cooperative; and NextEra Energy Marketing, LLC.

## TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ................................................................................. 1

II.  UNDISPUTED FACTS ......................................................................................... 2

    A.  The SFA and ERCOT Protocols ................................................................ 2

    B.  Winter Storm Uri ........................................................................................ 4

    C.  The PUCT Orders and the market price of energy ..................................... 4

    D.  Brazos's use of the ERCOT market ............................................................ 6

    E.  Brazos's failure to pay the ERCOT invoices ............................................. 7

    F.  Brazos's bankruptcy filing. ......................................................................... 8

III.  LEGAL STANDARD .......................................................................................... 9

IV.  ARGUMENT AND AUTHORITIES ................................................................. 10

    A.  ERCOT is entitled to summary judgment on Count 1 because the PUCT Orders supplanted the Protocols' pricing provisions under the SFA. ................................... 10

        1.  The PUCT Orders superseded the portion of the Protocols on which Brazos relies, as expressly provided for in the Protocols. ........................................ 11

        2.  ERCOT was required to comply with the PUCT Orders. ..................................... 13

        3.  The SFA on which Brazos relies for its claim contemplates that the Protocols and the SFA are subject to and may be superseded by a PUCT order. ....................... 14

        4.  Brazos cannot nullify the PUCT Orders based on a misreading of Senate Bill ("SB") 1580. ........................................................................................ 14

    B.  ERCOT is entitled to summary judgment on Count 2 because ERCOT had no authority to reprice the market to reduce Brazos's debt, and it employed the RUC procedure Brazos invokes. ........................................................................................ 16

    C.  ERCOT is entitled to summary judgment on Count 3 because, even if there has been a force majeure event, the SFA's force majeure clause does not relieve Brazos of its responsibility to pay. .................................................................................. 18

    D.  ERCOT is entitled to summary judgment on Counts 4 and 5 because Brazos did not receive less than reasonably equivalent value for the goods it received .................... 21

    E.  ERCOT is entitled to summary judgment on Count 8 because Brazos purchased and received the goods at issue in the ordinary course of its business. ........................... 24

        1.  What constitutes the ordinary course of business generally depends on what is commonplace for both the debtor and for the industry as a whole. ...................... 24

        2.  The transactions at issue are ordinary course for Brazos. ................................... 26

        3.  The transactions at issue are customary for the industry. .................................... 28

V.  CONCLUSION .................................................................................................. 28

    APPENDIX OF EXHIBITS ................................................................................. 29

i

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Amazing Spaces, Inc. v. Metro Mini Storage,*
    608 F.3d 225 (5th Cir. 2010) ................................................................................................9

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................................9

*BFP v. Resolution Tr. Corp.,*
    511 U.S. 531 (1994)..........................................................................................................22

*In re Black Elk Energy Offshore Ops., LLC,*
    2021 Bankr. LEXIS 227 (Bankr. S.D. Tex. Feb. 1, 2021).......................................................21

*Brumfield v. Hollins,*
    551 F.3d 322 (5th Cir. 2008) ..............................................................................................9

*Campo v. Allstate Ins. Co.,*
    562 F.3d 751 (5th Cir. 2009) ..............................................................................................9

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)............................................................................................................9

*In re Clear the Air, LLC,*
    631 B.R. 286 (Bankr. S.D. Tex. June 22, 2021) ..................................................................21

*In re Fairchild Aircraft Corp.,*
    6 F.3d 1119 (5th Cir. 1993) ..............................................................................................22

*Gray Law LLP v. Transcon. Ins. Co.,*
    560 F.3d 361 (5th Cir. 2009) ..............................................................................................9

*Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1,*
    908 S.W.2d 415 (Tex. 1995)..............................................................................................18

*Greenwood 950, L.L.C. v. Chesapeake La., L.P.,*
    683 F.3d 666 (5th Cir. 2012) ......................................................................................14, 21

*In re Johns-Manville Corp.,*
    60 B.R. 612 (Bankr. S.D.N.Y 1986)...........................................................................25, 26, 28

*In re La. Pellets, Inc.,*
    838 F. App'x 45 (5th Cir. 2020) ........................................................................................22

*Lewis v. Jacksonville Bldg. & Loan Ass'n,*
    540 S.W.2d 307 (Tex. 1976)..............................................................................................12

*Nat'l Commc'ns Ass'n v. AT&T*,
    2001 WL 99856 (S.D.N.Y Feb. 5, 2001) ............................................................... 18

*In re Nat'l Gypsum Co.*,
    1996 U.S. App. LEXIS 45187 (5th Cir. Apr. 8, 1996) ..................................... 25, 26

*New Orleans City v. Ambac Assur. Corp.*,
    815 F.3d 196 (5th Cir. 2016) .......................................................................... 14, 21

*In re PMC Mktg. Corp.*,
    517 B.R. 386 (1st Cir. BAP 2014) ........................................................................ 24

*Rodriguez v. Serv. Lloyds Ins. Co.*,
    997 S.W.2d 248 (Tex. 1999) ................................................................................. 12

*In re SemCrude, L.P.*,
    416 B.R. 399 (Bankr. D. Del. 2009) ..................................................................... 24

*In re SemCrude, L.P.*,
    504 B.R. 39 (Bankr. D. Del. 2013) .................................................................. 24, 25

*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) .................................................................................. 9

*In re Spencer*,
    2016 Bankr. LEXIS 3867 (Bankr. N.D. Miss. Nov. 1, 2016) ................................ 24

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) .................................................................................. 9

*In re World Imps.*,
    516 B.R. 296 (Bankr. E.D. Pa. 2014) ................................................................... 24

*In re Wrt Energy Corp.*,
    282 B.R. 343 (Bankr. W.D. La. 2001) .................................................................. 22

**Statutes**

11 U.S.C. § 363(b)(1) ............................................................................................... 28

11 U.S.C. § 364 ........................................................................................................ 28

11 U.S.C. § 503(b)(9) ......................................................................................... 24, 28

11 U.S.C. § 547(c)(2) ............................................................................................... 24

11 U.S.C. § 584(d)(2)(A) ......................................................................................... 21

Tex. Bus. & Com. Code § 24.006(a) ....................................................................... 21

TEX. UTIL. CODE § 39.151 ................................................................2, 11, 13, 17

TEX. UTIL. CODE § 39.1515 .........................................................................16

TEX. UTIL. CODE § 41.151(b)(1) ............................................................15, 16

**Other Authorities**

16 TEX. ADMIN. CODE § 25.365 .............................................................16, 17

16 TEX. ADMIN. CODE. § 25.501(a) ............................................................2, 5

16 TEX. ADMIN. CODE § 25.505.................................................3, 11, 12, 14

TO THE HONORABLE DAVID R. JONES, CHIEF U.S. BANKRUPTCY JUDGE:

Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, Electric Reliability Council of Texas, Inc. ("ERCOT") moves for summary judgment in its favor on Counts 1, 2, 3, 4, 5, and 8 of Debtor Brazos Electric Power Cooperative, Inc.'s ("Brazos") *First Amended Complaint Objecting to ERCOT's Proof of Claim and Other Relief* [Dkt. No. 173] (the "Amended Complaint").

## I.    SUMMARY OF ARGUMENT

1.     ERCOT is entitled to summary judgment on Count 1. ERCOT's claim derives from energy prices ERCOT charged Brazos at the direction of the Public Utility Commission of Texas ("PUCT"), and both the Standard Form Market Participant Agreement ("SFA") and the ERCOT Nodal Protocols ("Protocols") yield to such direction as a matter of law. Brazos's position to the contrary is unsupported by Texas's regulatory scheme and the plain language of the SFA.

2.     The Court should grant summary judgment on Count 2 because ERCOT did not have the authority to re-price the wholesale market to benefit Brazos, and in any event, it employed the RUC procedure Brazos invokes.

3.     The Court should grant summary judgment on Count 3 because, under the SFA, a force majeure event "does not relieve" Brazos's responsibility to pay ERCOT.

4.     Summary judgment on Counts 4 and 5 is appropriate because Brazos did not receive less than reasonably equivalent value for the goods it received—an element it must prove for each of its fraudulent transfer claims. Because the PUCT entered orders (the "PUCT Orders") setting the price of energy at $9,000/MWh to accurately reflect the scarcity of energy at the time—and the orders doing so have not been disturbed by any court—$9,000/MWh is reasonably equivalent value for the megawatts received by Brazos as a matter of law. Additionally, Brazos received

1

reasonably equivalent value because the ERCOT market achieved the system-wide offer cap of $9,000 in the days before the PUCT Orders were entered, as it does other times of year when energy is scarce.

5.      Summary judgment is also warranted on Count 8, as Brazos purchased electricity in the ordinary course of its business. Brazos uses the ERCOT Day-Ahead and Real-Time Markets most days. ████████████████████████████████ And, importantly, Brazos can bid in the ERCOT market during the pendency of this bankruptcy *because* doing so is part of Brazos's ordinary course of business. Use of the ERCOT market is also commonplace in Brazos's industry.

## II.   UNDISPUTED FACTS

### A.   The SFA and ERCOT Protocols

6.      Under Texas's Public Utility Regulatory Act ("PURA"), the PUCT is required "to adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants" in the Texas energy market.[4] PURA instructs the PUCT to designate an independent organization to regulate the Texas energy market, and it has designated ERCOT to fill that role.[5]

7.      As a matter of law, ERCOT determines market-clearing prices of energy and other ancillary services "[e]xcept as otherwise directed by" the PUCT.[6] As a matter of law, the PUCT set the $9,000/MWh scarcity pricing cap in the wholesale market and retained the supervening

---

[4] TEX. UTIL. CODE § 39.151(d).

[5] *Id.* § 39.151(a).

[6] 16 TEX. ADMIN. CODE. § 25.501(a).

authority to "tak[e] actions necessary to protect the public interest, including actions that are otherwise inconsistent with the provisions in this section."[7]

8.      Brazos and ERCOT have entered into the SFA.[8] This document governs Brazos and ERCOT's relationship and, among other things, incorporates the ERCOT Protocols. The ERCOT Protocols are defined as:

> the document adopted by ERCOT, including any attachments or exhibits referenced in [that document], as amended from time to time, that contains the scheduling, operating, planning, reliability, and Settlement (including Customer registration) policies, rules, guidelines, procedures, standards, and criteria of ERCOT.[9]

9.      The SFA is itself part of the Protocols.[10] Section 11(L) of the SFA provides that the SFA is "subject to" orders issued by a "Governmental Authority," and those orders shall control over the SFA or ERCOT Protocols:

> *This Agreement is subject to* applicable federal, state, and local laws, ordinances, rules, regulations, *orders of any Governmental Authority* and tariffs. Nothing in this Agreement may be construed as a waiver of any right to question or contest any federal, state and local law, ordinance, rule, regulation, order of any Governmental Authority, or tariff. *In the event of a conflict between this Agreement and an* applicable federal, state, and local law, ordinance, rule, regulation*, order of any Governmental Authority* or tariff, the applicable federal, state, and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff *shall prevail*, provided that Participant shall give notice to ERCOT of any such conflict

---

[7] *Id.* § 25.505(h). The PUCT recently changed the system wide offer cap. *See Proposal for Adoption for Amendments to 16 TAC 25.505 as Approved at the Dec. 2, 2021 Open Meeting*, Docket No. 52631-47 (Dec. 2, 2021) (adopting amendments to TAC § 25.505 with respect to high system-wide offer cap).

[8] A true and correct copy of the SFA is attached hereto as Exhibit 1.

[9] Protocols § 1.1(1). Due to the voluminous nature of the ERCOT Protocols, the portions of the February 2021 ERCOT Protocols cited in this Motion are attached hereto as Exhibit 2. The February 2021 version of the full ERCOT Protocols are available at https://www.ercot.com/files/docs/2021/08/18/February_1__2021_Nodal_Protocols.pdf.

[10] Protocols § 22A (Exhibit 2).

affecting Participant. In the event of a conflict between the ERCOT Protocols and this Agreement, the provisions expressly set forth in this Agreement shall control.[11]

10.     The Protocols, in accordance with PUCT Substantive Rules, provide for a High System-Wide Offer Cap ("HCAP"), the maximum offer a market participant may place in ERCOT, of $9,000/MWh.[12]

**B.     Winter Storm Uri**

11.     Starting on February 12, 2021, a severe winter storm ("Winter Storm Uri" or "the Storm") blanketed Texas in snow and ice and sent temperatures plunging to well below freezing in many places across the state. In response, ERCOT ultimately declared an Energy Emergency Alert Level 3 ("EEA3"), its highest alert level, reflecting a severe lack of reserve energy availability, which directed transmission operators to curtail load to protect the State's energy reserves. The EEA3 was in place from the night of February 15 until the morning of February 19, 2021.[13]

**C.     The PUCT Orders and the market price of energy**

12.     On February 15 and 16, in the midst of Winter Storm Uri, the PUCT issued emergency orders determining that "adjustments [were] needed to ERCOT prices to ensure they accurately reflect[ed] the scarcity conditions in the market" (the "PUCT Orders").[14] The PUCT

---

[11] SFA § 11(L) (emphasis added) (Exhibit 1).

[12] Protocols § 4.4.11(1) (Exhibit 2).

[13] ███████████████████████████████████████████████████████

[14] Order Directing ERCOT to take Action and Granting Exception to Commission Rules (Feb. 15, 2021) a*vailable at* http://interchange.puc.texas.gov/Documents/51617_3_1111656.PDF ("February 15 Order"); Order Directing ERCOT to take Action and Granting Exception to Commission Rules (Feb. 16, 2021) *available at* https://interchange.puc.texas.gov/Documents/51617_4_1111709.PDF ("February 16 Order"). True and correct copies of the PUCT Orders are attached hereto as Exhibits 3 and 4.

observed that "energy prices across the system are clearing at less than $9,000," noted that was "inconsistent with the fundamental design of the ERCOT market," and concluded that "the market price for the energy needed to serve load should also be at its highest."[15] The PUCT instructed ERCOT to adjust the energy market prices in order to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[16] Notably, the PUCT referenced its "complete authority" over ERCOT and its legal authority to "otherwise direct" ERCOT to set the price of energy under 16 TEX. ADMIN. CODE § 25.501(a).[17]

13.     ERCOT complied with the PUCT Orders



[18]

"[19]

14.     However, the ERCOT market was already reaching the HCAP (and sometimes higher) days before the PUCT Orders.

---

[15] *E.g.* February 15 Order at 1 (Exhibit 3)

[16] *Id.* at 2.

[17] *Id.* at 1.

[18]

[19]

[20]

██████████████████████████████████████████████████████████████

███████████████████████████.[21]

## D.    Brazos's use of the ERCOT market

15.    Brazos offers its generation capacity into the ERCOT market almost daily.[22] And when Brazos's generation and bilateral power purchases do not cover its load, Brazos covers its exposed load in the ERCOT Day-Ahead Market.[23] Brazos is a "net buyer" in ERCOT—as it was during much of EEA3—on days that it has "less resources than loads settled each hour in the real-time market relative to [its] day-ahead positions[.]"[24] This occurs frequently in the summer[25] and sometimes in winter.[26]

16.    Additionally, Brazos's market activity sometimes requires it to settle in the real-time market as it did during and after EEA3. And this "occurrence is not . . . isolated to" February

---

[21] ████████████████████████████████████████████████████████████
████

[22] Clevenger Dep. 11/12/21 Tr. at 48, attached hereto as Exhibit 11 (Brazos "provide[s] bids to the day-ahead market virtually every day.").

[23] Karnei Dep. 11/18/21 Tr. at 21–22 (Exhibit 6); Kueker Dep. Tr. at 51, attached hereto as Exhibit 12 (discussing "settlement in ERCOT's realtime or day-ahead markets" when there is load that could not be served by generation and bilateral purchases).

[24] Clevenger Dep. 11/12/21 Tr. at 184 (Exhibit 11).

[25] Karnei Dep. 11/18/21 Tr. at 24 (Exhibit 6) (stating that Brazos's generation fleet covers "roughly 2,600 megawatts," and in "rough numbers," it has "around 1,400 megawatts of hedges," when Brazos expects up to 3,900 megawatt peak load in the summer).

[26] *Id*. at 29–30 (Exhibit 6) (noting that "if generation exceeds load forecast" during the winter, there is no hedge to cover that); Karnei Dep. 11/19/21 Tr. at 22, attached hereto as Exhibit 13 (When peak load is "above the amount that Brazos can generate during the winter months" Brazos "will evaluate either purchasing additional bilateral products or purchase that power from the ERCOT day-ahead market.").

2021.[27] "[T]his type of thing happens . . . any day when the weather forecasts are missed."[28] Indeed, Brazos uses the Real-Time Market "primarily" to cover "differences in [its] load forecast, between load forecast and actual."[29]

### E.    Brazos's failure to pay the ERCOT invoices

17.    Brazos, like other market participants, purchased and received electricity at the price ordered by the PUCT during the Storm. After the Storm, however, Brazos failed to pay ERCOT for the energy purchased and received from ERCOT.

18.    ███████████████████████████████████

███████,[30] ███████████████████████████████

██████,[31] Brazos declined to pay the invoices. On February 25, Brazos sent a Notice of Force Majeure Event to ERCOT (the "Force Majeure Notice"), ████████████████████████



---

[27] Clevenger Dep. 11/12/21 Tr. at 184 (Exhibit 11).

[28] *Id.* at 184–85 (Exhibit 11).

[29] Karnei Dep. 11/18/21 Tr. at 27 (Exhibit 6).

[30] ████████████████████████████████

████

[31] ██████████████████████████

████████████████████████████████

████████████

████████████████████



19. ████████████████████████████████████████████████████

████████████████████████████████████.[35] ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████[36] The SFA says exactly that: "Notwithstanding the foregoing, a Force Majeure Event does not relieve a party affected by a Force Majeure Event of its obligation to make payments . . . ."[37]

**F.    Brazos's bankruptcy filing.**

20. On March 1, 2021, Brazos filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[38]  Brazos filed its Original Complaint in this Proceeding on August 18, 2021, and filed its First Amended Complaint and Objection to ERCOT's Proof of Claim on October 25, 2021 (the "Amended Complaint").[39] On November 4, 2021, ERCOT filed its Amended Proof of Claim in the amount of $1,886,595,737.08.[40]

---

[34] █████

[35] ███████████████████████

[36] █████████████

[37] SFA § 8(C)(2) (Exhibit 1).

[38] *In re Brazos Elec. Power Coop., Inc.*, No. 21-20725 (DRJ) (Bankr. S.D. Tex.) Dkt. No. 1.

[39] Compl. [Dkt. No. 1]; Am. Compl. [Dkt. No. 173].

[40] *In re Brazos Elec. Power Coop., Inc.*, No. 21-30725 (DRJ) (Bankr. S.D. Tex.) Claim No. 115.

### III.   LEGAL STANDARD

21.    Summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[41] Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings. A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine issue of material fact.[42]  A genuine issue of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party.[43] The court is to view the facts and evidence in the light most favorable to the non-moving party.[44] "The moving party bears the burden of establishing that there are no genuine issues of material fact."[45]

22.    As noted above, the moving party's burden on summary judgment may also be "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[46] Indeed, there is no genuine issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[47]

---

[41] *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009) (quoting FED. R. CIV. P. 56(c)).

[42] *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

[43] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[44] *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009).

[45] *Id*.

[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[47] *Amazing Spaces, Inc. v. Metro Mini Storage,* 608 F.3d 225, 234 (5th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

# IV.   ARGUMENT AND AUTHORITIES

**A.   ERCOT is entitled to summary judgment on Count 1 because the PUCT Orders supplanted the Protocols' pricing provisions under the SFA.**

23.   Count 1 in Brazos's Amended Complaint does not allege a breach of contract claim and is not a claim for affirmative relief or damages against ERCOT.[48] Rather, Brazos alleges that ERCOT is not entitled to payment in the amount asserted because that amount is not supported by the ERCOT Protocols or the SFA.[49] Brazos notes that ERCOT was required by the SFA to comply with the Protocols.[50] And Brazos concedes that it was obligated to pay ERCOT the amounts owed under the SFA and protocols.[51]

24.   The SFA and the Protocols, however, do not exist in a vacuum. They are part of a regulatory construct in which both the Protocols and the SFA are subordinate to orders by the PUCT, PUCT Substantive Rules, and PURA. Because the PUCT Orders overrode one section of the Protocols and the SFA during EEA3—as is expressly contemplated by PUCT Substantive Rules and the SFA—ERCOT's setting the price of energy at $9,000/MWh as directed by the PUCT was not contrary to the SFA or the Protocols. It was required by them. Count 1 fails as a matter of law.

---

[48] Brazos's Answers & Obj. to ERCOT's Second Interrog. at 4, attached hereto as Exhibit 16 ("Brazos Electric has not alleged a breach of contract claim against ERCOT in its First Amended Complaint nor does Brazos Electric seek affirmative relief or damages from ERCOT in its First Amended Complaint."). Brazos inadvertently styled this document as "Brazos Electric Power Cooperative, Inc.'s First Supplemental Objections and Answers to ERCOT's *First* Set of Interrogatories."

[49] *Id.*

[50] Am. Compl. ¶ 123.

[51] *Id.*

1. **The PUCT Orders superseded the portion of the Protocols on which Brazos relies, as expressly provided for in the Protocols.**

25. Although Brazos tries to confine the dispute to the Protocols and the SFA, it is necessary to examine the statutory and regulatory hierarchy in which those documents exist. The highest level of the hierarchy is PURA, which authorizes the PUCT to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants[.]"[52] PURA allows the PUCT to delegate to ERCOT the responsibility for establishing or enforcing such rules, but PURA provides that any rules adopted by ERCOT "are subject to commission oversight and review."[53] PURA also mandates that Brazos must follow the market rules adopted or overseen by the PUCT.[54]

26. The PUCT chose to delegate to ERCOT authority to adopt the rules governing the wholesale market, including the rules governing scarcity pricing. ERCOT complied by adopting Protocol § 6.5.7.3.1, among others, which is the Protocol that Brazos claims ERCOT violated by setting prices at $9,000/MWh.

27. As explained earlier, however, the PUCT expressly retained authority to set its own prices for the prices prescribed by the Protocols, and the PUCT Substantive Rules governing the scarcity pricing mechanism allow it to take inconsistent actions when necessary to protect the public interest:

> ERCOT must use a stakeholder process to develop and implement rules that comply with this section. *Nothing in this section prevents the commission from taking actions necessary to protect the public interest, including actions that are otherwise inconsistent with the other provisions in this section.*[55]

---

[52] TEX. UTIL. CODE § 39.151(d).

[53] *Id.*

[54] *Id.* § 39.151(j).

[55] 16 TEX. ADMIN. CODE § 25.505(h) (emphasis added).

Notably, Brazos has not challenged the PUCT's authority under the PUCT Substantive Rules to "otherwise direct" ERCOT to set prices or to take actions that differ from those prescribed by the Protocols when necessary to protect the public interest.

28.     And the PUCT took action that it deemed necessary to protect the public interest by issuing the PUCT Orders, which directed ERCOT to set prices at the highest level during the period of scarcity at issue. The PUCT was expressly authorized to do so under its substantive rules.[56] The PUCT Substantive Rules have the "same force and effect of state statutes,"[57] and the Protocols require ERCOT to abide by those rules.

29.     That ERCOT amended Protocol § 6.5.7.3.1 in June 2021 to add firm load shed as a factor triggering scarcity pricing is of no moment.[58] Indeed, the PUCT Orders did not *permanently* supersede or amend the Protocols. Rather, the PUCT Orders overrode the Protocols *during* the period of scarcity. But the ERCOT stakeholders realized during that period that the Protocols were inconsistent with fundamental market design principles, so they changed those Protocols.[59] The fact that the market stakeholders, including Brazos, agreed to revise the Protocols so that they comport with what the PUCT ordered during the Storm only demonstrates that the PUCT got it right.

---

[56] *Id.* §§ 25.505(h) and 25.501(a).

[57] *See Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999) (citing *Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310 (Tex. 1976)).

[58] Am. Compl. ¶ 130.

[59]     ERCOT, Nodal Protocols Revision Request 1081, Voting Record, http://www.ercot.com/mktrules/issues/NPRR1081#votingrecord;

### 2.      ERCOT was required to comply with the PUCT Orders.

30.      PURA provides that ERCOT is "directly responsible and accountable" to the PUCT and that the PUCT has "complete authority" to oversee and investigate ERCOT's finances, budgets, and operations.[60] ERCOT is required to "fully cooperate" with the PUCT in the PUCT's oversight function, and if ERCOT does not adequately perform its functions, the PUCT is authorized to take "appropriate action" against ERCOT, including decertification of ERCOT as the independent system operator in the ERCOT region.[61]

31.      Because ERCOT is "directly responsible and accountable" to the PUCT, it was required by statute to follow the PUCT Orders and to set prices at $9,000/MWh. Had it done otherwise, it would have violated its statutory duty to "fully cooperate" with the PUCT and would have nullified the PUCT's statutory right to oversee ERCOT's actions and the rules of the wholesale market. The undisputed evidence of record supports this.[62]

32.      Even Brazos does not contend that ERCOT was entitled to ignore or contravene the PUCT Orders. Brazos's General Manager, Clifton Karnei, conceded that "ERCOT could be decertified as the independent system operator" if it did not comply with an order of the PUCT.[63] Mr. Karnei further testified that, in his decades-long tenure as an ERCOT director, the ERCOT board never voted to disregard a PUCT order for this reason.[64]

---

[60] TEX. UTIL. CODE § 39.151(d).

[61] *Id.*

[62] ███████████████████████████████████████████████████████
████████

[63] Karnei Dep. 11/18/2021 Tr. at 59 (Exhibit 6).

[64] *Id.* at 60 (Exhibit 6).

**3.      The SFA on which Brazos relies for its claim contemplates that the Protocols and the SFA are subject to and may be superseded by a PUCT order.**

33.     Because the Protocols must yield to the PUCT Orders under 16 TEX. ADMIN. CODE §§ 25.505(h) and 25.501(a), the next question is whether Brazos can rely solely on the SFA for its assertion that ERCOT erred by charging $9,000/MWh. The answer to that question is no. SFA § 11(L) provides that the SFA is "subject to" orders of any governmental authority, and that an order of a governmental authority "shall prevail" over the SFA in the event of a conflict:

> In the event of a conflict between this Agreement and an applicable federal, state, and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff, the applicable federal, state, and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff *shall prevail* . . . .[65]

There is no dispute that the PUCT is a governmental authority or that it issued the PUCT Orders. Thus, under the plain language of the SFA, Brazos's rights under the SFA were "subject to" the PUCT Orders, and the PUCT Orders prevailed over any conflicting term in the SFA or the Protocols. As contract interpretation is a question of law appropriate for resolution on summary judgment,[66] Brazos can present no evidence supporting its interpretation.[67]

**4.      Brazos cannot nullify the PUCT Orders based on a misreading of Senate Bill ("SB") 1580.**

34.     Brazos also argues in its Amended Complaint that the Texas Legislature's enactment of SB 1580 evidenced a legislative intent that Brazos's liability be measured differently than all of the market participants that paid their bills.[68] As a threshold matter, Brazos misreads

---

[65] SFA § 11(L) (Exhibit 1) (emphasis added).

[66] *New Orleans City v. Ambac Assur. Corp.*, 815 F.3d 196, 200 (5th Cir. 2016) (citation omitted); *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 668 (5th Cir. 2012).

[67] *See* Brazos's Answers & Obj. to ERCOT's Second Interrog. at 4 (Exhibit 16) (failing to cite any evidence in support of Count 1).

[68] Am. Compl. ¶¶ 126–28.

the legislation by claiming that "the SFA and the protocols, *as they existed prior to Winter Storm Uri*, are the only authority for determining" the amount Brazos owes ERCOT.[69] Brazos goes on to contend that only "the protocols that were in effect on February 12, 2021—prior to the issuance of the PUCT Orders" can be used to calculate the amount it owes ERCOT.[70] But SB 1580 refers to the Protocols in effect *during* Winter Storm Uri, not the Protocols in effect *before* it. And during the storm, Protocol § 6.5.7.3.1—which is the Protocol section Brazos relies on for its argument that firm load shed is not a factor that would allow ERCOT to set the market-clearing price at the HCAP—was supplanted, in part, by the PUCT Orders, ███████████████████████████████ ████████████████████████████████████████.[71]

35.     That SB 1580 accounts for the PUCT Orders as part of the Protocols is supported by the language of SB 1580. Indeed, the amount owed to ERCOT under SB 1580 depends upon the Protocols both "in effect *during the period of emergency*" and "promulgated *subject to the approval of the commission*."[72]  Considered in the context of the statute as a whole, these phrases include the Protocols in effect during the storm that made the SFA "subject to" to PUCT Orders and any temporary changes that the PUCT had made to the Protocols during Winter Storm Uri. Thus, the statutory language evidences an intent to incorporate the changes effected by the PUCT Orders, not to reject them.

---

[69] *Id.* at ¶ 126 (emphasis added).

[70] *Id.* ¶ 128.

[71] ████████████████████████████████████████████ ████████████████████████████████████

[72] Tex. Util. Code § 41.151(b)(1) (emphasis added).

36.     Finally, Brazos's interpretation of SB 1580 ignores that, by its own terms, it applies to amounts that are securitized.[73] Brazos has not securitized what it owes ERCOT. Thus, SB 1580 is inapplicable as a matter of law.

37.     Because ERCOT properly charged $9,000/MWh in accordance with valid PUCT Orders contemplated by the SFA and Protocols, and because Brazos cannot overcome this fact by reliance on SB 1580, ERCOT is entitled to judgment as a matter of law on Count 1.

**B.     ERCOT is entitled to summary judgment on Count 2 because ERCOT had no authority to reprice the market to reduce Brazos's debt, and it employed the RUC procedure Brazos invokes.**

38.     Brazos alleges in Count 2 that ERCOT refused to reprice the Real-Time Market based on an alleged pricing error relating to the last 33 hours of scarcity pricing during the Storm.[74]

██████████████████████████████████████████████████████████████

███████████████.[75] Regardless, the issue escalated above ERCOT shortly after the Storm, and the PUCT rejected, in an open meeting, the recommendation by Carrie Bivens, its Independent Market Monitor ("IMM"), to reprice the last 33 hours of scarcity pricing.[76] While the IMM can make recommendations to the PUCT, it is solely the PUCT's province to decide policy.[77] And

---

[73] *Id.* § 41.151(b) ("A cooperative . . . shall: (1) use all means necessary to *securitize* the amount owed to the independent organization, calculated solely according to the protocols of the independent organization in effect during the period of emergency promulgated subject to the approval of the commission . . . .") (emphasis added)).

[74] Am. Compl. ¶¶ 135, 138.

[75] ████████████████████████████████████████████████████
████████████████████████████████████

[76] PUCT Open Meeting 03/05/21 Tr. at 28–35, attached hereto as Exhibit 22.

[77] *See* TEX. UTIL. CODE § 39.1515(d) ("The commission shall retain all enforcement authority conferred under this title, and this section may not be construed to confer enforcement authority on the market monitor or to authorize the commission to delegate the commission's enforcement authority to the market monitor."); *Id.* § 39.1515(e) ("The commission shall develop and implement policies that clearly separate the policymaking responsibilities of the commission and the monitoring, analysis, and reporting responsibilities of the market monitor."); 16 TEX. ADMIN.

ERCOT is subject to the complete authority of the PUCT and had no discretion to disregard the PUCT's policy decision and unilaterally reprice the market contrary to the PUCT's mandate.[78]

39.     After the PUCT made its decision, the Texas Legislature considered the issue, too, and also refused to reprice the last 33 hours.[79]

40.     ERCOT could not have repriced the entire market to reduce the fixed amount of Brazos's invoices. The PUCT refused the IMM's recommendation to do so.[80] And the Texas Legislature refused to do so.[81] It would have been *unreasonable* for ERCOT to defy the policy decisions of its overseers and unilaterally reprice the market as Brazos contends.[82] And it would have been unlawful.[83] "[A]n injured party is not required or expected to act unlawfully in order to

---

CODE § 25.365(a) ("The IMM shall operate under the [PUCT's] supervision and oversight, but the IMM shall offer independent analysis to the [PUCT] to assist in making judgments in the public interest."); *Id*. § 25.365(e)(1) ("The IMM . . . has no enforcement authority."); ███████████████ ███████████████

[78] TEX. UTIL. CODE § 39.151(d).

[79] *See* Tex. S.B. 2142, 87th Leg., R.S. (2021), attached hereto as Exhibit 23; 87th Leg., R.S. (2021). The Senate passed a repricing bill, but it died in a House Committee amid concerns that repricing would further destabilize the market. *See* https://capitol.texas.gov/BillLookup/BillStages.aspx?LegSess=87R&Bill=SB2142; s*ee also* Shawn Mulcahy, Cassandra Pollock, and Patrick Svitek, *Electricity Repricing Bill Hits Wall in House, Marking First Major Schism with Senate this Session*, Texas Tribune https://www.texastribune.org/2021/03/16/ercot-overbilling-legislature/ (last visited Dec. 20, 2021).

[80] *See generally* PUCT Docket No. 51812 (Issues Related to the State of Disaster for the Feb. 2021 Winter Weather Event), at http://interchange.puc.texas.gov/Search/Filings?ControlNumber=51812.

[81] *See* Tex. S.B. 2142, 87th Leg., R.S. (2021) (Exhibit 23).

[82] SFA § 8(D) (Exhibit 1) (noting that the parties must make *reasonable* efforts to mitigate).

[83] TEX. UTIL. CODE § 39.151(d).

minimize damages."[84] Brazos's Count 2 mitigation defense that seeks to reprice the market should accordingly be dismissed.

41.     Brazos additionally alleges that ERCOT did not mitigate its damages by failing to employ a procedure known as RUC (Reliability Unit Commitment).[85] This allegation is incorrect. ERCOT did RUC the limited units that it could before entering EEA3.[86] And it also RUC'ed units later in the storm.[87] Because the premise of this portion of Count 2 is inaccurate, it should also be dismissed.

42.     Finally, ERCOT is entitled to summary judgment on Count 2 because Brazos's invocation of mitigation is flawed under Texas law. The doctrine of mitigation "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the" party asserting the breach.[88] A buyer under a contract cannot avoid unpaid invoices on a theory that the seller can "mitigate" those invoices by retrospectively lowering the price of what was sold. The idea that ERCOT should reprice the 33 hours in mitigation of its claim is an implicit attack on the applicability of the PUCT Orders and fails as a matter of law for the reasons explained above.

**C.     ERCOT is entitled to summary judgment on Count 3 because, even if there has been a force majeure event, the SFA's force majeure clause does not relieve Brazos of its responsibility to pay.**

43.     Brazos acknowledges that it has not paid the amounts ERCOT claims it is owed pursuant to the ERCOT invoices. However, Brazos asks this Court to find it is not in default of the

---

[84] *Nat'l Commc'ns Ass'n v. AT&T*, 2001 WL 99856, at *8 (S.D.N.Y Feb. 5, 2001).

[85] Am. Compl. at ¶ 136.

[86] *See* Dwayne Rickerson Decl. ¶¶ 5–6, attached hereto as Exhibit 32.

[87] *Id.*

[88] *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995).

SFA and asks the Court to "disallow in their entirety" any amounts ERCOT seeks resulting from Brazos's default under the SFA because Brazos provided its Force Majeure Notice to ERCOT.[89] As a preliminary matter, failure to timely pay, failure to comply with the ERCOT Protocols, and filing a petition for bankruptcy all constitute events of default under the SFA.[90]  Despite Brazos's multiple events of default beyond only its failure to timely pay, Brazos relies on § 8(A)(5) of the SFA: "If, due to a Force Majeure Event, a Party is in breach with respect to any obligation hereunder, such breach shall not result in a Default by that Party."[91] Assuming only for the purposes of summary judgment that the force majeure provision applies in this case, Brazos's request to have the ERCOT claim disallowed is an invalid remedy, which is not permitted in the SFA:  "Notwithstanding the foregoing, *a Force Majeure Event does not relieve a Party affected by a Force Majeure Event of its obligation to make payments* or of any consequences of  non-performance . . . ."[92]

44.    Brazos has been aware that a force majeure event does not allow non-payment since before it submitted the Force Majeure Notice to ERCOT. [94]

---

[89] Am. Compl. ¶¶ 143–44.

[90] SFA § 8(A)(1), (3) (Exhibit 1).

[91] *Id.* § 8(A)(5) (Exhibit 1).

[92] *Id.* § 8(C)(2) (Exhibit 1) (emphasis added).

[93]

[94]

45.    Brazos's general manger also admitted that failure to pay due to a force majeure event does not excuse Brazos's payment obligation pursuant to the SFA:



46.     Thus, Brazos's requested relief in Count 3 that "any amounts resulting from the Debtor's alleged default under the SFA . . . be disallowed in their entirety"[96] is not permitted by the SFA and should be dismissed with prejudice.[97]

**D.      ERCOT is entitled to summary judgment on Counts 4 and 5 because Brazos did not receive less than reasonably equivalent value for the goods it received.**

47.     "A fraudulent transfer under § 548(a)(1)(B) entitles the trustee [or debtor-in-possession] to avoid any transfer from the debtor if the following elements are established: (1) that the transfer was of an interest of the debtor in the property; (2) that the Debtor made the transfer on or within two years before the petition date; (3) that the Debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) that the Debtor was insolvent on the date the transfer was made."[98] "Similarly, a constructively fraudulent transfer is avoidable under [the Texas Uniform Fraudulent Transfer Act] if: (i) the transfer was made without the debtor receiving reasonably equivalent value; (ii) the debtor was insolvent at the time of the transfer; (iii) a creditor exists whose claim arose before the transfer for whom the trustee may act; and (iv) the cause of action arose within four years of the transfers."[99]

48.     In this context, value is "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."[100] "[T]he inquiry" of whether the debtor received reasonably equivalent value in exchange for the transfer at issue is "whether the debtor has received value that

---

[96] Am. Compl. ¶ 144.

[97] *New Orleans City*, 815 F.3d at 200 (contract interpretation is a question of law); *Greenwood*, 683 F.3d at 668 (same).

[98] *In re Clear the Air, LLC*, 631 B.R. 286, 297 (Bankr. S.D. Tex. June 22, 2021) (emphasis omitted).

[99] *In re Black Elk Energy Offshore Ops., LLC*, 2021 Bankr. LEXIS 227, at *34 (Bankr. S.D. Tex. Feb. 1, 2021) (citing, *inter alia*, TEX. BUS. & COM. CODE § 24.006(a)).

[100] 11 U.S.C. § 584(d)(2)(A).

is substantially comparable to the worth of the transferred property."[101] Fair market value can be a relevant benchmark in determining reasonably equivalent value, and "value is determined at the time of transfer[.]"[102] Moreover, "the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value."[103]

49.     Brazos did not receive less than reasonably equivalent value for the goods subject to ERCOT's claim. It is undisputed that ERCOT charged $9,000/MWh for energy during the relevant period at the PUCT's direction.[104] Under the PUCT Orders and PUCT Substantive Rules, $9,000/MWh is *per se* the value of the goods Brazos received under the PUCT Orders. In other words, the PUCT Orders set the value of energy for the relevant time period, and that value is $9,000/MWh. Accordingly, Brazos received reasonably equivalent value for energy purchased from ERCOT during the period at issue as a matter of law.

50.     That $9,000/MWh represents the value of the goods Brazos received during EEA3 under the PUCT Orders is confirmed by the undisputed fact that the ERCOT market achieved the $9,000 HCAP *before* the PUCT Orders required this price. ████████████████████████

███████████████████████████████████████████████████████████████

---

[101] *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994).

[102] *In re La. Pellets, Inc.*, 838 F. App'x 45, 49–50 (5th Cir. 2020); *see also In re Wrt Energy Corp.*, 282 B.R. 343, 405 (Bankr. W.D. La. 2001) (noting that reasonably equivalent value is similar to fair market value, and fair market value is "what the property would bring if actually sold on the market at the time of the transfer, assuming a hypothetical willing seller and a hypothetical willing buyer").

[103] *In re La. Pellets, Inc*., 838 F. App'x at 49–50 (quoting *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125–26 (5th Cir. 1993), *abrogated in part on other grounds by In re Dunham*, 110 F.3d 286, 288–89 (5th Cir. 1997)).

[104] February 15 Order at 1–2 (Exhibit 3); February 16 Order at 1–2 (Exhibit 4); ████████████ ████████████████████████ Brazos has confirmed that it does not challenge the validity of these Orders. Hrg. 10/18/2021 Tr. at 122 ("Mr. Mendiola: There's no challenge to the validity of the PUCT Orders that we've raised, Your Honor, here in this court.").



51.     Moreover, Winter Storm Uri is not the first time energy prices in ERCOT reached the HCAP. It happened in "2018 or 2019" simply because there was "a shortfall of generation reserves relative to load."[110] Brazos participates in a market where energy prices may reach and do reach up to $9,000/MWh. ████████████████████████████████████████ ████████████████████████████—and should have expected that price—in a time of scarcity. Summary judgment is warranted on Counts 4 and 5.



[110] Clevenger Dep. 11/12/21 Tr. at 284 (Exhibit 11).

**E.    ERCOT is entitled to summary judgment on Count 8 because Brazos purchased and received the goods at issue in the ordinary course of its business.**

52.    A creditor is entitled to an administrative expense claim if it "(1) sold goods to the debtor; (2) the goods were received by the debtor within twenty days prior to filing; and (3) the goods were sold to the debtor in the ordinary course of business."[112]

**1.    What constitutes the ordinary course of business generally depends on what is commonplace for both the debtor and for the industry as a whole.**

53.    There is no test for what constitutes ordinary course of business under § 503(b)(9). However, the tests developed under other sections of the Bankruptcy Code and under the Uniform Commercial Code ("UCC") follow a common theme: what is the ordinary course of business depends upon what is commonplace for the debtor or for the industry as a whole.[113]

54.    Under the UCC, a person buys goods in the ordinary course "if the sale to the person comports with the usual or customary practices *in the kind of business* in which the seller is engaged or with the *seller's own usual or customary practices*."[114] For example, in *SemCrude II*,

---

[112] *In re Spencer*, 2016 Bankr. LEXIS 3867, at *4 (Bankr. N.D. Miss. Nov. 1, 2016) (alterations and emphasis omitted) (quoting *In re World Imps.*, 516 B.R. 296, 297 (Bankr. E.D. Pa. 2014)); *see also* 11 U.S.C. § 503(b)(9).

[113] Section 503(b)(9) only requires that the "goods have been sold to the debtor in the ordinary course of such *debtor's* business," but ERCOT will demonstrate below why the energy charges at issue were both within Brazos's normal business affairs and commonplace for wholesale energy purchasers at the time. *See* 11 U.S.C. § 503(b)(9); *cf.* 11 U.S.C. § 547(c)(2) (enumerating elements of ordinary-course defense to preference action, including both that the transfer was "made in the ordinary course of business or financial affairs of the debtor and transferee" *or* "made according to ordinary business terms").

[114] *In re SemCrude, L.P.*, 504 B.R. 39, 64 (Bankr. D. Del. 2013) ("*SemCrude II*") (emphasis added) (citing U.C.C. § 1-201(b)(9) (defining buyer in the ordinary course of business))); *see also In re SemCrude, L.P.*, 416 B.R. 399, 405 (Bankr. D. Del. 2009) ("*SemCrude I*") (noting that the UCC may be consulted for definitions of terms not defined by the Bankruptcy Code); *In re PMC Mktg. Corp.*, 517 B.R. 386, 392 (1st Cir. BAP 2014) (noting that the meaning of "goods" under § 503(b)(9) is primarily informed by the meaning of *goods* under Article 2 of the UCC and collecting cases).

the debtor purchased oil and gas from producers and sold it to downstream purchasers.[115] The court considered whether the downstream purchasers were insulated from claims by the producers on the ground that they were buyers in the ordinary course of business.[116] The court found that because "the Debtors were in the business of buying and selling oil and gas as midstream purchaser[s]," the "Debtors bought oil and gas from the Producers and promptly sold it to the Downstream Purchasers," and the downstream purchasers "were also in the business of buying and selling oil," it was "clear" that "trading oil and gas derivatives was ordinary course of business for the[] parties."[117] The court further emphasized the agreements between the downstream purchasers and the debtors "were customary *both* in the industry and between" the parties themselves.[118]

55.      Similarly, as it relates to claims under § 503(b)(1), allowing for the administrative expenses necessary to preserve the estate, and under §§ 363 and 364, permitting the debtor to conduct certain business postpetition, courts have developed the "horizontal" and "vertical" dimension tests for determining the ordinary course of a debtor's business.[119]

56.      Under the vertical dimension test, courts "focus . . . on the debtor's internal operation and workings" and its "prepetition business practices and conduct."[120] The vertical dimension test asks whether creditors of the estate would reasonably expect the debtor to make the

---

[115] *SemCrude II*, 504 B.R. at 44.

[116] *See id.* at 61.

[117] *Id.* at 65.

[118] *Id.* (emphasis added).

[119] *See also In re Brazos Elec. Power Coop., Inc.*, No. 21-30725 (DRJ) (Bankr. S.D. Tex.), Debtor's Obj. to ERCOT's Proof of Claim [Bankr. Dkt. No. 930] at 30 (applying this standard).

[120] *In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y 1986); *see also In re Nat'l Gypsum Co.*, 1996 U.S. App. LEXIS 45187, at *2 (5th Cir. Apr. 8, 1996) (approving of *In re Johns-Manville Corp.*'s discussion of the vertical and horizontal dimension tests).

transaction at issue.[121] The focus of the horizontal dimension test, on the other hand, is industry wide: it asks whether the transaction at issue is ordinary for "this business vis-à-vis similar businesses."[122] In other words, it compares the "debtor's business to other like businesses."[123] In sum: whether a transaction is in the ordinary course of business depends upon whether it was ordinary for the debtor that made it and whether it would be ordinary in the debtor's industry. Both are true here.

### 2. The transactions at issue are ordinary course for Brazos.

57.     Use of the ERCOT market is ordinary course for Brazos. Brazos uses the ERCOT market every day. ███████████████████████████████████████████████

████████████████████████████████████████.[124]

58.     Brazos offers its generation capacity into the ERCOT market almost every day.[125] And when Brazos's generation and bilateral power purchases do not cover its load, Brazos covers its exposed load in the ERCOT Day-Ahead Market.[126] Brazos is a "net buyer" in ERCOT—as it was during much of EEA3—on days that it has "less resources than loads settled each hour in the real-time market relative to [its] day-ahead positions[.]"[127] For example, this may happen on "hot

---

[121] *Johns-Manville*, 60 B.R. at 617.

[122] *Id.* at 618.

[123] *Id.*

[124] ████████████████████████████████████████████████████████
███████████████

[125] Clevenger Dep. 11/12/21 Tr. at 48 (Exhibit 11) (Brazos "provide[s] bids to the day-ahead market virtually every day.").

[126] Karnei Dep. 11/18/21 Tr. at 21–22 (Exhibit 6); Kueker Dep. Tr. at 51 (Exhibit 12) (discussing "settlement in ERCOT's realtime or day-ahead markets" when there is load that could not be served by generation and bilateral purchases).

[127] Clevenger Dep. 11/12/21 Tr. at 184 (Exhibit 11).

summer day[s]" and "*cold winter day*[*s.*]"[128] In fact, it happens routinely in the summer.[129] While Brazos may not rely on the Day-Ahead Market as frequently in winter, it is not unheard of.[130]

59.     Sometimes, Brazos's market activity requires it to settle in the Real-Time Market. And this "occurrence is not . . . isolated to" February 2021.[131] "[T]his type of thing happens . . . any day when the weather forecasts are missed."[132] Indeed, Brazos uses the Real-Time Market "primarily" to cover "differences in [its] load forecast, between load forecast and actual."[133]

60.     Moreover, Brazos sells energy to its member cooperatives every day.[134] In fact, Brazos agrees to supply the cooperatives *all* their electricity needs.[135] Use of the ERCOT market is how Brazos does so.

61.     Therefore, Brazos cannot dispute that it participates in the ERCOT Day-Ahead and Real-Time Markets as part of its ordinary course of business—███████████████████████████ ███████████ And because Brazos's participation in the ERCOT Day-Ahead and Real-Time

---

[128] Karnei Dep. 11/18/21 Tr. at 21–22 (Exhibit 6) (emphasis added).

[129] *Id.* at 24 (Exhibit 6) (stating that Brazos's generation fleet covers "roughly 2,600 megawatts," and in "rough numbers," it has "around 1,400 megawatts of hedges," when Brazos expects up to 3,900 megawatts at its peak load in the summer).

[130] *Id.* at 30 (Exhibit 6) (confirming that "if generation exceeds load forecast" during the winter, there is no hedge to cover that); Karnei Dep. 11/19/21 Tr. at 22 (When peak load is "above the amount that Brazos can generate during the winter months" Brazos "will evaluate either purchasing additional bilateral products or purchase that power from the ERCOT day-ahead market.").

[131] Clevenger Dep. 11/12/21 Tr. at 184 (Exhibit 11).

[132] *Id.* at 184–85 (Exhibit 11).

[133] Karnei Dep. 11/18/21 Tr. at 27 (Exhibit 6).

[134] Karnei Dep. 11/19/21 Tr. at 122 (Exhibit 13).

[135] *Id.* at 120–21 (Exhibit 13).

Markets—no matter the price of energy—is in the ordinary course of Brazos's business, Brazos

may participate in the ERCOT market during the pendency of its bankruptcy.[136]

### 3.   The transactions at issue are customary for the industry.

62.     Use of the ERCOT market by its market participants is also commonplace—in fact,

required—in Texas. Because ERCOT operates as the energy market clearinghouse for the

wholesale power market, other energy generators and transmission operators likewise participate

in ERCOT.[137] ████████████████████████████████████████████████[138]

To the extent the Court considers ordinary course for the industry relevant under § 503(b)(9), the

transactions at issue meet this requirement.[139]

63.     ERCOT's claim was incurred in the ordinary course of Brazos's business. Brazos

has not and cannot demonstrate otherwise.

## V.   CONCLUSION

ERCOT respectfully requests that the Court enter summary judgment in its favor on Counts

1, 2, 3, 4, 5, and 8 of Brazos's Amended Complaint.

---

[136] *See* 11 U.S.C. §§ 363(b)(1) (noting that the debtor or trustee may not "use, sell, or lease" estate property except in the ordinary course of business without court permission), 364 (providing that the debtor or trustee may obtain credit in the ordinary course of business).

[137] *See* ERCOT, About ERCOT, https://www.ercot.com/about.

[138] ████████████████████████████████████████████████
████████████████████████████████

[139] *See In re Johns-Manville*, 60 B.R. at 618 ("[A]n extensive showing that such transactions occurred often, or even regularly, is not necessary. The transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally.").

# APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1. | Standard Form Market Participant Agreement ("SFA") |
| 2. | Relevant portions of the ERCOT Nodal Protocols in effect in February 2021 |
| 3. | PUCT Order dated February 15, 2021 |
| 4. | PUCT Order dated February 16, 2021 |
| 5. | Karnei Deposition Exhibit 13 |
| 6. | Relevant portions of Clifton Karnei's 11/18/21 deposition transcript |
| 7. | Walker Deposition Exhibit 124 |
| 8. | Relevant portions of DeAnn Walker's deposition transcript |
| 9. | Thrall Deposition Exhibit 57 |
| 10. | Relevant portions of Dean Thrall's deposition transcript |
| 11. | Relevant portions of Josh Clevenger's 11/12/21 deposition transcript |
| 12. | Relevant portions of Dan Kueker's deposition transcript |
| 13. | Relevant portions of Clifton Karnei's 11/19/21 deposition transcript |
| 14. | Karnei Deposition Exhibit 35 |
| 15. | Karnei Deposition Exhibit 33 |
| 16. | Brazos's Answers & Objections to ERCOT's Second Set of Interrogatories |
| 17. | Bivens Deposition Exhibit 206 |
| 18. | Bivens Deposition Exhibit 207 |
| 19. | Relevant portions of Carrie Bivens's deposition transcript |
| 20. | Relevant portions of Arthur D'Andrea's deposition transcript |
| 21. | Relevant portions of Bill Magness's deposition transcript |
| 22. | Relevant portions of the transcript of a PUCT open meeting dated 3/5/21 |
| 23. | Texas Senate Bill 2142 |
| 24. | Relevant portions of Jayapal Parakkuth's deposition transcript |
| 25. | Kueker Deposition Exhibit 68 |
| 26. | Kueker Deposition Exhibit 42 |
| 27. | Kueker Deposition Exhibit 44 |
| 28. | Clevenger Deposition Exhibit 125 |
| 29. | Relevant portions of Josh Clevenger's 11/16/21 deposition transcript |

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| **30.** | Relevant portions of Kenan Ogelman's deposition transcript |
| **31.** | Walker Deposition Exhibit 123 |
| **32.** | Declaration of Dwayne Rickerson |

Dated: December 22, 2021

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Jamil N. Alibhai*

Kevin M. Lippman
Texas Bar No. 00784479
klippman@munsch.com
Deborah Perry
Texas Bar No. 24002755
dperry@munsch.com
Jamil N. Alibhai
Texas Bar No. 00793248
jalibhai@munsch.com
Ross Parker
Texas State Bar No. 24007804
rparker@munsch.com

3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile:  (214) 855-7584

**COUNSEL FOR ELECTRIC RELIABILITY
COUNCIL OF TEXAS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 22, 2021, I caused a copy of the foregoing document to be served via CM/ECF on all counsel of record in this matter.


*/s/  Jamil N. Alibhai*
Jamil N. Alibhai

32