IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>       Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>       Plaintiff / Intervenor-Plaintiff,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.,<br><br>       Defendant. | Adv. Proc. No. 21-03863 (DRJ) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**MOTION FOR SUMMARY JUDGMENT**
[Relates to Adv. Dkt. No. 173]

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT https://ecf.txsb.uscourts.gov/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

TO THE HONORABLE DAVID R. JONES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

1

The Official Committee of Unsecured Creditors (the "Committee") of Brazos Electric Power Cooperative, Inc. (the "Debtor"), as intervening plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), files this motion (the "Motion") for entry of an order granting summary judgment on Count 8 of the *Amended Complaint Objecting to Electric Reliability Council of Texas, Inc.'s Proof of Claim and Other Relief* [Adv. Dkt. No. 173] (the "Amended Complaint").[2] In support of the Motion, the Committee respectfully states as follows.

## PRELIMINARY STATEMENT

1. Winter Storm Uri was an extraordinary storm lasting at least seven days. It brought the Texas transmission grid to within minutes of total failure, required ERCOT to order extraordinary load shed, and led the Public Utility Commission of Texas ("PUCT") to enter unprecedented orders directing ERCOT to reflect load shed in the price of power. To reflect load shed, ERCOT took the extraordinary step of pretending that it had bought power from non-ERCOT generators when it had not done so. It did this to raise the price of power to the maximum price for an extraordinary period of time. ERCOT applied its extraordinary prices to invoice the Debtor for power and ancillary services in extraordinary amounts, leading the Debtor to file for bankruptcy and ERCOT to file a claim for roughly $1.9 billion (the "Claim").

2. Notwithstanding the foregoing, ERCOT asserts that $1,874,552,630.40 of its Claim arose "in the ordinary course of [the] debtor's business" under Section 503(b)(9).

3. Count 8 of the Amended Complaint seeks an order denying administrative expense priority, and classifying ERCOT's Claim as a general unsecured claim, on the ground that

---

[2] Capitalized terms not otherwise defined herein have the same meanings ascribed to them in the Amended Complaint.

13200512

ERCOT's Claim did not arise in the ordinary course of the Debtor's business. The Committee respectfully requests that the Court now grant summary judgment in Plaintiffs' favor on Count 8.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The predicates for the relief requested herein are Section 503(b), Rules 3013, 7056 and 9013 of the Federal Rules of Bankruptcy Procedure, and Local Rules 7007-1 and 9013-1.

## FACTS

7. The facts set forth herein are admitted by ERCOT in its Answers, adopted by ERCOT in its Motions to Dismiss, asserted in other court filings by ERCOT (including its Motion for Summary Judgment filed on December 22, 2021),[3] set forth in ERCOT publications or reports, testified to by ERCOT officers under oath in legislative hearings, and otherwise subject to judicial notice or not subject to reasonable dispute.

8. Effective April 1, 2015, the Debtor and ERCOT entered into the Standard Form Market Participant Agreement ("SFA") governing their relationship. The 14-page SFA incorporates ERCOT's Protocols, consisting of more than 1,800 pages of rules, guidelines, and the like, including, without limitation, hundreds of pages that determine the price market participants like the Debtor must pay to ERCOT to procure power. That price is a market "clearing price," reflecting actual offers to sell power *to* ERCOT and actual bids to buy power *from* ERCOT, plus certain "adders" calculated in accordance with arithmetic formulas in the Protocols.

---

[3] The Committee reserves all rights to respond to ERCOT's Motion for Summary Judgment at the appropriate time.

3

13200512

9. As stated in ERCOT's own Motion to Dismiss:

> During the catastrophic Winter Storm in February 2021, the demand for electricity overwhelmed available supply as nearly 50% of the ERCOT region's generation capacity went offline. On February 15, 2021, ERCOT entered Emergency Energy Alert Level 3 ("EEA3") and directed that transmission operators substantially curtail load. Nevertheless, the system ERCOT uses to set prices kept the clearing price for energy below the system-wide offer cap, which the PUCT had by rule set at $9,000/MWh.

Adv. Dkt. No. 23, ¶ 13 (internal citations omitted).

10. That Winter Storm Uri triggered unprecedented, indeed, *extraordinary*, consequences cannot seriously be disputed. ERCOT itself has represented in recent court filings that Winter Storm Uri was an "*unprecedented public emergency*," causing "*extremely unusual weather conditions*" that "resulted in *extraordinary hardship*," and an "*unprecedented demand* for electricity," which threatened "*complete failure* of the electricity grid." *Motion for Certification of Direct Appeal*, Civil Action No. 4:21-cv-03692 [Dist. Ct. Dkt. No. 20] ("ERCOT Certification Motion"), at 2, 4, 5 (emphasis added). Indeed, ERCOT has argued that the PUCT directed it to peg the price of energy at $9,000/MWh *because* Texas's regulatory framework was not performing as designed (*id*. at 5), a dispositive concession that such a price was not set in the ordinary course.

11. On February 15 and 16, 2021, the PUCT issued orders (the "PUCT Orders") stating that, in light of the curtailment of load, market clearing prices being set by the Protocols then in effect were "inconsistent with the fundamental design of the ERCOT market." Adv. Dkt. No. 23-1 & 23-2. Without specifically decreeing what price must be charged, the PUCT then directed ERCOT "to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." *Id*.

4

13200512

12. ERCOT "implement[ed] the pricing outcomes directed by the [PUCT Orders] by making an administrative adjustment" to ERCOT's pricing mechanisms "during all intervals in which ERCOT had directed firm Load shed." Adv. Dkt. No. 23, ¶ 20 (citations and quotations omitted). The "administrative adjustment" consisted of ERCOT inserting fictional data into the Protocols' pricing algorithms – namely, purchases of power from generators outside ERCOT when no such purchases actually were being made. The insertion of that data caused the price of power to increase to a market clearing price at or near $9,000/MWh.

13. Moreover, on multiple days during the storm, ERCOT assumed fictional purchases of 20,000 MW to account for load shed when zero MWs were being shed, let alone purchased.

14. Notably, according to the ERCOT Protocols in effect during Winter Storm Uri, firm load shed[4] was not included among the scarcity pricing triggers. *See* Protocols, § 6.5.7.3.1. The omission of firm load shed as a factor in determining scarcity pricing under its Protocols was by design: in 2014, ERCOT considered and rejected a proposal to include firm load shed as a factor in scarcity pricing in proposed amendments to section 6.5.7.3.1 of the Protocols.[5] Thus, the rules (*i.e.*, Protocols) that governed the Debtor's settlement prices with ERCOT going into Winter Storm Uri expressly did not include firm load shed as a factor in scarcity pricing. As an admission of the foregoing, ERCOT ultimately did change the Protocols to include firm load shed as a consideration in the Real Time Reliability Deployment Price Adder, but not until three months after Winter

---

[4] Rolling blackouts, also known as "firm load shed," are sometimes necessary when there is insufficient generation to meet demand.

[5] *See* NPRR 626, August 2014 Board Report on Reliability Deployment Price Adder, available at https://www.ercot.com/files/docs/2014/08/13/626nprr_12_board_report_081214.doc.

5

13200512

Storm Uri.[6] ERCOT's use of load shed in 2021 as a trigger for one of its scarcity price adders was therefore extraordinary.

15. In its own motion for summary judgment filed December 22, 2021 [Dkt. No. 280] ("ERCOT Summary Judgment Motion"), ERCOT has finally abandoned any argument that its repricing was under the Protocols at all. ERCOT argues repeatedly that the PUCT Orders "*overrode*" the Protocols, *id*. at ¶¶ 24, 29; that the PUCT Orders "*supersede*" the Protocols, *id*. at ¶ 13; and that the Protocols must "*yield*" to the PUCT Orders, *id*. at ¶¶ 1, 33.[7] Such regulatory compulsion was extraordinary.

16. As a result of ERCOT's actions in February 2021, ERCOT invoiced the Debtor for more than $2.2 billion in settlement charges. Prior to the storm, the Debtor had posted approximately $350 million in collateral with ERCOT, but that amount was insufficient to cover ERCOT's invoices during the storm. From February 14 onward, the Debtor was required to post more and more collateral. ERCOT eventually swept $350,259,036.38 in posted collateral to obtain partial payment of its invoices dated after February 18, 2021. *See* Exhibit F to ERCOT's Amended Proof of Claim (defined below).

17. On March 1, 2021 – seventeen days after Winter Storm Uri hit Texas on February 12, and ten days after the storm ended – the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code [Bankr. Dkt. No. 1] (the "Petition Date").

18. On March 15, 2021, the United States Trustee for the Southern District of Texas appointed the Committee, which was later reconstituted on March 24, 2021. Bankr. Dkt. No. 285.

---

[6] *See* NPRR 1081 (approved on June 28, 2021 and effective July 1, 2021), available at http://www.ercot.com/mktrules/issues/NPRR1081#summary.

[7] ERCOT previously argued, or appeared to argue, that the Protocols somehow "incorporated" the PUCT Orders such that repricing pursuant to the PUCT orders was done pursuant to or in accordance with the Protocols.

6

13200512

19. On June 14, 2021, ERCOT filed a proof of claim alleging that the Debtor owes it $1,899,152,990.64, and that $1,877,591,506.10 – or 99% – of the total amount was entitled to priority as an administrative expense under Section 503(b)(9) as a claim for goods sold within 20 days of the Petition Date "in the ordinary course" of the Debtor's business. *See* Stretto Claim No. 403 and ECF Claim No. 115-1.

20. On August 18, 2021, the Debtor filed a complaint commencing this Adversary Proceeding [Adv. Dkt. No. 1], and, on October 25, 2021, the Debtor filed an amended complaint (the "Amended Complaint") [Adv. Dkt. No. 173].

21. On November, 4, 2021, ERCOT – without notice, consent, or leave of this Court – filed an amended proof of claim, revising the amount of the Claim that is allegedly entitled to priority treatment to $1,874,552,630.40, and asserting for the first time that the Debtor's liability is based not only on the SFA and the Protocols, as ERCOT originally pleaded, but also on the PUCT Orders. *See* Stretto Claim No. 743, ECF Claim No. 115-2 (the "Amended Proof of Claim").

## RELIEF REQUESTED

22. The Committee respectfully requests entry of an order, substantially in the form attached (the "Proposed Order"), granting summary judgment in Plaintiffs' favor on Count 8 of the Amended Complaint pursuant to Bankruptcy Rule 7056.

23. Count 8 presents a pure question of law: Given the extraordinary nature of Winter Storm Uri, the extraordinary loss of power during the storm, the extraordinary load shed ordered by ERCOT, the extraordinary PUCT Orders directing ERCOT to reflect load shed in pricing, ERCOT's extraordinary manipulation of its Protocols to raise prices to $9,000/MWh, and ERCOT's extraordinarily high invoices for power – none of which is disputed – do ERCOT's charges to the Debtor for electricity and ancillary services during Winter Storm Uri qualify as sales made in the ordinary course of the Debtor's business?

24. The Committee respectfully submits that the undisputed facts set forth above, standing alone, are sufficient to establish that ERCOT's charges to the Debtor during Winter Storm Uri were not sales made "in the ordinary course" of the Debtor's business, and ERCOT cannot establish a genuine issue of material fact on Count 8.[8]

## ARGUMENTS AND AUTHORITY

### I. Summary Judgment Standard.

25. When a "movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law," the Court "shall grant summary judgment" on a claim or defense asserted or any portion thereof. Fed. R. Civ. P. 56(a); *Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 868 (S.D. Tex. 2019) (citing *Shepherd v. City of Shreveport*, 920 F.3d 278, 282-83 (5th Cir. 2019)). "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

26. The Committee bears the initial burden of identifying the basis for its Motion and those portions of the record which reveal that there is no genuine issue in dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). But once the Committee meets its burden, the burden shifts to ERCOT to come forward with specific facts establishing the existence of a genuine dispute, which requires ERCOT to do more than merely show that there is some "metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586. With respect to Count 8 of the Amended Complaint, the Committee can easily satisfy its burden under the relevant standard; ERCOT cannot.

---

[8] If the Court denies this Motion, ERCOT has the burden of proof at trial on the issue of "ordinary course" and the Committee reserves the right to prove additional facts in response to ERCOT's proof.

8

13200512

**II.     Plaintiffs Are Entitled to Summary Judgment on Count 8 Because ERCOT's Claim Does Not Arise from Goods Sold in the Ordinary Course of the Debtor's Business.**

27.     Section 503 of the Bankruptcy Code provides in pertinent part:

(b) After notice and a hearing, there shall be allowed, administrative expenses . . . including—

(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor *in the ordinary course of such debtor's business.*

11 U.S.C. § 503(b)(9) (emphasis added).

28.     The Committee submits that the words of the statute are determinative, without the need for judicial explication or legislative history. To justify administrative expense priority for any portion of its Claim, ERCOT must show that it sold goods to the Debtor in the ordinary course of the Debtor's business. The undisputed facts detailed above show that ERCOT cannot prove its case – the extraordinary circumstances of ERCOT's sales during Winter Storm Uri and the extraordinary prices ERCOT invoiced to the Debtor were, individually and collectively, out of the ordinary course.[9]

29.     In fact, as discussed above, ERCOT itself admits that Winter Storm Uri was an "*unprecedented public emergency*," involving "*extremely unusual* weather conditions" that "resulted in *extraordinary hardship*" and "*unprecedented demand* for electricity." ERCOT Certification Motion, at 2, 4 (emphasis added).[10] ERCOT maintains that, during the storm, it

---

[9] ERCOT also cannot establish administrative priority over any portion of its Claim because electricity and ancillary services are not "goods" for purposes of Section 503(b)(9), and because charges reflected on ERCOT's invoices far exceed any value received by the Debtor for electricity and ancillary services. But those issues are not the subject of this Motion.

[10] *See also* February 18, 2021 ERCOT Press Conference Transcript, available at https://www.rev.com/blog/transcripts/ercot-press-conference-transcript-february-18-remaining-power-outages-due-to-weather-not-forced ("[T]he central problem . . . was the amount of demand that we had to reduce was really unprecedented, just because of the challenge that we faced with the weather and with the generation."); February 19, 2021 CNN Interview of ERCOT President and CEO Bill Magness, available at https://www.cnn.com/videos/business/2021/02/19/ercot-ceo-bill-magness-texas-power-outages-storm-camerota-

9

13200512

"directed transmission service providers to impose rolling electricity outages because the only alternative was the *complete failure* of the electricity grid." *Id*. at 5 (emphasis added). ERCOT also asserts that "Texas's regulatory framework was designed to create a market response to such *emergencies*, raising prices to a pre-set regulatory maximum price of $9,000/MWh to signal the urgent need for electricity" (*id*. (emphasis added)) – but pegging the price at that level was not accomplished in the ordinary course; ERCOT made an unprecedented "administrative adjustment" to its Protocols' pricing mechanisms. *See* Adv. Dkt. No. 23, ¶ 20.

30. The Committee is aware of no case law interpreting "ordinary course" in the specific context of Section 503(b)(9). "Ordinary course" is used in numerous other sections of the Bankruptcy Code and has generated substantial case law, but little is relevant given the different policies underlying such sections. Section 547(c)(2) protects transfers on account of antecedent debt received in the ordinary course from avoidance as a preference – the cases focus on whether the creditor took extraordinary measures to collect the debt. Section 364(a)(1) provides an administrative expense to creditors who extend postpetition credit to a debtor without a court order but in the ordinary course of business – the cases focus on protecting postpetition creditors who are simply doing their usual business with such debtor and protecting prepetition creditors from unusual postpetition credit.

31. A common thread in the "ordinary course" case law, however, is whether the "course of business" at issue is consistent with, or different from, the parties' historical course of business. *See Hechinger Investment Corp. v. Universal Forest Products* (*In re Hechinger Inv. Co.*), 489 F.3d 568, 577 (3d Cir. 2007) (extreme changes in credit terms out of character with long

---

newday-vpx.cnn ("[T]he storm that came into Texas . . . is unprecedented and causing tragic outcomes all over the state"); *id.* ("What we saw when the storm came in was the demand on the system spiking to levels we've never seen in winter season in Texas").

10

historical relationship supported finding that payments were not ordinary course). For example, in *Xtra Inc. v. Seawinds Ltd.* (*In re Seawinds Ltd.*), 91 B.R. 88, 91-92 (Bankr. N.D. Cal. 1988), the court held that payments made in respect of leased equipment after the lessor terminated leases and raised rents were not made in accordance with ordinary business terms. Just as the lessor's lease terminations and rent hikes made *Seawinds*' payments not in the ordinary course, so here ERCOT's collateral calls and price hikes make ERCOT's subsequent invoices not in the ordinary course.

32.     This principle has been applied to changes other than credit terms. An unusually large transaction between parties who have previously only done small transactions would not be "in the ordinary course." *Official Plan Comm. ex rel. Estate of Valley Steel Prods. Co. v. G&M Fabricating* (*In re Valley Steel Products Co.*), 166 B.R. 1017 (Bankr. E.D. Mo. 1993); *see also Sherman v. OTA Franchise Corp.* (*In re Essential Fin. Educ., Inc.*), 629 B.R. 401, 450 (Bankr. N.D. Tex. 2021) (transfer "several orders of magnitude" larger than any previous transfer was a factor that weighed in favor of finding the transfer "extraordinary"); *Huennekens v. Marx* (*In re Springfield Contracting Corp.*), 154 B.R. 214, 224 (Bankr. E.D. Va. 1993) ("four fold increase" in executive's reimbursed expenditures was not in the ordinary course). The fact that the Debtor's business is to buy and sell power through ERCOT does not render the price increase in the "ordinary course" as a wide range of cases show that non-ordinary transactions may arise between regular trading partners dealing in their regular products. Just as an unusual increase in the size of a transaction disqualifies it as "ordinary course" in other cases, so too in this proceeding, an unusual increase in the price of a transaction between ERCOT and the Debtor should disqualify it as "ordinary course."

33. Thus, in the midst of an extraordinary winter storm, ERCOT dramatically altered its course of business with the Debtor. ERCOT had always sold the Debtor power at a price determined under the Protocols in effect without regard to, or any adder component accounting for, load shed. During Winter Storm Uri, ERCOT manually adjusted its Protocols to force prices to reflect load shed. It did so in response to extraordinary load shed and extraordinary PUCT Orders directing ERCOT to account for such load shed in scarcity pricing. ERCOT's increased prices led to increased collateral calls to the Debtor and ERCOT's eventual sweep of hundreds of millions of dollars in Debtor-posted collateral. Whether or not charges based on ERCOT's manipulation of its pricing algorithms are unenforceable under the Protocols (as asserted in Counts 1 and 2) or constitute fraudulent obligations (as asserted in Counts 4 and 5) or were appropriate or justified to rectify perceived shortcomings of the Protocols, such manipulation was indisputably extraordinary and historically unprecedented in the course of business between ERCOT and the Debtor – which is all that matters under Section 503(b)(9). ERCOT cannot show otherwise. Indeed, through two answers, two motions to dismiss, and its own motion for summary judgment, ERCOT has never even alleged otherwise.

34. In essence, during Winter Storm Uri, ERCOT boosted its sales price over a hundred-fold. The Committee submits that Section 503(b)(9) does not allow a creditor to boost its price a hundred-fold and then obtain an administrative expense priority that jumps its Claim ahead of all other creditors who did not or could not increase their prices to a similar extent. This is especially true where, as here, the Debtor had no choice but to pay whatever ERCOT charged. The landlord who doubles a month-to-month tenant's rent (and thereby forces the tenant into bankruptcy) does not do so "in the ordinary course" of the bankrupt tenant's business even if the landlord has also doubled the rent of all other tenants. Thus, here too, ERCOT charging the Debtor

12

$9,000/MWh for power for an unprecedented period during an unprecedented winter storm (and thereby forcing the Debtor into bankruptcy) is outside the ordinary course of the Debtor's business, and no less so merely because ERCOT raised its price to all market participants.

## RESERVATION OF RIGHTS

35. The Committee reserves the right to move for summary judgment on any and all other Counts of the Amended Complaint.

## PRAYER

For the reasons set forth in this Motion, the Committee respectfully requests that the Court enter the Proposed Order, granting summary judgment in Plaintiffs' favor on Count 8 of the Amended Complaint, and ordering such other and further relief as is just and appropriate under the circumstances.

Dated: December 27, 2021

                                        Respectfully submitted,

                                        **PORTER HEDGES LLP**

                                        */s/     John F. Higgins*
                                        John F. Higgins (TX 09597500)
                                        Eric D. Wade (TX 00794802)
                                        Heather K. Hatfield (TX 24050730)
                                        M. Shane Johnson (TX 24083263)
                                        Megan Young-John (TX 24088700)
                                        PORTER HEDGES LLP
                                        1000 Main Street, 36th Floor
                                        Houston, Texas 77002
                                        Telephone: (713) 226-6000
                                        Facsimile: (713) 228-1331
                                        jhiggins@porterhedges.com
                                        ewade@porterhedges.com
                                        hhatfield@porterhedges.com
                                        sjohnson@porterhedges.com
                                        myoung-john@porterhedges.com

                                            - and –

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Thomas Moers Mayer (admitted *pro hac vice*)
Amy Caton (admitted *pro hac vice*)
Jennifer Sharret (admitted *pro hac vice*)
John P. Coffey (admitted *pro hac vice*)
Ronald S. Greenberg (admitted *pro hac vice*)
Jeffrey S. Trachtman (admitted *pro hac vice*)
Seth F. Schinfeld (admitted *pro hac vice*)
Nancy M. Bello (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
(212) 715-8000
tmayer@kramerlevin.com
acaton@kramerlevin.com
jsharret@kramerlevin.com
jcoffey@kramerlevin.com
rgreenberg@kramerlevin.com
jtrachtman@kramerlevin.com
sschinfeld@kramerlevin.com
nbello@kramerlevin.com

*Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I certify that, on December 27, 2021, I caused a true and correct copy of the foregoing Motion to be served via CM/ECF on counsel for all parties of record in this proceeding.

/s/ *John F. Higgins*
John F. Higgins