## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>      Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC., *et al.*,<br><br>      Plaintiff / Intervenor-Plaintiffs,<br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF<br>TEXAS, INC., *et al.*,<br><br>      Defendant / Intervenor-Defendants. | Adv. Proc. No. 21-03863 (DRJ) |

## DEBTOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Brazos Electric Power Cooperative, Inc. ("Brazos" or the "Debtor"), the debtor and debtor-

in-possession in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case"), hereby

files this Motion for Partial Summary Judgment (the "Motion") on Count 1 of the Debtor's *First*

*Amended Complaint Objecting to Electric Reliability Council of Texas, Inc.'s Proof of Claim and*

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

*Other Relief* (the "Amended Complaint").  In support of this Motion, the Debtor respectfully states as follows:

## I.      PRELIMINARY STATEMENT

1.      The amounts ERCOT alleges the Debtor owes[2] are unenforceable as a matter of law.   Summary judgment should therefore be granted in the Debtor's favor on Count 1 of the Debtor's Amended Complaint, for the following reasons:

2.      Under the unambiguous terms of the Standard Form Market Participant Agreement (the "SFA") between the Debtor and ERCOT, the amount the Debtor owes to ERCOT must be calculated ***according to the protocols in effect during Winter Storm Uri***.[3]

3.      The Texas Public Utility Regulatory Act ("PURA") likewise mandates the manner in which the amount the Debtor owes ERCOT is to be calculated: ***"solely according to the protocols in effect"*** ***during Winter Storm Uri***.  *See* Tex. Util. Code § 39.160(a).

4.      As a matter of law, the Protocols in effect during Winter Storm Uri do not obligate the Debtor to pay charges that exceed those authorized by the Protocols:

---

[2] ERCOT filed an amended proof of claim on November 4, 2021(the "ERCOT Claim").  The ERCOT Claim alleges that Brazos is liable to ERCOT in the amount of $1,886,595,737.08, with $1,874,552,630.40 of that amount allegedly subject to administrative expense priority status.  The ERCOT Claim states that the Debtor owes these amounts to ERCOT on the alleged basis that the Debtor was in default of its "obligations under the Brazos SFA, the ERCOT Protocols and the two orders issued by the Public Utility Commission of Texas (the 'PUCT') dated February 15 and February 16, 2021 (the 'PUCT Orders')."   ERCOT Claim at Addendum B.1 (Claim 115).

The ERCOT Claim applies a reduction of approximately $350 million of collateral posted by the Debtor that ERCOT unilaterally swept pre-petition and applied to outstanding invoices.  The Debtor reserves all rights relating to the sweep of this collateral, calculation of and accounting for the amount swept, and the Debtor's ability to have the collateral applied to any amounts ultimately determined to be owed to ERCOT pursuant to the Amended Complaint.

[3] *See* Ex. 1, SFA § 2.B ("For the purposes of determining responsibilities and rights at a given time, the ERCOT Protocols . . . in effect at the time of the performance or non-performance of an action, shall govern with respect to that action.").

5.      The invoiced amounts are based on ERCOT's unilateral manipulation of its algorithms in a manner *contrary* to the Protocols in an attempt to effectuate the PUCT Orders' directive to include "firm load that is being shed" into ERCOT's scarcity pricing mechanisms.[4]

6.      Even if the PUCT Orders imposed obligations on ERCOT, ERCOT was required to, but did not, follow the Protocol change procedures in order to make those obligations effective against the Debtor.

7.      ERCOT refused to allow energy prices to clear according to the Protocols *after* firm load shed ceased, in contravention of the PUCT Orders, the SFA, and the Protocols' detailed pricing methodology.

8.      At a minimum, the ERCOT Claim should be reduced by $641 million,[5] which is the difference between charges based on ERCOT's imposition of maximum prices for 33 hours after load shed ceased and the amount chargeable under the Protocols.

9.      Thus, any portion of the ERCOT Claim in excess of amounts chargeable "according to the protocols in effect" during Winter Storm Uri are unenforceable against the Debtor under the plain language of PURA § 36.060(a), the SFA, the Protocols, and must be disallowed as a matter of law.  *See* 11 U.S.C. § 502(b)(1).

10.     Summary judgment should be granted in the Debtor's favor on Count 1 (Objection to ERCOT Claim under 11 U.S.C. § 503(b)(1)) disallowing the portion of the ERCOT Claim that exceeds the Debtor's obligations under the SFA and Protocols.[6]

---

[4] Ex. 2, PUC Docket No. 51617, Order Directing ERCOT to Take Action and Granting Exception to Commission Rules at 2 (Feb. 15, 2021).

[5] *See* Ex. 3, *Joint Stipulation to Calculations and Expert Testimony at Trial* (Jan. 6, 2022).

[6] At least $1.124 billion of the ERCOT Claim should be disallowed as exceeding amounts properly owed by the Debtor to ERCOT under the SFA and the Protocols.  *See id.*  As noted in the Stipulation, the parties have reached an agreement regarding the Real Time Market statement amounts once ERCOT's pricing adjustment is removed but reserve all claims and defenses regarding whether RTM statements based on the pricing adjustment can be charged to the Debtor.

## II.   UNCONTESTED FACTS

### A.   The Debtor and ERCOT's Contractual Relationship

11.     The Debtor and ERCOT entered into the SFA "in order to establish the terms and conditions by which ERCOT and [Brazos] will discharge their respective duties and responsibilities under the ERCOT Protocols."[7]   The SFA defines the ERCOT Protocols as the "document adopted by ERCOT . . . as amended from time to time, that contains the scheduling, operating, planning, reliability, and Settlement . . . policies, rules, guidelines, procedures, standards, and criteria of ERCOT."[8]

12.     The Protocols contain detailed provisions that govern how the wholesale market clearing prices for energy are established.  Prices during normal operating periods are largely set by the prices that generators (through their power marketers) offer into the "Real-Time Market."[9] Those offers are adjusted based on system constraints that vary by region.[10]  The result is a market price that is specific to a particular location.[11]

13.     The settlement price of electricity in ERCOT's Real-Time Market consists of three components: (1) Locational Marginal Price, i.e., the marginal cost to serve incremental load at a specific location; plus (2) a Real-Time On-Line Reserve Price Adder designed to incentivize generation of power when reserves are scarce; and (3) a Real-Time On-Line Reliability Deployment Price Adder ("RDPA") designed to ensure that any net increases in reserves resulting

---

[7] Ex. 1, SFA Recitals at C.

[8] Ex. 1, SFA § 2.B.

[9] Ex. 4, Deposition of Carrie Bivens, ERCOT Independent Market Monitor, at 35:20-36:5.

[10] *Id*. at 36:22-37:7.

[11] *Id*.

from ERCOT's "out of market" actions do not push prices downward and discourage generation from available operators.[12]

14.      The RDPA is codified in Protocol 6.5.7.3.1.  The provisions of that Protocol set forth the shortage-related factors that impact scarcity pricing.  Under the Protocols in effect during Winter Storm Uri, firm load shed was not included among the scarcity pricing triggers.[13]

15.      ERCOT deliberately excluded "firm load shed" from the Protocols' scarcity pricing mechanism.  In 2014, ERCOT considered, vetted, and ultimately rejected a proposal to include firm load shed as a factor in scarcity pricing in proposed amendments to section 6.5.7.3.1 of the Protocols:[14]

**6.5.7.3.1          Determination of Real-Time On-Line Reliability Deployment Price Adder**

(1)      The following categories of reliability deployments are considered in the determination of the Real-Time On-Line Reliability Deployment Price Adder:

　　(a)      RUC-committed Resources with a telemetry Resource Status of ONRUC;

　　(b)      RMR Resources that are On-Line, including capacity secured to prevent an Emergency Condition pursuant to paragraph (2) of Section 6.5.1.1, ERCOT Control Area Authority;

　　(c)      Deployed Load Resources other than Controllable Load Resources; and

　　(d)      Deployed Emergency Response Service (ERS); and

　　(e)      Firm Load Shed

## B.      Winter Storm Uri

16.      On Wednesday, February 10, 2021, ERCOT issued an advisory for a predicted extreme cold weather event for the ERCOT region.  On this same date, the Emergency

---

[12] Ex. 5, Deposition of Dave Maggio at 41:22-42:19; 99:3-9.

[13] *See* Ex. 6, Protocol 6.5.7.3.1.

[14] Ex. 7, ERCOT Board report on Nodal Protocol Revision Request 626 (NPRR 626), August 12, 2014 (excerpt).

Management Coordinator of the PUCT sent an email to several market participants warning that "this Arctic Air Mass is expected to make it all the way down to the [Rio Grande] Valley!"[15]

17.     According to ERCOT, at least 312 generating units at 219 power plants lost capacity for varying durations between Sunday, February 14, and Friday, February 19, 2021.[16] The highest amount of unavailable generating capacity during Winter Storm Uri—totaling 51,173 MW of generating capacity off-line—occurred at approximately 8:00 a.m. on Tuesday, February 16, 2021.[17]  ERCOT reported that approximately 48.6% of generation capacity was forced out at the highest point of outages due to the impacts of the extreme weather conditions.[18]

18.     On February 15 at 1:20 a.m., ERCOT instructed Transmission Operators (i.e., local utilities) to institute rolling blackouts, otherwise known as an instruction to shed "firm load."[19] Firm load consists of residential and small-commercial customers who take service at distribution level and can be subject to ERCOT's involuntary curtailment instructions.[20]  Customers who take service at transmission level, typically industrial customers, are not subject to ERCOT-directed firm load shed.[21]

19.     ERCOT's firm load shed instructions remained in place until February 18th at midnight.  ERCOT admits that, as of that date and time, it "had ceased all firm load shed."[22]

---

[15] Ex. 8, Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (PUCT 0000352).

[16] Ex. 9, ERCOT Letter, dated March 4, 2021, Generator Outages During February 2021 Cold Weather Event.

[17] Ex. 10, February 2021 Extreme Cold Weather Event: Preliminary Report on Causes of Generator Outages and Derates, April 6, 2021. PUC Project No. 51878, Item 20.

[18] Ex. 11, Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation, dated February 24, 2021.

[19] Ex. 12, Deposition of Kenan Ögelman at 59:12-18 (Nov. 5, 2021).

[20] Ex. 4, Deposition of Carrie Bivens at 23:24-24:4.

[21] Ex. 13, Deposition of Former PUCT Chair DeAnn Walker at 159:25-160:5 ("Most industrials are served at transmission level, not distribution.  And the only people who are -- experience rolling outages are distribution-level customers.").

[22] ERCOT's First Am. Answer ¶ 58 (Adv. Dkt. No. 192); Brazos' First Am. Compl. ¶ 58 (Adv. Dkt. No. 173).

**C.**     **Real-Time Energy Prices During Winter Storm Uri**

20.     When ERCOT instructed Transmission Operators to institute firm load shed on February 15, it knew that firm load shed was not a factor in the Protocols' scarcity pricing signals.[23] Under the scarcity conditions that existed on the 15th, market prices were clearing pursuant to the Protocols, from a low of $1,200/MWh to a high of $9,000/MWh in many intervals.[24]

21.     "[28]

22.     Later that day, the PUCT issued an order that noted prices were clearing "as low as $1,200" during firm load shed and instructed ERCOT to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[29]   ERCOT "implement[ed] the

---

[23] *See, e.g.*, Ex. 14, emails between Dan Jones and Dave Maggio, February 15, 2021 (ERCOT_B0169429) (highly confidential); Ex. 15, email from Sai Moorty to Dave Maggio, Pamela Shaw, Dan Jones, Aaron Townsend, Hailong Hui, and Blake Holt, February 15, 2021 (ERCOT_B0285866) (highly confidential).

[24] Ex. 5, Deposition of Dave Maggio at 73:10-18.

[25] Ex. 4, Deposition of Carrie Bivens at 29:7-10.

[26] *Id*. at 30:22-31:13.

[27] *Id*. at 28:24-29:4; 31:9-13.

[28] Ex. 5, Deposition of Dave Maggio at 74:7-11.

[29] *See* Ex. 2,  PUC Docket No. 51617, Order Directing ERCOT to Take Action and Granting Exception to Commission Rules at 2 (Feb. 15, 2021).

pricing outcomes directed by the [PUCT Orders] by making an administrative adjustment" to ERCOT's pricing mechanisms "during all intervals in which ERCOT had directed firm Load shed."[30]  That administrative adjustment consisted of an alteration of the operation of the RDPA to make firm load shed a factor in a manner that pegged real-time energy prices at $9,000/MWh. Specifically, ERCOT inputted the "cumulative MW ERCOT has directed for Load shed" as a "Real-Time Block Load Transfer import (RTBLTIMPORT)"[31] into the RDPA.[32]

23.    At 8:50 p.m. on February 17, as firm load was being brought back online and ERCOT's load shed directives were declining, ERCOT modified its implementation of the PUCT Orders by inputting a static value of 20,000 MW into the RTBLTIMPORT function.[33]  Its accompanying market notice told participants that it would cease making this adjustment once firm load shed ceased:  "[o]nce ERCOT is no longer instructing firm Load shed, the adjustment will be set to 0 . . . ."[34]

24.    ERCOT misled the market.  At 11:55 p.m. on February 17, ERCOT was no longer instructing firm load shed, yet it did not set the RDPA adjustment to zero.[35]  Instead, ERCOT—of its own accord—entered a fictional firm load shed adjustment to the RDPA in order to keep prices at $9,000/MW for another 33 hours until 9 a.m. on February 19.[36]

---

[30] Ex. 16, ERCOT February 15, 2021 Market Notice M-C021521-01 (PUCT 0013531).

[31] Unlike firm load shed, Real-Time Block Load Transfer import was a scarcity pricing factor of the RDPA at the time of the storm. Ex. 6, Protocol 6.5.7.3.1.

[32] Ex. 16, ERCOT February 15, 2021 Market Notice M-C021521-01 (PUCT 0013531).

[33] Ex. 17, ERCOT February 17, 2021 Market Notice M-C021521-03 (PUCT 0204695).

[34] *Id*.

[35] *See* ERCOT's First Am. Answer ¶ 58 (Adv. Dkt. No. 192); Brazos' First Am. Compl. ¶ 58 (Adv. Dkt. No. 173); Ex. 4, Deposition of Carrie Bivens at 40:9-14, 41:16-18.

[36] Ex. 18, ERCOT February 18, 2021 Market Notice M-C021521-04 (PUCT 0015023).

25.     ERCOT's departure from the Protocols' pricing provisions resulted in the issuance of invoices to Brazos for real-time energy and ancillary services charges that exceed charges calculated under the Protocols in effect during the Winter Storm. ERCOT's Amended Claim should therefore be reduced by approximately $1.124 billion; $641 million of that amount is attributable to ERCOT's continued imposition of $9,000/MWh prices on Brazos for 33 hours after load shed ceased.

### III.     LEGAL STANDARD

26.     Summary judgment should be granted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Natixis Funding Corp. v. Genon Mid-Atlantic, LLC (In re Genon Mid-Atlantic Dev., LLC)*, Case No. 17-33703, 2021 Bankr. LEXIS 2829, at *13-14, (Bankr. S.D. Tex. June 15, 2021) (J. Jones) (citing Fed. R. Civ. P. 56(c);[37] *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009)). A movant must show either "an absence of evidence to support the non-moving party's claims" or "an absence of a genuine issue of material fact." *Id.* (citing *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006)).

27.     "Where, as here, 'the only issue[s] before the court [are] [] pure question[s] of law,' 'summary judgment is appropriate.'" *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (quoting *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991)); *see also Trevino v. U.S. Bank Tr., N.A. (In re Trevino)*, Nos. 10-70594, 13-7031, 2021 Bankr. LEXIS 2489, at *11 (Bankr. S.D. Tex. Sept. 10, 2021) (J. Rodriguez) ("Where the facts are

---

[37] Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings.

undisputed and only questions of law exist, a court must apply the appropriate law to the facts to determine whether the movant is entitled to judgment as a matter of law.") (citations omitted).

28.     The Debtor has the initial burden of identifying the basis for its motion and those parts of the record that reveal there is no genuine issue in dispute.  *See Matsushita Elec. Indus. Cod. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Once it meets that burden, ERCOT must come forward with specific facts showing a genuine dispute, which requires more than a showing of some "metaphysical doubt as to material facts."  *Id*.  The existence of some factual dispute will not defeat summary judgment; rather, the requirement is that no genuine issue of material fact exists.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 371, 327 (1986); *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986).  A genuine dispute of material fact exists only if a reasonable trier of fact could enter a verdict in favor of the non-moving party. *See Anderson*, 477 U.S. at 252; *Celotex Corp.*, 477 U.S. at 327.

29.     No genuine issue of material fact exists regarding Count 1 of the Debtor's Amended Complaint, and the Court should grant summary judgment in Plaintiffs' favor.

## IV.   ARGUMENT

30.     ERCOT's Amended Claim exceeds the amount that can be charged to the Debtor under the SFA, the Protocols, and applicable law, and the Court should render judgment in the Debtor's favor on Count 1.  "If applicable law prevents [ERCOT] from recovering compensation for the services performed, [Brazos] may use these laws to disallow the claims."  *In re Anloc, LLC*, 487 B.R. 825, 835 (Bankr. S.D. Tex. 2013) (J. Isgur) (citing 11 U.S.C. § 502(b)(1)).  Under binding Texas law, the ERCOT Claim must be reduced to the amount calculated under the Protocols in effect during Winter Storm Uri.  *See* Tex. Util. Code § 39.160(a).  In the alternative, and under

any circumstance, there is no legal basis for ERCOT's request to recover energy charges at $9,000/MWh for February 18 and 19, 2021 after firm load shed ceased.

**A.      ERCOT cannot demonstrate that the SFA, the Protocols, or the PUCT Orders obligate the Debtor for the entire amount of ERCOT's Amended Claim.**

*(1) The PUCT Orders do not obligate Brazos.*

31.     The PUCT Orders do not tell Brazos to do anything.  By their terms, the PUCT Orders give instructions to ERCOT, not Brazos:  "Accordingly, the Commission directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[38]  The PUCT has stated in court filings that its Order did not apply to the Debtor:

> . . . the Price-Adjustment Orders apply to ERCOT and solely to ERCOT.  As such they are not "applicable to all ERCOT participants."  At no point did the Price-Adjustment Orders direct any market participant to do anything . . . ."[39]

32.     Other than ERCOT's erroneous amended proof of claim, there appears to be little disagreement with the PUCT's statement.  The former Chair of the PUCT, DeAnn Walker, agreed that the PUCT Orders did not direct market participants to do anything,[40] as did ERCOT's corporate representative and Vice President of Commercial Operations, Kenan Ögelman.[41]

33.     Because Brazos does not have any obligations under the PUCT Orders—in order to prevail—ERCOT must demonstrate that the Protocols or the SFA obligate Brazos to pay the full amount of the ERCOT Claim.  But neither the SFA nor the Protocols do so.

---

[38] Ex. 19, PUC Docket No. 51617, Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 16, 2021).

[39] Ex. 20, Excerpted Brief of PUCT as Appellee in *Luminant Energy Company, LLC v. Public Utility Commission of Texas*, No. 03-21-00098-CV (Tex. App.—Houston), dated Sept. 2, 2021, at 24 (internal citations omitted).

[40] Ex. 13, Deposition of Deann Walker at 100:8-18.

[41] Ex. 21, Corporate Representative Deposition of Kenan Ögelman at 69:15-70:14 (Nov. 8, 2021).

(2)    *Neither the Protocols nor the SFA require Brazos to pay charges that exceed those authorized by the Protocols.*

34.    It is beyond dispute that the portion of the ERCOT Claim for energy and ancillary services incurred between February 15 at 10:15 p.m. and February 19 at 9 a.m. is not based on the Protocols.  Instead, ERCOT alleges that the PUCT Orders gave it the authority to peg prices at $9,000/MWh and that the orders "prevail" where they conflict with the Protocols.[42]

35.    

.[45]

36.    Brazos is not obligated to pay the disputed charges because there is no obligation to pay such amounts under the SFA.  The SFA is unambiguous on this issue.  "In matters involving contract interpretation, an unambiguous contract should be interpreted as a matter of law, and summary judgment is appropriate when no genuine dispute exists regarding a contract's meaning."  *In re Genon Mid-Atlantic Dev., LLC*, Case No. 17-33703 2021 Bankr. LEXIS 2829, at *14 (Bankr. S.D. Tex. June 15, 2021) (J. Jones) (citing *Sims v. Monumental Gen. Ins. Co.*, 960 F.2d 478, 479-80 (5th Cir. 1992)).  Under Texas law, a contract is not ambiguous "simply because

---

[42] ERCOT's Emergency Motion to Dismiss ¶19 (Adv. Dkt. No. 191); ERCOT's Mot. for Summ. J. ¶33 (Adv. Dkt. No. 279).

[43] Ex. 4, Deposition of Carrie Bivens at 30:22-31:13.

[44] Ex. 5, Deposition of Dave Maggio at 74:7-11; Ex. 22, Corporate Representative Deposition of Dave Maggio at 11:12-22.

[45] ERCOT's Mot. for Summ. J. ¶¶ 24, 29 (Adv. Dkt. No. 279).

the parties disagree over a contract's meaning." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, L.P., 426 S.W.3d 59, 63 (Tex. 2014). It is "the parties' chosen words" that "matter and evidence their true intent." *Petty Bus. Enters., L.P. v. Chesapeake Expl., L.L.C. (In re Chesapeake Energy Corp.)*, Case No. 20-ap-3433, 2021 Bankr. LEXIS 2503, at *29 (Bankr. S.D. Tex. Sept. 14, 2021) (J. Jones).

37.     As stated in the contract's opening recitals, Brazos and ERCOT entered into the SFA "in order to establish the terms and conditions by which ERCOT and [Brazos] will discharge their respective duties and responsibilities under the ERCOT Protocols."[46] ERCOT is obligated to "comply with, and be bound by, all ERCOT Protocols."[47] In the event of a dispute between ERCOT and Brazos over a party's obligations, the Protocols govern: "[f]or the purposes of determining responsibilities and rights at a given time, the ERCOT Protocols . . . in effect at the time of the performance or non performance of an action, shall govern with respect to that action."[48] This unambiguous provision must be given effect. *See Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) ("[C]ourts must examine the entire agreement and give effect to each provision so that none is rendered meaningless."). Under the plain terms of the agreement, the Protocols control the amount of any enforceable claim against Brazos. 11 U.S.C. § 502(b)(1) ("[T]he court . . . shall allow such claim . . . except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement . . . .).

38.     ERCOT argues that the SFA's "Miscellaneous Section 11.L.—Conflicts" provision makes the PUCT Orders override the parties' agreement that the Protocols govern. That

---

[46] Ex. 1, SFA Recitals, C.

[47] Ex. 1, SFA § 6.A.

[48] Ex. 1, SFA § 2.B.

interpretation is inconsistent with the text of Section 11.L., and would impermissibly write Section 2.B. out of existence.  *See Barnes*, 340 S.W.3d at 425.  In its entirety, Section 11.L. reads:

> <u>Conflicts.</u> This Agreement is subject to applicable federal, state, and local laws, ordinances, rules, regulations, orders of any Governmental Authority and tariffs. Nothing in this Agreement may be construed as a waiver of any right to question or contest any federal, state and local law, ordinance, rule, regulation, order of any Governmental Authority, or tariff. In the event of a conflict between this Agreement and an applicable federal, state, and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff, the applicable federal, state, and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff shall prevail, provided that Participant shall give notice to ERCOT of any such conflict affecting Participant.

39.     ERCOT argues that the first sentence makes the SFA "subject to" the PUCT Orders, and the third sentence makes the PUCT Orders "prevail" over any conflicting provision of the SFA or the Protocols.[49]  Even if ERCOT's construction were correct, for the reasons discussed below, the provisions of PURA § 39.160(a) would be incorporated into the agreement, and the amount Brazos' owes must be limited to the amount "calculated solely according to the protocols in effect" during Winter Storm Uri.[50]  SFA Section 11.L. ("This Agreement is subject to applicable . . . state . . . laws . . . .").   Under Texas law, PURA takes precedence over any PUCT order.  *See Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001) ("The PUC is a creature of the legislature and has no inherent authority.").

40.     The SFA's conflicts provision reflects the parties' chosen allocation of risks and responsibilities.   ERCOT's interpretation not only eliminates Section 2.B., but also ignores the linchpin of the Conflicts provision itself: that it becomes operational only on the condition that a market participant apprise ERCOT of the conflict: "[i]n the event of a conflict . . . the applicable .

---

[49] ERCOT's Mot. for Summ. J. ¶ 33 (Adv. Dkt. No. 279).

[50] "The commission shall require that all market participants pay or make provision for the full and prompt payment of amounts owed calculated solely according to the protocols in effect during the period of emergency to the independent organization certified under Section 39.151 for the ERCOT power region . . . ." Tex. Util. Code § 39.160(a).

. . order of any Governmental Authority or tariff shall prevail, **provided that Participant shall give notice to ERCOT of any such conflict affecting Participant**."[51]

41.     The operation of this provision is thus entirely conditional on Participant's (i.e., the Debtor's) provision of notice regarding a conflict affecting Participant.[52]  *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) ("In order to make performance specifically conditional, a term such as . . . '**provided that**' . . . or some similar phrase of conditional language must normally be included." (emphasis added)).  ERCOT's interpretation not only ignores the SFA's actual language, but it seeks to impermissibly read a general provision as controlling over the specific provisions governing what authority controls in the event of a dispute.  *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019).

42.     In contrast, the Debtor's interpretation harmonizes and gives effect to each of the SFA's provisions, as they are actually written.  *See In re Chesapeake Energy Corp.*, 2021 Bankr. LEXIS 2503, at *29 ("The Court will not insert words into [a contract] that do not exist.").  The SFA and the Protocols govern the relationship between ERCOT and Brazos; to the extent the PUCT Orders imposed obligations on ERCOT, ERCOT was required to follow the contract's terms in order to enforce its obligations under the PUCT Orders against Brazos.  As discussed above, the Conflicts provision does not provide a means for doing so.  Instead, ERCOT should have followed the procedures contained in the Protocols.  SFA §2.B. ("For the purposes of determining responsibilities and rights at a given time, the ERCOT protocols, as amended in accordance with the change procedure(s) described in the ERCOT protocols . . . shall govern with respect to that action.") (emphasis added).

---

[51] Ex. 1, SFA §11.L (emphasis added)

[52] As discussed in paragraph 31 above, by the PUCT's admission, the PUCT Orders applied "to ERCOT and solely to ERCOT."

43.     ERCOT failed to follow the Protocol change procedures, including Protocol 21.5, which provides that a revision can be made on an "urgent" basis where "an existing Protocol or condition is impairing or could imminently impair ERCOT System reliability or wholesale or retail market operations . . . ."[53]  If ERCOT believed it could not implement such a change with sufficient speed, the Protocols permit ERCOT to suspend the real-time energy market "at its sole discretion and communicated to Market Participants in as timely a manner as feasible, given the constraints of the triggering event."[54]

44.     Because the "protocols, in effect at the time of the performance or non-performance of an action, shall govern with respect to that action," ERCOT's claim against the Debtor can be allowed only in an amount calculated pursuant to the Protocols in effect during the winter storm.[55]

**B.      The Public Utility Regulatory Act Requires that the ERCOT Claim be Calculated According to the Protocols.**

45.     The ERCOT Claim should be reduced for the independent reason that a governing state statute requires it.  *See In re Anloc, LLC*, 487 B.R. at 835 (Bankr. S.D. Tex. 2013) (J. Isgur) (citing 11 U.S.C. § 502(b)(1)).  When construing a Texas statute, federal courts "follow 'the same rules of construction that a Texas court would apply—and under Texas law the starting point of [a court's] analysis is the plain language of the statute.'"  *Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 248 (5th Cir. 2016) (quoting *Wright v. Ford Motor Co*., 508 F.3d 263, 269 (5th Cir. 2007)).  Under Texas law, courts "must apply statutes as written and refrain from rewriting text that lawmakers chose."  *Davis v. Morath*, 624 S.W.3d 215, 222 (Tex. 2021) (quotation omitted).  The Legislature's "voted-on language is what constitutes the law, and when

---

[53] Ex. 6, Protocol 21.5.

[54] Ex. 6, Protocol 25.1(1).

[55] Ex. 1, SFA § 2(B).

a statute's words are unambiguous and yield but one interpretation, the judge's inquiry is at an end." *Pruski v. Garcia*, 594 S.W.3d 322, 325 (Tex. 2020) (quotations omitted).

46.     On June 18, 2021, PURA § 39.160(a) became effective pursuant to Senate Bill 1580.  That provision specifically addresses the amount the Debtor owes to ERCOT for charges incurred during Winter Storm Uri.  It provides:

> The commission shall require that all market participants pay or make provision for the full and prompt payment of amounts owed **calculated solely according to the protocols in effect during the period of emergency** to the independent organization certified under Section 39.151 for the ERCOT power region to qualify, or to continue to qualify, as a market participant in the ERCOT power region. Tex. Util. Code § 39.160(a) (emphasis added).

47.     The "period of emergency" is statutorily defined as "the period beginning 12:00 a.m., February 12, 2021, and ending 11:59 p.m., February 20, 2021." Tex. Util. Code § 41.152(8). *See Health Care Serv. Corp.*, 814 F.3d at 248 ("When a statute defines a term, the court is bound to construe that term by its statutory definition only." (internal quotation omitted)).

48.     PURA Section 39.160(a) thus unambiguously provides that the ERCOT Protocols in effect during Winter Storm Uri must be used to calculate the "full" amount the Debtor owes, PURA § 39.160(a), and prohibits the use of the PUCT Orders as a basis for calculating such amounts.  *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("When interpreting statutes, we presume the Legislature chose the statute's language with care, purposefully choosing each word, while purposefully omitting words not chosen.").   The Legislature knows how to distinguish between the ERCOT Protocols and the PUCT's orders, as shown by specific references to the Protocols and orders within the same chapter of PURA.[56]  If

---

[56] *Compare, e.g.*, Tex. Util. Code § 39.151(l) ("No operational criteria, **protocols**, or other requirement established by an independent organization, including the ERCOT independent system operator, may adversely affect or impede any manufacturing or other internal process operation associated with an industrial generation facility . . .) *with* Tex. Util

the Legislature intended Brazos' debt to be calculated according to a PUCT order and not the Protocols, it would have said so.  *See, e.g., In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018).

49.     Calculating the amount the Debtor owes under the Protocols reduces the outstanding balance of the ERCOT Claim by approximately $1.24 billion.[57]  11 U.S.C. § 502(b)(1).

**C.     In the alternative, the ERCOT Claim should be reduced by the unauthorized $9,000/MWh charges for 33 hours after load shed ceased.**

50.     ERCOT has requested a ruling from this Court to permit it to recover almost $2 billion from the Debtor's estate on the basis that the PUCT Orders required ERCOT to charge the amounts reflected in its Amended Proof of Claim.[58]  Even if that were true for February 15-17, 2021, which the Debtor disputes, there is no basis whatsoever for ERCOT's request to recover charges at $9,000/MWh for February 18 and 19, 2021.  Neither the PUCT Orders, the Protocols, nor any law gave ERCOT the authority to assess those charges, which total approximately $641 million in excess of what would have been charged under the Protocols.[59]

51.     Section 1 of the PUCT Orders contains a single instruction: "the Commission directs ERCOT to ensure that ***firm load that is being shed*** in EEA3 is accounted for in ERCOT's scarcity pricing signals."[60]  ERCOT admits that at midnight on February 18th it "had ***ceased all firm load shed***."[61]  Notwithstanding the end of load shed, ERCOT invoiced Brazos for energy and ancillary services charges based on a real-time energy price of $9,000/MWh for an additional 33

---

Code § 39.253(a)(1) (50 percent of those costs shall be allocated in accordance with the methodology used to allocate the costs of the underlying assets in the electric utility's most recent **commission order** addressing rate design.").

[57] *See* Ex. 3, *Joint Stipulation to Calculations and Expert Testimony at Trial* (Jan. 6, 2022

[58] ERCOT's Amended Claim at 3 (Claim 115); ERCOT's Mot. for Summ. J. ¶1 (Adv. Dkt. No. 279).

[59] *See* Ex. 3, *Joint Stipulation to Calculations and Expert Testimony at Trial* (Jan. 6, 2022).

[60] Ex. 19, PUC Docket No. 51617, Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 16, 2021).  The February 16 order rescinded the February 15 order's directive that ERCOT adjust prices issued prior to the order.

[61] ERCOT's First Am. Answer ¶58 (Adv. Dkt. No. 192); Brazos' First Am. Compl. ¶ 58 (Adv. Dkt. No. 173).

hours: from 12 a.m. on the 18th through 9 a.m. on the 19th.[62]   No provision of the PUCT Orders, the SFA, or the Protocols permitted ERCOT to continue to adjust the RDPA, or obligated the Debtor to pay maximum prices based on the false pretense that firm load was being shed when it was not.

52.    ERCOT knew that the PUCT Orders contained no direction to peg prices at $9,000/MWh once it ceased its firm load shed instructions.  Indeed, in its February 17 "Update" to the market regarding "Public Utility Commission Emergency Orders Affecting ERCOT Market Prices," ERCOT stated that "[o]nce ERCOT is no longer instructing firm Load shed, **the adjustment will be set to 0** . . . ."[63]  While ERCOT has since pivoted to claim that it kept prices at $9,000/MWh to avoid load shed,[64] the ***avoidance*** of ***potential*** load shed is not "load that is being shed"[65] and cannot provide a legal basis to impose maximum prices on the Debtor.

53.    ERCOT concedes that the decision to extend maximum pricing for an additional 33 hours was made by ERCOT's former CEO, Bill Magness.[66]  Mr. Magness agreed that the PUCT's directive does not even include the concept that the avoidance of firm load shed as a basis to keep prices at $9,000/MWh.[67]  Thus, ERCOT decided to impose maximum prices of its own accord, without authorization, permission, direction, or compulsion from the PUCT Orders, under the PUCT Orders, or otherwise.  Once the PUCT Orders no longer applies, nothing authorized ERCOT to set prices (and certainly nothing obligated the Debtor to pay prices) except pursuant to the

---

[62] *See* ERCOT's Am. Claim at Ex. G (Claim 115).

[63] Ex. 17, ERCOT February 17, 2021 Market Notice M-C021521-03  (emphasis added).

[64] Ex. 23, Deposition of Bill Magness at 299:25-301:2.

[65] Ex. 19, PUC Docket No. 51617, Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules at 2 (Feb. 16, 2021).

[66] Ex. 23, Deposition of Bill Magness at 281:19-282:6.

[67] Ex. 23, Deposition of Bill Magness at 305:11-19.

Protocols.[68]  ERCOT's claim should therefore be reduced by, at a minimum, $641 million.  *See* 11 U.S.C. § 502(b)(1).

## V.    <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant summary judgment on behalf of Plaintiffs on Count 1 of the Amended Complaint, and provide any other relief to which Plaintiffs are entitled.

---

[68] Ex. 1, SFA § 6.A ("ERCOT shall comply with, and be bound by, all ERCOT Protocols.").

Dated:  January 6, 2022

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

By: */s/ Lino Mendiola*
Lino Mendiola (SBT 00791248)
Michael Boldt (SBT 24064918)
Jim Silliman (SBT 24081416)
One American Center
600 Congress Ave., Suite 2000
Austin, TX 78701
Telephone: (512) 721-2700
Facsimile: (512) 721-2656
Email: linomendiola@eversheds-sutherland.us
Email: michaelboldt@eversheds-sutherland.us
Email: jimsilliman@eversheds-sutherland.us

*Special Counsel for the Debtor and Debtor in Possession*

**O'MELVENY & MYERS LLP**
Louis R. Strubeck, Jr. (SBT 19425600)
Nick Hendrix (SBT 24087708)
2501 North Harwood Street
Dallas, Texas 75201
lstrubeck@omm.com
nhendrix@omm.com
(972) 360-1925

*Co-Counsel for the Debtor and Debtor in Possession*

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Jason L. Boland*
Jason L. Boland (SBT 24040542)
Julie G. Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1301 McKinney Street, Suite 5100
Houston, TX 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
Email: jason.boland@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokrzycka@nortonrosefulbright.com

Paul Trahan  (SBT 24003075)
98 San Jacinto Boulevard, Suite 1100
Austin, TX  78701
Telephone:  (512) 536 5288
Facsimile:  (512) 536 4598
Email: paul.trahan@nortonrosefulbright.com

Steve A. Peirce (SBT 15731200)
111 West Houston Street, Suite 1800
San Antonio, TX  78205
Telephone:   (210) 270-7179
Facsimile:  (210) 270-7205
Email: steve.peirce@nortonrosefulbright.com

*Counsel for the Debtor and Debtor in Possession*

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing document was served upon the counsel for parties of record in this Adversary Proceeding, electronically through the Bankruptcy Court's Electronic Case Filing System on those parties that have consented to such service on the 6th day of January, 2022.

*/s/  Maria Mokrzycka*

Maria Mokrzycka
