**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC., *et al.*,<br><br>        Plaintiff / Intervenor-Plaintiffs,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF<br>TEXAS, INC., *et al.*,<br><br>        Defendant / Intervenor-Defendants. | Adv. Proc. No. 21-03863 (DRJ) |

**DEBTOR'S RESPONSE (A) TO ELECTRIC RELIABILITY COUNCIL**
**OF TEXAS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGEMENT**
**AND (B) IN SUPPORT OF (I) DEBTOR'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AND (II) OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS' MOTION FOR SUMMARY JUDGMENT**
**[Relates to Adv. Dkt. Nos. 280, 281, 285, 288, and 289]**

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos.  The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................3

STATEMENT OF FACTS ...........................................................................................5

LEGAL STANDARD...................................................................................................6

RESPONSE..................................................................................................................7

    A.    ERCOT's request for summary judgment on Count 1 should be denied because Brazos is not obligated to pay the amounts asserted in ERCOT's Amended Proof of Claim under the SFA and the applicable Protocols or the PUCT Orders. ..................................................................................................7

        i.    Texas's overall regulatory framework provides no support for ERCOT's summary judgment motion. ................................................9

        ii.    Nothing in PURA or the PUCT Orders obligates Brazos to pay amounts in excess of those calculated under the SFA and the Protocols....................................................................................10

        iii.    ERCOT's proposed interpretation of the SFA's "Conflicts" provision reads the applicable Protocols out of Texas law. ..............14

        iv.    Senate Bill 1580 confirms that the ERCOT invoices must be calculated "solely according to the protocols in effect during the winter storm. ..................................................................15

        v.    ERCOT was not authorized under the PUCT Orders to ignore the Protocols when it stopped shedding load. ...................................19

    B.    ERCOT's request for summary judgment on Count 2 should be denied as there are material questions of fact concerning the extent to which ERCOT mitigated its damages....................................................................................20

    C.    ERCOT's request for summary judgment on Count 3 shows a continued misunderstanding of Count 3, again ignores the SFA's plain terms, and should be denied. ................................................................................22

    D.    Counts 4 and 5 are not ripe for summary judgment because they require a fact-intensive inquiry to determine whether the estate received reasonably equivalent value. ..................................................................................25

    E.    ERCOT's request for summary judgment on Count 8 should be denied because the nature of the transactions underlying ERCOT's claim and the relevant circumstances were extraordinary and have never occurred in Brazos's history with ERCOT. ..............................................................28

        i.    ERCOT misreads the statute's plain, unambiguous language to expand its scope and meaning......................................................29

        ii.    The undisputed facts make clear that the transactions at issue fall outside the ordinary course of Brazos's business ......................31

CONCLUSION...........................................................................................................37

Brazos Electric Power Cooperative, Inc. (the "Debtor" or "Brazos"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case, hereby files this response (this "Response") (a) in opposition to *Electric Reliability Council of Texas, Inc.'s Motion for Partial Summary Judgement* [Adv. Dkt. No. 280] (the "ERCOT Summary Judgment Motion") and (b) in support of *Debtor's Motion for Partial Summary Judgment* [Adv. Dkt. No. 285] (the "Debtor's Summary Judgment Motion") and the *Official Committee of Unsecured Creditors' Motion for Summary Judgment* [Adv. Dkt. No. 281] (the "Committee's Summary Judgment Motion", and together with the Debtor's Summary Judgment Motion, the "Plaintiffs' Motions").[2]  In support of this Response, Brazos respectfully states as follows:

## PRELIMINARY STATEMENT

1.     ERCOT manipulated the operation of the Protocols that set wholesale clearing prices during Winter Storm Uri in a manner that artificially inflated Brazos's invoices.  The result was more than $1.124 billion in excessive charges incurred over a five-day period—an amount that exceeded Brazos's annual gross revenue in each of the last two years combined and drove a company with an "A" and "A+" credit-rating into bankruptcy.

2.     ERCOT argues that the PUCT Orders "overrode the Protocols" and required it to peg prices at $9,000/MWh.[3]  But the PUCT Orders are directed at ERCOT, not Brazos, and the SFA required ERCOT to implement the Protocols' change provisions in order to make any pricing changes effective against Brazos.  No such amendment occurred.  Regardless, a Texas statute unambiguously clarifies that the amount Brazos owes to ERCOT must be "calculated solely

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the ERCOT Summary Judgment Motion or the Plaintiffs' Motions, as applicable.

[3] ERCOT Motion for Summary Judgment ¶¶ 29, 31.

according to the protocols in effect during" Winter Storm Uri.[4]  ERCOT's interpretive gymnastics concerning Senate Bill 1580 only serve to confirm the correctness (and obviousness) of Brazos's construction of the legislation.

3.     ERCOT's assertion that it raised prices to $9,000/MWh "during all intervals in which ERCOT has directed firm Load shed" is technically accurate, but misleading.   While EROCT did in fact peg prices at $9,000 during the intervals in which it directed load shed, it also held prices at $9,000 for an additional 33 hours after firm load shed ceased, violating every arguably applicable authority, including the PUCT Orders that ERCOT asserts it was implementing.  ERCOT further refused to exercise its authority to reprice the market to correct the 33-hour period overcharges, in violation of its duty to mitigate its damages under the SFA.

4.     ERCOT does not (and cannot) dispute that its price manipulation and billon-plus-dollar charge was wholly inconsistent with both the express terms of its contract with Brazos and its historical course of dealing with Brazos in terms of both procedure and amount.  Instead, ERCOT attempts to evade the Bankruptcy Code's limitations on one creditor's ability to gather all the estate's value for itself through a simplistic argument that whatever ERCOT dictates is *per se* reasonable and ordinary course.

5.     Of course, the Bankruptcy Code does not contain an exemption for ERCOT. ERCOT, like any other creditor, has the burden of establishing all elements of its section 503(b)(9) administrative priority claim, including that its charges were made in the ordinary course of Brazos's business.  ERCOT, like any other creditor, is also subject to its claim being reduced or disallowed as a fraudulent obligation because it is not supported by reasonably equivalent value. A transaction based on unprecedented, extraordinary (not to mention extra-contractual) price

---

[4] TEX. UTIL. CODE § 39.160(a).

manipulation and resulting in a multi-billion dollar claim that bankrupts a solvent company is the opposite of "reasonable" and "ordinary course."

6.     For all the reasons set forth herein and in the Plaintiffs' Motions, the ERCOT Summary Judgment Motion should be denied and the Plaintiffs' Motions should be granted.

## STATEMENT OF FACTS

7.     On January 6, 2021, Brazos filed the Debtor's Summary Judgment Motion, which the Committee joined.[5]  Also on January 6, 2021, Brazos filed its joinder to the Committee's Summary Judgment Motion.[6]  Facts relevant to this Response are set forth in the Plaintiffs' Motions and are incorporated herein by reference.  Brazos further incorporates all arguments and exhibits attached to the Plaintiffs' Motions herein.

8.     The ERCOT Summary Judgment Motion purports to include a statement of "Undisputed Facts."[7]  Parts of that section, however, present as statements of "undisputed fact" certain legal conclusions and mischaracterizations,[8] each of which is addressed appropriately through argument in the Plaintiffs' Motions and this Response (as well as numerous other filings in this adversary proceeding).  Brazos largely disputes ERCOT's characterization of the various statutes, rules, orders, and agreements referred to in the ERCOT Summary Judgment Motion, the Plaintiffs' Motions, and this Response.  Brazos agrees, however, that Counts 1 and 8 of the

---

[5] *Official Committee of Unsecured Creditors' Joinder to Debtor's Motion for Partial Summary Judgment* [Adv. Dkt. No. 289].

[6] *Debtor's Joinder to the Official Committee of Unsecured Creditors' Motion for Summary Judgment* [Adv. Dkt. No. 288].

[7] ERCOT Summary Judgment Motion § II.

[8] *See, e.g., id.* ¶¶ 7 ("As a matter of law, the PUCT . . . retained supervening authority to 'take actions necessary to protect the public interest, including actions that are otherwise inconsistent with the provisions in this section.'"), 13 (asserting that ERCOT "complied with the PUCT Orders").

Amended Complaint are ripe for summary judgment, and for the reasons set forth in its separate motions, Brazos seeks a ruling in the estate's favor on those Counts.

## LEGAL STANDARD

9.      Rule 56(c) of the Federal Rules of Civil Procedure, incorporated here by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[9] A material fact is one which might affect the outcome of the suit due to its legal import.[10] "Factual disputes that are irrelevant or unnecessary will not be counted."[11] A dispute is "genuine" when the evidence is such that a reasonable finder of fact could return a verdict for the non-movant.[12] "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."[13] In making that determination, courts are required to view the facts and draw reasonable inferences in the light most favorable to the non-movant."[14]

---

[9] FED. R. CIV. P. 56(c).

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11] *Id.*

[12] *Id.*

[13] *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (internal quotations and citation omitted).

[14] *Scott v. Harris*, 550 U.S. 372, 378–79 (2007); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005).

## RESPONSE

**A.     ERCOT's request for summary judgment on Count 1 should be denied because Brazos is not obligated to pay the amounts asserted in ERCOT's Amended Proof of Claim under the SFA and the applicable Protocols or the PUCT Orders.**

10.     Count 1 presents a legal question:  whether some part of the ERCOT Claim should be reduced as "unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."[15]  Count 1 alleges $1.124 billion of that amount is unrecoverable under the SFA,[16] the pricing rules contained in the Protocols, and PURA § 39.160(a), which provides that the amount Brazos owes to ERCOT must be calculated "solely according to the protocols in effect" during Winter Storm Uri.  ERCOT contends its claim is recoverable because the charges are authorized under the PUCT Orders.  The Court should resolve this purely legal dispute in Brazos's favor.  As shown in the Debtor's Summary Judgment Motion, Brazos's payment obligations can only arise under the SFA and the Protocols in effect during the storm—as confirmed by PURA § 39.160(a)—not the PUCT Orders.[17]  And, solely in the alternative, there is no authority whatsoever—not the PUCT Orders, the SFA, the Protocols, nor any other statute or rule—that authorizes ERCOT to recover, or obligates Brazos to pay, the $641 million in energy charges for the 33 hours after firm load shed ceased.

11.     More than $1.124 billion of ERCOT's asserted claim was not calculated under or in accordance with the SFA and the Protocols, but under the PUCT Orders, through which ERCOT has tried to justify its manual adjustment of certain inputs used to calculate the "Real-Time On-

---

[15] 11 U.S.C. § 502(b)(1).

[16] Brazos and ERCOT have stipulated that this is the amount in dispute for purposes of Count 1.  *See Joint Stipulation to Calculations and Expert Testimony at Trial* [Adv. Dkt. No. 291] (the "Joint Stipulation") (describing the administrative adjustment that ERCOT implemented resulting in a $1.124 billion increase in charges to Brazos over a five-day period).

[17] *See* Debtor's Summary Judgment Motion ¶¶ 30-44; *see* Ex, 1, SFA.

Line Reliability Deployment Price Adder" (or RDPA)[18] in order to peg energy prices at $9,000/MWh instead of the Protocol-determined market clearing price.  ERCOT has struggled since filing its original proof of claim[19] to reconcile the invoices it issued under the PUCT Orders with the SFA and the Protocols.  ERCOT has equivocated on the issue, arguing at times that the PUCT Orders were *incorporated* into the SFA,[20] and arguing at other times that they *conflicted* with, *superseded*, or *overrode* the SFA and Protocols.[21]  ERCOT even amended its proof of claim[22]

---

[18] *See* Debtor's Summary Judgment Motion ¶¶ 13-14, 22.  The RDPA is an a charge that, under certain circumstances, could increase the market-clearing wholesale price, the amount of which is calculated using various other Protocol-based scarcity-pricing factors. Ex. 2, Protocol § 6.5.7.31.

[19] *See* Ex. 3, Stretto Claim No. 403 (the "Original Proof of Claim"), Addendum § A ("The Brazos SFA establishes the terms and conditions by which ERCOT and Brazos discharge their respective duties and responsibilities under the ERCOT Protocols"), § B ("Prior to the Petition Date, Brazos was in default of its obligations under the Brazos SFA and the ERCOT Protocols").  ERCOT filed an amended proof of claim on November 4, 2021 (the "Amended Proof of Claim" or the "ERCOT Claim").  *See* Ex. 4, Stretto Claim No. 743.  The Amended Proof of Claim alleges that Brazos was in default of its "obligations under the Brazos SFA, the ERCOT Protocols *and the two orders issued by the Public Utility Commission of Texas (the 'PUCT') dated February 15 and February 16, 2021 (the 'PUCT Orders')*."  Amended Proof of Claim at Addendum B.1 (emphasis added).

[20] *See, e.g., Electric Reliability Council of Texas, Inc.'s Motion to Dismiss and for Abstention* [Adv. Dkt. No. 23] (the "Dismissal and Abstention Motion") ¶ 38 ("But Brazos's claims ignore the PUCT's orders and their express *incorporation* into Brazos's SFA") (emphasis added).

[21] *See, e.g., Electric Reliability Council of Texas, Inc.'s Emergency Motion to Dismiss* [Adv. Dkt. No. 191] (the "Second Dismissal Motion") ¶¶ 18-19 (arguing that the PUCT Orders are enforceable against Brazos under the SFA's "*Conflict*" provision and, thus, "*prevail over*" the SFA) (internal marks omitted and emphasis added); ¶¶ 14-17 (arguing that, under section 25.501(a) of the Texas Administrative Code, PUCT retained "supervening authority" to direct ERCOT to set wholesale market prices and that, as a result, the "PUCT Orders *supersede* the portion of the Protocols on which Brazos relies."); (The PUCT's Orders *override inconsistent Protocols* as a matter of law under [the Texas Administrative Code].  *The PUCT Orders override the existing Protocols here*.  It is irrelevant how ERCOT achieved this PUCT-directed price").  *See also* ERCOT Summary Judgment Motion ¶¶ 1, 7, 13, 24, 29, 33. *See also* Ex. 5 Magness Dep. Tr. 222:10-17 (Nov. 11, 2021) (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ."), Ex. 6, Magness Corp. Dep, Tr. 9:12-21 (confirming prior answer in capacity as ERCOT's corporate representative); *Electric Reliability Council of Texas, Inc.'s Objections and Responses to Brazos Electric Power Cooperative, Inc.'s First Set of Interrogatories, First Requests for Admission, and Third Set of Requests for Production to ERCOT* at p. 11 ("27.  Please admit or deny that is ERCOT's understanding that, according to the ERCOT protocols in effect during Winter Storm Uri, firm load shed was not included among the scarcity pricing triggers of Protocol 6.5.7.3.1.  RESPONSE: Denied to the extent that Request for Admission No. 27 implies or could be interpreted as stating that the ERCOT Nodal Protocols are the exclusive set of rules that govern "scarcity pricing" which is set by PUC rules. Subject to and without waiving the foregoing objections, ERCOT admits that firm load shed was not part of Protocol 6.5.7.3.1 until the PUCT Orders became part of *or overrode the Protocols*") (emphasis added).

[22] *See* Ex. 4. Amended Proof of Claim at Addendum B.1.

to include the PUCT Orders as an independent basis for its claim in an apparent effort to fill any gaps as it shifted positions.  Now, the ERCOT Summary Judgment Motion adds a couple of new terms to the array, arguing that the Protocols "must *yield* to the PUCT Orders" and that the Protocols were "*supplanted*, in part, by the PUCT Orders."[23]

12.     As explained below and in the Debtor's Summary Judgment Motion, the Court should decline ERCOT's invitation to ignore Texas law and deny its request for summary judgment.

 i.  ***Texas's overall regulatory framework provides no support for ERCOT's summary judgment motion.***

13.     Brazos is not challenging the PUCT Orders' validity in this proceeding, but ERCOT has made their validity central to the ERCOT Summary Judgment Motion by offering an interpretation of Texas's regulatory framework that is inaccurate on critical points, but, ultimately, is unhelpful to ERCOT's position.  But ERCOT is right about one thing: PURA is the "highest level of the hierarchy."[24]  Under the valid and directly applicable provisions of PURA § 39.160(a), the amount Brazos owes cannot be calculated under the (hierarchically inferior) PUCT Orders, but instead must be "calculated solely according to the protocols in effect" during Winter Storm Uri. ERCOT's arguments regarding the scope of the PUCT's "complete authority" over ERCOT and

---

[23] ERCOT Summary Judgment Motion ¶¶ 1, 33, 35 (emphasis added); *see also id.* at p. 10 ("A.  ERCOT is entitled to summary judgment on Count 1 because the PUCT Orders *supplanted* the Protocols' pricing provisions under the SFA") (emphasis added).  Brazos agrees with the Committee that, at this stage, ERCOT can no longer reasonably maintain that its repricing of the wholesale market pursuant to the PUCT Orders was effected "under the Protocols." *See* Committee's Summary Judgment Motion ¶ 15 ("In [ERCOT's] own motion for summary judgment . . ., ERCOT has finally abandoned any argument that its repricing was under the Protocols at all. ERCOT argues repeatedly that the PUCT Orders "*overrode*" the Protocols; that the PUCT Orders "*supersede*" the Protocols; and that the Protocols must "*yield*" to the PUCT Orders. . . .") (internal citations omitted).

[24] *See* ERCOT Summary Judgment Motion ¶ 25.

whether the PUCT's (hierarchically inferior) rules gave the PUCT the authority to issue the PUCT Orders are irrelevant.[25]

    ii. ***Nothing in PURA or the PUCT Orders obligates Brazos to pay amounts in excess of those calculated under the SFA and the Protocols.***

    14.    ERCOT instead asks that the Court adopt a construction of Texas's regulatory law hierarchy that would nullify some provisions (like the Protocols' change procedures) and contort the plain language of others (like PURA's requirement that ERCOT only collect amounts "calculated according to the protocols" or the meaning of the PUCT's "complete authority"). Brazos submits that the Court should construe all relevant statutes, rules, and agreements together, and give effect to the plain, unambiguous language in each such text when it can.  ERCOT agrees that the Protocols have the "same force and effect as Texas statutes"[26] (including Protocol §§ 6.6.1.1. through 6.6.1.3., which dictate how ERCOT must calculate wholesale energy prices). ERCOT agrees that firm load shed was not a scarcity pricing trigger under Protocol § 6.5.7.3.1 during Winter Storm Uri because, in 2014, ERCOT and the market stakeholders expressly rejected a proposal to include firm load shed as a pricing factor under scarcity conditions.[27]  ERCOT agrees that the software used to implement the Protocol-mandated algorithm functioned as designed and

---

[25] Those arguments are also wrong for the reasons discussed in the *Debtor's Reply to the Public Utility Commission of Texas's Brief in Support of the Electric Reliability Council of Texas, Inc.'s Motion to Dismiss and for Abstention* [Adv. Dkt. No. 108], which is incorporated herein by reference.

[26] *See* Dismissal and Abstention Motion ¶ 6 (citing *PUC v. Constellation Energy Commodities Grp., LLC.*, 351 S.W.3d 588, 594-95 (Tex. App.—Austin 2011, pet. denied)).

[27] Ex. 5, Maggio Dep. Tr. 69:16-70:14 (Dec. 1, 2021); *see* Ex. 7, ERCOT Board report on Nodal Protocol Revision Request 626 (NPRR 626), August 12, 2014. ERCOT argues that it is "of no moment" that Protocol § 6.5.7.3.1 was not revised to "add firm load shed as a factor triggering scarcity pricing" until *after* the storm because "the PUCT Orders did not ***amend or supersede*** the Protocols."  *See* ERCOT Summary Judgment Motion ¶ 29 (emphasis added only to note again ERCOT's equivocation).  But then ERCOT argues that the result of the stakeholder process serves to demonstrate both the stakeholders' consent (including Brazos's) and their subjective belief that the amendment is "[]consistent with fundamental market design principles."  *See id.*  Assuming that ERCOT is right, that must also have been true of ERCOT's 2014 amendment; thus, NPRR 626 conclusively demonstrated stakeholders' collective judgment that ***excluding*** firm load shed as a scarcity pricing trigger was then consistent with the market's design.  The argument underscores that the rules in effect ***during the storm*** required a different result.

consistent with the Protocols on February 15, before ERCOT's intervention.[28]   What ERCOT disagrees with are the market-clearing prices that the Protocols required wholesale-power purchasers (like Brazos) to pay to ERCOT during the storm.  Instead, ERCOT determined that firm load shed should have been included as a scarcity pricing trigger (even though it was explicitly *excluded* from the Protocols)[29] and solicited the PUCT's help to fix the "problem."  With the PUCT Orders in hand (and following various rounds of drafting edits to the PUCT Orders by ERCOT itself), ERCOT ignored the applicable Protocols and "manually manipulated" the Protocol-based algorithms to ensure that prices would stay pegged at $9,000/MWh for days on end.[30]

15.     The PUCT Orders are straightforward:  they directed ERCOT to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."[31]   ERCOT continues to suggest that the PUCT Orders created obligations for Brazos.  For instance, ERCOT argues that Brazos "must follow the market rules adopted" by the PUCT and that the PUCT exercised its authority under its own rules when it issued the PUCT Orders.[32]   But according to the PUCT, the orders were "not generally applicable and instead pertain[ed] only to internal agency management"; they did not "direct any market participant," including Brazos, to "do anything"; or constitute "self-executing statements applicable to market participants that 'electricity will be

---

[28] *See* Ex. 8, Ogelman Dep. Tr. 113:22–114:2, 114:18–115:7 (Nov. 5, 2021).

[29] *See id.* at 96:20-97:3 ("Q: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ) (Nov. 5, 2021); Ex. 9, emails between Dan Jones and Dave Maggio, February 15, 2021 (ERCOT_B0169429); Ex. 10, email from Sai Moorty to Dave Maggio, Pamela Shaw, Dan Jones, Aaron Townsend, Hailong Hui, and Blake Holt, February 15, 2021 (ERCOT_B0285866).

[30] *See also* Joint Stipulation.

[31] *See* Ex. 11, PUCT Order dated Feb. 15, 2021.

[32] ERCOT Summary Judgment Motion ¶¶ 25, 28.

automatically priced at the $9,000 system-wide offer cap."[33]  The PUCT issued a directive to ERCOT,  and it was up to ERCOT to follow the PUCT Orders in a manner consistent with applicable law (including the Protocols) and its third-party obligations, including those obligations to Brazos under the SFA and the Protocols.

16.     While ERCOT attempts to inject issues into this proceeding concerning ERCOT's relationship with the PUCT, Brazos's relationship with ERCOT is governed by the SFA and the Protocols.  Brazos and ERCOT entered into the SFA "in order to establish the terms and conditions by which ERCOT and [Brazos] will discharge their respective duties and responsibilities under the ERCOT Protocols."[34]  ERCOT obligated itself to "comply with, and be bound by, all ERCOT Protocols."[35]  In the event of a dispute over a party's obligations, the Protocols control: "[f]or the purposes of determining responsibilities and rights at a given time, the ERCOT Protocols . . . in effect at the time of the performance or non-performance of an action, shall govern with respect to that action."[36]  ERCOT's interpretation of the SFA's "Conflicts" section impermissibly writes those provisions out of existence.[37]  That interpretation is wrong because the SFA and the Protocols provide a mechanism through which ERCOT implements regulatory orders to which it is subject. As discussed below, the SFA's "Conflicts" provision is intended to operate in favor of market

---

[33] *See* Ex. 12, Brief of Appellee PUCT at 15, *Luminant Energy Company, LLC v. Public Utility Commission of Texas*, (No. 03-21-00098-CV), Texas Third Court of Appeals, 2021 at pp. 23-24.  *See also id.* at p. 27 ("In sum, the [PUCT Orders] are not generally applicable rules because the only possible impact on private parties stems from subsequent actions that ERCOT may or may not have taken in following internal agency guidance").  Brazos does not adopt the PUCT's statements, but mentions them here to show the inconsistent positions taken by ERCOT and the PUCT before different courts on these issues.

[34] Ex. 1, SFA Recitals, C.

[35] Ex. 1, SFA § 6(A).  The Protocols contain detailed instructions for calculating the prices for wholesale electricity in the ERCOT market.  *See* Ex. 2, Protocol § 1.7 (Rules of Construction).  The Protocols provide that "[t]he word 'shall' denotes a duty."  Ex. 2, Protocol § 1.7(2)(e).

[36] Ex. 1, SFA § 2(B).

[37] *See Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) ("[C]ourts must examine the entire agreement and give effect to each provision so that none is rendered meaningless.").

participants (not ERCOT) that are subject to a governmental order which conflicts with the SFA, and that provision is only effective if an affected participant gives ERCOT notice of the conflict.

17.     The Protocols' two principal change procedures are set forth in Protocol § 21 (specifically, Protocol §§ 21.4 and 21.5).[38]  If ERCOT could not sufficiently expedite the usual process under Protocol § 21.4, Protocol § 21.5 includes change procedures that ensure ERCOT can quickly revise and implement rules under emergency conditions.[39]  Protocol revisions and other actions can be taken under Protocol § 21.5 on an "urgent" basis where "an existing Protocol or condition is impairing or could imminently impair ERCOT System reliability or wholesale or retail market operations."  And in addition to these change procedures, Protocol § 25 provides a mechanism for ERCOT to suspend the Real-Time Market rules.[40]  Although ERCOT asserts that it could not ignore a PUCT directive, nothing in the PUCT Orders, PURA, the PUCT Substantive Rules or elsewhere can be fairly interpreted to grant ERCOT carte blanche authority to wholly ignore its obligations to Brazos under these change procedures or any other provision of the SFA, the Protocols, or Texas law.

18.     It is ERCOT's burden to prove its claim.  It cannot do so by hiding behind the PUCT and its purported authority and actions in connection with Winter Storm Uri.  ERCOT could have complied with both the PUCT Orders and its obligations to Brazos the SFA and the Protocols by implementing any necessary adjustments to the pricing algorithm through the applicable change procedures.  It chose not to, and has admitted that the PUCT Orders did *not* amend the Protocols.[41]

---

[38] *See* Ex. 2, Protocol §§ 21.4, 21.5.

[39] *See* Ex. 2, Protocol § 21.5(1).

[40] *See* Ex. 2, Protocol § 25.

[41] *See* Ex. 5, Magness Dep. Tr. 222:10-17 ("Q. ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ); Ex. 6, 9:12-21 (confirming prior answer in capacity as ERCOT's corporate representative).

And to justify its noncompliance, ERCOT asks the Court to read into the PUCT Orders language that is not there, language that ERCOT apparently believes relieved it from the burdens of its obligations to Brazos under the SFA and the Protocols.[42]  Thus, ERCOT's refrain that it had no choice but to follow the PUCT Orders and ignore its obligations to Brazos cannot be squared with the governing legal paradigm (or common sense).[43]  Both as a matter of textual interpretation and governing Texas law, Brazos's invoices must be reduced to the amount calculated under the Protocols.

> ### iii. *ERCOT's proposed interpretation of the SFA's "Conflicts" provision reads the applicable Protocols out of Texas law.*

19.     As mentioned above, in ERCOT's Motion for Summary Judgment, it again relies on the SFA's "Conflicts" provision.[44]  The applicability and interpretation of section 11(L) is a legal question, one that has also been extensively briefed at this point.[45]  ERCOT's section 11(L) argument relies on a forced reading of the SFA that, again (and among other problems), ignores ordinary rules of interpretation and unnecessarily reads the Protocols' pricing and change

---

[42] *See* ERCOT Summary Judgment Motion ¶ 28 (referencing the *PUCT's* rights and the *PUCT's* authority under PURA and the PUCT Substantive Rules to argue that "the PUCT took action that it deemed necessary to protect the public interest by issuing the PUCT Orders, which directed ERCOT to set prices at the highest level during the period of scarcity at issue.").  As ERCOT notes, the PUCT Orders were expressly premised on the PUCT's authority to regulate *ERCOT* in its capacity as the "independent organization."

[43] *See* ERCOT Summary Judgment Motion ¶¶ 30-32; *see also Electric Reliability Council of Texas, Inc.'s Answer and Affirmative Defenses to Brazos Electric Power Cooperative's Inc.'s First Amended Complaint* [Adv. Dkt. No. 192] (the "Amended Answer"), Affirmative Defenses ¶ 18 ("the Debtor's Complaint is barred or fails, in whole or in part, because ERCOT was bound to comply with and did comply with orders issued by the PUCT. Under the SFA, the PUCT's Orders are orders of a Governmental Authority.").

[44] ERCOT Summary Judgment Motion ¶ 33.  Section 11(L) of the SFA provides that "In the event of a conflict between this Agreement and an applicable federal, state, and local law, ordinance, rule, regulation, order of an Governmental Authority or tariff, the applicable federal, state, and local law, ordinance, rule, regulation, order of any Governmental Authority or tariff shall prevail, provided that Participant shall give notice to ERCOT of any such conflict affecting Participant."

[45] Specifically, Brazos briefed issues pertaining to the applicability and interpretation of section 11(L) of the SFA in its response to ERCOT's Dismissal and Abstention Motion [Adv. Dkt. No. 42] (the "First Dismissal Response") and Second Dismissal Motion [Adv. Dkt. No. 231] (the "Second Dismissal Response"), which arguments are incorporated herein by reference.  *See, e.g.,* First Dismissal Response ¶¶ 97-99; Second Dismissal Response ¶¶ 19-24.

procedures out of Texas law.  The calculation of wholesale-energy prices and related rules are set forth in great detail over hundreds of pages in the Protocols, and the manner and method for varying those rules (during ordinary circumstances and emergency extraordinary circumstances, such as Winter Storm Uri) is also included in the Protocols.  ERCOT's reading of the SFA renders all of that meaningless, flipping the law on its head so that a general provision would always be understood to nullify a specific provision.[46]

20.     Instead, the clear purpose of the Conflicts provision is to provide a mechanism for a market participant to apprise ERCOT of a government order that creates conflicting obligations for the participant, but only if the participant gives ERCOT notice: "In the event of a conflict between this Agreement and an applicable . . .  order of any Governmental Authority . . . the applicable . . . Governmental Authority . . . shall prevail, provided that Participant shall give notice to ERCOT of any such conflict affecting Participant."[47]  The provision is not intended to be the means through which ERCOT incorporates orders of the PUCT, as the Protocol change procedures are already designed to do just that.  Accordingly, Brazos respectfully submits that section 11(L) of the SFA is inapplicable and does not support ERCOT's calculation of its claim against Brazos and the estate.

iv.  ***Senate Bill 1580 confirms that the ERCOT invoices must be calculated "solely according to the protocols in effect during the winter storm.***

21.     SB 1580 amended a number of PURA provisions, including PURA § 41.151 and PURA § 39.160.  PURA § 41.151 relates to amounts securitized by electric cooperatives, but

---

[46] *See, e.g., Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) ("To that end, we [the Texas Supreme Court] consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless."); *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 531 (Tex. 2015); *Kartsotis v. Bloch*, 503, 518 S.W.3d 506 (Tex. App.—Dallas 2016, pet. denied); *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002); *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).

[47] Ex. 1, SFA § 11(L).

PURA § 39.160 is not limited to securitization transactions.  Specifically, PURA § 39.160 provides that (a) the PUCT will require market participants to pay (or provide for the "full and prompt payment" of) amounts owed to ERCOT "*calculated solely according to the protocols in effect during the period of emergency*,"[48] (b) ERCOT must report to the PUCT any market participant that fails to pay such amounts "as in default",[49] and (c) the PUCT must then prohibit ERCOT from both (i) accepting that participant's loads or generation for scheduling in the ERCOT power region, and (ii) allowing that participant "to be a market participant in the ERCOT power region for any purpose" until all amounts "*as calculated under the protocols*" are paid in full.[50]  ERCOT does not dispute the validity of the Texas Legislature's amendments to PURA enacted through SB 1580.

22.     At least three provisions in SB 1580 unambiguously provide that the "full" amount Brazos owes ERCOT for energy charges during Winter Storm Uri must be "calculated *solely* according to the protocols" in effect during the storm.[51]  ERCOT, however, argues that the statute actually means that the amount should be calculated according to the PUCT Orders, or perhaps the Protocols *and* the PUCT Orders.[52]  That interpretation violates numerous canons of statutory construction.  Under Texas law, courts "presume the Legislature chose the statute's language with care, purposefully choosing each word, while purposefully omitting words not chosen."[53]  If the

---

[48] *See* PURA § 39.160(a) (emphasis added).  The electric cooperative securitization statute, PURA § 41.151, includes nearly identical language authorizing cooperatives to securitize amounts owed to ERCOT "calculated solely according to the protocols [of ERCOT] in effect during the period of emergency."  *Id.* § 41.151(b)(1).

[49] *See* § 39.160(b).

[50] *See id.*

[51] Tex. Util. Code §§39.160(a)-(b); 41.151(b)(1) (emphasis added).

[52] ERCOT Summary Judgment Motion ¶ 35.

[53] *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

Texas Legislature intended the PUCT Orders to be used to calculate the amounts owed, it would have said so.[54]

23.    Courts "must apply [Texas] statutes as written and refrain from rewriting text that lawmakers chose."[55]  The Texas Legislature's "voted-on language is what constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, the judge's inquiry is at an end."[56]  By ERCOT's admission, the PUCT Orders conflict with the pricing provisions contained in the Protocols, and did not amend those Protocols.[57]  The Protocols in effect "during the period of emergency," specifically, "the period beginning 12:01 a.m., February 12, 2021, and ending at 11:59 p.m., February 20, 2021"[58] did ***not*** include firm load shed as a scarcity-pricing factor.[59]  Thus, where the statute says Brazos's liability must be calculated "solely" according to the Protocols in effect during the period of emergency, it ***cannot*** refer to the PUCT Orders.

24.    ERCOT attempts to avoid SB 1580 by focusing on the securitization amendments under PURA § 41.151 and ignoring the amendments unrelated to securitization under PURA

---

[54] The Texas Legislature knows the difference between PUCT Orders and the ERCOT Protocols. *Compare, e.g.*, TEX. UTIL. CODE § 39.151(l) ("No operational criteria, ***protocols***, or other requirement established by an independent organization, including the ERCOT independent system operator, may adversely affect or impede any manufacturing or other internal process operation associated with an industrial generation facility . . .) *with* TEX. UTIL. CODE § 39.253(a)(1) (50 percent of those costs shall be allocated in accordance with the methodology used to allocate the costs of the underlying assets in the electric utility's most recent ***commission order*** addressing rate design.").

[55] *Davis v. Morath*, 624 S.W.3d 215, 222 (Tex. 2021).

[56] *Pruski v. Garcia*, 594 S.W.3d 322, 325 (Tex. 2020) (quotations omitted).

[57] Ex. 13, Testimony of ERCOT Interim CEO Brad Jones before the Texas Senate Business and Commerce Committee at 7:14-19, 8:24-25 (May 4, 2021) ("The market rules themselves weren't changed, but what's important to know is the market rules weren't followed.  The decision by the [PUCT] and ERCOT, as an advisor to the [PUCT], was made . . . to hold those prices at [$]9,000. . . .  [O]nce that decision was made, that overrode the ERCOT protocols at that point."); Ex. 5, Magness Dep. Tr. 222:10-17; ERCOT Motion for Summary Judgment ¶ 33 (Describing the PUCT Orders' requirement to reflect firm load shed in ERCOT's scarcity pricing signals: "the PUCT Orders prevailed over any conflicting term in the SFA or the Protocols.").

[58] PURA § 41.151 defines the period of emergency as "the period beginning 12:01 a.m., February 12, 2021, and ending at 11:59 p.m., February 20, 2021."  *Id.* § 41.151(b)(1).

[59] *See, e.g.,* Amended Answer ¶ 114 ("ERCOT admits that 'firm load shed' was not listed as a 'reliability deployment' in Protocol 6.5.7.3.1 during Winter Storm Uri . . . .").

§ 39.160.  That statute concerns the **collection** of Winter Storm Uri costs and **twice** defines the amount owed for the period during the storm as amounts "**calculated solely according to the protocols in effect during the period of emergency**."[60]

25.     Moreover, ERCOT's construction of SB 1580's securitization provisions is flawed. First, if Brazos is to employ the securitization statute as a part of its plan to exit bankruptcy, then the provisions are applicable and pertinent to this proceeding.  Second, ERCOT's contention that PURA § 41.151(b)(1) refers to the PUCT Orders violates the plain language of the statute.  The statute requires "a cooperative that owes" ERCOT "amounts incurred as a result of operations during the period beginning 12:01 a.m., February 12, 2021, and ending at 11:59 p.m., February 20, 2021" to "use all means necessary to securitize the amount owed [ERCOT], calculated solely according to the protocols of [ERCOT] in effect during the period of emergency promulgated subject to the approval of the commission . . . ."  As discussed above and in the Debtor's Summary Judgment Motion, because the Protocols in effect during the storm did not include firm load shed in the scarcity-pricing signals, this statutory language cannot refer to the PUCT Orders.  The clause "subject to the approval of the commission" simply describes the fact that the Protocols are subject to the PUCT's approval—it does not refer to a prior PUCT order that conflicted with the Protocols then if effect.  If there were any doubt about the meaning of the clause, such doubt is laid to rest by reference to PURA § 39.160(a), which does not contain the "subject to approval" clause.  When the descriptions of the "full" amount Brazos owes to ERCOT contained in SB 1580 are read together, the Texas Legislature's intent to refer to the Protocols, and not the PUCT Orders, is beyond serious dispute.[61]

---

[60] PURA § 39.160(a), (b) (emphasis added).

[61] *Sommers v. Sandcastle Homes, Inc*., 521 S.W.3d 749, 755 (Tex. 2017) ("Absent a plainer pronouncement from the Legislature, we must read the provisions together as a contextual whole . . . .").

v. ***ERCOT was not authorized under the PUCT Orders to ignore the Protocols when it stopped shedding load.***

26.     The PUCT Orders contained one clear directive to ERCOT: "ensure that ***firm load that is being shed*** in EEA3 is accounted for in ERCOT's scarcity pricing signals."[62]   ERCOT then manipulated the Protocol-based pricing algorithm to account for firm load shed, first by inputting the actual amount of load shed ERCOT had directed as a component of the RDPA[63] and later by manually substituting actual load shed for a fictional, static value of 20,000 MW (*i.e.*, the maximum amount of load that ERCOT can shed) in order to keep prices at $9,000/MWh.[64] ERCOT initially reported to Brazos and other market participants that, consistent with the PUCT Orders, the "static value" adjustment would "be set to 0"—thereby restoring the Protocol-mandated algorithm and the usual market rules—as soon as ERCOT stopped "instructing firm Load shed. . . ."[65]   ERCOT again did not do what it said.   Instead, though ERCOT stopped instructing firm load shed just a couple hours later, it kept manipulating the RDPA adjustment until 9 a.m. on February 19th.[66]   ERCOT's actions plainly violated the SFA and the Protocols, and impermissibly inflated ERCOT's claim against the estate by $641 million.

27.     Accordingly, Brazos submits that the ERCOT Summary Judgment Motion on Count 1 should be denied.

---

[62] Ex. 14, PUC Docket No. 51617, Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules at 2 (Feb. 16, 2021) (emphasis added).  The February 16 order rescinded the February 15 order's directive that ERCOT adjust prices issued prior to the order.

[63] Ex. 15, ERCOT February 15, 2021 Market Notice M-C021521-01 (PUCT 0013531).

[64] Ex. 16, ERCOT February 17, 2021 Market Notice M-C021521-03 (PUCT 0204695).

[65] *Id*.

[66] *See* Amended Answer ¶ 58; Amended Complaint ¶ 58; Ex. 17, Bivens Dep. Tr. 40:9-14, 41:16-18.

**B.      ERCOT's request for summary judgment on Count 2 should be denied as there are material questions of fact concerning the extent to which ERCOT mitigated its damages.**

28.      Count 2 of the Amended Complaint seeks a partial reduction in the amount of ERCOT's claim related to its refusal to mitigate its damages by failing to reprice the market for the 33-hour period after load shed ceased.  Texas contract law and section 8(D) of the SFA[67] both impose upon ERCOT a duty to mitigate its damages as a party asserting a breach of contract claim.[68]  ERCOT cannot, consistent with the SFA and state law, set a wholesale market price in contravention of the Protocols (and, for the 33 hours period from 11:55 p.m. on February 17th to 9:00 a.m. on February 19th, the PUCT Orders) and then refuse to mitigate its potential damages for nonpayment.

29.      Under Protocol § 9,[69] ERCOT had the ability and the authority to correct its erroneous pricing and retroactively adjust Real-Time Market prices.[70]  Specifically, Protocol § 9.5.6(1) authorizes the ERCOT board to direct a resettlement of real-time prices "at any time, to address unusual circumstances."  ERCOT chose not to use that authority—contrary to its statutory and contractual duties to mitigate its damages—and instead seeks to saddle Brazos with an estimated $640 million in additional liabilities.  Moreover, ERCOT could have spurred

---

[67] *See* Ex. 1, Section 8(D) of the SFA provides the following:

> Duty to Mitigate. Except as expressly provided otherwise herein, each Party shall use commercially reasonable efforts to mitigate any damages it may incur as a result of the other Party's performance or non-performance of this Agreement.

[68] *See Electric Reliability Council of Texas, Inc. and Defendant-Intervenors' Response in Opposition to Debtor's Motion for Judgment on the Pleadings and for Entry of an Order Striking Certain Expert Opinions* [Adv. Dkt. No. 293] (ERCOT admitting that "[t]he doctrine of mitigation applies to breach of contract claims and the longstanding law of this state requires that *if a claimant can mitigate with reasonable effort or trifling expenses they must do so.*") (citing *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W. 2d 854, 857 (Tex. 1999)) (emphasis added).

[69] Ex. 2, Protocol § 6.3.

[70] It is undisputed that ERCOT staff had clear authority to reprice the $9,000/MWh charges within 30 days of the relevant operating days when the charges were assessed.  *See, e.g.,* Ex. 18, Opinion No. KP-0363 of the Attorney General of Texas issued on March 17, 2021 (confirming that ERCOT had the legal authority to change and correct its excessive prices).

additional generation that it might have needed at a much lower cost through the effective use of the Protocols' Reliability Unit Commitment (or "RUC") procedure.

30.     ERCOT seeks summary judgment on Count 2 based on three arguments: (a) ERCOT asserts that the PUCT and Texas Legislature made a "policy decision" not to revisit Real-Time Market prices, and ERCOT had to comply; (b) ERCOT did "RUC" generation units during the storm; and (c) Brazos's argument is legally flawed because a seller is not required to reduce its invoices.  ERCOT's argument that it is powerless to independently exercise its judgment and rights under the Protocols is contrary to its own position and has no firm basis in the applicable law (here, the Protocols).  On the one hand, ERCOT has repeatedly argued that it had no choice but to obey the PUCT's directive to brush aside the market rules and set power prices during Winter Storm Uri.  On the other hand, Bill Magness, ERCOT's then-CEO, ***chose*** to exceed the PUCT's mandate[71] (and defy ERCOT's representation to Brazos and the rest of the market) by failing to adjust the RDPA after ERCOT stopped directing load shed.  ERCOT also had the authority under Texas law to revisit the issue, but chose not to; and now, it asserts a claim against Brazos under the SFA in this Court in an effort to collect hundreds of millions of dollars arising under the 33-hour period.  ERCOT cannot have it both ways.  ERCOT must stand in the shoes of an ordinary breach-of-contract plaintiff and cannot under the SFA and applicable law[72] pursue amounts that should have never been charged to Brazos and that ERCOT is authorized by law to correct.

31.     Nevertheless, there are genuine disputes concerning facts material to the Court's consideration of Count 2 that must be resolved at trial.  For example, although ERCOT argues that

---

[71] Ex. 5, Magness Dep. Tr. 281:19-282:6; Ex. 17, Bivens Dep. Tr. 46:6–12.

[72] *See, e.g., Great Am. Ins. Co. v. N. Austin Mun. Util. Dist.*, 908 S.W.2d 415, 426 (Tex. 1995) ("[T]he doctrine of mitigation of damages . . . prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff.").

the PUCT has determined that the 33-hour period should not be repriced, the PUCT entered into a "Rule 11 Agreement" shortly after the storm in connection with litigation concerning whether the PUCT had made a final decision on whether Winter Storm Uri charges should be repriced.[73] The Rule 11 Agreement states unequivocally that "[the PUCT] has not prejudged or made a final decision on whether to reprice."[74]

32.     Accordingly, Brazos believes that the Court's consideration of Count 2 in the Amended Complaint requires that the factual record be fully and finally developed and respectfully requests that the Court deny the ERCOT Summary Judgment Motion in respect of Count 2.

**C.     ERCOT's request for summary judgment on Count 3 shows a continued misunderstanding of Count 3, again ignores the SFA's plain terms, and should be denied.**

33.     ERCOT continues to struggle to address directly the Amended Complaint's allegations and the SFA's plain language as applied to Count 3.[75]   The Amended Complaint does not ask the Court to excuse Brazos from its obligation to pay amounts validly owed to ERCOT under the SFA and Protocols.[76]   In Count 3, Brazos asserts a simple, two-paragraph objection to ERCOT's Amended Proof of Claim:  to the extent that ERCOT asserts a claim for default damages under the SFA on account of the occurrence of a "Default" related to Winter Storm Uri, any such

---

[73] *See* Ex. 12, *Luminant Energy Company, LLC v. Public Utility Commission of Texas*, (No. 03-21-00098-CV), Texas Third Court of Appeals; Ex. 19, D'Andrea Dep. Tr. 121:15-122:21.

[74] Ex. 20, Rule 11 Agreement.  Under Rule 11 of the Texas Rules of Civil Procedure, attorneys and parties to a lawsuit are authorized to execute and file "Rule 11 Agreements" as to nearly any issue or matter in a given lawsuit (*e.g.*, a settlement agreement or an agreement not to challenge certain facts), and that agreement is then binding and enforceable against such parties.  *See* TEX. R. CIV. P. 11.

[75] What ERCOT really wants from the Court on Count 3 is unclear.  Despite moving for summary judgment in its favor, ERCOT ultimately requests that Count 3 be "dismissed with prejudice."  ERCOT Summary Judgment Motion ¶ 46.

[76] To the contrary, Brazos has in numerous filings plainly stated that the entire purpose of this claim-objection proceeding is to determine, among other things, the amount that Brazos **owes to ERCOT** under the SFA and the Protocols.

claim must be disallowed.[77]  Those amounts are not enforceable against Brazos under the SFA

because no "Default" occurred in light of Brazos's assertion of a force majeure event.  For the

purposes of Count 3:  if a Force Majeure Event[78] occurs that renders a party unable to perform any

obligation, and that party gives notice to the other within 14 days,[79] that party is not relieved of its

obligations under the SFA or the Protocols ***except that*** such nonperformance does not constitute a

"Default" under the SFA.[80]  It is only liquidated and unliquidated claims (if any) arising as a result

---

[77] *See* Amended Complaint ¶¶ 143-144.

[78] Under the Protocols, which are incorporated into the SFA, a "Force Majeure Event" means "[a]ny event beyond the reasonable control of, and that occurs without the fault or negligence of, an Entity whose performance is prevented by the occurrence of such event. Examples of such a Force Majeure Event may include the following, subject to the limitations of the above sentence: an act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, breakage or accident to machinery or equipment, or a curtailment, order, regulation or restriction imposed by governmental, military, or lawfully established civilian authorities."  *See* Ex. 2, Protocol § 2 (Definitions and Acronyms).

[79] *See* Ex. 1, SFA § 8(C)(1).  The full text of section 8(C)(1) is as follows:

> If, due to a Force Majeure Event, either Party is in breach of this Agreement with respect to any obligation hereunder, such Party shall take reasonable steps, consistent with Good Utility Practice, to remedy such breach.  If either Party is unable to fulfill any obligation by reason of a Force Majeure Event, it shall give notice and the full particulars of the obligations affected by such Force Majeure Event to the other Party in writing or by telephone (if followed by written notice) as soon as reasonably practicable, but not later than fourteen (14) calendar days, after such Party becomes aware of the event.  A failure to give timely notice of the Force Majeure event shall constitute a waiver of the claim of Force Majeure Event.  The Party experiencing the Force Majeure Event shall also provide notice, as soon as reasonably practicable, when the Force Majeure Event ends.

[80] *See* Ex. 1, SFA § 8(C)(2).  The full text of section 8(C)(2) is as follows, with emphasis added to the provision ERCOT left out of its Summary Judgment Motion:

> Notwithstanding the foregoing, a Force Majeure Event does not relieve a Party affected by a Force Majeure Event of its obligation to make payments or of any consequences of non-performance pursuant to the ERCOT Protocols or under this Agreement***, except that the excuse from Default provided by subsection 8(A)(5) above is still effective***.

*See also id.*, SFA § 8(A)(5).  Section 8(A)(5) provides in full:  "If, due to a Force Majeure Event, a Party is in breach with respect to any obligation hereunder, such breach shall not result in a Default by that Party."  The defined term "Default" is set forth in section 8(A)(1) of the SFA as follows (with emphasis added):

> ***Failure by Participant to (i) pay when due, any payment or Financial Security obligation owed to ERCOT or its designee, if applicable, under any agreement with ERCOT ("Payment Breach"), or (ii) designate/maintain an association with a QSE (if required by the ERCOT Protocols) ("QSE Affiliation Breach"), shall constitute a material breach and event of default ("Default")*** unless cured within one (1) Bank Business Day after ERCOT delivers written notice of the breach to Participant. Provided further that if such a material breach, regardless of whether the breaching Party cures the breach within the allotted time after notice of the material breach, occurs more than three (3) times in a 12-month period, the fourth such breach shall constitute a Default.

of an alleged capital "D" default under the SFA that must be disallowed (in the typical case, things like default interest, attorneys' fees, *etc.*), not the entire Amended Proof of Claim, as ERCOT repeatedly suggests.  Under the SFA, Brazos is not in "Default" on account of any obligations related to Winter Storm Uri.  ERCOT does not directly engage Brazos's allegations and instead responds by offering a reading of the SFA that makes superfluous the "force majeure" exception.[81] Consequently, as a matter of law, ERCOT is not entitled to judgment ***in its favor*** on Count 3.

34.     Here, a force majeure event did occur[82] and Brazos served ERCOT with the requisite notice under the SFA.[83]  The SFA, as drafted, dictates that Brazos is not in "Default" for any nonperformance related to Winter Storm Uri and, therefore, any claim that ERCOT has asserted in its proof of claim for amounts arising on account of such "Default" is unenforceable against Brazos.[84]  Count 3 only asks that the Court issue a ruling that confirms the plain language of the relevant SFA provisions.

35.     Accordingly, ERCOT's request for summary judgment on Count 3 must be denied.

---

[81] *See, e.g., Transitional Learning Cmty. at Galveston, Inc. v. U.S. Off. of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000) (". . . a contract should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous").

[82] *See also, e.g.,* ERCOT Amended Answer, Affirmative Defenses ¶ 14 (asserting an affirmative defense "because any alleged harm or loss for which Debtor seeks relief arose from an Act of God."); *Motion for Certification of Direct Appeal*, Civil Action No. 4:21-cv-03692 [Dist. Ct. Dkt. No. 20] ("ERCOT Certification Motion"), at 2, 4, 5 (asserting that Winter Storm Uri was an "*unprecedented public emergency*," causing "*extremely unusual weather conditions*" that "*resulted in extraordinary hardship*," and an "*unprecedented demand for electricity*," which threatened "*complete failure of the electricity grid.*").

[83] *See* Ex. 21, Force Majeure Notice dated February 25, 2021.  That notice has never been disputed in this Court or anywhere else.

[84] ERCOT makes passing reference to "Brazos's multiple events of default beyond [] its failure to timely pay," which defaults apparently include a "failure to comply with the ERCOT Protocols, and filing a petition for bankruptcy."  *See* ERCOT Summary Judgment Motion ¶ 43.  ERCOT cannot credibly argue that its Amended Proof of Claim is premised on or encompasses a purported breach under the SFA that does not also relate to Winter Storm Uri and, thus, fall within the section 8(A)(5) exception.  Moreover, Brazos notes that, if the SFA is an executory contract as ERCOT contends, Brazos's bankruptcy filing is not an enforceable "event of default" as a matter of black letter law.  *See, e.g.,* 11 U.S.C. § 365(e).

**D.    Counts 4 and 5 are not ripe for summary judgment because they require a fact-intensive inquiry to determine whether the estate received reasonably equivalent value.**

36.    ERCOT's request for summary judgment on Counts 4 and 5 is premised on the contention that ERCOT's claim amount was dictated by the PUCT Orders and, therefore, is *per se* reasonable.  This contention is flawed in multiple respects.

37.    First, as set forth above, the PUCT Orders do not provide a legal basis for ERCOT's claim.  The PUCT Orders were directed at ERCOT, not Brazos.[85]  Brazos's obligations to ERCOT are defined by the SFA and applicable Protocols in effect during Winter Storm Uri.

38.    Second, even if Brazos's obligations to ERCOT could somehow be construed to have arisen under the PUCT Orders (which Brazos contests), ERCOT fails to cite any authority holding that a price unilaterally dictated by one counterparty in response to a regulator's directive is reasonable as a matter of law in any context, let alone in the context of a fraudulent obligation claim.

39.    Rather, in the fraudulent obligation context, determining reasonably equivalent value is inherently fact-intensive.[86]  Further, courts have consistently emphasized the importance of a competitive, functioning market for establishing the reasonableness of value.[87]

---

[85] *See, supra,* note 33.

[86] *In re Dunham,* 110 F.3d 286, 289 (5th Cir. 1997) ("The reasonable equivalency inquiry is ordinarily fact-intensive, as the court bases its determination upon subsidiary fact findings regarding the value of the property transferred and the value received in the exchange."); *In re Chicago Mgmn't Consulting Group, Inc.,* 929 F.3d 803, 810 (7th Cir. 2019) ("Whether value was given is a question of fact . . ."); *In re Chase & Sanborn Corp.,* 904 F.2d 588, 593 (11th Cir. 1990) (fair consideration is a question of fact).

[87] *Iridium IP LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value, and when available to the Court, is the preferred standard of valuation.") (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007)); *see also Bank of America Nat. Trust and Sav. Ass'n v. 203 North La Salle Partnership,* 526 U.S. 434, 457 ("the best way to determine value is exposure to a market").

40.    Indeed, in the mortgage or tax lien foreclosure context, courts have consistently held that whether a foreclosure price in accordance with applicable state law constitutes reasonably equivalent value under Bankruptcy Code section 548[88] is contingent upon a competitive and public sale process.[89]  No such functioning and competitive market existed in the case of the prices unilaterally set by ERCOT after issuance of the PUCT Orders; indeed, those prices were based on manual inputs into an algorithm made for the admitted purpose of manipulating the price for market participants above the price that was actually clearing in the market.[90]

41.    The absence of a functioning, competitive market precludes reliance upon the prices resulting from ERCOT's intervention in the market during Winter Storm Uri.[91]  Regardless of the motivation for the market manipulation (or even whether the manipulation was a policy choice believed to serve a common good), the fact that price was manipulated and therefore determined by factors other than the market precludes the prices purportedly charged under the

---

[88] Although Brazos did not bring affirmative avoidance claims under Bankruptcy Code section 548, the Court should look to cases interpreting section 548 when construing Brazos's section 502(d) defenses to prevent ERCOT's recovery on account of a fraudulent obligation.

[89] *In re Murphy*, 331 B.R. 107, 120 (Bankr. S.D.N.Y. 2005) ("Where property is seized without a sale or competitive bidding, there cannot be a presumption as a matter of law that reasonably equivalent value was received ***because market forces were completely absent***.") (emphasis added); *Fed. Nat'l Mortgage Assoc. v. Fitzgerald (In re Fitzgerald)*, 237 B.R. 252, 266 (Bankr. D. Conn. 1999) ("Neither judicial oversight nor the technical ability of the mortgagor to elect a foreclosure by sale in lieu of strict foreclosure makes up for the absence of an *actual* public foreclosure sale") (emphasis in original); *Sherman v. Rose (In re Sherman)*, 223 B.R. 555, 559 (B.A.P. 10th Cir. 1998) (tax foreclosure sale pursuant to Wyoming statute did not constitute reasonably equivalent value because the statute did not provide for competitive bidding).

[90] *See* Ex. 11, PUC Docket No. 51617, Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 15, 2021); Ex. 14, PUC Docket No. 51617, Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 16, 2021).

[91] *See In re Pilgrim's Pride Corp.*, 421 B.R. 231, 244 (Bankr. N.D. Tex. 2009) (noting that, while natural gas that is publicly traded on the commodities market might be valued "based on the price at which it could be purchased during the relevant period on the commodity market," goods sold to Debtors by a utility and therefore not priced by an open, functioning market, "may not be so easily valued."); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 109-110 (Bankr. S.D.N.Y. 1999) ("the posted prices of" stock during the time when a party "was actively manipulating the market" was "not an appropriate measure of [the stock's] value for purposes of § 548(a)(1)(B)."); *see also In re Chemtura Corp.*, 439 B.R. 561, 586 & n. 106 ("financial accounting techniques (such as capitalizing expenses without writing them down to realizable value) or fraud can give the marketplace a distorted impression of" value).

PUCT Orders from constituting fair market prices.  The actual fair market value and the reasonableness of the value in relation to the services provided by ERCOT will be determined by this Court at trial.

42.    For purposes of the ERCOT Summary Judgment Motion, the existence of a disputed and material fact issue alone warrants denial, and there are multiple disputed fact issues regarding the reasonableness of the $2.2 billion[92] charged to Brazos during Winter Storm Uri. Although ERCOT moved for summary judgment on the sole basis that it is entitled by law (at least when it is responding to a PUCT order) to determine reasonably equivalent value for power sold in the Real-Time and Day-Ahead Markets, ERCOT and certain intervenors have argued that "[t]he detailed fact-finding and valuation entailed in the reasonably equivalent value analysis often requires the fact finder to assess the contrary opinions of the competing experts" and that the expert opinions ERCOT and the intervenors submitted "contain multiple insights into the value of the energy that Brazos purchased from ERCOT, with direct relevance for Counts 4 and 5."[93]

43.    Moreover, ERCOT's motion admits that actual prices clearing in the market during Winter Storm Uri fluctuated significantly both prior to and after issuance of the PUCT Orders and were, at least at times, significantly below $9,000/MWh.[94]  The PUCT Orders also acknowledge that prices in the actual market were "clearing at less than $9,000" and as low as $1,200, as well

---

[92] The referenced $2.2 billion gross amount takes into account a reduction of approximately $350 million of collateral posted by Brazos that ERCOT unilaterally swept pre-petition and applied to outstanding invoices. Brazos has reserved all rights relating to the sweep of this collateral, calculation of and accounting for the amount swept, and Brazos's ability to have the collateral applied to any amounts ultimately determined to be owed to ERCOT pursuant to the Amended Complaint.

[93] *Electric Reliability Council of Texas, Inc. and Defendant-Intervenors' Response in Opposition to Debtor's Motion for Judgment on the Pleadings and for Entry of an Order Striking Certain Expert Opinions* [Adv. Dkt. No. 294], ¶ 66 (internal quotation marks and citations omitted).

[94] ERCOT Summary Judgment Motion, ¶ 50.

as acknowledging the PUCT's alleged intent to raise prices above the actual market to reach $9,000/MWh.[95]

44.    Additionally, as set forth above, ERCOT has admitted that it manually manipulated the Protocol-based algorithm to reprice the wholesale power market and ensure that prices would stay artificially inflated at $9,000/MWh for days on end.[96]  The resulting increase in charges to Brazos's real time market statements because of this manual adjustment reaches **over $1.1 billion**,[97] clearly showing that prices in a truly competitive market would have been much lower absent the adjustment and precluding ERCOT's assertion that the $9,000/MWh constitutes reasonably equivalent value.

45.    Finally, the PUCT Orders did not authorize ERCOT to continue "adjusting" the algorithm after load shed ceased.  As set forth above, ERCOT stopped instructing firm load shed at 11:55 p.m. on February 17th, but did not change the inflated pricing until 9 a.m. on February 19th—a 33 hour period.

46.    For all the above reasons, there is a substantial and genuine issue of fact regarding the reasonableness of the pricing that is the basis of ERCOT's claim, and the Court should deny the ERCOT Summary Judgment Motion on Counts 4 and 5.

**E.    ERCOT's request for summary judgment on Count 8 should be denied because the nature of the transactions underlying ERCOT's claim and the relevant circumstances were extraordinary and have never occurred in Brazos's history with ERCOT.**

47.    ERCOT cannot, as a matter of law, carry its burden to demonstrate that the energy provided to Brazos through the Real-Time and Day-Ahead Markets during Winter Storm Uri was

---

[95] *See* Ex. 11, PUC Docket No. 51617, Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 15, 2021); Ex. 14, PUC Docket No. 51617, Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 16, 2021).

[96] *See* Ex. 8, Ogelman Dep. Tr.  39:24–40:11 (Nov. 4, 2021).

[97] *See* Joint Stipulation.

sold in the ordinary course of Brazos's business.[98]  ERCOT's request for summary judgment is premised upon an "ordinary course" definition that is contrary to section 503(b)(9)'s plain terms and is without the support of precedent.

   i.  ***ERCOT misreads the statute's plain, unambiguous language to expand its scope and meaning.***

48.     Throughout this proceeding, ERCOT has asserted positions that, in effect, contend that the usual rules of construction and interpretation should not apply.  ERCOT's attempt to apply section 503(b)(9) here fits that approach and should be rejected.  The statute is clear:  a creditor's claim is entitled to administrative priority only for certain goods "sold to the debtor in the ordinary course of ***such debtor's business***."[99]  ERCOT, however, argues that the Court should define ordinary course under section 503(b)(9) by "what is commonplace for both the debtor ***and the industry as a whole***."[100]  ERCOT is correct that there is no test prescribed by precedent to determine when a transaction is "ordinary" under section 503(b)(9), but ERCOT's construction of the statute not only conflicts with the statute's plain language, it ignores the close attention paid by Congress to language concerning the evaluation of whether a transaction is in the "ordinary course."  Instead, ERCOT analyzes tests applied under other provisions in the Bankruptcy Code and in the Uniform Commercial Code (the "UCC") to justify its foray into the market place and read into section 503(b)(9) an objective ordinary course test.  If Congress had intended that section

---

[98] For the avoidance of doubt, as set forth in Counts 6 and 7 of the Amended Complaint, Brazos believes that neither the energy nor ancillary services that it purchased from ERCOT during Winter Storm Uri constitute "goods" for purposes of section 503(b)(9).  *See* Amended Complaint ¶¶ 154-161.  The failure of ERCOT to meet its burden on even ***one*** element of its 503(b)(9) claim defeats its ability to obtain administrative priority status.  *See, e.g., Pilgrim's Pride*, 421 B.R. at 240.

[99] 11 U.S.C. § 503(b)(9) (emphasis added).

[100] ERCOT Summary Judgment Motion ¶ 53 (emphasis added); *see id.* ¶¶ 62-63 (arguing that "[t]he transactions at issue are customary for the industry.").

503(b)(9) must include an "objective," industry-focused standard, it could have said so, but it did not.[101]

49.     Although some bankruptcy courts in other jurisdictions have looked to the UCC and other Bankruptcy Code provisions for guidance in construing other terms in section 503(b)(9), none of those cases (or any other applicable authorities) supports the simplistic, *per se* rule ERCOT puts forth here.  In essence, ERCOT argues that because Brazos purchases power in the ERCOT market in the course of its business, ***any*** such transaction is in the ordinary course of Brazos's business, regardless of the amount, nature, or circumstances surrounding that transaction.[102]

50.     The Court is not constrained to examine only the ***kind*** of transaction or ignore every aspect of that transaction or other facts relevant to its nature and potential impact on the estate.[103] Such a rule would run contrary to the narrow construction given to section 503 administrative expenses in the Fifth Circuit (and in most other jurisdictions),[104] the core bankruptcy principal of

---

[101] For example, section 547(c) provides a statutory defense to certain avoidance actions based on both a subjective and an objective ordinary-course test, *see* 11 U.S.C. § 547(c)(2)(B), while the phrase "ordinary course of business" under section 363(b) is not so limited in order to achieve different policy goals, *see* 11 U.S.C. § 363(b)(1); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986) ("The 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate").

[102] *See, e.g.,* ERCOT Summary Judgment Motion ¶¶ 57-61("Brazos cannot dispute that it participates in the ERCOT Day-Ahead and Real-Time Markets as part of its ordinary course of business—and, in fact, it is its policy to do so on most days.  And because Brazos's participation in the ERCOT Day-Ahead and Real-Time Markets—no matter the price of energy—is in the ordinary course of Brazos's business, Brazos may participate in the ERCOT market during the pendency of its bankruptcy").

[103] *See, e.g., In re SemCrude, L.P.*, 416 B.R. 399 (Bankr D. Del. 2009) (noting that, while there is a presumption under section 503(b)(9) that the purchase price is the best determinant of value, that "presumption . . . may be rebutted by evidence indicating that, ***under the facts and of a particular transaction***, the purchase or invoice price is not an appropriate or relevant indicator of the 'value' obtained by the Debtors") (emphasis added).  *See also, e.g., Morey Mach. Co. v. Great W. Indus. Mach. Co.*, 507 F.2d 987, 989 (5th Cir. 1975) (finding that the buyer was not in the ordinary course where close relation of the buyer and the seller raised concern that the sale was effected to protect the collateral from the seller's creditor).

[104] Courts have consistently held that administrative priorities under section 503(b), including section 503(b)(9), must be applied narrowly because an administrative claim is contrary to the Bankruptcy Code's principal of equitable distribution among unsecured creditors.  *In re United Merchants & Manufacturers, Inc.,* 597 F.2d 348, 349 (2d Cir. 1979)); *In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("It is generally the policy in bankruptcy to distribute assets of the estate equally to creditors . . . Such a policy requires that any statutory priority be narrowly construed."); *see also In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992); *In re Pilgrim's Pride Corp.*,

equitable distribution to creditors underlying the Bankruptcy Code, and the many decisions holding that charges incurred under extreme circumstances, in unusual amounts, or in a manner inconsistent with the parties' historical dealings are typically not ordinary under the Bankruptcy Code.[105]  Moreover, such a simplistic, *per se* rule reads out of section 503(b)(9) the requirement that goods be received "in the ordinary course of such debtor's business," as, under ERCOT's interpretation, there would be no other circumstances in which Brazos could possibly receive power from ERCOT.  ERCOT's allegation is essentially that ***any time*** Brazos purchases power from ERCOT, no matter the circumstances, that transaction is inherently ordinary.  The undisputed facts here, in conjunction with many others, take ERCOT's claim far outside ***Brazos's*** "ordinary course" under any rational definition of the term.[106]

ii.   ***The undisputed facts make clear that the transactions at issue fall outside the ordinary course of Brazos's business***

51.   The relevant facts at issue in Count 8 are not contested.  Rather, ERCOT prefers that the Court put on blinders and ignore all of the facts that make Brazos's transactions with

---

421 B.R. 231, 240 n. 9 (holding that 503(b)(9) should be narrowly construed); *In re Northstar Offshore Grp., LLC*, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020) ("Generally, section 503(b) priorities should be narrowly construed to maximize the value of the estate for all creditors.") (quoting 4 Collier on Bankruptcy ¶ 503.06[2] (Richard Levin & Henry J. Sommers eds., 16th ed.)); *In re Texas Pellets, Inc.*, No. 16-90126, 2017 WL 6508974, at *2 (Bankr. E.D. Tex. Dec. 19, 2017) (stating that "[section] 503(b) is narrowly construed in order to hold administrative expenses to a minimum amount and thus preserve the estate assets for the benefit of all creditors.").

[105] ERCOT has not identified a single case that confronts the kind of extraordinary facts at issue here under any test developed under the UCC or the Bankruptcy Code, and Brazos is unaware of any such case.  *See In re SemCrude, L.P.*, 504 B.R. 39,64 (Bankr. D. Del. 2013) (analyzing the applicability of certain UCC "ordinary course" defenses in various lien-priority litigations between creditors, ***not*** in respect of a section 503(b)(9) claim asserted against a bankruptcy estate); *SemCrude, L.P.*, 416 B.R. 399 (noting that the court need not look "beyond" the UCC in construing section 503(b)(9)); *In re PMC Marketing Corp.*, 517 B.R. 386 (B.A.P 1st Cir. 2014) (vacating decision finding that electricity is a "good" based on the debtor's relationship with the utility and remanding with instruction to focus on whether electricity itself qualifies as a "good"); *Johns-Manville*, 60 B.R. 612 (discussing the debtor's employment of nonattorney lobbyists as an ordinary-course activity under Bankruptcy Code section 363's "vertical" and "horizontal" tests).

[106] Brazos's initial objection to the ERCOT Claim [Dkt. No. 930]—which has since been withdrawn—argued that the underlying transactions could not satisfy the horizontal, vertical, or UCC-based tests.  *See id.* ¶¶ 76-82.  Generally, however, Brazos notes that where the Bankruptcy Code contemplates that both tests could be applied, "[i]f either test or dimension is not satisfied, most likely the disputed transaction is not in the ordinary course of business."  *In re Media Cent., Inc.*, 115 B.R. 119, 124 (Bankr. E.D. Tenn. 1990).

ERCOT during the storm truly extraordinary.[107]  Brazos's transactions with ERCOT during Winter

Storm Uri are unlike any others in Brazos's more than 30-year history with ERCOT.  Since the

deregulation of Texas's wholesale power market in 1999, ERCOT has ***never*** sold power to Brazos

premised on a PUCT price-setting order; it has ***never*** sold power to Brazos based on a "manual

adjustment" to the Protocol-based pricing algorithm; it has ***never*** sold power to Brazos at a fixed

price outside of the SFA and the then market-approved Protocols, it has ***never*** sold power to Brazos

during a force majeure event.  Those facts combined to result in a gross $1.8 billion ERCOT

invoice for energy sold to Brazos, including a five-day period based on a price fixed at

$9,000/MWh—the highest possible point—for more than three consecutive days (including the

33-hour period after the PUCT Orders expired);[108] an invoice amount that is more than ***double***

Brazos's total power cost for all of 2020 and instantly surpassed the total amount of Brazos's then-

outstanding secured debt.[109]  The size, nature, and circumstances surrounding the ERCOT Claim

could not have been reasonably anticipated by Brazos or anyone else.[110]  Indeed, as a point of

comparison, ERCOT's monthly round-the-clock prices for wholesale electricity during November

2020 and through January 2021 were in the range of $21/MWh to $29/MWh, and in August 2020

(typically the season for "peak demand" in the ERCOT power region), monthly round-the-clock

---

[107] Notably, even the Texas Legislature, through certain of SB 1580's PURA amendments, acknowledged the extraordinary nature of Winter Storm Uri and the associated costs and expenses.  *See* PURA § 41.151(a) (noting that the purpose of the statute is to enable electric cooperatives "to recover ***extraordinary costs and expenses*** incurred due to the ***abnormal weather events*** . . . .") (emphasis added).

[108] *See* Joint Stipulation.

[109] *See Declaration of Clifton Karnei in Support of Chapter 11 Petition and Emergency First-Day Motions* [Dkt. No. 3] ¶ 56 ("The Black Swan Winter Event caused ERCOT wholesale market to  incur charges of $55 billion over a seven-day period, an amount equal to what it ordinarily incurs over four years. Notwithstanding Brazos Electric's efforts to leverage low prices available in ERCOT through various markets, including real-time energy market and the Day-Ahead Market, Brazos' share of those charges are estimated at $2.1 billion for the seven-day Black Swan Winter Event, whereas Brazos Electric's total power cost in 2020 was $774 million. The $2.1 billion for seven days is more than the amount of Brazos Electric's total outstanding secured debt to FFB/RUS").

[110] As discussed above, ERCOT and market participants had considered and specifically rejected a proposal to include firm load shed in the Protocols' scarcity-pricing factors.  *See, supra,* ¶ 14.

prices for wholesale electricity peaked at $128.88/MWh during a Texas heat wave.[111]  Neither Brazos, nor ERCOT, nor any other creditor, could have reasonably expected that Brazos would enter February 2021 with "A" to "A+" credit ratings and strong economic outlook, and by month's end find itself in chapter 11 with its unsecured liabilities more than doubled.[112]  Yet, in ERCOT's view, this was all "ordinary" for Brazos and the estate.

52.    Winter Storm Uri was unlike any storm Texas has seen in memory.[113]  It unleashed an avalanche of unforeseeable consequences for Brazos and its estate.  None of those consequences transformed the estate as drastically as ERCOT's decision to—for the first time in Brazos's history with ERCOT—set aside its obligations under the SFA and the Protocols and intervene in the wholesale market by "administratively adjusting" the Protocols' existing scarcity-pricing triggers[114] and inputting fictional data into an algorithm to ensure that prices would not move below $9,000/MWh.[115]  ERCOT's Independent Market Monitor testified that she had **never** seen ERCOT take such an extreme measure before.[116]

---

[111] *See id.* ¶ 53.

[112] *See id.* ¶¶ 13, 46-48, 62-64.

[113] *See* Ex. 22, Magness Dep. Ex. 2 ("No, the February 2021 event was much more severe than the 2011 event. As ERCOT noted in its March 18. 2021 response to the Committee's questions, low temperatures in the major load centers of Dallas, Houston, San Antonio, and Austin were 13 degrees, 21 degrees, 19 degrees, and 18 degrees, respectively, while low temperatures for those same cities during the 2021 event were -2 degrees, 13 degrees, 12 degrees, and 6 degrees, respectively. Also, the 2021 event involved snowfall of several inches or more across most of the state in 2021, which did not occur in 2011. The duration of the period below freezing during the 2021 event was also much longer than it was during the 2011 event.").

[114] *See* Ex. 2, Protocol § 6.5.7.3.1; Ex. 17, Bivens Dep. Tr. 26:22-27:8 (███████████████████████████ ███████████ ).

[115] ERCOT's Motion for Dismissal and Abstention ¶ 20 (citations and quotations omitted); *see also* Ex. 15, ERCOT February 15, 2021 Market Notice M-C021521-01; Ex. 16, ERCOT February 17, 2021 Market Notice M-C021521-03.

[116] *See* Ex. 17, Bivens Dep. Tr. 61:11–61:21 (██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ), 62:5–8 ("████████████████████████████████████████████ ████████████ ").

53.     ERCOT's actions, right or wrong, were allegedly prompted by a first-of-its-kind mandate issued by the PUCT over a holiday weekend (when market participants were effectively unable to react) ***during*** the ongoing, unprecedented storm.  The PUCT Orders, like ERCOT's implementation of them, are also unlike any other event in Brazos's history with ERCOT.  As ERCOT's then-CEO testified, he "had not before seen a [PUCT] order that told ERCOT to change the prices in that way."[117]  No party to this proceeding has identified any actions or circumstances similar to those that gave rise to the ERCOT Claim.  Those actions resulted in ERCOT selling energy to Brazos at $9,000/MWh for roughly 83 hours.[118]  While the Protocols—when they were allowed to function as designed—resulted in ***intermittent*** $9,000/MWh pricing both during Winter Storm Uri and before, prices were ***never*** pegged at that level.  Before Uri, the two longest periods where energy prices hit the system-wide offer cap during prior winter storms were for a total of (a) six hours in 2011 and (b) just over one hour in 2014.[119]

54.     Nothing in the Bankruptcy Code suggests that the Court cannot look at these facts in evaluating what is, or is not, ordinary for Brazos and the estate.  Bankruptcy courts have observed that "[s]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary."[120]  For example, when applying the "subjective"[121] or "vertical"[122] components of the "ordinary course of business" definition under

---

[117] *See* Ex. 5, Magness Dep. Tr. 230:13-230:20 (Nov. 11. 2021).

[118] *See*  Ex. 8, Ogelman Dep. Tr. 40:9–41:10 (Nov. 5, 2021).

[119] Ex. 23, Expert Report of Matthew W. Tanner, PhD at § IV.A.i.

[120] *In re Waterfront Companies, Inc. v. Johnston*, 56 B.R. 31, 35 (Bankr. D. Minn. 1985).

[121] 11 U.S.C. § 547(c)(2)(A) (referring to transfers "made in the ordinary course of business or financial affairs ***of the debtor*** and the transferee.") (emphasis added).  A court assessing this "subjective prong" under section 547(c) makes a factual inquiry into the prior dealings between the parties.  *In re Vogel Van & Storage, Inc.*, 210 B.R. 27, 34 (N.D.N.Y. 1997), *aff'd*, 142 F.3d 571 (2d Cir. 1998).

[122] The vertical dimension, or creditor's expectation test, views the disputed transaction 'from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.'" *In re Dant & Russell, Inc.*, 853 F.2d 700, 705 (9th Cir.

Bankruptcy Code section 363 which, like section 503(b)(9), focus on the course of a particular debtor's business, courts consistently hold that transactions that are especially large or otherwise unusual are outside the debtor's ordinary course even when the debtor typically executes such transactions for its business.[123]  Cases addressing the "subjective prong" of the ordinary course defense to the trustee's avoidance powers also consistently recognize that transactions that are extraordinarily large or made under markedly different circumstances than usual are not made in the ordinary course of the debtor's business.  "[T]he cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor."[124]  Under this test courts consistently hold that payments that are much higher than previous payments are outside the usual course and may be avoided.[125]  Other

---

1988) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)).  "The vertical component necessarily includes an examination of the pre-petition relationship between the debtor and his creditors to determine whether the transaction in question was ordinary in the context of that relationship."  *In re Poff Const., Inc.*, 141 B.R. 104, 106 (W.D. Va. 1991).

[123] For example, in *In re Patriot Place, Ltd.*, the debtor landlord issued a notice of termination purporting to terminate its tenant's lease in the debtor's shopping center.  The court noted that, while the debtor's business was operating the shopping center, this termination was still outside of the ordinary course of the landlord's business because it terminated the lease of the debtor's largest rent-paying tenant.  486 B.R. 773 (Bankr. W.D. Tex. 2013).  Similarly, the court in *In re Leslie Fay Companies, Inc.* held that a postpetition amendment to a collective bargaining agreement fell outside of the ordinary course of the debtor's business because, while the debtor had previously entered into amendments modifying the collective bargaining agreement, the amendment in question was "fundamentally different" from any prior agreement in that it "both contain[ed] terms different from and whose magnitude greatly exceed any similar agreement into which the parties previously entered."  168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).  S*ee also In re Century Brass Prods.*, 107 B.R. 8, 11 (Bankr. D. Conn. 1989) (holding that large post-petition severance pay agreements entered into between debtor and debtor's officer were not in the ordinary course of business because, while the debtor had granted severance pay benefits to its employees in the past, the severance pay provisions at issue were "a radical departure from any prior severance-pay benefits granted to any of the debtor's employees.").

[124] *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr. W.D. Okla. 1986); *In re Conex Holdings, LLC*, 522 B.R. 480, 487 (Bankr. D. Del. 2014); *see also In re Essential Fin. Educ., Inc*., 629 B.R. 401, 449–50 (Bankr. N.D. Tex. 2021) (listing four elements: "(1) the length of time the parties were engaged in transactions prior to the preference period; (2) whether the amount or form of tender differed from past practices; (3) whether the creditor engaged in any unusual collection or payment activities prior to the transfers; and (4) the circumstances under which the transfers were made").

[125] For example, in *In re Hayes Lemmerz Intern., Inc.*, the court held that a payment of certain invoices was outside the normal range established during the parties' business relationship.  While the transfer was made on the same weekly schedule as a previous transfer, it was substantially larger in amount than previous payments, and appeared to have been influenced by the supplier's letter requiring advance payment by wire (rather than check) going forward and to pay all outstanding amounts before business could resume.  337 B.R. 49 (Bankr. D. Del. 2006).  Similarly, the court in *In re McElroy* held that a debtor's payment of $10,000 to his parents on antecedent debt following the

extreme changes in the course of dealing or otherwise normal transactions between the debtor and transferee can also place a transaction outside the "ordinary course" of a debtor's business.[126]

55.     That ERCOT contends that its actions were sanctioned by state law and consistent with the Protocols is irrelevant under section 503(b)(9).  Given the dearth of precedent, the statute directs the Court to consider the "ordinary course of [Brazos's] business" to determine whether ERCOT's massive claim is entitled to priority.  That analysis should take into account the Fifth Circuit's directive to narrowly construe priority provisions to grant administrative-expense treatment only to those otherwise unsecured creditors that clearly meet the statute's requirements, a policy informed by the Bankruptcy Code's goal of achieving an equal distribution among creditors.  Here, ERCOT's manual pricing intervention in response to a regulator's unprecedented price-setting orders is what gave rise to the vast majority of its purported $1.8 billion administrative claim.[127]  No such transaction has ever before occurred in Brazos's three-decade history with ERCOT or any other counterparty.  Almost overnight, ERCOT "swamped" the claim of every other unsecured creditor of the estate, and imperiled Brazos's ability to continue as a market

---

settlement of his personal injury claims was not in the ordinary course of business because, while the court acknowledged that the debtor had regularly paid $50.00 to $60.00 per month to his parents, it held that the payment of $10,000 was extraordinary.  *See* 228 B.R. 791 (Bankr. M.D. Fla. 1999); *see also In re Vunovich*, 74 B.R. 629, 631 (Bankr. D. Kan. 1987) (holding that, while the debtor made previous monthly payments in the amount of roughly $95, his final payment of $3,181.31 before filing bankruptcy greatly exceeded the ordinary monthly amount and was therefore not made according to the ordinary business terms between the debtor and transferee).

[126] *See, e.g., In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568 (3d Cir. 2007) (affirming the bankruptcy court's ruling that, where the debtor was pressured to make accelerated payments under vigorous enforcement of the debtor's credit limit, such changes (among others) in the parties' relationship were "extreme" and "out of character with the long historical relationship between these parties."); *In re Essential Financial Education, Inc.*, 629 B.R. 401, 450 (Bankr. N.D. Tex. 2021) (holding that a transfer was outside of the ordinary course of the debtor's business where the transferee (not unlike ERCOT during Winter Storm Uri) exercised "unilateral control" over the sale price and mechanics for payment of the same).  *See also In re Whistler Energy II, LLC*, 608 B.R. 655, 661 (Bankr. E.D. La. 2019) (unprecedented contract amendment rendered transfer outside the ordinary course of the debtor's business).

[127] Standing alone, the fact that ERCOT's $1.8 billion claim allegedly entitled to administrative priority status occurred entirely within the 20-day period prior to the Petition Date, where Brazos normally incurs only **one-third** of such amount in a **one-year** period, exemplifies the extraordinary nature of these transactions.  The lack of precedent cited by both ERCOT and Brazos further emphasizes the extraordinary nature of such a massive claim incurred in such a short period of time.

participant and deliver reliable, affordable power to its Members' and more than 1.5 million Texans.  Granting ERCOT's claim special status under the circumstances would undermine the Bankruptcy Code's policies and goals.

56.     In light of the extensive, undisputed record already established in this proceeding, ERCOT simply cannot carry its burden to demonstrate that the entirety of its claim "fit[s] clearly within the priority statute in order to be granted a priority claim."[128]   Accordingly, Brazos respectfully requests that the Court deny the ERCOT Summary Judgment Motion on Count 8 and grant the Committee's Summary Judgment Motion on Count 8.

## <u>CONCLUSION</u>

WHEREFORE, Brazos respectfully requests that the Court enter the attached proposed order, denying the ERCOT Summary Judgment Motion in its entirety and granting Brazos such other and further relief as it deems just and proper under the circumstances.

[*Remainder of Page Intentionally Left Blank*]

---

[128] *See Pilgrim's Pride*, 421 B.R. at 240.

Dated:  January 12, 2022                                    Respectfully submitted,
        Houston, Texas


**EVERSHEDS SUTHERLAND (US) LLP**          **NORTON ROSE FULBRIGHT US LLP**

By: */s/ Lino Mendiola*                     By: */s/ Jason L. Boland*
Lino Mendiola (SBT 00791248)                Jason L. Boland (SBT 24040542)
Michael Boldt (SBT 24064918)                Julie G. Harrison (SBT 24092434)
Jim Silliman (SBT 24081416)                 Maria Mokrzycka (SBT 24119994)
One American Center                         1301 McKinney Street, Suite 5100
600 Congress Ave., Suite 2000               Houston, TX 77010
Austin, TX 78701                            Telephone: (713) 651-5151
Telephone: (512) 721-2700                   Facsimile: (713) 651-5246
Facsimile: (512) 721-2656                   Email: jason.boland@nortonrosefulbright.com
Email: linomendiola@eversheds-sutherland.us Email: julie.harrison@nortonrosefulbright.com
Email: michaelboldt@eversheds-sutherland.us Email: maria.mokrzycka@nortonrosefulbright.com
Email: jimsilliman@eversheds-sutherland.us

                                            Paul Trahan (SBT 24003075)
*Special Counsel for the Debtor and Debtor in*   98 San Jacinto Boulevard, Suite 1100
*Possession*                                Austin, TX  78701
                                            Telephone: (512) 536 5288
**O'MELVENY & MYERS LLP**                   Facsimile: (512) 536 4598
Louis R. Strubeck, Jr. (SBT 19425600)       Email: paul.trahan@nortonrosefulbright.com
Nick Hendrix (SBT 24087708)
2501 North Harwood Street                   Steve A. Peirce (SBT 15731200)
Dallas, Texas 75201                         111 West Houston Street, Suite 1800
Telephone: (972) 360-1925                   San Antonio, TX  78205
Email: lstrubeck@omm.com                    Telephone:  (210) 270-7179
Email: nhendrix@omm.com                     Facsimile:  (210) 270-7205
                                            Email: steve.peirce@nortonrosefulbright.com

*Co-Counsel for the Debtor and Debtor in*
*Possession*                                *Counsel for the Debtor and Debtor in Possession*

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing document was served upon the counsel for parties of record in this Adversary Proceeding, electronically through the Bankruptcy Court's Electronic Case Filing System on those parties that have consented to such service on the 12th day of January, 2022.

*/s/  Maria Mokrzycka*
Maria Mokrzycka