## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER,<br>COOPERATIVE, INC.[1]<br><br>Debtor. | Chapter 11<br><br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC., *et al.*[2]<br><br>Plaintiffs,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF<br>TEXAS, INC., *et al.*[3]<br><br>Defendants. | <br><br><br>Adv. Proc. No. 21-03863 (DRJ) |

## RESPONSE OF CALPINE CORPORATION, TENASKA POWER SERVICES CO., NRG ENERGY, INC., ENGIE ENERGY MARKETING NA, INC., TALEN ENERGY SUPPLY, LLC, SOUTH TEXAS ELECTRIC COOPERATIVE, INC., AND NEXTERA ENERGY MARKETING, LLC IN OPPOSITION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT
[Relates to Adv. Dkt. No. 281]

---

[1] The Debtor in this chapter 11 case, along with the last four digits its federal tax identification number is:  Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the website of the Debtor's proposed claims and noticing agent at http://cases.stretto.com/Brazos.  The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

[2] The Plaintiff-Intervenors in this adversary proceeding are:  the Official Committee of Unsecured Creditors, Mid-South Electric Cooperative Association; Denton County Electric Cooperative, Inc., d/b/a CoServ Electric; United Electric Cooperative Services, Inc., d/b/a United Cooperative Services; Tri-County Electric Cooperative, Inc.; Bartlett Electric Cooperative, Inc.; Comanche County Electric Cooperative Association; Cooke County Electric Cooperative Association, Inc. d/b/a PenTex Energy; Hamilton County Electric Cooperative Association; Heart of Texas Electric Cooperative, Inc.; J-A-C Electric Cooperative, Inc.; Navasota Valley Electric Cooperative, Inc.; and Wise Electric Cooperative, Inc.

[3] The Defendant Intervenors in this adversary proceeding are:  Calpine Corporation; Tenaska Power Services Co.; NRG Energy, Inc.; ENGIE Energy Marketing NA, Inc.; Talen Energy Supply, LLC; Golden Spread Electric Cooperative, Inc; South Texas Electric Cooperative; and NextEra Energy Marketing, LLC.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND..............................................................................................4

LEGAL STANDARD..........................................................................................................9

ARGUMENT .......................................................................................................................9

      A.     The Committee Ignores The Horizontal and Vertical Tests For Determining Ordinary Course Transactions—Which Are Met Here. ...........................................9

      B.     The Committee's Motion Should Be Denied Because Market-Wide Terms Do Not Render A Transaction Outside the Ordinary Course As A Matter Of Law. ...............................................................................................................13

      C.     Ordinary Course Status Should Not Depend on One Market Participant's Hedging Strategy. ................................................................................................16

      D.     Even If The Committee's Position Applies, There Are Genuine Issues Of Material Fact As To Whether Their Standard Is Met. ...........................................17

CONCLUSION...................................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Federal Cases**

*In re Cowin*, No. 13–30984, 2014 WL 1168714 (Bankr. S.D. Tex. Mar. 21, 2014) ....................10

*In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir. 1988) ...............................................................10

*Dep't of Revenue of Ore. v. ACF Indus., Inc.*, 510 U.S. 332 (1994) .............................................11

*In re Great Atl. & Pac. Tea Co.*, 498 B.R. 19 (S.D.N.Y. 2013) ...................................................11

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)...............................................................................11

*Haverda v. Hays Cnty.*, 723 F.3d 586 (5th Cir. 2013) ......................................................................9

*In re Hechinger Inv. Corp. v. Univ. Forest Prods. (In re Hechinger Inv. Co.)*, 489 F.3d
 568...........................................................................................................................................14

*Huennekens v. Marx (In re Springfield Contracting Corp.)*, 154 B.R. 214 (Bankr. E.D.
 Va. 1993)..................................................................................................................................14

*In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986) ...............................................13

*In re Lavigne*, 114 F.3d 379 (2d Cir. 1997) ...................................................................................10

*LeMaire v. La. Dep't of Tranp. & Dev.*, 480 F.3d 383 (5th Cir. 2007) ..........................................9

*In re Magwood*, No. 07–11288–DHW, 2008 Bankr. LEXIS 479 (Bankr. M.D. Ala. Feb.
 22, 2008) .................................................................................................................................11

*Nat'l Gypsum Co. v. Fortulakis (In re Nat'l Gypsum Co.),* No. 95-10569, 1996 U.S. App.
 LEXIS 45187(5th Cir. Apr. 8, 1996) ......................................................................................10

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ...............................................................................10

*In re Roth Am., Inc.*, 975 F.2d 949 (3d Cir. 1992).........................................................................10

*In re Semcrude, L.P.*, 416 B.R. 399 (Bankr. D. Del. 2009)............................................................11

*In re SemCrude, L.P.*, 504 B.R. 39 (Bankr. D. Del. 2013) ............................................................13

*Sherman v. OTA Franchise Corp. (In re Essential Fin. Educ., Inc.)*, 629 B.R. 401 (Bankr.
 N.D. Tex. 2021) .......................................................................................................................14

*In re World Imports, Ltd.*, 862 F.3d 338 (3d Cir. 2017) ................................................................12

*Wyatt v. Hunt Plywood Co.*, 297 F.3d 405 (5th Cir. 2002)...........................................................9

*Xtra Inc. v. Seawinds Ltd.* (*In re Seawinds Ltd.*), 91 B.R. 88 (Bankr. N.D. Cal. 1988) ...............14

**Federal Statutes**

Bankr. C. § 363 ...........................................................................................................................14

Bankr. C. § 364 ...........................................................................................................................10

Bankr. C. § 503(b)(9).............................................................................................. *passim*

Bankr. C. § 546(c)........................................................................................................................12

Bankr. C. § 547 ...........................................................................................................................10

**Federal Rules**

Fed. R. Bankr. P. 7056 ..................................................................................................................9

Fed. R. Civ. P. 56 ..........................................................................................................................9

Fed R. Civ. P. 56(a) .......................................................................................................................9

**Texas Statutes**

16 Tex. Admin. Code 25.505(g)(6)(B) ..........................................................................................8

16 TEX. ADMIN. CODE § 25.501(a) .............................................................................................8

Tex. Bus. & Com. Code § 1.209(b)(9) .........................................................................................12

**Texas Regulations**

31 Tex. Reg. 7317 (2006) .............................................................................................................8

31 Tex. Reg. 7335 (2006) .............................................................................................................8

**Other Authorities**

Fed. Energy Reg. Comm'n, *Electric Power Markets* (Jul. 20, 2021),
    https://www.ferc.gov/electric-power-markets ......................................................................4

Testimony of Bill Magness testimony to Senate Committee on Jurisprudence (March 11,
    2021) ....................................................................................................................................8

Calpine Corporation, on behalf of itself and each of its affiliates, including but not limited to Calpine Energy Services, L.P., Calpine Energy Solutions, LLC, and Cavallo Energy Texas, LLC (collectively, "Calpine"); Tenaska Power Services Co. ("TPS"); NRG Energy, Inc., on behalf of itself and each of its affiliates, including but not limited to Direct Energy LP, NRG Cedar Bayou Development Company, LLC, NRG South Texas LP, NRG Texas Power LLC, NRG Power Marketing LLC, and Cirro Group, Inc. (collectively, "NRG"); ENGIE Energy Marketing NA, Inc., on behalf of itself and each of its affiliates, including but not limited to Anson Solar Center LLC, Live Oak Wind Project LLC, Engie Long Draw Solar LLC, Las Lomas Wind Project LLC, Jumbo Hill Wind Project, LLC, Prairie Hill Wind Project, LLC, Solaire Holman 1 LLC, Seymour Hills Wind Project LLC and Engie Resources LLC (collectively, "ENGIE"); Talen Energy Supply, LLC, on behalf of itself and each of its affiliates, including but not limited to Talen Energy Marketing, LLC (collectively "Talen"), South Texas Electric Cooperative ("STEC"), and NextEra Energy Marketing, LLC (together with Calpine, TPS, NRG, ENGIE, and STEC, the "Defendant Intervenors"), hereby file this response in opposition (the "Response") to the *Official Committee of Unsecured Creditors' Motion for Summary Judgment* [Adv. Dkt. No. 281] (the "Motion") and respectfully state as follows.[4]

## PRELIMINARY STATEMENT

1.      Buying and selling a commodity that is inherently subject to fluctuations in price is at the center of the Debtor's business and industry.  Creditors reasonably expected this Debtor to purchase electricity at the market-wide price that all participants bore during the twenty-day period leading up to the bankruptcy.  The Debtor has continued to do just that post-bankruptcy, without any specific authority from this Court.  Had the storm or a heat wave hypothetically occurred after

---

[4] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Motion.

Brazos filed for chapter 11 relief, it would not have needed an order approving its purchases, at a price dictated by the Texas regulatory regime and market, to meet the needs of Texas consumers. Yet, notwithstanding more than 80 years of this Debtor buying and selling electricity during Texas's scorching summers and frigid winters in the ordinary course of business, the Official Committee of Unsecured Creditors (the "Committee") seeks summary judgment, contending that the Debtor's purchase of electricity in February 2021 was outside the ordinary course.

2.       The Committee and Debtor short-change the horizontal and vertical tests for determining "ordinary course" of business, and the cases they cite focus on changes to the timing of payments, quantities, or credit terms of a single distressed party or trustee under court supervision, that creditors would not have expected.  Here, however, the change in circumstances that the Debtor and Committee spotlight—the price—was not specific to one distressed party. Brazos incurred charges at a price that was publicly known and applied equally to all buyers and sellers through ERCOT.  The Debtor's purchases were made pursuant to a long-standing standard form agreement, and on the same terms and conditions that *all* businesses in the Debtor's industry faced.

3.       In the Debtor's original objection to ERCOT's claim, the Debtor correctly identified the standard to determine whether goods sold to the Debtor by ERCOT and the Defendant Intervenors were made in the ordinary course under section 503(b)(9):

> Although "ordinary course" is not defined in the Bankruptcy Code or the legislative history for section 503(b)(9), in determining whether a transaction qualifies as "ordinary course," the courts use the "horizontal" dimension test (i.e., "the way businesses operate within a given industry") and the "vertical" dimension test (i.e., whether the transaction is consistent with the reasonable "expectations of creditors"). "The horizontal dimension test focuses on whether other businesses in the same industry engage in the same type of transaction on a regular basis. The

vertical dimension test focuses on the expectations of creditors of the estate."[5]

4.      ERCOT rightfully adopted the same standard in its motion for summary judgment. In its reply briefing and joinder in support of the Committee's Motion, however, the Debtor has now done an about-face.  Contrary to its original position, the Debtor now asks this Court to ignore the way businesses operate within its industry, the expectations of its creditors, and facts related to how other market participants reacted to Winter Storm Uri.  The Debtor and Committee concede that there is no case law supporting their new position, yet they ask this Court to adopt it despite a wealth of case law on what constitutes "ordinary course" in other contexts, bankruptcy and otherwise.

5.      As dramatic as Winter Storm Uri was, the prices and regulatory responses were consistent with market expectations and established law.  The Committee's Motion is based on the fact that ERCOT complied with the PUCT orders—orders whose validity the Committee does not purport to challenge.  Market participants across the state of Texas made purchases at the same price and time as this Debtor.  There was no significant change in the Debtor's strategy or how it operated during the twenty-day period relevant to the 503(b)(9) claims of the Defendant Intervenors and ERCOT.  The purchases the Debtor made during that time, as compared to its historic business practices and the practices of all those in its industry, were done in the ordinary course of business for purposes of section 503(b)(9) of the Bankruptcy Code.  The Committee's motion for summary judgment on Count 8 of the Amended Complaint, in which the Debtor also joins, should be denied.

---

[5] *See Debtor's Objection To Electric Reliability Council Of Texas, Inc.'s Proof Of Claim* [Dkt. No. 930] ("Debtor Claim Objection"), ¶ 76 (internal citations omitted).

## FACTUAL BACKGROUND

### The ERCOT Market

6.      The ERCOT market is predicated on dynamic, real-time pricing fluctuations to continuously reflect changes in supply and demand.  The Texas power market was opened to participants through a lengthy legislative and regulatory process that applied free market principles with imbedded safeguards to address extraordinary events.  By structural design, it is an energy-only market "intended to include occasional large price spike events."[6]  Unlike every other RTO/ISO in the United States, in Texas generators are not paid in a parallel "capacity market" or similar system for merely being available.[7]  Nevertheless, demand fluctuates, and the electric grid has an acute need for reliability when load is high.  To meet spikes in demand, prices must be set to induce maximum generation and maximum curtailment of load.  The ERCOT market pricing accordingly includes mechanisms for various adders that produce elevated energy prices in times of scarcity.[8]  These price adders provide adequate compensation for critical units to cover fixed costs, compensate (particularly industrial) customers to reduce demand in times of scarcity, and create incentives for generators to invest in increasing system capacity to the benefit of all Texans. Such adders can produce the substantial changes in price that are necessary for ERCOT to function reliably as an energy-only market.

7.      This intentional, underlying commercial framework is well-known to all market participants and therefore reasonably expected to be known by their creditors.

---

[6] Ex. 1, *Opening Expert Report of Frank C. Graves Principal at the Brattle Group* (the "Brattle Report") § G.

[7] *Id.* § B.1; Fed. Energy Reg. Comm'n, *Electric Power Markets* (Jul. 20, 2021), https://www.ferc.gov/electric-power-markets.

[8] Ex. 1, Brattle Report § B.3.

***The Debtor's Participation in the ERCOT Market***

8.      Since the creation of the ERCOT market, the Debtor's business has been premised on participating in it.  In fact, the Debtor purchases and sells power in the ERCOT market every day, in obvious reliance on the ERCOT market design and the regulatory framework that supports it.[9]  The Debtor entered into its most recent Standard Form Market Participant Agreement (the "SFA") in 2015.[10]  The SFA provides that it is subject to, among other authorities, "orders of any Governmental Authority."[11]  The SFA also provides that, in the event of a conflict between the SFA and such an order, the order "shall prevail."[12]

9.      During the Debtor's time operating in the ERCOT market, prices have hit the system-wide high offer cap (the "HCAP" amount, which also reflects the administratively determined "value of lost load" during scarcity conditions) at various points, including most recently in August 2019.[13]  As the Debtor has noted, ███████████████████████████████ ████████████████████████████████████[14]  Extreme weather is not necessarily a precondition for scarcity pricing—████████████████████████████████████[15] Ultimately, the market and industry in which the Debtor operates is, by design, one of dynamic

---

[9] Ex. 2, Deposition of Clifton Karnei, Nov. 18, 2021, 20:20-25 █████████████████████████ █████████████████, 26:20-25, 27:1-3 ████████████████████████████████████████ ████████.

[10] Ex. 3, SFA.

[11] *Id.* § 11(L).

[12] *Id.*

[13] Ex. 4, Deposition of Carrie Bivens, 63:24-25, 64:1-15; Ex. 5, Deposition of Joshua Clevenger, Nov. 12, 2021, 284:10-20 ████████████████████████████████████████ ███████████████████████████████ Ex. 6, Deposition of Joshua Clevenger, Nov. 16, 2021, 121:13-21.

[14] Ex. 7, Brazos Board Planning Session, September 29, 2020, pages 36-38 (BRAZOS_000007944-7946).

[15] Ex. 8, Deposition of Clifton Karnei, November 19, 2021, 15:15-16.

pricing.  Such dynamic pricing is designed to ensure the overall reliability of the grid by providing incentives to support adequate supply for reliable operations.[16]  Consistent with this design, prices for electricity typically fluctuate the most during severe weather patterns when demand threatens to outstrip supply, creating scarcity conditions and increasing the probability that blackouts (referred to as load shed) will be required to preserve reliability of the grid.  Market participants in the ERCOT market are well aware of scarcity pricing and how ERCOT prices to account for scarcity;[17] indeed, the Debtor itself has such familiarity, which is not surprising, given that an officer of the Debtor was a member of ERCOT's board for more than twenty years, including prior to and during the relevant events.[18]

10.     Beginning at least as early as February 4, 2021, weather reports began to show likely arctic weather for the week of February 14, 2021.[19]  As February 14 approached, the forecast continued to deteriorate, and most market participants took mitigation steps.  For example,



[20]

[21] Going into the storm,

---

[16] Ex. 1, Brattle Report § B.1.

[17] The Debtor participated in the ERCOT Nodal Protocol Revision Request ("NPRR") meetings in which the price adders at issue in this case were codified in the Protocols back in 2013 (with the Debtor voting in favor).  *See* NPRR 568, November 2013, Real-Time Reserve Price Adder Based on Operating Reserve Demand Curve, available at https://www.ercot.com/files/docs/2013/11/19/568nprr_25_board_report_111913.doc.     During those meetings, ERCOT's Credit Working Group stated that "implementation of NPRR568 will not impact the current credit calculations, but ***potentially higher prices will increase the risk profile and default risk of the market and increase the frequency of higher prices***, and that it is anticipated that prices will be more volatile and increase credit requirements to Counter-Parties," (emphasis added).

[18] Ex. 2, Deposition of Clifton Karnei, November 18, 2021, 15:7-23; *see also* Ex. 7, Brazos Board Planning Session, September 29, 2020, pages 36-38 (BRAZOS_000007944-7946)████████████████████████████████████████████.

[19] Ex. 1, Brattle Report § C.1.

[20] Ex. 5, Deposition of Joshua Clevenger, Nov. 12, 2021, 162:6-25, 163:2-20.

[21] *Id.*; Ex. 8, Deposition of Clifton Karnei, Nov. 19, 2021, 26:14-24.

[REDACTED] [22]

[REDACTED]

[REDACTED] [23]

11.     Starting on February 14, sub-freezing temperatures drove customer demand that in turn pushed the grid to a new winter demand peak.[24]  The ERCOT market responded as anticipated, as it is uncontroverted that prices reached the $9,000/MWh offer cap prior to any action by the PUCT.[25]  As demand continued to soar, however, supply dramatically and unevenly decreased as power plants went offline, in many cases because their natural gas supply failed or was cut.[26]  At one point, Texas had lost nearly half of all electric generation in the ERCOT market, requiring ERCOT to direct firm load shed (rolling blackouts) to preserve the integrity of the grid.[27]  As a result, the cost to generate electricity from gas-fueled power plants increased dramatically—a cost that many market participants, including the Defendant Intervenors, chose to incur in reliance on the $9,000/MWh price.

12.     Even though scarcity was at its maximum as load was being shed, to the surprise of many, prices dropped to as low as $1,200/MWh.[28] [REDACTED]

[REDACTED]

---

[22] *See, e.g.*, Ex. 9, Brazos Electric Cooperative, February 2021 Power Cost Estimate, February 4, 2021 (BRAZOS_000090309); Ex. 10, Brazos Electric Cooperative, February 2021 Power Cost Estimate, February 12, 2021 (BRAZOS_000100949).

[23] Ex. 5, Deposition of Joshua Clevenger, Nov. 12, 2021, 179:21-25, 180:2-6.

[24] Ex. 1, Brattle Report, Appendix D; Ex. 2, Deposition of Clifton Karnei, Nov. 18, 2021, 99:3-7.

[25] Ex. 2, Deposition of Clifton Karnei, Nov. 18, 2021, 76:2-11; Ex. 8, Deposition of Clifton Karnei, Nov. 19, 2021, 14:11-21.

[26] Ex. 11, ERCOT Letter, dated March 4, 2021, Generator Outages During February 2021 Cold Weather Event (BRAZOS_B0025588-89).

[27] Ex. 12, Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation, dated February 25, 2021.

[28] Ex. 1, Brattle Report § D.1.

████████████████████████[29]   However, ERCOT's systems were reflecting the firm load shed as a *decrease* in demand for power.[30]   The PUCT issued orders to ERCOT on February 15 and 16 to ensure that market prices would reflect the actual scarcity of supply, and to provide incentives to mitigate the risk of complete failure of the electricity grid (collectively, the "Orders").[31]   To implement the Orders, ERCOT made an administrative adjustment in its scarcity pricing mechanism to account for the load that had been shed, which had the effect of pricing electricity at the proper level:  the "value of lost load" or VOLL, which is by regulation $9,000/MWh.  *See* 16 Tex. Admin. Code 25.505(g)(6)(B) and (E) (setting VOLL at the HCAP, which was $9,000/MWh in February 2021).

13.   During the storm, ████████████████████████████████



**Section 503(b)(9) Claims**

14.   ERCOT and substantially all of the Defendant Intervenors filed claims against the Debtor's estate under section 503(b)(9) of the Bankruptcy Code for the value of electricity received

---

[30] Ex. 15, Testimony of Bill Magness testimony to Senate Committee on Jurisprudence (March 11, 2021) 147:4-11.

[31] *See* Exhibits 3 and 4 to *Electric Reliability Council of Texas, Inc.'s Motion for Partial Summary Judgment* [Adv. Dkt. No. 279].  These Orders properly implemented the "scarcity pricing mechanism" rule.  *See* 31 Tex. Reg. 7317 (2006).  This rule, "provides generation with strong incentives to be available on short notice," and "provides load with strong incentives to voluntarily curtail on short notice to save money."  31 Tex. Reg. 7335 (2006).  ERCOT has the authority to set prices unless it is "otherwise directed by the [PUCT]."  16 TEX. ADMIN. CODE § 25.501(a).  Neither the Debtor nor the Committee challenge the validity of the Orders.

[32] Ex. 2, Deposition of Clifton Karnei, November 18, 2021, 119:12-18.

[33] Ex. 1, Brattle Report § E.3.  ████████████████████████████████  *See* tab [ERCOT] in Ex. 16, BRAZOS_000084658.xlsx.

by the Debtor in the twenty days before the petition date, and which was sold to the Debtor in the ordinary course of its business.[34]

## **LEGAL STANDARD**

15.     Rule 56 of the Federal Rules of Civil Procedure is incorporated into adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure.  Fed. R. Bankr. P. 7056. Pursuant to Rule 56, summary judgment is proper only if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  "A genuine dispute as to a material fact exists when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, a court determines that the evidence is such that a reasonable jury could return a verdict for the party opposing the motion." *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013) (citing *LeMaire v. La. Dep't of Tranp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).  An issue of fact is material if it could affect the outcome of an adversary proceeding.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  The Court "must view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party."  *Id.*

## **ARGUMENT**

**A. The Committee Ignores The Horizontal and Vertical Tests For Determining Ordinary Course Transactions—Which Are Met Here.**

16.     The Committee begins its argument with the proposition that there is no "need for judicial explication" for purposes of applying section 503(b)(9), and then invents its own standard unsupported by law.  But this analysis belies the fact that an established standard for determining whether sales were made in the ordinary course of business has long existed:  the "horizontal" and

---

[34] Certain of the Defendant Intervenors' claims also include the value of ancillary services received by the Debtor in February 2021.  The Defendant Intervenors who have such claims maintain that references in this Response to "electricity" apply in equal force to arguments regarding ancillary services.

"vertical" tests. *See* Brazos Claim Objection ¶ 76 ("in determining whether a transaction qualifies as 'ordinary course,' the courts use the 'horizontal' dimension test . . . and the 'vertical' dimension test").[35]

17.     The "horizontal test" determines a transaction is ordinary if it is one typically undertaken by businesses in the debtor's industry while the "vertical test" more subjectively focuses on the practices and operations of the debtor, with the rationale of determining whether the transaction exposed creditors to the type of risk they expected. *See In re Roth Am., Inc.,* 975 F.2d 949, 954 (3rd Cir. 1992). This Court has previously applied such standard.[36] Tellingly, the Debtor previously argued that this standard should apply to this case. *See* Brazos Claim Objection ¶ 76 ("in determining whether a transaction qualifies as 'ordinary course,' the courts use the 'horizontal' dimension test . . . and the 'vertical' dimension test").

18.     For purposes of applying section 503(b)(9), the Committee further presupposes that "little is relevant" with case law interpreting ordinary course in other sections of the Bankruptcy Code, notably sections 364 and 547. But, the Supreme Court has said that "[a] term appearing in several places in the statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). That "different policies" possibly underlie different sections of the Bankruptcy Code does not alter or eviscerate this binding convention of statutory

---

[35] *See also Nat'l Gypsum Co. v. Fortulakis (In re Nat'l Gypsum Co.),* No. 95-10569, 1996 U.S. App. LEXIS 45187(5th Cir. Apr. 8, 1996) (applying the vertical and horizontal test to determine definition of "ordinary course" as used in debtor's plan); *In re Lavigne,* 114 F.3d 379, 384 (2d Cir. 1997) (stating that "two tests have emerged to determine whether a transaction is 'ordinary'"); *In re Roth Am., Inc.,* 975 F.2d 949, 952 n.4 (3d Cir. 1992) (noting that "[t]his framework has been routinely applied by many courts"); *In re Dant & Russell, Inc.,* 853 F.2d 700, 704 (9th Cir. 1988) ("courts interpreting the term [ordinary course of business] have established guidelines which are helpful and persuasive here.").

[36] *See In re Cowin,* No. 13–30984, 2014 WL 1168714 at *43 (Bankr. S.D. Tex. Mar. 21, 2014) (noting there is "some merit" in applying only the "vertical" creditor expectations test).

construction.[37]  Other courts construing section 503(b)(9) have rejected such policy considerations as sufficient grounds to ignore applicable standards and terms.[38]  Instead, courts must follow "the 'normal rule of statutory construction' that 'identical words in the same act are intended to have the same meaning.'"  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (quoting *Dep't of Revenue of Ore. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)).

19.    In asking the Court to fashion a new standard, the Committee also states that it "is aware of no case law interpreting 'ordinary course' in the specific context of section 503(b)(9)." But there is case law on point.  In fact, there are at least two cases in which bankruptcy courts have analyzed "ordinary course" in the context of section 503(b)(9), and each provides guidance that supports the 503(b)(9) standard advanced by ERCOT and the Defendant Intervenors.  In one of these decisions, the court focused on whether the debtor was in the business of buying the goods at issue.  *See In re Magwood*, No. 07–11288–DHW, 2008 Bankr. LEXIS 479, at *1 n.1 (Bankr. M.D. Ala. Feb. 22, 2008) ("The seller does not meet the requirements for an administrative claim under 11 U.S.C. § 503(b)(9) because, *inter alia,* the debtor is not in the business of buying vehicles").  In the second relevant case, the Court noted that "[t]here is nothing in the Code or in the legislative history accompanying the recent enactment of § 503(b)(9) suggesting that Congress intended that bankruptcy courts should look beyond the Uniform Commercial Code to construe or define [ordinary course] as it appl[ies] to sales of goods."  *In re Semcrude, L.P.*, 416 B.R. 399, 405

---

[37] In the specific context of section 503(b)(9), courts have rejected such policy considerations as sufficient grounds to ignore terms' established definitions.  *See In re Great Atl. & Pac. Tea Co.*, 498 B.R. 19, 31 (S.D.N.Y. 2013) (reversing the bankruptcy court's decision predicated on the notion "administrative priorities should be narrowly construed," and directing the bankruptcy court to conduct an evidentiary hearing to determine whether electricity met the definition of goods under the Uniform Commercial Code).

[38] *Id.*

(Bankr. D. Del. 2009);[39] *see also In re World Imports, Ltd*., 862 F.3d 338, 342 (3d Cir. 2017) (concluding that as "Congress meant for terms used in § 546(c) to bear the definitions used in the UCC at the time of BAPCPA's enactment, it follows that the UCC definitions also apply to the § 503(b)(9) exception").  Under the Uniform Commercial Code, which is ultimately the source of the horizontal and vertical analysis in bankruptcy cases,[40] "a person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices." Tex. Bus. & Com. Code § 1.209(b)(9).

20.    The transactions at issue here satisfy the horizontal and vertical tests, made applicable by the words "ordinary course" in section 503(b)(9).  As such, the Committee's Motion fails as a matter of law (and ERCOT should so prevail).  Buying and selling a commodity in a market that is subject to fluctuating prices (with a cap) is the basis of the Debtor's business and industry.  Creditors expected the Debtor to purchase electricity at the market-wide price, as provided by ERCOT and the PUCT.  Since the inception of the ERCOT market for electricity, ██ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████[41]  Creditors expect that ERCOT electricity, like other energy commodities, is subject to changes in pricing as a result of inclement weather.  The high price on which the Committee hangs its hat was a predetermined administrative value, was publicly posted, and applied to all

---

[39] To the extent these statements are dicta, they still provide relevant guidance, particularly in comparison to cases addressing other sections of the Bankruptcy Code.

[40] And presumably, the parties will ask this Court to look to law based on the Uniform Commercial Code for the definition of "goods."

[41] Ex. 8, Deposition of Clifton Karnei, Nov. 19, 2021, 20:23-25 ████████████████████████████████  ██████████████████████  Ex. 6, Deposition of Joshua Clevenger, Nov. 16, 2021, 139:11-13 ████████████████████████

buyers and sellers through ERCOT.  The Debtor's purchases were made pursuant to a standard form agreement that is identical for all market participants.  ERCOT sold the power on a non-discriminatory basis, at a market price and in compliance with all applicable, pre-existing laws. The Debtor's purchases of electricity through ERCOT in the twenty days before the petition date were undertaken on terms and conditions that every other business in the Debtor's industry faced, and that creditors expected.

21.    Taken together, these facts support ERCOT's argument that electricity was purchased in the ordinary course, and they contradict the Committee's conclusory assertions to the contrary.  At the very least, such facts illustrate that the arguments raised by the Committee give rise to a genuine dispute of material fact regarding the Debtor's purchase of electricity in the ordinary course of its business, which takes the Committee's Motion outside the realm of summary judgment.

**B.  The Committee's Motion Should Be Denied Because Market-Wide Terms Do Not Render A Transaction Outside the Ordinary Course As A Matter Of Law.**

22.    The Committee and Debtor ask the Court to investigate whether, as a *per se* rule, "extraordinary prices" and external circumstances rendered a transaction outside the ordinary course.  This would make new law.  *See, e.g.*, *In re SemCrude, L.P.*, 504 B.R. 39, 66–67 (Bankr. D. Del. 2013) ("An increase in sales, by itself, does not operate to turn otherwise ordinary course transactions out of the ordinary").  Fluctuations in market prices, particularly when changing prices are a fundamental part of the design of the commercial system, do not render transactions non-ordinary as a matter of law, as "'ordinary course of business' . . . is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate."  *In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986).  No cases cited by the Committee hold otherwise.  Summary judgment is therefore

improper.

23.     To the contrary, most cases applying the proper ordinary course standard, including those cited by the Committee, focus on changes to the timing of payments, quantities, or credit terms of a single distressed party or trustee under court supervision.[42]  Their synthesized rationale is to protect against a change specific to **one debtor** (or potential debtor) ***that its creditors could not have expected***.  But here, ERCOT charged a market price to ***all*** market participants at a price level that was expected by creditors.  Changes in the market price of a commodity that, by design, is subject to fluctuations in supply and demand—even dramatic ones—especially in periods of severe weather, and priced in accordance with a seven-year-old standard form agreement, cannot render a transaction outside the ordinary course as a matter of law.  Stated differently, valid and generally applicable macroeconomic events do not dictate, as a matter of law, the ordinary course analysis.

24.     Had Brazos filed bankruptcy prior to Winter Storm Uri, would it have needed court authority under section 363 of the Bankruptcy Code to continue operating to meet the needs of Texas consumers?   Defendant Intervenors submit that it would have exercised its business judgment, as it did during Winter Storm Uri, and continued to purchase in the ordinary course without filing an emergency motion or in reliance on any particular first day order.  The law should be, even for debtors-in-possession, that ERCOT and the Texas regulatory regime dictate pricing for electricity bought and sold through the ERCOT market, including during a winter storm or heat wave.  To decide that, as a matter of law, sales to the Debtor during Winter Storm Uri were outside

---

[42] *See In re Hechinger Inv. Corp. v. Univ. Forest Prods.* (*In re Hechinger Inv. Co.*), 489 F.3d 568, 577 (parties changed credit terms); *Xtra Inc. v. Seawinds Ltd.* (*In re Seawinds Ltd.*), 91 B.R. 88, 91-92 (Bankr. N.D. Cal. 1988) (payments made after agreement terminated); *Sherman v. OTA Franchise Corp.* (*In re Essential Fin. Educ., Inc.*), 629 B.R. 401, 450 (Bankr. N.D. Tex. 2021) (creditor engaged in unusual collection practices); *Huennekens v. Marx* (*In re Springfield Contracting Corp.*), 154 B.R. 214, 224 (Bankr. E.D. Va. 1993) (increase in expense reimbursement request by officer of the debtor).

the ordinary course of business would be tantamount to ruling that any changes to market-wide prices would require court approval for a debtor like Brazos. It would also discourage suppliers from selling to debtors during challenging times and run contrary to the theory behind providing administrative priority treatment to sales within twenty days of a bankruptcy filing.

25.     In order to align the system with its legislative design[43] and the expectations of market participants, the PUCT directed ERCOT to account for the actual severe scarcity in the marketplace, including sustained blackouts, in its pricing. While the Debtor may argue that this intervention, the severe scarcity that led to it, and the related pricing were unprecedented, they were not unanticipated. The SFA anticipated such interventions and addressed the effect of governmental orders.[44] The Protocols themselves provided ERCOT with the authority to "develop policies, guidelines, procedures, forms and applications . . . to comply with applicable rules, laws and orders of a Governmental Authority." Protocols § 1.1(2). And once the PUCT Orders were issued, the Debtor could not have expected prices other than what it accepted.

26.     As dramatic as Winter Storm Uri was, the prices and regulatory responses were consistent with market expectations. The market as a whole was keenly aware that scarcity pricing was necessary for the ERCOT market to function according to its design. Indeed, market participants were surprised when market prices *did not* appropriately signal the gravity of the situation. Once the PUCT Orders were issued, the market reacted in accordingly, and the Debtor decided to continue purchasing power at the market clearing price as it always had. During Winter Storm Uri, there was no significant change in the Debtor's strategy or how it operated during the twenty-day period relevant to the 503(b)(9) claims of the Defendant Intervenors and ERCOT.

---

[43] The Texas legislature presumably sought to promote free market principles with the needed accommodation provided by the cap in extraordinary events.

[44] *See* Ex. 3, SFA § 11.

Consumers (and their creditors) expect electric companies to deliver power, even—and perhaps especially—in times of inclement weather.  Hundreds of utilities across the state of Texas made purchases at the same price and time as this Debtor.  This is the essence of ordinary course dealing.

### C.  Ordinary Course Status Should Not Depend on One Market Participant's Hedging Strategy.

27.     As described above, price fluctuations are a part and parcel of the ERCOT market design in which the Debtor conducts its business in the ordinary course.  At times, the Debtor recognized substantial benefits from this market design.  Indeed,



[45] During a period of extended cold weather,

[46]

[47]

28.     Nevertheless,

.[48]

[49]

---

[45] Ex. 1, Brattle Report § G.1; Ex. 8, Deposition of Clifton Karnei, Nov. 19, 2021, 58:12-23.

[46] Ex. 1, Brattle Report § G.1.

[47] Ex. 6, Deposition of Joshua Clevenger, Nov. 16, 2021, 123:8-9 ; Ex. 7, Brazos Board Planning Session, September 29, 2020, pages 36-38 (BRAZOS_000007944-7946).

[48] Ex. 17, *Confidential Expert Report of Todd W. Filsinger and Clifford Watson* § 6.3.3.

[49] *Id.*

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████  The Debtor should not now be rewarded, to the detriment of other market participants, because its ordinary course strategy failed.

### D. Even If The Committee's Position Applies, There Are Genuine Issues Of Material Fact As To Whether Their Standard Is Met.

29.     Even if the Committee's position were adopted by this Court, whether external circumstances are sufficiently extraordinary to render a transaction outside of the ordinary course is an inherently factual question.  No one disputes the extremity of the cold weather during Winter Storm Uri, but the Committee makes little effort to delineate precisely *when and to what extent* things were extraordinary enough to purportedly preclude a 503(b)(9) claim as a matter of law.  As an example, the value on which the section 503(b)(9) claims are premised was provided to the Debtor over a twenty-day period.  Here, the disputed law and facts at issue—including creditor expectations[50]—may break differently over the course of that period and require additional showing at trial.  Accordingly, the Motion should be denied.

### CONCLUSION

For the reasons set forth above, the Defendant Intervenors respectfully request that the Court enter an order denying the Motion, enter an order granting ERCOT's *Motion for Partial Summary Judgment* [Adv. Dkt. No. 280], and grant any other relief to which the Defendant Intervenors may be entitled, whether at law or in equity.

---

[50] The Debtor and UCC's tact is to ignore the expectations of the those participating in the legislatively enacted free market system that underpins ERCOT's role in this market.

Dated:  January 18, 2022
Dallas, TX


By: */s/ Judith W. Ross*
**ROSS & SMITH, PC**
Judith W. Ross
TX Bar No. 21010670
700 North Pearl Street, Suite 1610
Dallas, TX 75201
Telephone:      (214) 377-8659
Email:           judith.ross@judithwross.com

***Counsel to Tenaska Power Services Co.***


By: */s/ Patrick L. Hughes*
**HAYNES AND BOONE, LLP**
Patrick L. Hughes
Texas State Bar No. 10227300
David Trausch
Texas State Bar No. 24113513
1221 McKinney, Suite 4000
Houston, TX 77010
Telephone:      (713) 547-2000
Facsimile:      (713) 547-2600
Email:           patrick.hughes@haynesboone.com
Email:           david.trausch@haynesboone.com

***Counsel to South Texas Electric Cooperative, Inc.***

Respectfully submitted,


By: */s/ Mark McKane*
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
David R. Seligman, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           david.seligman@kirkland.com

-and-

Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (212) 439-1500
Email:           mark.mckane@kirkland.com

-and-

Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           aparna.yenamandra@kirkland.com

***Counsel to Calpine Corporation***

18

By: */s/ Ian E. Roberts*
**SHEARMAN & STERLING LLP**
C. Luckey McDowell (SBT 24034565)
Ian E. Roberts (SBT 24056217)
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:   (214) 271-5777
Email:       luckey.mcdowell@shearman.com
Email:       ian.roberts@shearman.com

-and-

Joel Moss (admitted *pro hac vice*)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:   (415) 616-1100
Email:       joel.moss@shearman.com

-and-

Jonathan M. Dunworth (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022
Telephone:   (212) 848-4000
Email:       jonathan.dunworth@shearman.com

***Counsel to NRG Energy, Inc., ENGIE Energy
Marketing NA, Inc., Talen Energy Supply, LLC,
and NextEra Energy Marketing, LLC***

## CERTIFICATE OF SERVICE

I certify that on January 18, 2022, I caused (i) a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and (ii) an unredacted copy of the foregoing document to be sent by email to counsel for the Debtor, UCC, ERCOT and intervening parties pursuant to the protective order entered in this Adversary Proceeding.

*/s/ Alexander Babcock*
Alexander Babcock