1              IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4  BRAZOS ELECTRIC POWER          §      CASE NO. 21-03863-ADV
   COOPERATIVE, INC., ET AL       §      JOINTLY ADMINISTERED
5                                 §      HOUSTON, TEXAS
   VERSUS                         §      FRIDAY,
6                                 §      FEBRUARY 25, 2022
   ELECTRIC RELIABILITY COUNCIL   §
7  OF TEXAS, INC.                 §      2:00 P.M. TO 2:44 P.M.

8
          BENCH TRIAL DAY FOUR (AFTERNOON SESSION ONLY)
9
           BEFORE THE HONORABLE DAVID R. JONES
10             UNITED STATES BANKRUPTCY JUDGE

11

12     APPEARANCES:                    SEE NEXT PAGE

13     ELECTRONIC RECORDING OFFICER: VRIANA PORTILLO

14     COURTROOM DEPUTY:              VRIANA PORTILLO

15

16             (Recorded via CourtSpeak.)

17

18

19

20             TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX 77478
                   281-277-5325
23          www.judicialtranscribers.com

24
     Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.

```
 1                          APPEARANCES:

 2

 3   FOR BRAZOS ELECTRIC
     POWER COOPERATIVE, INC.:     O'MELVENY & MYERS, LLP
 4                                Louis R. Strubeck, Jr. Esq.
                                  2501 North Harwood Street
 5                                Dallas, TX  75201
                                  972-360-1925
 6
                                  EVERSHEDS SUTHERLAND
 7                                Lino Mendiola, III, Esq.
                                  Jim L. Silliman, Esq.
 8                                Michael Boldt, Esq.
                                  600 Congress Avenue
 9                                Suite 2000
                                  Austin, TX  78701
10                                512-721-2720

11
     FOR THE PUBLIC UTILITY
12   COMMISSION OF TEXAS:         OFFICE OF THE ATTORNEY GENERAL
                                  Jason B. Binford, Esq.
13                                PO Box 12548, MC008
                                  Austin, TX  78711-2548
14                                512-463-2173

15
     FOR ELECTRIC RELIABILITY
16   COUNCIL OF TEXAS, INC.:      MUNSCH HARDT KOPF & HARR, PC
                                  Jamil N. Alibhai, Esq.
17                                500 N. Akard Street
                                  Suite 3800
18                                Dallas, TX  75201
                                  214-855-7500
19
     FOR CALPINE CORPORATION:     KIRKLAND & ELLIS, LLP
20                                Mark E. McKane, Esq.
                                  555 California St.
21                                San Francisco, CA  94104
                                  415-439-1400
22
     FOR TENASKA POWER SERVICES
23   CO.:                         JUDITH ROSS, PC
                                  Judith W. Ross, Esq.
24                                700 North Pearl St., Ste. 1610
                                  Dallas, TX  75201
25                                214-377-7879
```

1                          APPEARANCES (CONT'D):

2

3    FOR THE OFFICIAL COMMITTEE OF
     UNSECURED CREDITORS:              KRAMER LEVIN NAFTALIS &
4                                      FRANKEL, LLP
                                       Thomas Mayer, Esq.
5                                      Ronald Greenberg, Esq.
                                       Jeffrey Trachtman, Esq.
6                                      1177 Avenue of the Americas
                                       New York, NY  10036
7                                      212-715-9169

8

9

10

11

12   (Please also see Electronic Appearances.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2

3    WITNESS:            Direct      Cross      Redirect      Recross

4    DAVID MAGGIO
      By Mr. Clark        .           .           21            .
5     By Mr. Boldt        .           5           .            34

6

7    EXHIBITS:                      ADMITTED

8    DX-655                            7

9    PX-68                            15

10                                   ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **HOUSTON, TEXAS; FRIDAY, FEBRUARY 25, 2022; 2:00 P.M.**

2            THE COURT:  We are back on the Record in Adversary

3   No. 21-3863.  When we broke, the Debtors were about to begin

4   their cross-examination of the witness.

5            Are you ready?

6            MR. BOLDT:  Yes, Your Honor.

7            THE COURT:  All right.  Whenever you're ready.

8   Let's see, I need to get that over to Ms. Ellig.  Still

9   there?  Okay.

10           MR. BOLDT:  May I approach?

11           THE COURT:  Of course.  Thank you.

12           MR. BOLDT:  Thank you.  Good afternoon,

13  Your Honor.  Michael Boldt for the Debtor.

14           Good afternoon, Mr. Maggio.

15           THE WITNESS:  Good afternoon.

16       (Witness previously sworn.)

17               CROSS-EXAMINATION OF DAVID MAGGIO

18  BY MR. BOLDT:

19  Q    Mr. Maggio, I believe you mentioned in your discussion

20  with Mr. Clark that during Winter Storm Uri, you provided

21  updates to the PUC regarding system conditions; do you

22  recall that?

23  A    I'm not sure if we talked about that earlier, but I was

24  providing regular updates to the PUC.

25  Q    Okay.  Thank you for that clarification.

1          And those updates contained operational and

2   pricing updates; is that right?

3   A    That's correct.

4   Q    Okay.  In front of you, you've got a binder that says,

5   "Maggio Trial Exhibits" with a green label; do you see that?

6   A    I do.

7   Q    All right.  Will you turn to Defendant's Exhibit 655,

8   which is Docket 411-53?  And let me know -- are you there?

9   A    I am.

10  Q    Okay.  And do you recognize this as an update you

11  provided to the PUC on the afternoon of February 19th?

12  A    I do.

13          MR. BOLDT:  Your Honor, I'd offer Debtor's

14  Exhibit 655 into evidence.

15          THE COURT:  Mr. Clark, any objection?

16          MR. CLARK:  Your Honor, I don't object to the

17  email.  We filed at 655-A the -- we had the same issue of

18  personal numbers and we redacted it so if they'll agree to

19  offer 655-A, it is only that redacted number, then we don't

20  object.

21          THE COURT:  Of course they will.

22          Do we -- is it filed?

23          MS. SPEAKER:  Yes.

24          MR. CLARK:  It is Docket 477-2.

25          THE COURT:  477-2.

 1              And, Mr. Boldt, do you have 655-A?

 2              MR. BOLDT:  Not in front of me, but I won't

 3    need --

 4              THE COURT:  No, hold on.

 5              MR. BOLDT:  Yes, Your Honor.

 6              THE COURT:  I can probably help you.  Give me just

 7    a minute.

 8              MR. BOLDT:  Thank you, Your Honor.  Thank you.

 9              THE COURT:  477-2.  All right.  I will not be as

10    good as Ms. Ellig is, but I'm happy to move things around if

11    you will just direct me.

12              MR. BOLDT:  Thank you, Your Honor.  And apologies

13    for that.

14              THE COURT:  None needed.

15              MR. BOLDT:  So, Your Honor, has this exhibit been

16    admitted?

17              THE COURT:  With the clarification, absolutely.

18              655-A is admitted.

19         (DX-655-A received in evidence.)

20              MR. BOLDT:  Thank you.

21    BY MR. BOLDT:

22    Q    Mr. Maggio, you're aware of the frequency drop that

23    occurred on the ERCOT system on the morning of the 15th, are

24    you?

25    A    I am.

1 │Q    And that occurred because supply was not matching

2 │demand; is that right?

3 │A    That's correct.

4 │Q    And are you aware that ERCOT was able to bring that

5 │frequency back to 60 hertz by shedding load?

6 │A    That was one of the things that was used to do that.

7 │Q    Thank you.  And so that load shed helped supply match

8 │demand among the other things that they did.

9 │A    It did.

10 │Q    And are you aware that during the remainder of the

11 │storm, the frequency on the ERCOT system did not

12 │precariously outside 60 hertz?

13 │A    I don't know any specific large frequency deviations

14 │beyond what happened on the morning of the 15th.

15 │Q    So back to Defendant's Exhibit 655 here, do you see the

16 │first chart that --

17 │        MR. BOLDT:  Yes.  Thank you, Your Honor.

18 │BY MR. BOLDT:

19 │Q    This chart shows the total amount of outage capacity as

20 │of the afternoon of the 19th; is that correct?

21 │A    That's correct.

22 │Q    And then below that chart there's a graph that shows

23 │the real-time energy prices on the 18th and 19th to that

24 │period so far; is that correct?

25 │A    That is correct.

DAVID MAGGIO - CROSS BY MR. BOLDT                    9

1  Q    And your email, I believe, says that with the

2  transition out of EA, real-time energy prices have reduced

3  to more typical pricing outcomes; did I get that right?

4  A    That's correct.

5  Q    And the real-time energy price on this chart is

6  reflected by the light blue line; is that right?

7  A    The light blue line is that total price so that the

8  System Lambda plus the adders that we've been discussing.

9  Q    Thank you.  And this light blue line shows where RTI --

10 I'm sorry -- the real-time energy prices went once ERCOT

11 stopped implementing the RDPA adjustment; is that right?

12 A    Correct.  That was the -- that value at 9:00 o'clock

13 was when we removed the administrative adjustments.

14 Q    Thank you.  Let's talk about SCED for a moment.  You've

15 talked about a lot about it today already.

16         If we could turn back to Defendant's Exhibit 313?

17 That's Docket 407-5.  I've got a copy here for you -- this

18 has already been admitted -- in your binder.

19         So this is the training course that you discussed

20 with Mr. Clark; do you recognize that?

21 A    Yes.

22 Q    And please turn to page 69.  I believe you went over

23 this slide with Mr. Clark.  Just let me know when you're

24 there.

25 A    I have it available.

1  Q    So, Mr. Maggio, the SCED balance is supply and demand,
2  correct?
3  A    That is one of its primary functions, yes.
4  Q    And it does that from a physical perspective by
5  dispatching generation to meet demand; is that right?
6  A    That's correct.
7  Q    And then from a price perspective, it does that by
8  dispatching the cheapest available generation to meet demand
9  subject to security constraints?
10 A    That's correct.
11 Q    And specifically with respect to those prices, SCED
12 sets the location marginal prices; is that right?
13 A    It is.
14 Q    And, Mr. Maggio, these two SCED outcomes, dispatching
15 generation and setting clearing prices, that happened
16 simultaneously?
17 A    Correct.
18 Q    And I believe you discussed with Mr. Clark that SCED
19 dispatches pricing and base point instructions to resources?
20 A    It does.
21 Q    So, for instance, a generator that's online whose offer
22 has been struck and is needed to produce, SCED will send a
23 generator a base point instruction.
24        That's one type of resource, right?
25 A    That's correct.

1  Q     And generators let ERCOT know about any of their

2  resources' physical constraints ahead of time?

3  A     Yeah, that information's coming in, yes.

4  Q     SCED's programed to honor those ramp rates, correct?

5  A     Correct.

6  Q     And at the time of the storm, were you aware of any

7  generators that tripped offline because SCED sent base point

8  instructions to a generator that exceeded the resources'

9  ramp rates?

10 A     I'm not personally aware of that, no.

11 Q     Mr. Maggio, you talked a lot about today the two

12 scarcity pricing adders, the ORDC and the RDPA; do you

13 recall that?

14 A     Yes.

15 Q     And would you agree with me that the ORDC and RDPA

16 adders, like their names suggest, are added to the LMPs?

17 And I believe that's shown on this graph here.

18 A     That's correct.

19 Q     Okay.  Thank you.  And so these adders are derived

20 after SCED has dispatched generation; is that correct?

21 A     Those calculations are done afterwards, yes.

22 Q     And would you agree with me that changes in real-time

23 settlement point prices do not affect SCED dispatch?

24 A     They can't affect the five-minute dispatch that just

25 occurred.

1  Q    Earlier today you were asked by Mr. Clark whether you

2  had heard Debtor's counsel's opening statement; do you

3  recall that discussion?

4  A    I do.

5  Q    I believe you were asked if you were -- if you heard

6  Debtor's counsel's statement at opening that applying an

7  adder doesn't bring additional generation online; do you

8  recall that question?

9  A    I don't know if those were the exact words, but I

10 remember the question.

11 Q    Fair enough.  I just took some notes.  Thank you.

12        And I believe your response to that question was

13 that you disagreed with Mr. Mendiola's opening statement

14 because if a generator was offline and not yet running, the

15 price signal encourages generations to come online; did I

16 get your testimony correct?

17 A    That's correct.

18 Q    But you'd agree with me that the adders don't affect

19 whether generation that is online -- strike that.

20        You'd agree with me that the adders don't affect

21 whether generation that is online would produce additional

22 megawatts, right?

23 A    No.  They're expected to file their base point

24 instruction.

25 Q    Okay.  Thank you.  You also spoke to Mr. Clark about

1  ancillary services; do you recall that?

2  A    Yes.

3  Q    I just want to clarify a couple items.

4         So ancillary services, that's when a resource --

5  or resources provide offers to ERCOT -- let me start over.

6  Ancillary services, that market is comprised of resources

7  that provide offers to ERCOT and ERCOT actually procures the

8  service; is that right?

9  A    Yeah, ERCOT does the procurement through the day ahead

10 market of those services.

11 Q    Thank you.  And if ERCOT procures an ancillary service,

12 that resource they select, they're available in the real-

13 time operations to be called on to provide whatever type of

14 ancillary service they've been procured; is that right?

15 A    They're expected to.  There is some capability of the

16 qualified schedule entities that represent many resources to

17 move within their protocol of resources, but probably

18 somewhere within their protocol there should be a resource

19 that preserves that capacity to provide that service.

20 Q    Okay.  And certain ancillary services might be

21 regulation up service or regulation down service; is that

22 right?

23 A    That's correct.

24 Q    And the resources paid to be available, it's paid for

25 that particular service; is that right?

1  A    Correct.  They're paid to reserve -- be both -- be

2  online and to reserve that capacity to provide that service.

3  Q    Okay.  And then if they are called on to actually

4  produce energy, then isn't it true that that provider will

5  receive an energy payment from ERCOT?

6  A    There is an energy payment in the real-time market.

7  Q    Okay.  And isn't it also true that a portion of that

8  energy payment would be clawed back after that?

9  A    There's not a claw back of the energy payment.  There

10  is an imbalance charge for ancillary services that were

11  converted into energy.

12  Q    Okay.  Thank you for that clarification.

13        Would you please turn to Plaintiff's Exhibit 68,

14  68-A actually?  I'm sorry, Plaintiff's Exhibit 68, yeah.

15  And I believe this is -- well, excuse me one second.

16        Oh, actually you don't have a paper copy of this.

17  That's why I was confused.  Okay.  But we've got it up on

18  the screen.  Do you have it on your screen?

19  A    I have it up on my screen.

20  Q    Okay.

21        MR. BOLDT:  And this is Docket 397-18.

22        THE COURT:  Thank you.

23  BY MR. BOLDT:

24  Q    Mr. Maggio, do you recognize this as an email that you

25  sent to some folks on February 15th at 2:05 p.m.?

1   A    I believe so.

2          MR. BOLDT:  Would it be possible to zoom up?

3   There we go.  Thank you.

4   BY MR. BOLDT:

5   Q    Yes.  Thank you.  And who are the folks that you sent

6   this to?

7   A    Those were all members of my team so one of the

8   departments of mine is market analysis so all members of

9   that market analysis component of my department.

10         MR. BOLDT:  Your Honor, I offer Plaintiff's

11  Exhibit 68 into evidence.

12         THE COURT:  Any objection?

13         MR. SPEAKER:  No, Your Honor.

14         THE COURT:  Thank you.  It's admitted.

15      (PX-68 received in evidence.)

16         MR. BOLDT:  Okay.

17  BY MR. BOLDT:

18  Q    And do you see that you're telling everyone on this

19  email, the first sentence, you've gotten this call several

20  times today and you wanted to share your candid response?

21  A    I do.

22  Q    And was that in response to questions about why prices

23  weren't hitting the cap during firm load shed in EEA3?

24  A    That's correct.

25  Q    Okay.  And do you see the last sentence there?  You

1  say:

2       "This was a design decision that resulted from

3       discussion on NPRR 626 in 2014 and its eventual

4       implementation in 2015."

5             Did I read that correctly?

6  A    You did.

7  Q    So let's turn to PX-160-A.  If you have your big binder

8  from this morning from your direct examination, it'll be in

9  there.

10            MR. BOLDT:  And PX-160-A is Docket 476.

11            THE COURT:  Got it.  Thank you.

12            MR. BOLDT:  Are you there?  Thank you.

13 BY MR. BOLDT:

14 Q    So this is the email with your proposed edits to the

15 PUC Order; is that right?

16 A    It is.

17 Q    And if you'd turn to the second page of this exhibit,

18 there's your edits down there in redline; do you see that?

19 A    I do.

20 Q    And you were asked by Mr. Clark this morning why you

21 inserted "EEA3" into this draft Order; do you recall that

22 discussion?

23 A    I do.

24 Q    And I believe you testified that you wanted to

25 distinguish between ERCOT-directed localized firm load shed

1   and ERCOT-directed system-wide firm load shed; did I get

2   that right?

3   A    That's correct.

4   Q    Because it's the latter, it's the system-wide load shed

5   that that's what occurs in EEA3; is that correct?

6   A    Correct.

7   Q    And the PUC accepted this edit; isn't that right?

8   A    They did.

9   Q    Okay.  And just so the Record's clear, ERCOT directed

10  firm load shed in EEA3 ended at 23:55 on February 17th?

11  A    It did right around that time period.

12  Q    So you were also asked some questions this morning by

13  Mr. Clark about some of the language in the first full

14  paragraph below section 1 in this particular draft; do you

15  recall those questions?

16  A    I do.

17  Q    And those had to do with whether some of these

18  sentences were included in the final version of the PUC

19  Order; do you recall that?

20  A    I do.

21  Q    And one of those sentences that was in this draft that

22  didn't make it into the Order was the sentence that:

23       "ERCOT believes that this price may fail to fully

24       compensate many gas-fired generators which are having

25       to produce energy at an extremely high price due to

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1    prevailing gas shortages."

2         Did I read that correctly?

3    A    Yes.

4    Q    And that was one of the sentences that didn't make it

5    into the Order?

6    A    I believe that's correct.

7    Q    We can turn to the Order just to make sure and that is

8    DX-57, Docket 406-9, and it should be in the same -- just

9    the tab right before the one you've got right now.

10         And can you confirm that the sentence I just read

11   did not make it into the Commission's final Order?

12   A    That is correct.

13   Q    Mr. Maggio, you'd agree with me that at the time this

14   Order was being drafted and considered, that SCED was

15   running as designed?

16   A    It was -- yes, it was running as designed.

17   Q    And you'd also agree with me that generators who were

18   online at this particular time had submitted offer curves

19   into the real-time market?

20   A    They had.

21   Q    And the generators could offer -- could modify their

22   offer curves up to one hour before the start of the

23   operating hour?

24   A    They are or they can.

25   Q    And I believe you were also asked some questions by

1  Mr. Clark about Defendant's Exhibit 777 that showed System

2  Lambda on the 17th; do you recall those questions?

3  A    I do.

4  Q    Well, specifically he asked you if there was a time in

5  which real-time prices hit 9,000 without any adders; do you

6  recall that?

7  A    I do.

8  Q    And there was at least one interval in which that

9  happened?

10  A    That is correct.

11  Q    So ERCOT implemented the PUC Orders at 22:15 on

12  February 15th; is that right?

13  A    They did.

14  Q    So if we could turn to DX-467 -- it'll just be on the

15  screen -- which is Docket 408-28?  And this has already been

16  admitted.

17         Do you recognize this as an Excel file that you

18  discussed with Mr. Clark?

19  A    I do.  Oh, I don't think I discussed it with Mr. Clark,

20  but we discussed it earlier today.

21  Q    Okay.  Thank you for that clarification.

22         So this Excel file shows the ORDC and RDPA adders

23  for February 2021; do you see that?

24  A    It does.

25  Q    And then Column E shows the System Lambda; is that

1  right?

2  A    Yes.

3  Q    Okay.

4          MR. BOLDT:  And then, Ms. Ellig, if you could

5  please go to Row 4435?

6  BY MR. BOLDT:

7  Q    I don't know if there's a way to zoom in, but can you

8  see that?

9  A    I can see that.

10  Q    Okay.  And do you see that this shows that at 23:30:20

11  on the 15th, that the System Lambda was at $8,997 a megawatt

12  hour?

13  A    I do see that.

14  Q    So that would have been based on generator offer curves

15  and whatever the LMP was before any scarcity pricing adders?

16  A    That's correct.

17  Q    And this occurred prior to the implementation of the

18  PUC Orders?

19  A    This would have been 9:30 that evening so, yes, that

20  would have been about 45 minutes beforehand.

21          MR. BOLDT:  Thank you, Your Honor.  Pass the

22  witness.

23          THE COURT:  All right.  Thank you.

24          Mr. Clark, still have Redirect?

25          MR. CLARK:  Yes, Your Honor.

1          THE COURT:  Okay.

2      (Pause in the proceedings.)

3          REDIRECT EXAMINATION OF DAVID MAGGIO

4  BY MR. CLARK:

5  Q    Mr. Maggio, Mr. Boldt just asked you if SCED was

6  running as designed prior to the implementation of the PUC

7  Order; do you remember that?

8  A    I do.

9          MR. CLARK:  Your Honor, may I approach the

10  demonstrative?

11          THE COURT:  Of course.

12      (Pause in the proceedings.)

13  BY MR. CLARK:

14  Q    We looked at this demonstrative earlier and it shows

15  you how SCED solves whatever load it's presented with to

16  create a price, correct?

17  A    Yes.

18  Q    And in the case of February 15th before the PUC Order

19  was entered but after ERCOT had instructed firm load shed,

20  SCED took the load -- and we're here, as an example, of 1100

21  megawatts.  And if ERCOT shed 500 megawatts, it was solving

22  for 600 megawatts of load, wasn't it?

23  A    That's correct.

24  Q    And what effect did that have on pricing?

25  A    That would have the effect of decreasing prices.

1  Q     It suppressed the prices; is that right?

2              MR. SPEAKER:  Objection.  Leading, Your Honor.

3              THE COURT:  Sustained.

4  BY MR. CLARK:

5  Q     Are there protocols in place and is there a system

6  designed through years of developing the ORDC and the RDPA

7  that are intended to prevent price suppression caused by

8  ERCOT's out-of-market actions?

9  A     Yes.  That is more or less the purpose behind the

10  (indiscernible) point price adder process as well as there's

11  also adjustments in the ORDC to remove cases where ERCOT has

12  taken out-of-market actions.

13  Q     And so while it's true to say that SCED was running as

14  designed, the market wasn't performing as designed, was it?

15             MR. SPEAKER:  Objection.  Leading, Your Honor.

16             THE COURT:  Just rephrase the question.

17  BY MR. CLARK:

18  Q     How was the market performing when SCED was running as

19  designed?

20  A     The market was (indiscernible) at the price relative to

21  the amount of load that hadn't been shed so that's all it

22  was trying to solve for.

23  Q     And did that line up with the ERCOT market design?

24  A     So that it lined up with the rules within the

25  protocols, but obviously we had talked about before that

1  the -- so the intent is the, as we are getting into those

2  levels of scarcity, that we see prices at the -- at its

3  highest levels.

4  Q    And if the energy-only market is designed to go to VOLL

5  as you get close to 2,000 megawatts of reserve because the

6  theory is you're very close to load shed, does it stand to

7  reason that you should get to VOLL if you're actually in

8  load shed?

9           MR. SPEAKER:  Objection, Your Honor.  Leading.

10          THE COURT:  Overruled.

11          THE WITNESS:  So again that is the intent although

12  in the rules (indiscernible) account for that within the

13  point price adder.  That is the broad intent of the scarcity

14  pricing mechanisms that are in place.

15          MR. CLARK:  Can we pull up DX-777?

16  BY MR. CLARK:

17  Q    Mr. Maggio, remind me which one of these Columns

18  represents the System Lambda that SCED puts out without

19  regard to any adders.

20  A    That would be the Column G that dispatches the Lambda

21  value.

22          MR. CLARK:  I think we're on DX-778, Ms. Kenny.

23          Can we put up DX-777?  I think that's what

24  Mr. Boldt was talking about.

25          MS. KENNY:  It was 777.

1         MR. CLARK:  It was?

2         MS. KENNY:  Uh-huh.

3         MR. CLARK:  Okay.  I stand corrected, Your Honor.

4         Please pull it up again, Ms. Kenny.

5         THE COURT:  Got to trust those who keep you

6   straight.

7         MR. CLARK:  That's right, I do, and they do a

8   great job.

9         Mr. Boldt took you to the Row 479 and Column G.

10         But before we get there, Ms. Kenny, can we start

11   from the first Row?  And let's just scroll our way down

12   Column G because I think I heard Mr. Boldt say that it was

13   only in at least one interval that the System Lambda

14   dispatch was at VOLL so if we could just scroll down?  And

15   you see 9001, we're on Rows in the 60s and we keep

16   scrolling, 9001, 9001, I mean, keep -- just keep scrolling

17   all the way down, Ms. Kenny.

18   BY MR. CLARK:

19   Q    It was not just one interval that the System Lambda all

20   by itself was at the high cap, was it, Mr. Maggio?

21   A    There were several intervals during that series of days

22   that occurred.

23   Q    And again that has nothing to do with the

24   administrative adjustment that ERCOT made to implement the

25   PUC's Order, does it?

1    A    Correct.

2    Q    Mr. Schinfeld asked you about some negative pricing

3    that occurred on February 19th; do you recall that?

4    A    I do.

5    Q    Is that unusual?

6    A    It is not entirely unusual, no, particularly during the

7    various parts of the day, particularly at night, for

8    example.

9    Q    And what causes that?

10   A    Typically that happens when load begins to come down to

11   lower levels and, for example, we'll have a high degree of

12   wind output in West Texas.

13   Q    And I think he was looking at the afternoon of

14   February 19th.

15         What would explain those pricing shifts on that

16   day?

17   A    I would expect that would have been something similar

18   to what I was just describing where there was now a lot of

19   generation that was available including wind and other

20   things that would offer at lower prices and load also being

21   reduced at that time relative to other times of the day or

22   what we had been seeing earlier.

23   Q    And what effect does a change in temperature have on

24   load?

25   A    That would tend to -- well, it would depend on the time

1   of year but --

2   Q    That was a very -- thank you.

3         If it got warmer on February 19th in the afternoon

4   than it had been for days, what effect would that have on

5   load?

6   A    That would have tended to reduce the amount of load on

7   the system.

8   Q    Are there often large swings in pricing during an

9   operating day in the ERCOT market?

10  A    Yes, there can be certainly between sort of the early

11  morning hours and the evening hours relative to the key

12  parts of the day.

13  Q    Mr. Schinfeld asked you about testimony you gave when

14  we were talking and the words "what prices would have been"

15  under the protocols with respect to the spreadsheets we were

16  looking at; do you remember that?

17  A    I do.

18  Q    And do you remember that I also asked you to clarify

19  some of our earlier discussion about what prices would have

20  been; do you remember that?

21  A    I do.

22  Q    Just so we're clear, does Defendant's Exhibit 777 or

23  778 represent what prices would have been if the PUC Order

24  had never happened?

25  A    Those are really just the prices with the

1  administrative adjustment removed and not necessarily

2  reflective of what prices had been.

3  Q    And if you said the prices in Defendant's Exhibit 777

4  and 778 were in accordance with protocols, were you only

5  referring to the block load transfer adder in 6.5.7.3.1?

6  A    I'm sorry, can you repeat the question?

7           THE COURT:  I mean, if you're going to lead --

8           MR. CLARK:  I'll move on.

9           THE COURT:  -- just lead well.

10           MR. CLARK:  I'll move on.

11      (Laughter.)

12           MR. CLARK:  Can we pull up Plaintiff's

13  Exhibit 190?  Can we zoom in to the time please of when this

14  was issued?

15  BY MR. CLARK:

16  Q    Plaintiff's Exhibit 190 is the market notice that went

17  out in the morning of February 18th; do you remember that?

18  A    Yes.

19  Q    And that was the morning after the meeting that you

20  were not in the room for, correct?

21  A    That's correct.

22  Q    Do you know why that market notice was not issued until

23  just before 8:00 a.m. February 18th?

24  A    Not specifically what would have gone into it.  My

25  understanding is -- and I did see some -- have some emails

1  that folks were drafting at that -- early hours of that

2  morning, but going through the process of the approvals, I

3  don't know necessarily (indiscernible) time.

4  Q    Does the market notice have to --

5           MR. SPEAKER:  Objection, Your Honor.  Speculation.

6           THE COURT:  His beginning answer was "I don't

7  know," so I'm going to strike the testimony after that.

8           MR. CLARK:  Fair enough.

9  BY MR. CLARK:

10 Q    Generally speaking, do market notices go through

11 multiple steps in the ERCOT chain before they get published

12 in the market?

13 A    Yes.  There's a process of approval that we go through

14 for the submission of any market notice.

15 Q    And this was 7:45 in the morning on the fourth or fifth

16 day of a storm in which ERCOT employees had been working

17 around the clock?

18 A    That's correct.

19 Q    Earlier you talked about the fact that the ORDC curve,

20 the ORDC reserve amount where VOLL kicks in, which is at

21 2,000 megawatts, you could change the input to 4,000

22 megawatts; do you remember that?

23 A    Yes.

24 Q    So that is a --

25           MR. CLARK:  May I approach the --

1          THE COURT:  Of course.

2          MR. CLARK:  All right.

3    BY MR. CLARK:

4    Q    So if I understood what you were saying is you could,

5    through your software, change this 2,000 value to 4,000 and

6    that would cause the time at which VOLL kicks in to come out

7    further along the X axis and then the curve would drop down

8    and be further along the bottom X axis; is that essentially

9    what would happen?

10   A    Correct.  Effectively the whole graph would shift to

11   the right by 2,000 megawatts or whatever the increase in the

12   value was.

13   Q    And you could have made that change on February 15th?

14   A    We could have changed that.  There is a parameter in

15   our system that we could have updated.

16   Q    And you chose to change the block load transfer

17   parameter instead.

18   A    Correct.

19   Q    Why?

20   A    With the concern being that the prices were not at VOLL

21   given the amount of load shed, really the focus was the

22   reliability point price adder.  I believe we could have

23   changed the ORDC although I don't know that we could

24   necessarily have tried to guarantee any sort of pricing

25   outcome just by doing a shift of the ORDC.

1  Q    Explain to me why shifting the ORDC does not guarantee

2  prices will be at their highest.

3  A    So I guess as an example, if you did a shift to the

4  right such that that occurred at 4,000, you know, if you

5  looked at some of the days -- and I believe this was in one

6  of the exhibits that we were reviewing -- if you had

7  reserves at 5,000 or 6,000, you would see a higher price but

8  you wouldn't necessarily see prices at the value loss load

9  just associated with the ORDC adder.

10          MR. CLARK:  May I approach again?

11          THE COURT:  Of course.

12 BY MR. CLARK:

13 Q    I think what I heard you say is in order to ensure

14 prices would be at the highest, you would have to have 4,000

15 megawatts of reserves or less in order to guarantee that.

16 A    Specifically with the ORDC component of it, yes.

17 Q    Sure.  And I'm still referring to the ORDC.

18          So in that scenario, if you had gone with this

19 approach to implement the PUC Order and the available

20 reserves were 5,000, would the price be at its highest?

21 A    It would not have been just through the ORDC component.

22 Q    And would that have complied with the PUC Order?

23 A    Prices would not have been (indiscernible) as was the

24 expectation and discussion on the 15th.

25          MR. CLARK:  No more questions, Your Honor.

1                THE COURT:  Before you step down.

2                MR. CLARK:  Yes, Your Honor.

3                THE COURT:  So just for point of reference, can --

4    I have three demonstratives that you've used.

5                MR. CLARK:  Yes, Your Honor.

6                THE COURT:  Can we call that one "ERCOT

7    Demonstrative 1"?

8                MR. CLARK:  So a point of clarification --

9                THE COURT:  Sure.

10               MR. CLARK:  -- I have called it a "demonstrative,"

11   and for this particular one.  That is a mistake because it

12   is actually Exhibit DX-462.0016.

13               THE COURT:  Okay.

14               MR. CLARK:  And so I should have said that that's

15   blowup of that exhibit page.

16               The others have -- we didn't have them in an

17   exhibit so.

18               THE COURT:  All right.  So can we go to the other

19   two, which was the one behind it, which I think has 51 in

20   the lower right-hand corner?

21               MR. CLARK:  Yes, Your Honor.

22               THE COURT:  Can we call that "ERCOT

23   Demonstrative 1"?

24               MR. CLARK:  Absolutely.

25               THE COURT:  All right.  And then I have the one --

1  actually this was -- this was actually part of another

2  exhibit too, was it not, or was it?

3          MR. CLARK:  Unfortunately it was not, no.

4          THE COURT:  Okay.  Can we call this "ERCOT

5  Demonstrative 2"?

6          MR. CLARK:  Yes, Your Honor.

7          THE COURT:  Okay.  Any objection?

8          MR. SPEAKER:  No objection.

9          THE COURT:  All right.  Then thank you.

10          MR. CLARK:  Thank you, Your Honor.

11          THE COURT:  Any additional?

12          MR. SCHINFELD:  I don't have additional.

13          THE COURT:  All right.

14          MR. SCHINFELD:  I think we did it all.

15          THE COURT:  All right.  Thank you.  All right.

16          Does the Committee have any Recross?

17          MR. SPEAKER:  No, Your Honor.

18          THE COURT:  Debtors have any Recross?

19          MR. BOLDT:  Your Honor, I just have one thing that

20  I'd like to clear up.

21          THE COURT:  All right.

22          MR. BOLDT:  Your Honor, I'm not really sure how to

23  do it because Mr. Clark went over an Excel file.  I think he

24  asked for Exhibit 777 and I don't believe that was what was

25  put and I don't know what was put up because I can't find

1   it.

2          THE COURT:  So I think we finally concluded that

3   777 was, in fact, put up.

4          MR. BOLDT:  With Mr. Clark?

5          THE COURT:  And I think he even -- I think --

6          MR. BOLDT:  Okay.

7          THE COURT:  That was the whole conversation,

8   you've got to trust those that support you and --

9          MR. BOLDT:  Okay.

10          THE COURT:  -- the whole team was nodding you're

11   just wrong and, yeah, yeah, it was --

12          MR. BOLDT:  That is -- okay.

13      (Laughter.)

14          MR. BOLDT:  Well, then let's go with that.

15          THE COURT:  Okay.

16          MR. BOLDT:  I just have one clarification.

17          THE COURT:  Can I ask, Ms. Kenny, could you put up

18   777 please, ma'am, just for -- in the interest of time?  I

19   think -- oh, did you give it up?

20          MS. KENNY:  Yes.

21          THE COURT:  In that case, then I'll switch it back

22   over to Ms. Ellig because that won't save any time.

23      (Pause in the proceedings.)

24          THE COURT:  All right, Ms. Ellig.

25              RECROSS-EXAMINATION OF DAVID MAGGIO

1  BY MR. BOLDT:

2  Q    Mr. Maggio, do you see -- this is Defendant's Exhibit

3  777 that -- and you were asked some questions by your

4  counsel about this exhibit?

5  A    Yes.

6  Q    And he asked you about Column G there.

7  A    Yes.

8  Q    The System Lambda dispatch.  Okay.

9            And this exhibit, isn't it true that it only

10 contains the 83 time period during which ERCOT was adjusting

11 the RDPA in response to the PUC Order?

12 A    Well, this spreadsheet only has the data for the 15th

13 to the 17th, but it is limited to only the SCED intervals in

14 which the adjustment was being made.

15 Q    Okay.  Thank you.  So that first 50-hour period

16 approximately?

17 A    Approximately, yes.

18 Q    Okay.

19            MR. BOLDT:  So, Ms. Ellig, will you please turn to

20 DX-467?

21            And I apologize, Your Honor, I don't have the

22 docket number.

23            THE COURT:  It's okay.  I got it.

24 BY MR. BOLDT:

25 Q    Now, Mr. Maggio, do you recall me asking you questions

1   about this particular exhibit?

2   A    I do.

3   Q    And this exhibit contains the real-time prices for the

4   entire month of February?

5   A    It does.

6   Q    Okay.  And I asked you about Column E, the System

7   Lambda in this exhibit?

8   A    You did.

9   Q    And specifically Row 4435?

10  A    Yes.

11  Q    And that was an interval prior to the implementation of

12  the Commission's Order?

13  A    It was.

14  Q    All right.  Thank you.

15           MR. BOLDT:  No further questions.

16           THE COURT:  All right.  Thank you.

17           Mr. Clark, anything else?

18           MR. CLARK:  Nothing from me, Your Honor.

19           THE COURT:  All right.  Mr. McKane, just to make

20  sure.

21           MR. MCKANE:  Nothing further.

22           THE COURT:  All right.  Thank you.

23           Any reason that Mr. Maggio cannot be excused?

24           MR. SPEAKER:  Not from us.

25           THE COURT:  All right.  Mr. Maggio, you are a

1  breath of fresh air.  I very much appreciate you taking your

2  time out of your day.  We should all sleep a little better

3  given that we know we have someone as competent as you are

4  in your job.

5          Thank you, sir.  You're free to go.

6          THE WITNESS:  Thank you, Your Honor.

7      (Witness excused.)

8          THE COURT:  Mr. Alibhai?

9          MR. ALIBHAI:  I don't think I could be that good a

10  breath of fresh air, but hopefully this helps.  We have

11  determined, based upon the direct, cross, redirect, all that

12  just happened, that our next witness' testimony is probably

13  not necessary for the Court.

14          THE COURT:  Okay.

15          MR. ALIBHAI:  And so we would propose, if the

16  Court would allow us, to wrap up here for today and then

17  resume on Monday.  We've also, I believe, worked out a

18  stipulation or agreement that Mr. Clark and somebody else

19  have worked on to remove another witness for Monday and so

20  we're making some progress and we'll then start with some

21  additional witnesses on Monday morning.

22          THE COURT:  Okay, terrific.  I assume no

23  objection.

24          MR. SPEAKER:  No, Your Honor.

25          THE COURT:  All right.  Anything that we need to

1   do in terms of just closing up access for the weekend?

2          MR. MCKANE:  Oh, just about the courtroom and

3   leaving things in the courtroom, Your Honor?

4          THE COURT:  All just fine.  This is yours until

5   we're done because it -- when I have the panel, there won't

6   be anybody here because we do those virtually.

7          MR. ALIBHAI:  The morning of Tuesday?

8          THE COURT:  Correct.

9          MR. ALIBHAI:  Correct.

10          THE COURT:  Yeah.  So what I would do, when you

11  all clear out for the afternoon, would you appoint someone

12  just to buzz on Chambers' door and say, "Hey, we're gone,"

13  and then we'll make the circle and lock the conference rooms

14  and lock the courtroom doors, but you're free to leave

15  anything in here you wish.

16          MR. ALIBHAI:  And then I believe we're going to

17  provide the Court with some of the deposition testimony,

18  that is, the deposition testimony that the parties have

19  discussed providing.

20          THE COURT:  Sure.

21          MR. ALIBHAI:  And notebook with deposition and

22  exhibits; is that correct?

23          THE COURT:  That would be great.

24          MR. ALIBHAI:  And in terms of single side or

25  double-sided and condensed, it some questions I've been

1   asked to ask Your Honor so --

2           THE COURT:  No, those are all really good

3   questions.  I will tell you when I was 40, I could take the

4   four pages per page.  I would prefer to have full page at

5   this point in my life.

6           MR. ALIBHAI:  Full page.  And single side or

7   double side?

8           THE COURT:  Double side is fine.

9           MR. ALIBHAI:  Okay.

10          THE COURT:  Let's not kill the trees any more than

11  we have to.

12          Can you tell me, am I going to get those all at

13  one time, are going to space them out and just spoon feed

14  them to me, how am I going to get those?

15          MR. ALIBHAI:  I think you're going to get them in

16  the context of the testimony so --

17          THE COURT:  Sure.

18          MR. ALIBHAI:  -- I need to check, but I think

19  you're going to get one or two Monday.

20          THE COURT:  Okay.  I won't read anything over the

21  weekend.  I'll just watch lots of TV so I'll be ready to

22  read something.  I'm just joking.  All right.  That's all

23  just fine.

24          MR. ALIBHAI:  I have video if you want something

25  to watch.

1          THE COURT:  I thought it --

2          MR. ALIBHAI:  I mean, I don't think you want that.

3          THE COURT:  No, because I can read a lot faster

4   than I can watch so I got that.

5          MR. ALIBHAI:  Absolutely, absolutely.

6          THE COURT:  No, that will all just be fine so I'm

7   just -- when you're ready, let me know.

8          MR. ALIBHAI:  Yes, sir.

9          THE COURT:  All right.  Anything else?

10       (No audible response)

11         THE COURT:  All right.  Thank you, folks.  If

12  you're traveling, please be safe and I'll see everybody

13  Monday morning.  We'll be adjourned.

14       (Afternoon Session adjourned 2:44 p.m.)

15                        *  *  *  *  *

16         *I certify that the foregoing is a correct*

17  *transcript to the best of my ability produced from the*

18  *electronic sound recording of the proceedings in the above-*

19  *entitled matter.*

20  */S/ MARY D. HENRY*

21  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

22  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

23  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

24  *JTT TRANSCRIPT #65272*

25  *DATE FILED:  FEBRUARY 25, 2022*